```
1                    IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF DELAWARE

3

4     DASSO INTERNATIONAL, INC. and    )
      EASOON USA, LLC,                  )
5                                       )
                      Plaintiffs,       )
6                                       ) C.A. No. 17-1574-RGA
      v.                                )
7                                       )
      MOSO NORTH AMERICA, INC., and     )
8     MOSO INTERNATIONAL B.V.,          )
                                        )
9                     Defendants.       )

10
                                           J. Caleb Boggs Courthouse
11                                         844 North King Street
                                           Wilmington, Delaware
12
                                           Tuesday, July 2, 2019
13                                         3:20 p.m.
                                           Preliminary Injunction Hearing
14

15    BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

16    APPEARANCES:

17             O'KELLY ERNST & JOYCE, LLC
               BY:  SEAN T. O'KELLY, ESQUIRE
18             BY:  THOMAS H. KRAMER, ESQUIRE

19                       -and-

20             O'ROURKE LAW OFFICE, LLC
               BY:  GERARD M. O'ROURKE, ESQUIRE
21
                                           For the Plaintiffs
22

23

24

25
```

```
 1    APPEARANCES CONTINUED:

 2              POTTER ANDERSON & CORROON, LLP
              BY:  DAVID E. MOORE, ESQUIRE
 3              BY:  BINDU A. PALAPURA, ESQUIRE

 4                      -and-

 5              AKERMAN, LLP
              BY:  THOMAS PASTERNAK, ESQUIRE
 6              BY:  EVELINA GENTRY, ESQUIRE
              BY:  JOHN M. SCHAFER, ESQUIRE

 7
                            For the Defendants
 8
      Also Present:
 9
              Mr. Avery Chua
10              Mr. Rene Zaal
              Mr. Brett Kelly
11              Mr. Felix Bock
              Mr. Rubin Shmulsky
12              Mr. Mark Clifton
              Mr. Arjan van der Vegte
13
                  ***   PROCEEDINGS   ***
14

15              COURT CLERK:  All rise.

16              THE COURT:  All right.  Good afternoon,

17    everyone.  Please be seated.  This is the preliminary

18    injunction hearing in Dasso International versus MOSO North

19    America.  Civil Action Number 17-1574.

20              Mr. O'Rourke, good afternoon.  Can you tell me

21    who else you have here with you?

22              MR. O'ROURKE:  Good afternoon, Your Honor.

23    Gerry O'Rourke from the O'Rourke Law Office on behalf of the

24    plaintiffs.  With me is Mr. Scott Hoopes from the Mills &

25    Hoopes Law Firm, also on behalf of the plaintiffs.  At the
```

03:21:26 1    end of the table is Mr. Sean O'Kelly from the O'Kelly &

03:21:30 2    Ernst firm on behalf of the plaintiffs.  Behind him is

03:21:32 3    Mr. Tom Kramer, also of the O'Kelly & Ernst firm.

03:21:36 4              And Judge, I would like to introduce you to our

03:21:39 5    two witnesses.  First is Mr. Avery Chua.  He is the

03:21:42 6    president and CEO of the plaintiff, Easoon.

03:21:46 7              And next to him is Dr. Rubin Shmulsky.  He is

03:21:49 8    the president and head of the department of sustainable

03:21:52 9    bioproducts at Mississippi State University.  He is the

03:21:55 10   expert that provided the declaration in support of our

03:21:58 11   preliminary injunction motion.

03:21:59 12             THE COURT:  All right.  Thank you, Mr. O'Rourke.

03:22:02 13             Good afternoon, Mr. Moore.

03:22:03 14             MR. MOORE:  Good afternoon, Your Honor.  David

03:22:05 15   Moore and Bindu Palapura on behalf of defendants.  With us

03:22:08 16   today from the Akerman Firm are Tom Pasternak, Eve Gentry,

03:22:13 17   and Jay Schafer.

03:22:15 18             And in the next row, we have our witnesses.  We

03:22:18 19   have Felix Bock, Rene Zaal, and Brett Kelly.  And then also

03:22:25 20   joining us are Mark Clifton and Arjan van der Vegte.

03:22:30 21             THE COURT:  Okay.  So first off, I'm sorry that

03:22:35 22   the scheduling has caused you all to have to wait around for

03:22:45 23   a long time.

03:22:47 24             Here's what I propose to do.  I think what we

03:22:53 25   ought to do is have your fact witnesses who are here testify

03:22:59  1    to whatever you want to have them testify to.  I think your

03:23:02  2    two experts ought to testify at another occasion after

03:23:09  3    they've finished submitting reports or being deposed, or the

03:23:15  4    briefing on striking the reports is all done.  It seems kind

03:23:18  5    of silly to have the hearing in the middle of all that.

03:23:23  6          And so that's what I propose.  I'm guessing

03:23:30  7    these fact witnesses are something that can probably be done

03:23:34  8    without too much more time or that won't take that long.

03:23:38  9          Mr. O'Rourke, any comment?

03:23:39 10          MR. O'ROURKE:  Yes, Your Honor.  We did want to

03:23:41 11    talk to you about how you wanted to handle Mr. Bock's

03:23:45 12    declarations, both the original one, our challenge to it,

03:23:48 13    and the supplemental.  With all due respect, sending us out

03:23:53 14    after this hearing without any guidance would be

03:23:55 15    problematic.

03:23:56 16          THE COURT:  Well, I would let him submit a new

03:23:59 17    report.  I mean, the claim construction I gave is not the

03:24:02 18    one the defendants were asking for, and so, you know, maybe

03:24:08 19    a new claim construction means they concede.  Maybe it

03:24:12 20    doesn't.

03:24:13 21          But as I gather, if Mr. Bock has already

03:24:18 22    submitted something or wants to submit something, and so I

03:24:22 23    think he ought to submit it.  You can do whatever it is you

03:24:24 24    did in the first place.  You can file a reply, but basically

03:24:28 25    to flesh out both from the instance for him and in the

Chua - Direct

03:24:35  1    second instance for everybody what the issues are about

03:24:38  2    whatever his new submission is.

03:24:41  3                 MR. O'ROURKE:  Okay.  Thank you, Your Honor.

03:24:42  4                 Okay.  Any comment from the defendants?

03:24:44  5                 MR. PASTERNAK:  No, Your Honor.  That's

03:24:46  6    acceptable to us.

03:24:47  7                 THE COURT:  Okay.  All right.  Well,

03:24:50  8    Mr. O'Rourke, you've got -- is it Mr Chua?

03:24:54  9                 MR. O'ROURKE:  Yes, Your Honor.  Mr. Chua will

03:24:56 10    testify first, and his examination will be handled by

03:25:00 11    Mr. Scott Hoopes.

03:25:00 12                 THE COURT:  Okay.  Mr. Chua, come on forward.

03:25:28 13                 COURT CLERK:  Do you want to swear or affirm?

03:25:30 14                 THE WITNESS:  Yeah.

03:25:31 15                 COURT CLERK:  Can you please state and spell

03:25:33 16    your full name for the record?

03:25:34 17                 THE WITNESS:  My name is Seng Chee Chua spelled

03:25:37 18    S-E-N-G C-H-E-E C-H-U-A.

03:25:41 19                 COURT CLERK:  Please place your left hand on the

03:25:44 20    Bible and raise your right hand.

03:25:44 21                 Seng Chee Chua, after having been duly sworn

03:25:44 22    under oath, was examined and testified as follows:

03:25:44 23                     DIRECT EXAMINATION

03:26:03 24    BY MR. HOOPES:

03:26:03 25    Q.    Mr. Chua, can you give your full legal name to the

Chua - Direct

03:26:17  1   Court, please?

03:26:17  2   A.    Yes.  My name is Seng Chee Chua which is spelled

03:26:22  3   S-E-N-G C-H-E-E C-H-U-A.

03:26:27  4   Q.    And do you also go by Avery?

03:26:30  5   A.    Yes, I do go by Avery.

03:26:32  6   Q.    Can you just briefly tell the Court what your

03:26:37  7   background is before you came to the U.S.?

03:26:40  8   A.    Okay.  I have a bachelor's degree in forestry, and I

03:26:47  9   worked for a company that's called Hangzhou Dasuo Technology

03:26:52 10   in China prior to coming to U.S.  And I moved to U.S. in

03:26:56 11   2008.  And at that time, I established a company called

03:27:03 12   Easoon, U.S.A., and I am here ever since with traveling back

03:27:08 13   and forth.

03:27:12 14   Q.    So the company that you worked for in China --

03:27:16 15   A.    Yes.

03:27:16 16   Q.    -- are there initials or anything that is easier to

03:27:25 17   refer to them by or that you have referred to them by?

03:27:27 18   A.    The company right now is HDT, but at the time it

03:27:34 19   was -- I need to clarify a bit.  The company that I worked

03:27:38 20   for in way back; right?

03:27:39 21   Q.    Correct.

03:27:39 22   A.    Yeah, is called DIG.

03:27:41 23   Q.    And what's the pronunciation of the company?  How do

03:27:46 24   you say that?

03:27:51 25   A.    Hangzhou Dasuo Industrial Group.

Chua - Direct

03:27:51 1    Q.    Okay.  So if we refer to it just as DIG, then we'd

03:27:58 2    have an understanding of what that means?

03:28:00 3    A.    Yes.

03:28:00 4    Q.    Okay.  And so when you came over to the U.S. in 2008

03:28:06 5    to start Easoon, did you stop working for DIG at the time?

03:28:11 6    A.    No, at that time, I wanted to resign, do my own

03:28:15 7    thing, but the company tries to retain me and told me to

03:28:18 8    just continue on and help them with the daily stuff.  So I

03:28:22 9    did, and I continued to do that job until 2011.

03:28:30 10   Q.    Okay.  Then in 2011, did you cease working with or

03:28:34 11   for DIG?

03:28:35 12   A.    Yes.  After 2011, I'm on my own, and Easoon is my

03:28:41 13   only so-called job for that and some of the Easoon Group's

03:28:48 14   companies.

03:28:50 15   Q.    For purposes of this case, are you familiar with the

03:28:55 16   patents that are or, I guess, have been referenced in this

03:28:59 17   case?

03:28:59 18   A.    Yes, I am.

03:29:01 19   Q.    How many patents, is it your understanding, that are

03:29:04 20   in this case related to the patented product?

03:29:07 21   A.    The patent that this discusses specifically is a

03:29:12 22   patent involving a memo scrambler which is the '578, and

03:29:17 23   there's a counterpart of that patent in China, and I believe

03:29:20 24   the number ends with '764.

03:29:26 25   Q.    Okay.  So was the Chinese patent, the '764 patent,

Chua - Direct

03:29:32  1    filed first, or was the U.S. patent filed first?

03:29:36  2    A.    As I remember, it's -- the Chinese patent was filed

03:29:39  3    first, '764.

03:29:43  4    Q.    And do you recall when that patent was filed?

03:29:45  5    A.    I believe it's sometime in 2008.

03:29:52  6    Q.    And that was the same year you came over from Easoon?

03:29:56  7    A.    Yes.

03:29:57  8    Q.    And then do you recall when the '578 patent was filed

03:30:01  9    in the U.S.?

03:30:02 10    A.    '578, I remember when it was granted.  I believe it's

03:30:11 11    2014.

03:30:18 12    Q.    And can you explain to the Court what the name means?

03:30:23 13    What that is, Dasso?  What that is?

03:30:26 14    A.    As I said earlier, I work for that Hangzhou Dasuo and

03:30:31 15    subsequently the company changed its name to Dasso.  And it

03:30:34 16    is actually an acronym mix-up from Dazhuang and then moso

03:30:42 17    bamboo.  So it becomes Dazhuang Superior Bamboo, and so it's

03:30:47 18    D-A-S-S-O.  That subsequently becomes a brand -- just a

03:30:49 19    brand name.

03:30:50 20    Q.    Okay.  And what do you mean by Dasso has become a

03:30:55 21    brand name?  Can you explain that?

03:30:56 22    A.    Well, it's being used as a logo form.  So that

03:31:06 23    logo -- so that it's being recognized.  So that's how it is

03:31:10 24    brand.  There's no really company associated with it at the

03:31:14 25    time.

Chua - Direct

03:31:15  1    Q.    And is that logo a U.S. type of a brand, or is it a

03:31:19  2    global brand?

03:31:20  3    A.    It's a global brand.  It all starts with China, and

03:31:25  4    then subsequently they started to use that brand to sell

03:31:29  5    stuff overseas.  And then that's the same brand that I'm

03:31:33  6    using right now.

03:31:35  7    Q.    Do you have any specific rights to use the name

03:31:41  8    Dasso, any branding right?

03:31:42  9    A.    Yes, I do.  I have a licensing agreement that -- to

03:31:45 10    use that brand in U.S., So I'm the exclusive licensor.

03:31:52 11    Q.    And do you recall when you received or obtained that

03:31:55 12    license -- those licensing rights for the Dasso brand?

03:31:58 13    A.    It happened quite some time ago.  I would believe

03:32:03 14    it's sometime around 2011 or around there.

03:32:10 15    Q.    And as far as distribution rights to distribute the

03:32:14 16    patented product --

03:32:15 17    A.    Yeah.

03:32:16 18    Q.    -- do you have any specific contractual distribution

03:32:19 19    rights to distribute the product into the U.S.?

03:32:22 20    A.    Yes, I do.  Initially, I was selling the product, the

03:32:31 21    Dasso brand, and then I have a contract, also meaning Easoon

03:32:35 22    has a contract as an exclusive distributor for the '764

03:32:41 23    patent, the Dasso.  And subsequently when the U.S. patent

03:32:51 24    was granted, then I was given another contract.

03:32:57 25    Q.    And who were you given the other contract from?

Chua - Direct

03:32:59 1   A.      And this contract was signed between Easoon and Dasso

03:33:13 2   International.

03:33:13 3   Q.      I'm going to hand you what's going to be marked as

03:33:24 4   Plaintiff's Exhibit 1.

03:33:54 5                 MR. HOOPES:  May I approach the witness, Your

03:33:55 6   Honor?

03:33:56 7                 THE COURT:  Sure.

03:33:57 8   BY MR. HOOPES:

03:33:57 9   Q.      Now, do you recognize those agreements?

03:34:03 10  A.      Yes.

03:34:07 11  Q.      And what are those agreements?  What do those

03:34:11 12  agreements represent?

03:34:12 13  A.      It's the exclusive licensing and distribution

03:34:15 14  agreement that is between the DIG and Easoon, and this is

03:34:23 15  for the '764.

03:34:27 16  Q.      Okay.  If you turn to the Bates label at the bottom.

03:34:32 17  EASOON 54237.

03:34:37 18  A.      Yes, I have it.

03:34:39 19  Q.      Okay.  Could you tell the Court what this is?

03:34:45 20  A.      It reads "Exclusive License and Distribution

03:34:50 21  Agreement," and this is between DIG and Easoon, but the

03:34:56 22  date -- this is dated April 2014.  And the earlier one dated

03:35:04 23  September 2010, and this is still about the '764 patent.

03:35:14 24  Q.      And at the top of this distribution agreement is the

03:35:20 25  Dasso Industrial Group Company Limited.  Is that DIG?

Chua - Direct

03:35:25  1    A.      Yes, that's DIG.

03:35:26  2    Q.      And then if you turn to Easoon 54242.

03:35:30  3    A.      Yes.  Yes, I have it.

03:35:34  4    Q.      Can you tell the Court what that represents?

03:35:36  5    A.      Yes, this is an Amendment to the Exclusive License

03:35:39  6    and Distribution Agreement, and it's signed between Hangzhou

03:35:48  7    Dasuo Technology and Easoon.  And it's dated January 2015,

03:35:54  8    January 15th.

03:35:56  9    Q.      Okay.  And so this is with a different company I

03:36:00 10    think that was referred to in the litigation as HDT; is that

03:36:04 11    correct?

03:36:04 12    A.      Yes, that's correct.

03:36:06 13    Q.      And can you tell the Court what the difference is

03:36:08 14    between DIG and HDT and why it changed?

03:36:13 15    A.      Okay.  DIG initially is the patentholder of the '764.

03:36:22 16    And subsequently, there's a change in ownership of the

03:36:26 17    patent, and that was transferred to a company called New

03:36:31 18    Bamboo.  And then New Bamboo granted HDT the only exclusive

03:36:36 19    right to distribute that or to sell the product from China.

03:36:45 20    Q.      And are you given a specific territory throughout

03:36:48 21    these exclusive distribution agreements?

03:36:50 22    A.      Yes, I was.  My territory, North America, meaning

03:36:55 23    United States, and Canada, and including Mexico.

03:37:01 24    Q.      And if you could turn to 54251 or 54252?

03:37:07 25    A.      252.  Yes.

Chua - Direct

03:37:16 1    Q.     And it's in Chinese, but can you tell the Court what

03:37:21 2    that document is?

03:37:22 3    A.     Okay.  This document is about licensing meaning to

03:37:30 4    use the logo Dasso.

03:37:32 5    Q.     So is that the Dasso licensing agreement that you

03:37:35 6    referenced before?

03:37:36 7    A.     Yes.  That's the licensing agreement that I'm talking

03:37:40 8    about.

03:37:40 9    Q.     Turn quickly to 54247.

03:37:44 10   A.     47.  54247, yes.

03:37:51 11   Q.     And what is this agreement?  Who is the agreement

03:37:56 12   between?

03:37:56 13   A.     This is an agreement between Dasso International and

03:38:06 14   Easoon.

03:38:07 15   Q.     And who is Dasso International?

03:38:09 16   A.     Dasso International is the patentholder of '578, and

03:38:17 17   it's a registered company in New York.

03:38:19 18   Q.     And at the time of this agreement, August 3rd, 2017,

03:38:25 19   did Dasso International, Inc. hold the patent licensing

03:38:29 20   agreements to the '578 patent in the U.S.?

03:38:33 21   A.     I'm sorry.  Can you repeat that?

03:38:34 22   Q.     Yeah.  At the time that this agreement was entered

03:38:36 23   into, August 3rd, 2017, did Dasso International have the

03:38:44 24   patent ownership patent right to the '578 patent in the

03:38:47 25   U.S.?

Chua - Direct

A.    Yes, they do, and that's the reason why we signed the contract.

Q.    During this time, 2017, when you signed the contract with Dasso International, did you have more than one distribution agreement, one with Dasso International and one with HDT?

A.    Yes, I did.  That's just because there's two patents involved.

Q.    Okay.  And so if you are selling the patented product inside the U.S., who would you have to have a contract with at the time?

A.    I would have to have a contract with Dasso International because they had the patentholder of these patents, and it's protected by that patent number.

Q.    And if you were selling the patented product outside of the U.S. at the time in August 2017, would you have a separate contract with a different company?

A.    Yes.  And that is the HDT contract, and that is regarding the patent '764.

Q.    Now, these collection of distribution agreements that I gave you --

A.    Yeah.

Q.    -- are there original documents to these agreements?

A.    Yes, there's originals.  Yes.

Q.    And what are those original documents?

Chua - Direct

03:40:01 1   A.      It's the copy meaning this is a copy of that

03:40:07 2   original.

03:40:08 3   Q.      All right.  And is the original document written in

03:40:12 4   English?

03:40:12 5   A.      Yeah, usually when China sets up the contract, they

03:40:16 6   always start it with Chinese.  And if the readers do not

03:40:21 7   understand Chinese, then they have an English version

03:40:24 8   because English then is the most common and international

03:40:27 9   language.

03:40:29 10   Q.      These agreements that are in English, are these

03:40:32 11   agreements that were signed at the time, the Chinese

03:40:34 12   documents, or were these signed later?

03:40:36 13   A.      Some are.  Well, it depends.  If the -- the Chinese,

03:40:47 14   obviously, is signed as an originer.  And then if it's

03:40:52 15   necessary for the contract to be in English, then a copy

03:40:56 16   would be supplemented later on.

03:40:59 17   Q.      The English version of the documents, were these

03:41:02 18   signed at the time of the Chinese documents or signed later?

03:41:04 19   A.      They are signed later.

03:41:06 20   Q.      And who requested the documents be duplicated into

03:41:11 21   English?

03:41:11 22   A.      Well, the HDT part initiated the English one just

03:41:17 23   because when they file the review of the contract, and they

03:41:18 24   want everything to have filing that they can use, especially

03:41:22 25   when importers dealing, you know, in English as a medium.

Chua - Direct

Q.      And have you seen the documents, the patent

distribution agreements with MOSO in this case?

A.      Yes, I have.

Q.      And those documents, were those in just one language,

English or Chinese, or two different languages?

A.      No, they are in two languages, and that is just

because the customer reading the Chinese version.  The

Chinese and English is supplied at the same time so that

they can understand it and sign it.

Q.      Are you familiar with a company called TW Flooring

Group?

A.      Yes, I do.

Q.      And is there also a company called Disdero Wood?

A.      Yes, I do.

Q.      Can you explain to the Court what TW Flooring Group

is?

A.      Well --

        MR. PASTERNAK:  Objection, it's outside the

scope of his declaration.

        THE COURT:  Well, his declaration wasn't an

expert declaration, I guess, so I'm not sure that's a good

objection.

        THE WITNESS:  Well, should I answer that?

        THE COURT:  Yes.

        THE WITNESS:  TW Flooring Group is a joint

Chua - Direct

1   venture between Easoon Group Company and a company called

2   Dasso Wood.

3   BY MR. HOOPES:

4   Q.    And so can you explain a little bit more what was

5   Easoon's role in TW Flooring Company?

6   A.    Well, Easoon's -- Easoon has a huge amount of

7   flooring inventory.  So Easoon is in the business of

8   distributing wood flooring.  Easoon has a bunch of bamboo

9   flooring products as well, and then later on we get

10  bringing -- with the time, we started to bring in this

11  product called DassoXTR.

12          So we have a few divisions.  We have a division

13  that is importing the material.  We have a division that we

14  try to create to warehouse material and cater out of the

15  warehouse.  And then we have these specific brand names to

16  DassoXTR to distribute the exterior group of products.

17  Q.    And what services did TW Flooring Group provide?

18  A.    TW Flooring -- TW provides like the -- this TW

19  Flooring acts as a joint venture, and the Dasso helps in

20  providing the product and providing the understanding of

21  local market.

22  Q.    And do you recall when TW Flooring Group started?

23  A.    TW Flooring Group started sometime in 2011 after I

24  have resigned from my previous engagement with the Chinese

25  company, DIG.

Chua - Direct

03:44:27  1    Q.    And was there ever a point subsequent in 2011 that

03:44:34  2    you were looking to grow or expand the DassoXTR brand?

03:44:39  3    A.    Yes, that has always been the idea, and that's where

03:44:44  4    I find these Dasso Wood to be helpful to bringing in that

03:44:50  5    local knowledge.

03:44:51  6    Q.    And did you ever look to hire anybody to oversee the

03:44:55  7    XTR division of Easoon?

03:44:58  8    A.    Yes, I did.  I mean, we have been always trying to

03:45:01  9    look for talent to head up the DassoXTR part of the

03:45:07 10    business.  So in 2013, we hired Brett Kelly as the president

03:45:14 11    of the Easoon DassoXTR division.

03:45:19 12    Q.    And is that the Brett Kelly that's a defendant in

03:45:22 13    this lawsuit?

03:45:22 14    A.    Yes.

03:45:41 15    Q.    I'm going to hand you what I'm marking as P2.

03:45:45 16          MR. HOOPES:  May I approach the witness, Your

03:45:48 17    Honor?

03:45:48 18          THE COURT:  Yeah.

03:45:50 19    BY MR. HOOPES:

03:45:50 20    Q.    Can you look through P2 and tell me what P2 pertains

03:46:04 21    to?

03:46:04 22    A.    P2 is a contract -- employment contract of work to

03:46:11 23    Brett Kelly which he signed.

03:46:16 24    Q.    And are there any other agreements throughout P2?

03:46:19 25    A.    No, I don't believe so.  I think this is the only

Chua - Direct

03:46:23 1    agreement that we signed, and he's hired.

03:46:27 2    Q.    If you look at what's Bates labeled at the bottom

03:46:31 3    EASOON 1922 --

03:46:32 4    A.    Yes.

03:46:40 5    Q.    -- can you tell the Court what this 1922 represents?

03:46:45 6    A.    Yeah.  This document is the employment contract for

03:46:50 7    Mark Clifton.

03:46:51 8    Q.    And is Mark Clifton one of the defendants in this

03:46:53 9    case?

03:46:54 10   A.    Yes, he is.

03:46:56 11          MR. PASTERNAK:  Objection, Your Honor.  He's not

03:46:57 12   a defendant in this case.

03:46:58 13          THE COURT:  Yeah, I'm kind of wondering that

03:47:02 14   myself.  Isn't he a defendant in the case that's been joined

03:47:06 15   in this case?

03:47:08 16          MR. HOOPES:  Yes.

03:47:10 17          THE COURT:  Right.  So he's not actually a

03:47:12 18   defendant in this case.

03:47:14 19          MR. HOOPES:  Didn't we consolidate it?

03:47:16 20          THE COURT:  Well, I think we consolidated it,

03:47:18 21   but it doesn't seem that the motion that you filed in this

03:47:21 22   case is now a motion that you filed in that case.

03:47:24 23          MR. HOOPES:  Okay.

03:47:24 24          THE COURT:  Right?

03:47:25 25          MR. HOOPES:  Yeah, okay.  I'll strike that, Your

Chua - Direct

03:47:27  1   Honor.  Correct.

03:47:28  2   BY MR. HOOPES:

03:47:28  3   Q.    So Mark Clifton, you were saying this represents an

03:47:33  4   employment agreement?

03:47:34  5   A.    Yes.

03:47:35  6   Q.    And then if you look at 1924 --

03:47:40  7   A.    Yes.

03:47:41  8   Q.    -- can you tell the Court what that represents?

03:47:43  9   A.    This is the employment contract for Steve Osterman.

03:47:48 10   Q.    Okay.  If you go back to the first page of P2 --

03:47:52 11   A.    Yes.

03:48:02 12   Q.    -- can you tell the Court what the agreement says is

03:48:05 13   the start date for Mr. Kelly?

03:48:07 14   A.    It's mentioned here, Monday, June 3rd, 2013.

03:48:12 15   Q.    And under the supervisor who Brett Kelly reported to,

03:48:17 16   can you tell the Court --

03:48:19 17   A.    Yeah.

03:48:19 18   Q.    -- who the supervisors were?

03:48:20 19   A.    Yeah.  He's employed from the time and the supervisor

03:48:23 20   is Avery and Jop together.

03:48:26 21   Q.    And who is Jop?

03:48:28 22   A.    Jop is the William Jopling, and he's the owner of

03:48:32 23   Dasso Wood.

03:48:34 24   Q.    And was Jop with Dasso Wood?  Is that part of the TW

03:48:41 25   Flooring Group venture?

Chua - Direct

03:48:42  1   A.      It is.

03:48:42  2   Q.      Would that explain why Avery and Jop are both listed

03:48:45  3   there?

03:48:45  4   A.      Yes.

03:48:46  5   Q.      Okay.  Can you tell the Court under the working teams

03:48:50  6   you interact with, can you just tell the Court with Brett

03:48:53  7   Kelly, who he was supposed to interact with?

03:48:56  8   A.      Yeah, over here Brett is supposed to be interacting

03:48:59  9   with the inside sales and customer service team.  That

03:49:03 10   includes Andy Gallo, Vicki, Isabel, Sonja, Jenny.

03:49:09 11           And then on the technical team, there's, Rick.

03:49:15 12   There's me, Avery, Steve.  And marketing team, there's Andy,

03:49:20 13   Amy, then Jop.  Import team, Isabel, Grace, Jenny.

03:49:26 14   Accounting team, Maria and Rachel.

03:49:28 15   Q.      Okay.  And so was Mr. Kelly's position or role as

03:49:34 16   president of DassoXTR, was that limited to just sales?

03:49:38 17   A.      No, he's not.  Brett Kelly is actually hired in order

03:49:42 18   to head up the sales and is the whole setup of the whole

03:49:47 19   team of DassoXTR.

03:49:49 20   Q.      And on the first page of his contract, there's a

03:49:54 21   section that says what is major responsibilities will

03:49:58 22   include.  Do you see that?

03:49:58 23   A.      Yes.

03:50:00 24   Q.      And what were the major responsibilities as president

03:50:03 25   of DassoXTR?

Chua - Direct

03:50:05  1   A.      Well, other than sales, then the next part is setup

03:50:08  2   and manage of independent outside rep network.  Develop the

03:50:13  3   North American authorized dealer network.  That is being

03:50:18  4   included setup in buying of cooperatives and franchises,

03:50:22  5   establish authorized dealer programs for installed stores,

03:50:27  6   sales, and develop private label program when it's

03:50:31  7   appropriate.

03:50:33  8   Q.      At the time that you hired Mr. Kelly, did you look at

03:50:36  9   him as just an outside sales guy?

03:50:38 10   A.      No.  No.

03:50:44 11   Q.      Does this agreement reference or reflect certain

03:50:50 12   authorized outside work that was not XTR related?

03:50:54 13   A.      Some part, but then you need to get approval.  It's

03:50:58 14   basically to expand the DassoXTR group.  And then if there's

03:51:04 15   any leads that involve other products, then he should bring

03:51:07 16   back to the non-XTR group.

03:51:10 17   Q.      And on the second page, there's a bullet section that

03:51:20 18   says authorized non-XTR work at the very top.  Do you see

03:51:23 19   that?

03:51:23 20   A.      Yes.

03:51:24 21   Q.      And then below it, it says, "In all cases, the above

03:51:28 22   non-XTR work shall be handled as follows."  Do you see that?

03:51:31 23   A.      Yes.

03:51:32 24   Q.      Under Paragraph 1, was there a preauthorization

03:51:36 25   requirement if Mr. Kelly went and embarked on any projects

Chua - Direct

03:51:42  1    that were non-XTR type of work?

03:51:44  2    A.    I'm sorry.  Can I have you repeat that?

03:51:47  3    Q.    Sure.  Who was Mr. Kelly required to obtain approval

03:51:52  4    from for non-XTR type of work?

03:51:55  5    A.    That would be me, Avery.

03:51:59  6    Q.    Okay.  Would he have to obtain approval from Jop?

03:52:02  7    A.    Either one.  Either or.

03:52:05  8    Q.    Okay.  And under Paragraph 3 on the second page --

03:52:11  9    A.    Yeah.

03:52:12 10    Q.    -- if there are sales of non-XTR Dasso products, do

03:52:17 11    you see 3a?

03:52:19 12    A.    3a?

03:52:20 13    Q.    The second page.

03:52:24 14    A.    Twenty-two?  Sorry.  I'm not able to --

03:52:29 15    Q.    1920.

03:52:31 16    A.    1920.  Yes.

03:52:33 17    Q.    Okay.  There's a sub Paragraph 3 at the top.

03:52:38 18    A.    Okay.  Yes, I see it now.

03:52:41 19    Q.    Okay.  And was there a reservation of rights

03:52:44 20    contained in this agreement for Mr. Kelly to follow?

03:52:48 21    A.    Yes.  It's written here.

03:52:50 22    Q.    Okay.  And what does it say?

03:52:51 23    A.    It says, Dasso reserves the right to finance, or buy,

03:52:56 24    or resell or not to, and at its sole discretion based on all

03:53:02 25    of the alternatives presented.

Chua - Direct

03:53:05 1    Q.      Was your expectation that if there was any business

03:53:08 2    opportunities, that Mr. Kelly would bring them to you?

03:53:11 3    A.      Definitely.  He should be.

03:53:17 4    Q.      And do you know who prepared this agreement?

03:53:21 5    A.      Me and Mr. Jopling.  I mean, he writes it, but

03:53:27 6    basically we -- my discussion and my input.

03:53:31 7    Q.      Can you look at the third page?

03:53:33 8    A.      Yes.

03:53:33 9    Q.      And under the signature --

03:53:36 10   A.      Yes.

03:53:37 11   Q.      -- it says Avery or Jop?

03:53:38 12   A.      Yes.

03:53:39 13   Q.      Whose signature is that?

03:53:41 14   A.      That is Jop's signature.

03:53:42 15   Q.      And is there another signature on there?

03:53:45 16   A.      No.

03:53:47 17   Q.      Is there a signature?

03:53:48 18   A.      I mean, yeah, below that, there's Brett Kelly.

03:53:52 19   Q.      And are you familiar with Brett Kelly's signature?

03:53:54 20   A.      Yes.

03:54:01 21   Q.      And can you look at the other two agreements --

03:54:04 22   A.      Yeah.

03:54:04 23   Q.      -- that are in this?  Are these agreements that are

03:54:07 24   kept in the ordinary course and part of Easoon's business

03:54:10 25   records?

Chua - Direct

03:54:11  1   A.     Yes, it is.  It follows our business record.

03:54:14  2   Q.     And let me refer you back real quick to P1, the

03:54:19  3   license and distribution agreement.

03:54:20  4   A.     Yes.

03:54:25  5   Q.     Are these documents kept in the ordinary course of

03:54:30  6   business records of Easoon?

03:54:32  7   A.     Yes, it is.

03:54:40  8   Q.     These exclusive licenses and distribution agreements

03:54:43  9   with the various entities and patents, do you have a copy in

03:54:48 10   Chinese?

03:54:48 11   A.     Yes, I do.

03:54:53 12   Q.     And does HDT and DIG, do they maintain copies of the

03:54:58 13   Chinese documents as well?

03:54:59 14   A.     I believe they do.

03:55:02 15          MR. HOOPES:  Your Honor, I'd like to tender P1

03:55:04 16   and P2.

03:55:06 17          THE COURT:  All right.  Admitted.

03:55:08 18          (Plaintiff's Exhibit Nos. P1 and P2 were

03:55:18 19   admitted into evidence.)

03:55:18 20          THE COURT:  Mr. Hoopes, how much longer do you

03:55:20 21   expect the direct examination here to be?

03:55:23 22          MR. HOOPES:  I could make it a lot quicker.

03:55:27 23          THE COURT:  Well, I don't know what you're

03:55:29 24   trying to do, that's the reason I ask.  It occurred maybe I

03:55:32 25   should have asked before we started this.  I mean, I'm not

Chua - Direct

03:55:38  1    sure, but I have a feeling most of what's just happened we

03:55:41  2    didn't need to do at all.  But I don't know, maybe I'm not

03:55:46  3    correct in my understanding of what's going on here.

03:55:49  4              I mean, I expected -- well, I expected something

03:55:56  5    different.  So let's get to whatever the point is that you

03:55:58  6    really want to make here.

03:56:00  7              MR. HOOPES:  Okay.

03:56:01  8    BY MR. HOOPES:

03:56:01  9    Q.    Was Mr. Kelly authorized to sign contracts on behalf

03:56:12 10    of DassoXTR Easoon?

03:56:16 11    A.    Yes.  He is the president of Easoon DassoXTR

03:56:21 12    division.  So as a president, he is authorized to sign.

03:56:42 13              MR. HOOPES:  I'll mark this as P3.

03:56:59 14    BY MR. HOOPES:

03:56:59 15    Q.    And are you familiar with the document that's been

03:57:09 16    handed to you as Plaintiff's 3, P3?

03:57:12 17    A.    Yes.

03:57:13 18    Q.    And can you tell the Court what this reflects?

03:57:17 19    A.    Well, this reflects an agreement between Timber

03:57:22 20    Holdings and Dasso regarding a fastener.

03:57:28 21    Q.    Can you look at the last page of the agreement?

03:57:31 22    A.    Yes.

03:57:33 23    Q.    Or the third page?

03:57:33 24    A.    I have it.

03:57:34 25    Q.    Of what's EASOON 824?

Chua - Direct

03:57:37  1   A.      Yeah, I have it now.  "Standardized Outsourcing

03:57:39  2   Agreement."

03:57:40  3   Q.      And can you tell the Court what this document is?

03:57:44  4   A.      Well, this document is basically an agreement between

03:57:48  5   two corporations, Dasso's side and Timber Holdings regarding

03:57:53  6   a type of fastener.

03:57:56  7   Q.      And the document on the third page, the last page --

03:58:01  8   A.      Mm-hmm.

03:58:01  9   Q.      -- it's titled "Standard Outsourcing Agreement."  Is

03:58:05 10   that a contract between Easoon due to the XTR Dasso

03:58:12 11   division, and I guess, Timber Holdings, USA, LLC?

03:58:16 12   A.      Yes, it is.

03:58:17 13   Q.      Do you recognize the signature at the bottom?

03:58:19 14   A.      Yes, the bottom signature is Brett Kelly's signature.

03:58:28 15               MR. HOOPES:  Your Honor, I'll tender P3.

03:58:30 16               THE COURT:  All right.  Admitted.

03:58:30 17               (Plaintiff's Exhibit P3 was admitted into

03:58:30 18   evidence.)

03:58:39 19   BY MR. HOOPES:

03:58:39 20   Q.      And at what point did Mr. Kelly resign from Easoon

03:58:48 21   and DassoXTR?

03:58:49 22   A.      Brett Kelly resigned sometime in the month of

03:58:54 23   June 2017.

03:58:56 24   Q.      And after Mr. Kelly resigned and left, did you have

03:59:03 25   the opportunity to look through the email server for

Chua - Direct

03:59:09  1   documents pertaining to Mr. Kelly?

03:59:11  2   A.    Yes, I have.

03:59:13  3   Q.    Okay.  Did you uncover documents concerning Mr. Kelly

03:59:17  4   communicating directly with MOSO?

03:59:20  5   A.    Yes, I have, and quite a number of them.  But not --

03:59:24  6   they are not all found just in one instance, but rather a

03:59:29  7   constant visit to the server and constantly applying and

03:59:33  8   finding more and more email.

03:59:36  9   Q.    And were these documents found in the deleted folder

03:59:41 10   in the server?

03:59:42 11   A.    Yes, exactly.  They were deleted and put in different

03:59:44 12   places, and that's why it takes time to discover them.  So

03:59:48 13   it's -- the whole picture becomes clearer and clearer when I

03:59:51 14   have more and more emails.  And some of this email was

03:59:53 15   deleted, but it wasn't totally deleted because there's a

03:59:59 16   hold on those documents that nothing can be deleted.

04:00:38 17   Q.    I'm going to hand you what's been marked as P4.

04:00:59 18   A.    Thank you.

04:01:00 19   Q.    Can you tell the Court what this document, P4, is?

04:01:07 20   Is this one of the emails that you found?

04:01:09 21   A.    Yes, this is one of them.

04:01:19 22   Q.    And what is the date on this at the top on the email,

04:01:23 23   at the top of the first page?

04:01:24 24   A.    That's November 3rd, 2014.

04:01:28 25   Q.    And again, what was the start date for Mr. Kelly with

04:01:37 1    Easoon when he started?

04:01:38 2    A.    2013.

04:01:40 3    Q.    Okay.  If you can look at the third page, what's

04:01:46 4    Bates numbered EASOON 960.

04:01:48 5    A.    Yes.

04:01:51 6    Q.    If you look at the very bottom, can you tell me who

04:01:56 7    the -- there's an email from and to.

04:01:59 8    A.    Yes.  On this page, the email was Arjen Veltman.

04:02:07 9    There's Brett Kelly and Rene Zaal.

04:02:10 10   Q.    Okay.  And so Arjen Veltman, who is he?

04:02:16 11   A.    Arjen Veltman is one of the owners and directors of

04:02:21 12   MOSO International B.V.

04:02:25 13   Q.    And Rene Zaal is?

04:02:27 14   A.    Rene Zaal, as I understand, is the CO of MOSO

04:02:34 15   International B.V.

04:02:34 16   Q.    And on the third page, you'll see there's an email,

04:02:38 17   October 31st, 2014 from Brett Kelly.

04:02:42 18   A.    Yeah.

04:02:43 19   Q.    And who was that solely to?

04:02:46 20   A.    It's from Arjen Veltman to Brett Kelly and Rene.

04:02:56 21   Q.    Okay.  And if you go one step down, was there an

04:02:59 22   email from Brett Kelly?

04:03:00 23   A.    Yeah, and then further down, that's from Brett Kelly

04:03:02 24   to Arjen Veltman and Rene Zaal.

04:03:05 25   Q.    Okay.  And so in this document, there was a forward

Chua - Direct

04:03:10  1   from an email from William Jopling --

04:03:13  2   A.     Yeah.

04:03:14  3   Q.     -- to Brett Kelly at the very bottom.  Are you copied

04:03:17  4   on that?

04:03:17  5   A.     Yes.  Yes, I was copied on this.

04:03:20  6   Q.     And then when Brett Kelly forwarded it to Arjen

04:03:23  7   Veltman, MOSO North America, and Rene Zaal, were you copied

04:03:26  8   on that forward?

04:03:27  9   A.     It is shown here I was not copied, and I really do

04:03:29 10   not know anything about this until I found the emails.

04:03:34 11   Q.     And then if you look at the second page, 959 --

04:03:37 12   A.     Yeah.

04:03:43 13   Q.     -- do you see there's an email from Rene Zaal --

04:03:45 14   A.     Yeah.

04:03:46 15   Q.     -- to Arjen Veltman and Brett Kelly?

04:03:48 16   A.     Yes.

04:03:48 17   Q.     Is this a reply to the document or the email that

04:03:53 18   Brett Kelly sent to Arjen Veltman and Rene Zaal?

04:03:57 19   A.     Yes, it is.

04:03:59 20   Q.     And in this from Mr. Zaal, who's the president of

04:04:02 21   MOSO International B.V., can you briefly read this email?

04:04:09 22   A.     Yeah.  Well -- well, it says here, "Dear Brett, I'm

04:04:14 23   just thinking that you should a little bit 'Chinese' now.

04:04:20 24          The principle is that when someone is asking you

04:04:23 25   to do something which is inconvenient (or you do not like to

Chua - Direct

04:04:28  1    do for some reason)", and in capital letters "JUST IGNORE OR

04:04:33  2    DELAY."

04:04:33  3          "In this case you do not want to report

04:04:36  4    something which you already did before and which was not

04:04:39  5    addressed by the receiver.

04:04:41  6          Also in this case you have been asked to report

04:04:44  7    all potential projects, on which you are working now.  So

04:04:48  8    not in YOUR interest (and also not in the interest of MOSO

04:04:53  9    and you together).

04:04:56 10          Better now not replying.  When they ask again,

04:05:00 11    you can say that you plan to do it, but you are VERY busy

04:05:06 12    (which is true.)

04:05:08 13          When they ask again, you say; sorry, I forgot.

04:05:12 14          When they ask again, you send something, but

04:05:16 15    incomplete.

04:05:17 16          Rene."

04:05:22 17    Q.    And in response on the first page, 958 --

04:05:25 18    A.    Yeah.  Sorry.  I left out the last sentence on the

04:05:29 19    next page.  It says, "BY the way, this is not an European or

04:05:33 20    USA approach, but for Chinese it works."

04:05:38 21    Q.    And then on the first page, Page 958, did Brett Kelly

04:05:42 22    respond to Rene Zaal, the president of MOSO?

04:05:46 23    A.    Yes, he did, and he says, "Hi Rene.  Yes thank you

04:05:50 24    for the advice.  Not to worry as all these accounts and

04:05:54 25    relationships are mine!  I will drag my feet.  I am supposed

Chua - Direct

04:05:58  1      to send the projections to Avery and I'm now traveling for

04:06:01  2      the next few weeks.  It feels as though he is anticipating

04:06:05  3      my departure and thinks the information is worth more than

04:06:09  4      the relationship.  He must have a sense that if they were to

04:06:12  5      try and do something with Dasso, not sure what he thinks

04:06:16  6      that is, he will compete with MOSO.

04:06:20  7              I am just working to keep the work going and

04:06:23  8      things moving forward next year.

04:06:25  9              Regards, Brett Kelly," president of Dasso.

04:06:28 10      Q.    President of DassoXTR?

04:06:30 11      A.    Yeah.

04:06:32 12              MR. HOOPES:  Your Honor, I'll tender P4.

04:06:35 13              THE COURT:  All right.  Admitted.

04:06:35 14              (Plaintiff's Exhibit No. P4 was admitted into

04:06:35 15      evidence.)

04:06:40 16      BY MR. HOOPES:

04:06:40 17      Q.    I'll hand you what's been marked as P5.

04:07:36 18      A.    Thank you.

04:07:36 19      Q.    Is this one of the emails that was uncovered after

04:07:42 20      Mr. Kelly left?

04:07:43 21      A.    Yes, it is.

04:07:45 22      Q.    And what is the date at the top of this email?

04:07:47 23      A.    The date is November 6th, 2014.

04:07:52 24      Q.    And if you look at the second page, Page 947 --

04:07:56 25      A.    Yes.

Chua - Direct

04:07:58  1    Q.      -- there's an email.  It appears to be from you to

04:08:03  2    Brett Kelly and William Jopling.  Subject:  DassoXTR Trip.

04:08:07  3             Do you see that?

04:08:07  4    A.      Yes.

04:08:08  5    Q.      And at the top of the page, did Brett Kelly forward

04:08:13  6    this DassoXTR trip itinerary to Mr. Veltman and Mr. Zaal

04:08:19  7    with MOSO?

04:08:20  8    A.      Yes, it -- apparently, Brett Kelly forwarded with

04:08:24  9    Brett Kelly at DassoXTR the whole information to Veltman at

04:08:30 10    MOSO and Rene Zaal.

04:08:33 11    Q.      Okay.  And then on the first page, there was emails

04:08:38 12    going back and forth between Arjen Veltman with MOSO to

04:08:42 13    Brett Kelly and Rene Zaal; do you see that?

04:08:44 14    A.      Yes.

04:08:44 15    Q.      Are you copied anywhere on these emails?

04:08:47 16    A.      No, I wasn't.

04:08:49 17    Q.      Do you see if Jop was copied anywhere?

04:08:51 18    A.      No, he wasn't.

04:08:54 19    Q.      At the very top, there's an email from Brett Kelly to

04:08:59 20    Mr. Veltman and Mr. Zaal with MOSO?

04:09:02 21    A.      Yes.

04:09:03 22    Q.      And in that, he's addressing -- he says, "Hi Arjen."

04:09:06 23    A.      Yeah.

04:09:07 24    Q.      Addressing Mr. Veltman?

04:09:08 25    A.      Yeah.

Chua - Direct

04:09:10  1    Q.      Can you read those --

04:09:12  2    A.      Yes.

04:09:12  3    Q.      -- two?

04:09:13  4    A.      Yes.  He says, "Hi Arjen.  I think that will not be a

04:09:18  5    problem.  Knowing Jop he will keep me out of it because he

04:09:22  6    knows that I am not happy about XTR being ignored.  He knows

04:09:27  7    the requests that I have repeatedly made went unanswered.

04:09:32  8    If anything, I think I will be blamed for the problems.

04:09:35  9              I will get you everything I see and hear.

04:09:38 10              Regards, Brett."

04:09:40 11    Q.      Okay.  So that last sentence where Mr. Kelly told

04:09:46 12    Mr. Veltman and Mr. Zaal at MOSO, "I will get you everything

04:09:51 13    I see and hear," was that any type of his job

04:09:54 14    responsibilities to keep a competitor, MOSO, informed of

04:09:58 15    everything he sees and hears as the president of DassoXTR?

04:10:01 16    A.      Obviously not.  I mean, that is not expected of an

04:10:05 17    employee, especially a president.  The function of a

04:10:08 18    president is to benefit your shareholder and of the company.

04:10:14 19    You are not supposed to be sharing information to a

04:10:17 20    competitor.

04:10:46 21    Q.      I'm going to hand you what's been marked as P6.  And

04:10:58 22    is this one of the emails that you found Mr. Kelly left?

04:11:03 23    A.      Yes.

04:11:07 24    Q.      And the bottom, there's an email from a Brett

04:11:11 25    Kelly --

Chua - Direct

04:11:11 1   A.      Yeah.

04:11:11 2   Q.      -- to Arjen Veltman with MOSO?

04:11:14 3   A.      Yes.

04:11:16 4   Q.      And in this, he's asking about testing and getting

04:11:19 5   data from MOSO concerning testing in the U.S.?

04:11:23 6   A.      Yeah.

04:11:26 7   Q.      Brett.Kelly@rocketmail.com, do you know that email

04:11:31 8   address?

04:11:32 9   A.      No, I think until -- after I've seen these, the email

04:11:35 10  is when I found it.

04:11:36 11  Q.      When Brett Kelly was president of DassoXTR, was that

04:11:41 12  one of the emails that the company gave him to use?

04:11:43 13  A.      No, that's not.

04:11:44 14  Q.      Okay.  And at the top, Mr. Veltman responds to Brett

04:11:55 15  Kelly --

04:11:55 16  A.      Yeah.

04:11:56 17  Q.      -- and copies Rene Zaal, the president of MOSO.  It's

04:12:00 18  a small email.  Can you just read what Mr. Veltman said to

04:12:04 19  Mr. Kelly?

04:12:04 20  A.      Yes.  "Dear Brett, that's a lot of testing and a lot

04:12:09 21  of" money!  "Of course something we would immediately do

04:12:13 22  (such investment must be part of the business plan) if we

04:12:18 23  were in charge of the US market.

04:12:20 24          "I put all testing data in drop box," and

04:12:23 25  there's a link.  Please use it wisely.  "We normally don't

Chua - Direct

04:12:26  1   send those reports to just anybody because before you know

04:12:30  2   it, people remove the MOSO name, put another and use it for

04:12:34  3   their own product...  I trust you use it well.  As long as

04:12:39  4   you move those 100+ glass containers to MOSO, it is ok.

04:12:44  5            Good luck.

04:12:44  6            Kind regards, Arjen."

04:12:47  7   Q.     So in this email, Mr. Veltman is saying that that's a

04:12:52  8   lot of money, and of course, it's something they would

04:12:55  9   immediately do if they were in charge of the U.S. market?

04:12:58 10   A.     Yeah.

04:12:58 11   Q.     Do you see that?

04:12:59 12   A.     Yes.

04:12:59 13   Q.     And in this, this is in 2015, Mr. Veltman is saying

04:13:04 14   as long as you -- and the email was to Mr. Kelly; correct?

04:13:08 15   A.     Yes.

04:13:08 16   Q.     "As long as you move those 100-plus containers to

04:13:12 17   moso, it is okay" with a smily face.  Do you see that?

04:13:15 18   A.     Yes.  Yes.

04:13:16 19   Q.     Were you copied on this email?

04:13:18 20   A.     No, I wasn't.

04:13:19 21   Q.     Did you know about this proposal being discussed

04:13:23 22   between Mr. Kelly and Mr. Veltman with MOSO concerning

04:13:28 23   taking a hundred containers and giving them to MOSO?

04:13:32 24   A.     No, I didn't.  And to me, like the name Universal

04:13:36 25   product, that's a big name.  That would be a great customer

Chua - Direct

04:13:38 1    to have.

04:13:39 2    Q.    And was this opportunity ever given to DassoXTR by

04:13:43 3    Mr. Kelly?

04:13:43 4    A.    No, it wasn't mentioned.  It never came up to

04:13:46 5    discuss.

04:13:48 6    Q.    Is that a business opportunity that DassoXTR would

04:13:52 7    have liked to have?

04:13:52 8    A.    Definitely.

04:13:54 9    Q.    Was that a business opportunity that DassoXTR

04:13:57 10   expected Mr. Kelly to service or be out there looking for on

04:14:01 11   behalf of Easoon?

04:14:02 12   A.    Definitely, yes.

04:14:03 13              MR. PASTERNAK:  Objection; leading, Your Honor.

04:14:05 14              THE COURT:  Overruled.  All right.

04:14:09 15              So Mr. Hoopes, you have five more minutes, and

04:14:11 16   then I'm going to turn it over for cross.

04:14:14 17              MR. HOOPES:  Okay.

04:14:14 18   BY MR. HOOPES:

04:14:25 19   Q.    So at a point in time, as you testified, Mr. Kelly

04:14:27 20   left --

04:14:28 21   A.    Yes.

04:14:29 22   Q.    -- Easoon?

04:14:29 23   A.    Yes.

04:14:30 24   Q.    And do you know where he went?

04:14:32 25   A.    He resigned, and then the same week I found him

04:14:38 1   declaring himself as the CEO and president of MOSO North

04:14:42 2   America.

04:14:43 3   Q.    And at any time did he have any discussions with you

04:14:47 4   or give you a heads up or advance notice that he was getting

04:14:52 5   ready to head up a major competitor in the U.S. market?

04:14:55 6   A.    No, he didn't.

04:14:58 7   Q.    And prior to that one month prior, did Mr. Kelly

04:15:04 8   travel with customers of Easoon?

04:15:07 9   A.    Yes, he did.

04:15:08 10  Q.    And where was that?

04:15:09 11  A.    He has traveled to China with customers that Easoon

04:15:15 12  has to show him the factory and the product, as well he had

04:15:19 13  traveled to Canada to meet up with customers like Weston

04:15:24 14  Premium and Richelieu.

04:15:25 15  Q.    And this is May 2017, the month before he left?

04:15:30 16  A.    Yes, keep in mind that even the visit up to Weston

04:15:35 17  was within two weeks before he resigned.

04:15:39 18  Q.    And was Easoon understanding that he was traveling to

04:15:44 19  China for a trip to customers?

04:15:46 20  A.    Yes, there was a trip like two weeks earlier to

04:15:49 21  travel to China.

04:15:51 22  Q.    Okay.  And was Mr. Kelly able to get a direct flight

04:15:56 23  to China?

04:15:57 24  A.    He told -- he called me up and said he wasn't able to

04:16:01 25  get a direct flight to China or route through the side, so

04:16:04  1    he was going to route through Europe.

04:16:07  2    Q.    And where did you find out later that Mr. Kelly

04:16:09  3    actually went instead of going directly to China to meet

04:16:12  4    with customers?

04:16:12  5    A.    I later found out that he went to Amsterdam and to

04:16:16  6    meet up with MOSO and had been in the MOSO office.  Then he

04:16:21  7    continued his flight to China.  And all these were paid by

04:16:28  8    Easoon.

04:16:31  9    Q.    I'm going to hand you what's marked as Plaintiff's

04:16:35 10    Exhibit P7.  And can you tell the Court what P7 is?

04:16:54 11    A.    Yeah, P7, this is the sales data and expenses for

04:17:03 12    Easoon's DassoXTR division.

04:17:04 13    Q.    And when Mr. Kelly left, did he pursue customers of

04:17:11 14    Easoon and take those customers away?

04:17:12 15    A.    Yes, he did.

04:17:15 16    Q.    And this document here, what does this reflect?

04:17:21 17    A.    This?

04:17:22 18    Q.    Yes.

04:17:22 19    A.    On the revenue side, it actually reflects that the

04:17:25 20    drop in 2018.  Well, the key point here, though, is we were

04:17:30 21    growing our business.  And if you see like in 2017, our

04:17:34 22    sales has grown.  But in that meet -- in 2017, Brett Kelly

04:17:39 23    resigned and immediately goes and visits all our

04:17:42 24    distributors.

04:17:44 25              Subsequently, the distributors stopped buying

Chua - Direct

04:17:46 1    from us and channeled all their business to MOSO.  And it

04:17:50 2    reflects in our 2018 sales cost.  Then the year sales is

04:17:55 3    gone.

04:17:56 4    Q.    And then 2016, what was the revenue?

04:17:59 5    A.    2016 revenue is 1.5 million.

04:18:02 6    Q.    And this reflects DassoXTR's sales and revenue?

04:18:06 7    A.    Yes, it is.

04:18:07 8    Q.    And then in 2017, what was the revenue?

04:18:09 9    A.    2017, it was 2.2 million.  Nearly 2.3 million.

04:18:15 10   Q.    And Brett Kelly left in June 2017?

04:18:18 11   A.    Yes, he left in June.

04:18:20 12   Q.    And just briefly, when customers issue purchase

04:18:26 13   orders --

04:18:26 14   A.    Yeah.

04:18:26 15   Q.    -- how does that --

04:18:27 16   A.    Well, usually we will try to have a kind of cutoff

04:18:33 17   buying season.  So we provide a discount if customer will

04:18:38 18   take the products throughout the year.  So this is what

04:18:39 19   happens.  Like in 2017, customer place order earlier for it

04:18:43 20   to be delivered throughout the year.

04:18:46 21   Q.    And then 2018, did you see a decrease in sales?

04:18:49 22   A.    Yes, 2018, the sales was significantly, you know,

04:18:53 23   reduced, almost 50 percent.

04:18:55 24   Q.    And what was the amount of sales in 2018?

04:18:57 25   A.    It was 1.4 million only.  And this -- we have to get

Chua - Direct

04:19:01  1    new customer to patch up.

04:19:03  2    Q.    And what were the customers, the major customers that

04:19:07  3    left Easoon DassoXTR and went --

04:19:12  4    A.    The distributors, because they bought in bulk and,

04:19:14  5    then they dispute the different dealer, and those were

04:19:19  6    Weston Premium and Richelieu.  Disdero Lumber.  Boise

04:19:23  7    Cascade.

04:19:23  8         Like Boise Cascade is big name in the typical

04:19:27  9    industry where they distribute large amounts of products.

04:19:30 10    Q.    And since, for example, Boise Cascade left Easoon and

04:19:37 11    went to MOSO, have you been able to recover that business?

04:19:40 12    A.    Well, I wasn't able to recover Boise Cascade because

04:19:44 13    when we went to call them, they don't believe us, and they

04:19:47 14    say they have a relationship with Brett Kelly, and that they

04:19:55 15    believe we are being bankrupt.

04:19:57 16    Q.    Without going into those specifics, was Disdero a

04:20:06 17    customer that you lost?

04:20:06 18    A.    Yes.  Disdero is not a customer that we lost, but

04:20:10 19    subsequently, like end of last year, they came back.

04:20:15 20    Q.    And based on your declaration at the time, what did

04:20:19 21    you estimate that your damages and your losses were --

04:20:24 22    A.    Yeah.

04:20:25 23    Q.    -- at the time?

04:20:25 24    A.    Our losses would be at like 2 million.

04:20:31 25    Q.    Do you know specifically, though, a total amount that

Chua - Cross

04:20:34 1    you've been damaged as a result of MOSO's entry into the

04:20:39 2    U.S. market?

04:20:39 3    A.     No, I don't.  It's really difficult to assess, but

04:20:42 4    the key point is we're growing.  We will keep growing.  And

04:20:46 5    outside -- and this hit us, so we don't really know what is

04:20:49 6    the accidental damage.  And the 1.4 million, we try to

04:20:53 7    recruit and find new customers.

04:20:56 8           MR. HOOPES:  Your Honor, I have no further

04:20:57 9    questions.

04:20:57 10          THE COURT:  All right.  Thank you.

04:20:59 11          Mr. Pasternak, any cross-examination?

04:21:00 12          MR. PASTERNAK:  Yes, Your Honor.

04:21:00 13                  CROSS-EXAMINATION

04:21:00 14   BY MR. PASTERNAK:

04:21:06 15   Q.     Good afternoon, Mr. Chua.

04:21:08 16   A.     Hi.  Good afternoon.

04:21:09 17   Q.     Since the motion for the preliminary injunction was

04:21:11 18   filed in November 2018, you have lost no customers to MOSO;

04:21:16 19   correct?

04:21:16 20   A.     We?  Repeat.  Sorry.

04:21:18 21   Q.     Yeah.  Since the preliminary injunction was filed,

04:21:21 22   you have lost no customers to MOSO?

04:21:23 23   A.     There is, but I -- I would not know because this --

04:21:28 24   there's just too many of them out there, so I can only say I

04:21:31 25   do not know specifically.

Chua - Cross

04:21:32  1    Q.      You don't know whether you lost customers to MOSO or

04:21:35  2    not since the preliminary injunction was filed?

04:21:36  3    A.      I would say I have lost sales.

04:21:42  4    Q.      From who?

04:21:44  5    A.      From, you mean the customer name?

04:21:47  6    Q.      Yes.

04:21:47  7    A.      American Lumber would be one.

04:21:50  8    Q.      All right.  How much sales?

04:21:51  9    A.      I don't have specific numbers on the tip of my hand

04:21:54 10    right now.

04:21:54 11    Q.      Any others?

04:21:55 12    A.      Dainie Coiler.

04:22:00 13    Q.      Can you spell that?

04:22:01 14    A.      D-A-I-N-I-E C-O-I-L-E-R.

04:22:08 15    Q.      Can you say how much?

04:22:09 16    A.      I can't.

04:22:11 17    Q.      Any others?

04:22:11 18    A.      Not from the top of my head.

04:22:20 19    Q.      But you have taken a customer from MOSO; correct?

04:22:23 20    A.      I wouldn't know if I've taken their customer, but

04:22:25 21    they shouldn't be existing.

04:22:28 22    Q.      Well, they were a customer of MOSO; correct?

04:22:29 23    A.      Those are our customers in the first place.

04:22:32 24    Q.      But you took it back from MOSO since the preliminary

04:22:34 25    injunction was filed?

04:22:35 1    A.      They came back.

04:22:36 2    Q.      They came back since the preliminary injunction was

04:22:38 3    filed; correct?

04:22:39 4    A.      I wouldn't know whether it's after the preliminary

04:22:41 5    injunction is filed, but they came back.  They came back,

04:22:44 6    but they put out a long email saying why they came back.

04:22:47 7    Q.      And what did they say?

04:22:49 8    A.      Well, they basically say that they are -- they don't

04:22:53 9    trust the supplier that they have right now, so that's why

04:22:57 10   they came back.  They're being lied to.

04:22:59 11   Q.      And did you tell Disdero that MOSO was selling

04:23:03 12   counterfeit products?

04:23:04 13   A.      I didn't tell them specifically, but I said there's

04:23:08 14   an infringement going on.

04:23:09 15   Q.      Did anyone at your company tell Disdero that MOSO was

04:23:12 16   selling counterfeit products?

04:23:14 17   A.      I cannot be certain, but -- I cannot be certain.

04:23:19 18   Q.      Is that a no or a yes?

04:23:20 19   A.      Can you repeat that question?

04:23:24 20   Q.      Did anyone in your company tell Disdero that MOSO was

04:23:28 21   selling counterfeit products?

04:23:29 22   A.      I would believe they tell infringement product.

04:23:36 23   Q.      How much business have you done from Disdero since

04:23:40 24   you got it back from MOSO?

04:23:42 25   A.      I don't have that number, but I -- if I would need to

Chua - Cross

04:23:47  1   guess, it would be about 50,000 roughly.  Sorry, 500,000

04:23:56  2   roughly.

04:23:57  3   Q.    So since the preliminary injunction was filed, you

04:24:00  4   took a customer from MOSO of $500,000; correct?

04:24:04  5   A.    As I told you, they came back to us.  They came back

04:24:09  6   and tell us that they want to do business with us.

04:24:11  7   Q.    Wasn't that harm to MOSO?

04:24:13  8   A.    That wasn't a harm if it's considered that they

04:24:18  9   started the -- they should be already here in the first

04:24:21 10   place.

04:24:25 11   Q.    Now, there are two companies selling competing bamboo

04:24:28 12   products in the United States; correct?

04:24:30 13   A.    Yes.

04:24:31 14   Q.    And what are the two products?

04:24:33 15   A.    Sorry.  Is that a question?

04:24:38 16   Q.    Yes.  What are the two products called?

04:24:42 17   A.    It's a DassoXTR and MOSO Bamboo X-Treme.

04:24:45 18   Q.    And if MOSO had stopped from selling the bamboo

04:24:49 19   product, there would only be one player in the market;

04:24:53 20   right?

04:24:53 21   A.    Right.  That is supposed to be because I have the

04:24:56 22   exclusive distribution agreement.

04:24:59 23   Q.    Well, will there only be one player in the market if

04:25:03 24   MOSO is stopped from selling the product?

04:25:05 25   A.    Yes.

Chua - Cross

04:25:05 1    Q.     Would that be any control?

04:25:08 2    A.     I don't get that.  I don't understand you.

04:25:10 3    Q.     Sorry.  Will there be any control on your pricing at

04:25:14 4    that point?

04:25:15 5    A.     There will always be a control pricing.  There will

04:25:17 6    be a competing product from other products, but not

04:25:20 7    necessarily bamboo.  And I will have always benchmark

04:25:25 8    against the industry.

04:25:36 9    Q.     You filed a declaration in this case; correct?

04:25:38 10   A.     Yes.  I have a declaration.

04:25:41 11   Q.     Did you list any evidence of lost customers?

04:25:43 12   A.     Can I take a look at --

04:25:45 13   Q.     Yes.

04:25:46 14   A.     -- my declaration?

04:25:48 15   Q.     Yes.

04:27:02 16          MR. PASTERNAK:  May I approach, Your Honor?

04:27:05 17          THE COURT:  Sure.

04:27:11 18   BY MR. PASTERNAK:

04:27:12 19   Q.     So Mr. Chua, it's Exhibit A to Tab D.

04:27:15 20   A.     Thank you.

04:27:36 21   Q.     And just to remind you of the question:  Did you have

04:27:38 22   any evidence of lost customers in your declaration?

04:27:41 23   A.     I believe I mentioned Weston Premium Wood.

04:27:54 24   Q.     Is that in your declaration?

04:27:55 25   A.     Can you point me in my declaration because this is

Chua - Cross

04:28:02  1    huge?   Okay.  So which paragraph are we talking about?

04:28:17  2    Q.     You tell me.  I'm asking you where this evidence is.

04:28:24  3    A.     Then I would have to read through.

04:28:26  4    Q.     Yes.

04:28:27  5    A.     Thank you.  And while you're at it, why don't you

04:28:43  6    look for evidence of price erosion and lost market share.

04:28:46  7           THE COURT:  Mr. Pasternak, I think one thing at

04:28:48  8    a time.

04:28:50  9           MR. PASTERNAK:  Yes, Your Honor.

04:30:23 10           THE WITNESS:  Yes.  Mr. Pasternak, I have looked

04:30:24 11    through the title here.  There's nothing on that evidence of

04:30:29 12    loss of customers.

04:30:29 13    BY MR. PASTERNAK:

04:30:33 14    Q.     All right.  Did you look -- will you please look for

04:30:35 15    any evidence of price erosion?

04:30:38 16           THE COURT:  Why don't you first make sure that

04:30:41 17    you and he are talking about the same thing first when you

04:30:44 18    say price erosion.

04:30:44 19    BY MR. PASTERNAK:

04:30:45 20    Q.     Price erosion, what I mean when I say that is your

04:30:48 21    prices have decreased because of MOSO being in the market.

04:30:53 22    Yes?

04:30:54 23    A.     Yes, I understand, but does it have to be in my

04:30:56 24    declaration?  I mean --

04:30:57 25    Q.     I'm asking you if it's in your declaration.

04:30:59  1    A.      It's not in this declaration.

04:31:01  2    Q.      All right.  And then the last one is:  Is there any

04:31:05  3    evidence of loss of market share in your declaration?

04:31:07  4    A.      The evidence is not in the declaration.

04:31:18  5    Q.      You testified that Easoon has lost $2 million because

04:31:27  6    of MOSO being in the market; correct?

04:31:30  7    A.      Yes.

04:31:31  8    Q.      But you also testified that it's impossible to

04:31:35  9    compute the damages; correct.

04:31:37  10   A.      Yes.

04:31:37  11   Q.      Which is it, $2 million or impossible to compute?

04:31:41  12   A.      This doesn't conflict with each other.  It's

04:31:46  13   difficult to compute the losses because you do not know the

04:31:49  14   growth.  Every year the company grows, and every year you

04:31:51  15   get new customers.  And the original customers will continue

04:31:54  16   to buy, and whatever they continue to buy could grow or

04:31:57  17   could shrink.  So how to estimate an exact figure of

04:32:03  18   damages --

04:32:04  19   Q.      So it's impossible to compute an exact figure?

04:32:07  20   A.      Of damages, yes.

04:32:09  21   Q.      How did you compute $2 million then?

04:32:13  22   A.      That is what we have lost in terms of existing sales

04:32:15  23   that we have.

04:32:17  24   Q.      So you have lost $2 million in sales or some

04:32:21  25   percentage of that in profits?

Chua - Cross

04:32:23  1   A.      I kind of need to understand a bit.

04:32:28  2   Q.      Sure.  Have you lost $2 million in actual sales or

04:32:33  3   some percentage of $2 million in product profits?

04:32:37  4   A.      Well, for the three years at it, I would say between

04:32:41  5   2016, '17, okay, so it would be around 2017, 2018.  I'm

04:32:55  6   confused.  I'm really sorry.

04:32:58  7              Can you --

04:32:59  8   Q.      Lets me ask it this way.

04:33:00  9   A.      Yeah.

04:33:01 10   Q.      Explain to the Court how you come up with a $2

04:33:04 11   million number.

04:33:04 12   A.      Of loss?

04:33:06 13   Q.      Of loss.

04:33:09 14   A.      Roughly, am I disclosing confidential information

04:33:14 15   here, though?  That's fine?  All right.

04:33:17 16              So which means roughly the containers on average

04:33:21 17   cost 50,000 and we're sending 50 containers a year for the

04:33:28 18   three years, 2016, 2017, 2018.  And every container, we have

04:33:34 19   roughly 15,000 of gross profit margin.  That means 50,000

04:33:43 20   times 15 containers times three years, that is the loss.

04:33:50 21   And that will come out to be 2.2 -- 5 million roughly.

04:33:56 22   Q.      But you're not making $50,000 per container, are you?

04:33:59 23   You're making some percentage of that per container?

04:34:02 24   A.      Fifteen percent of it.

04:34:05 25   Q.      So --

Chua - Cross

04:34:05  1    A.      And that's what I'm using as --

04:34:07  2    Q.      So you're making 15 percent profit on a $50,000

04:34:10  3    container; correct?

04:34:11  4    A.      Correct.  Yes.

04:34:24  5    Q.      New Bamboo is the owner of a Chinese counterpart to

04:34:28  6    the '578 patent; right?

04:34:29  7    A.      Yes, I believe so.

04:34:31  8    Q.      And New Bamboo is a participating party in the Dasso

04:34:35  9    Group; correct?

04:34:36 10    A.      Which Dasso Group are you talking about?  The China

04:34:39 11    Dasso Group?

04:34:39 12    Q.      Is there more than one?

04:34:41 13    A.      There's a Dasso International, and there's -- in U.S.

04:34:48 14    registered in New York, and there's a Dasso Group China.

04:34:51 15    Q.      Let's say the Dasso Group China.  New Bamboo is a

04:34:55 16    participating part in the Dasso Group China; correct?

04:34:58 17    A.      Frankly, I do not know.

04:35:00 18    Q.      If Mr. Hoopes said they were, would you believe him?

04:35:02 19    A.      I probably would have to ask the owner of the New

04:35:08 20    Bamboo to get that information.

04:35:10 21    Q.      All right.  Let's mark an exhibit.

04:36:10 22            MR. PASTERNAK:  Permission to approach, Your

04:36:12 23    Honor?

04:36:12 24            THE COURT:  Sure.

04:36:14 25            THE WITNESS:  Thank you.

Chua - Cross

04:36:28  1    BY MR. PASTERNAK:

04:36:32  2    Q.      Mr. Chua, take a look at Tab 51 in the exhibit

04:36:35  3    binder, please.

04:36:36  4    A.      Fifty-one, yes.

04:36:39  5    Q.      Can you identify what's located at Tab 51?

04:36:41  6    A.      Yes.

04:36:42  7    Q.      What is it?

04:36:43  8    A.      A memorandum.

04:36:47  9    Q.      Have you seen it before?

04:36:49 10            MR. HOOPES:  Objection, Your Honor.

04:36:51 11            THE COURT:  What's the basis of the objection?

04:36:53 12            MR. HOOPES:  Although I don't know why there's

04:36:57 13    not Bates numbers at the bottom, but there's a batch of

04:37:02 14    documents that were inadvertently disclosed.  These

04:37:06 15    documents were in the middle of a discovery dispute we've

04:37:10 16    raised.

04:37:10 17            We've sent a privilege log.  We've raised an

04:37:13 18    attorney-client privilege.

04:37:14 19            THE COURT:  Okay.  All right.  So I'm going

04:37:17 20    to --

04:37:17 21            MR. PASTERNAK:  Your Honor, if I may, I received

04:37:19 22    this document in a subpoena with no privilege designations

04:37:25 23    from Disdero.

04:37:26 24            THE COURT:  Well, apparently that's the reason

04:37:28 25    why you're saying it was sent in error; right?  So I'm not

Chua - Cross

04:37:36 1    going to rule on privilege objections here other than to not

04:37:43 2    put them into the record.  I'm going to accept Mr. Hoopes'

04:37:47 3    representation that there's some kind of discussion going on

04:37:50 4    about this matter, and you shouldn't have to rely on letters

04:37:58 5    from attorneys to make your defense here.  So if you've got

04:38:04 6    something else, go ahead and do that.

04:38:05 7              MR. PASTERNAK:  You can put that aside.

04:38:15 8    BY MR. PASTERNAK:

04:38:19 9    Q.    So New Bamboo and the Zhuanghe Factory have entered

04:38:22 10   into a covenant not to sue under all patents; correct?

04:38:25 11   A.    I'm sorry.  I'm not getting the whole sentence.

04:38:28 12   Q.    New Bamboo and the Zhuanghe Factory have entered into

04:38:32 13   covenants not to sue?

04:38:33 14   A.    Sorry.  New Bamboo and what?

04:38:35 15   Q.    Zhuanghe Factory.

04:38:37 16   A.    I don't understand Zhuanghe.

04:38:42 17   Q.    Zhuanghe?

04:38:43 18   A.    Zhuanghe.

04:38:45 19   Q.    Sorry.

04:38:46 20   A.    Sorry, too.  I just want to get it.

04:38:49 21   Q.    So my question is New Bamboo and the Zhuanghe Factory

04:38:52 22   have entered into a covenant not to sue under all patents;

04:38:56 23   correct?

04:38:56 24   A.    You have a document?  I don't recall immediately from

04:39:01 25   here.

Chua - Cross

04:39:02  1    Q.    You don't recall?

04:39:03  2    A.    I know that there's a contract between two parties,

04:39:07  3    but I do not recall specifically who's on that.  And if you

04:39:11  4    have the document, that would help me a lot.

04:39:14  5    Q.    I understand.  All right.

04:39:18  6          Zhuanghe Factory sells bamboo products to MOSO

04:39:20  7    B.V.; correct?

04:39:21  8    A.    That's what I believe.  Yes.

04:39:26  9    Q.    And Steve Chen is the chairman of the board of the

04:39:29 10    Dasso Group; correct?

04:39:30 11    A.    No, I don't think Steve Chen is a chairman.

04:39:32 12    Q.    What's his title?

04:39:33 13    A.    I believe he's one of the vice presidents.

04:39:35 14    Q.    James Chen is Steve Chen's brother; correct?

04:39:39 15    A.    Yes, that's correct.

04:39:52 16    Q.    Hai Lin is an officer of the Dasso Group; correct?

04:39:54 17    A.    Yes.  It's most specifically for the HDT.

04:40:14 18          MR. PASTERNAK:  Nothing further, Your Honor.

04:40:15 19          THE COURT:  All right, thank you, Mr. Pasternak.

04:40:16 20          Anything further, Mr. Hoopes?

04:40:27 21          MR. HOOPES:  Just briefly, Your Honor.

04:40:31 22          THE COURT:  I hope so.

04:40:43 23          MR. HOOPES:  First of all, Your Honor, I'd like

04:40:44 24    to make sure I tender Plaintiff's 1 through 7.

04:40:50 25          THE COURT:  Okay.  As far as I'm concerned,

Chua - Redirect

04:40:52  1    they're admitted.

04:40:52  2                    REDIRECT EXAMINATION

04:40:53  3    BY MR. HOOPES:

04:40:53  4    Q.      Mr. Chua, in your declaration --

04:41:00  5    A.      Yes.

04:41:15  6    Q.      Do you have your declaration up there in front of

04:41:17  7    you?

04:41:18  8    A.      Yes.  No.

04:41:25  9                    MR. PASTERNAK:  That is at Tab D, Exhibit A.

04:41:29 10    BY MR. HOOPES:

04:41:29 11    Q.      Tab D, Exhibit A.

04:41:31 12    A.      Exhibit A.  That should be -- yes.

04:41:36 13    Q.      If you can turn to Paragraph 39.

04:41:40 14    A.      Yes.

04:41:44 15    Q.      And in Paragraph 39 -- well, did you reference the

04:41:51 16    loss of customers by Easoon because of the creation and

04:41:55 17    operations of MOSO North America?

04:41:57 18    A.      Yes.  I did.

04:42:00 19    Q.      So in your declaration, you do make reference to the

04:42:03 20    loss of customers because of the actions of MOSO; is that a

04:42:07 21    correct statement?

04:42:08 22    A.      Yes, that would be a correct statement.

04:42:11 23    Q.      And is it your testimony before the Court that

04:42:16 24    customers were lost as a direct result of MOSO'S activities

04:42:19 25    and entering into the North American market?

04:42:22 1   A.     Yes, I did, and that's how it is.

04:42:25 2   Q.     And is that not by the terms a loss of market share

04:42:28 3   to lose customers to MOSO?

04:42:31 4   A.     Yes, that's how it is.  Yes.

04:42:34 5            MR. HOOPES:  I have no further questions, Your

04:42:35 6   Honor.

04:42:35 7            THE COURT:  All right.  Thank you.  Mr. Chua,

04:42:37 8   you may step down.

04:42:39 9            Thank you very much.  Watch your step.  Okay.

04:42:41 10           THE WITNESS:  Thank you, Your Honor.

04:42:43 11           THE COURT:  All right.  So I assume that takes

04:42:44 12  care of your fact witnesses?

04:42:46 13           MR. O'ROURKE:  Yes, Your Honor.

04:42:46 14           THE COURT:  All right.  What about you all?

04:42:49 15           MR. PASTERNAK:  Yes, Your Honor.  We have two

04:42:52 16  fact witnesses.  Can we take a two-minute recess?

04:42:54 17           THE COURT:  Sure.

04:42:56 18           COURT CLERK:  All rise.

04:52:56 19           (Recess was taken.)

04:52:56 20           COURT CLERK:  All rise.

04:52:57 21           THE COURT:  Shall we go?  And if I can ask

04:52:59 22  everyone to be seated.

04:53:00 23           Ms. Gentry, how long do you expect your witness

04:53:04 24  to be on direct?

04:53:06 25           MR. PASTERNAK:  Your Honor, we have two.

04:53:07  1   Probably 15 minutes each.

04:53:08  2                THE COURT:  Okay.  Well, let's go then.  Sorry.

04:53:12  3                MR. O'ROURKE:  Before we start, Judge, there was

04:53:13  4   a point in the transcript -- I did raise this issue with

04:53:16  5   Mr. Pasternak during the break -- where Mr. Chua was

04:53:19  6   testifying, and he testified about their profit margin, his

04:53:22  7   profit margin.  That is very highly confidential trade

04:53:26  8   secret information of the plaintiffs.  We want to see if we

04:53:29  9   could get that portion of the transcript designated highly

04:53:33 10   confidential.

04:53:33 11                THE COURT:  Well, you'll be on the record having

04:53:36 12   asked it.  I don't tend to designate things that are said in

04:53:39 13   open court as confidential because they're said in open

04:53:41 14   court.  But it will be a couple months before that

04:53:47 15   transcript becomes public, and you can file papers if you

04:53:50 16   want.

04:53:50 17                MR. O'ROURKE:  Okay.  Thank you, Your Honor.

04:53:51 18                THE COURT:  Okay.  Go ahead, Ms. Gentry.

04:53:54 19                MS. GENTRY:  Defendant would like to call their

04:53:57 20   first witness, fact witness, Rene Zaal.

04:54:00 21                THE COURT:  Okay.

04:54:16 22                COURT CLERK:  Good afternoon.  Do you want to

04:54:17 23   swear or affirm?  Swear uses the Bible basically.  Affirming

04:54:20 24   does not.

04:54:21 25                THE WITNESS:  Affirm.

Zaal - Direct

04:54:22  1          COURT CLERK:  Affirm.  Please state and spell

04:54:24  2     your full name for the record.

04:54:25  3          THE WITNESS:  My name is Rene Zaal.

04:54:28  4          COURT CLERK:  Can you spell that, please?

04:54:29  5          THE WITNESS:  R-E-N-E and Z-A-A-L.

04:54:34  6          Renee Zaal, after having been duly affirmed, was

04:54:43  7     examined and testified as follows:

04:54:43  8          COURT CLERK:  You may have a seat.

04:54:46  9                    DIRECT EXAMINATION

04:54:46 10     BY MS. GENTRY:

04:54:54 11     Q.     Mr. Zaal, please introduce yourself to the Court.

04:54:57 12     A.     My name is Rene Zaal.

04:55:00 13     Q.     Where are you employed, Mr. Zaal?

04:55:02 14     A.     I am employed in MOSO International Company.

04:55:08 15     Q.     How long have you been employed at MOSO

04:55:11 16     International?

04:55:11 17     A.     From the start of the foundation of MOSO

04:55:17 18     International which is in 1997.

04:55:21 19     Q.     And what is your position at MOSO International?

04:55:23 20     A.     My position is, sorry, CEO.

04:55:28 21     Q.     And could you please tell us what MOSO International

04:55:31 22     does?

04:55:32 23     A.     MOSO -- MOSO International specializes in industrial

04:55:40 24     bamboo products, and we buy mainly -- it's several Chinese

04:55:47 25     factories, selling to most European countries and several

Zaal - Direct

04:55:52  1    countries in the world.

04:55:53  2    Q.     And as the CEO of MOSO International, are you

04:55:56  3    familiar with its day-to-day operations, including sales?

04:55:58  4    A.     Yes, I am.

04:56:00  5    Q.     And what is MOSO International's key product?

04:56:05  6    A.     The key products -- well, I would call it family of

04:56:12  7    products is MOSO Bamboo X-Treme.

04:56:20  8    Q.     And why would you call it the key product?

04:56:24  9    A.     Well, my estimation is that at least 50 percent of

04:56:29 10    our turnover in MOSO International.

04:56:32 11    Q.     And what is MOSO NA?

04:56:35 12    A.     MOSO NA is a hundred-percent subsidiary of MOSO

04:56:40 13    International.

04:56:40 14    Q.     And what does MOSO NA do?

04:56:43 15    A.     MOSO NA is responsible for the sales in the USA and

04:56:51 16    Canada markets, and its focus is mainly on sales of MOSO

04:57:01 17    Bamboo X-Treme products which is more or less 98, 97 percent

04:57:06 18    of the turnover.

04:57:08 19    Q.     And what is the relation between MOSO International

04:57:11 20    and MOSO NA?

04:57:12 21    A.     Well, MOSO International is -- is doing the sourcing,

04:57:20 22    purchasing product, developments, arranging -- arranging the

04:57:25 23    production control and shipments to the destination.  And in

04:57:29 24    this case, we will probably bring it to the USA product

04:57:36 25    harbor, and also MOSO NA will import it and distribution of

Zaal - Direct

04:57:41  1   the product.

04:57:42  2   Q.      And what is MOSO NA's key product?

04:57:45  3   A.      MOSO NA's key product is MOSO Bamboo X-Treme.

04:57:50  4   Q.      Okay.  And what type of product is MOSO Bamboo

04:57:54  5   X-Treme?

04:57:54  6   A.      Well, MOSO Bamboo X-Treme is actually a family group

04:57:58  7   of products, so it does all kinds of applications.  There

04:58:06  8   are common similarities between these products, but can be

04:58:10  9   hundreds of products.  Can be decking.  Can be furniture

04:58:14 10   components.  Can be many, many different products.

04:58:18 11   Q.      Is MOSO Bamboo X-Treme a bamboo scrimber product?

04:58:23 12   A.      Yeah, you can characterize it as -- the family as a

04:58:30 13   product based on scrimber technology.  So composed bamboo

04:58:37 14   with an additional heat treatment stage.

04:58:42 15   Q.      Okay.  And do you know how a bamboo scrimber product

04:58:46 16   is made?

04:58:47 17   A.      Yes, I do.

04:58:47 18   Q.      Okay.  Have you prepared a flow chart to assist you

04:58:54 19   with your testimony in the bamboo scrimber market?

04:58:57 20   A.      Yes, I have.

04:58:58 21   Q.      I'm going to demonstrate the flow chart that

04:59:01 22   Zaal prepared.  Could you please explain to the judge how

04:59:06 23   the bamboo scrimber product is made?

04:59:11 24            MR. O'KELLY:  Objection.  Your Honor, he has not

04:59:14 25   been tendered as an expert witness in this instance.

04:59:16   1          THE COURT:  Well, he's the CEO of the company.

04:59:19   2   It's his main product.  Why don't you ask another foundation

04:59:22   3   question, but if he has any basis and knowledge at all, I'm

04:59:27   4   inclined to let him do it.

04:59:27   5   BY MS. GENTRY:

04:59:30   6   Q.     Mr. Zaal, do you have any knowledge about the bamboo

04:59:33   7   scrimber product?

04:59:34   8   A.     Definitely.  This was already available almost in the

04:59:39   9   beginning of MOSO -- MOSO International's establishment and

04:59:44  10   a lot of scrimber products -- produced technology was

04:59:49  11   already there, but produced and developed in the year 2002

04:59:54  12   up until now hundreds of products.  And a little bit later,

04:59:58  13   there was also this additional with heat treatment step in

05:00:04  14   it and to develop X-Treme -- and I've been very strongly

05:00:08  15   involved in the development of all these products and also

05:00:11  16   certainly for Bamboo X-Treme.

05:00:13  17   Q.     Okay.  So based on that, could you please explain to

05:00:18  18   us how the bamboo scrimber product is made?

05:00:21  19   A.     Yeah.  This is a very general project.  Bamboo is

05:00:26  20   very schematic.  Well, basically you use your segment, the

05:00:31  21   culm which is the hollow woody culm.  Then out of these

05:00:37  22   segments, you can cut the second row.

05:00:41  23          The second picture, you see that.  You can cut

05:00:46  24   out the strips.  The strips still have the skin and an inner

05:00:49  25   member.  You have to remove that by the plating process.

Zaal - Direct

05:00:54   1          After that, it goes in the crushing process in

05:00:58   2   order to create more volume, surface volume because for

05:01:03   3   later -- for later, it's important to get better bonding in

05:01:08   4   the scrimber.

05:01:09   5          Then after that, you will create the glue

05:01:17   6   dipping step mostly with phenolic glue.  And then you put it

05:01:24   7   in a mold, so a fixed form, and then you compress it to very

05:01:29   8   high pressure to a scrimber to a beam, or hull, or a board.

05:01:35   9   And from there, you can further develop -- profile it to all

05:01:40  10   kinds of products.

05:01:41  11   Q.     Thank you.  And what are key differences between the

05:01:44  12   general bamboo scrimber product and the MOSO Bamboo X-Treme

05:01:49  13   products?

05:01:49  14   A.     Well, the scrimber product is not specifically for --

05:01:53  15   for outdoor.  It's indoor-outdoor, but in outdoor your

05:01:56  16   circumstances, the material will be exposed to much more

05:02:00  17   different circumstances, humidity, rain, sunshine, snow.  So

05:02:06  18   you need to have product properties.  You can engineer these

05:02:09  19   properties, and actually for -- well, you have a lot in each

05:02:13  20   step.  You can make some changes, but the big change is that

05:02:18  21   you do a heat treatment stage, and that way you can improve

05:02:26  22   durability of the material and the stability of the

05:02:28  23   material.

05:02:29  24          And secondly, you make a lot of changes in your

05:02:33  25   crushing process.

Zaal - Direct

05:02:34  1    Q.      Okay.  And have you prepared a slide illustrating

05:02:38  2    this crushing process?

05:02:39  3    A.      Yes.

05:02:41  4    Q.      Can you explain the crushing process?

05:02:45  5    A.      I can.  How we do it when we -- the crushing process

05:02:51  6    is that you have the strip deskinned and remove the inner

05:02:58  7    membrane.  Include -- then you bring it -- sorry -- more.

05:03:03  8    You add the plate strip and remove member.  Then you bring

05:03:11  9    it on a conveyor belt with the direction of the strip and

05:03:16 10    the fibers of the strip, direction of the motion of the

05:03:21 11    conveyor belt.

05:03:22 12            Then you go -- in the first stage, this is a

05:03:25 13    multi-roller machine, but first stage is you create incision

05:03:30 14    in the material.  And the incisions are separate shop cuts

05:03:37 15    with some distance between the cuts on the width and the

05:03:40 16    length.

05:03:40 17            And then you bring it in a second stage on the

05:03:43 18    machine, the machine line, and you use pressure rollers.

05:03:47 19    Then you compress the material with a certain pressure that

05:03:52 20    you compress it so that you get it controlled while breaking

05:03:56 21    off the strip into fiber bundles.  These fiber bundles are

05:04:01 22    still connected, cross-linked fiber bundles or cross-linked

05:04:08 23    strips about the same to make.

05:04:12 24            And this controlled cracking of the strip is

05:04:15 25    very important.  Not only do you bring more glue surface so

Zaal - Direct

05:04:19  1    that you get -- later get bonding and better quality of

05:04:23  2    scrimber, but you avoid that -- you later, in the pressure,

05:04:28  3    mold pressure process, that there will be additional cracks

05:04:31  4    because these additional cracks will not add any glue on it,

05:04:34  5    and it will make the -- give a lot of defects in your final

05:04:40  6    product.

05:04:40  7           So you have to create a very controlled and,

05:04:44  8    say, cracking strip in fiber forms, connected fiber lengths.

05:04:49  9    Q.    Mr. Zaal, did you bring any demonstratives that could

05:04:53 10    further help you explain this process?

05:04:55 11    A.    I would like to show it because it's much more clear,

05:05:00 12    I think.

05:05:02 13           MS. GENTRY:  Your Honor, may I approach?

05:05:04 14           THE COURT:  Sure.

05:05:10 15    BY MS. GENTRY:

05:05:11 16    Q.    Mr. Zaal, I'm handing you three demonstratives that

05:05:14 17    you brought with you to further explain the crushing

05:05:17 18    process.

05:05:18 19    A.    Where would you like me to start?

05:05:19 20    Q.    Start at the beginning.

05:05:21 21    A.    Okay.  Well, at the beginning.  I have to keep it in

05:05:30 22    or can I take it out?  Well, this is -- this is the incision

05:05:37 23    roller which is the first step to create the more surface

05:05:42 24    and to bring incision.  You see that there are not in a row,

05:05:48 25    and there's a different distance between the incision.  This

Zaal - Direct

05:05:54 1    is the first step.

05:05:58 2            After this one, a pressure roller, which you

05:06:02 3    don't have here.  Then you create this product.  You see --

05:06:07 4    well, this is still connected, and you see that there's

05:06:14 5    fiber bundles.  You can see that a bit more.

05:06:16 6            So the more you crush it like that, the better

05:06:19 7    your product will be in general.  The problem is when you

05:06:24 8    make it too good, then you also lose a lot of fibers.  So

05:06:27 9    that's why you try to find -- but at least you have -- you

05:06:30 10   have to create fiber bundles so to show you a compound of

05:06:35 11   these products.  In this case, it's heat treated.  That's

05:06:37 12   why it's a darker color.

05:06:39 13           So one piece of this is -- this is one fiber

05:06:46 14   bundle.  This is several fiber bundles still connected by

05:06:51 15   fibers.  I can show you, this is a fiber bundle because here

05:06:56 16   are the fibers.  Yeah.  So you see here the fibers are

05:07:00 17   bundled, still connected.  Here, you can see there is

05:07:05 18   separate fibers.

05:07:07 19           So what we do, and this is a little bit

05:07:09 20   different from the past, is that you create these cross

05:07:14 21   connected fiber bundles to make very still easily manageable

05:07:22 22   to deal with product which easily can put in a mold, but

05:07:27 23   with a maximum surface to create a good scrimber.

05:07:30 24   Q.     Thank you, Mr. Zaal.

05:07:31 25           Are most of the Bamboo X-Treme products made in

Zaal - Direct

05:07:36 1   a single factory of MOSO?

05:07:38 2   A.      No.  Can you repeat that?

05:07:40 3   Q.      Are most of the Bamboo X-Treme products made in a

05:07:45 4   single factory?

05:07:46 5   A.      MOSO X-Treme products are made in many factories,

05:07:51 6   probably five, six, seven, ten.

05:07:55 7   Q.      Are all those factories using the same production

05:07:58 8   method?

05:07:58 9   A.      Well, all -- I already told you that you can engineer

05:08:02 10  the products, so you have to see what are you making the

05:08:05 11  product, what kind of interpretation and what circumstances

05:08:09 12  it will be exposed.  So actually, each product, you have to

05:08:14 13  change the parameters with every step.

05:08:18 14          So my answer is they do it all differently.

05:08:22 15  Besides the fact that they can have some different press

05:08:27 16  systems and different, say, base machinery, but generally,

05:08:32 17  it looks the same.  But the first step, there are different

05:08:35 18  parameters.

05:08:37 19  Q.      What will happen to MOSO if the injunction is

05:08:40 20  granted?

05:08:42 21  A.      That would be a very big problem.  I should say

05:08:50 22  actually devastating.  It will -- I told you 97 percent is

05:08:57 23  the fall of MOSO NA.  It will liquidate MOSO NA.  Definitely

05:09:03 24  it will also have a big effect on, let's say, the general

05:09:06 25  investment from MOSO International to this activity.  It

Zaal - Cross

05:09:13  1   probably will also have a serious consequence for, let's

05:09:16  2   say, the labor force at MOSO International.

05:09:19  3              MS. GENTRY:  Thank you, Mr. Zaal.  Nothing

05:09:21  4   further.

05:09:22  5              THE COURT:  Actually, I just have one question.

05:09:24  6   Where is your office?

05:09:27  7              THE WITNESS:  Our office is in Zwaag.  It's

05:09:32  8   around 32 kilometers north of Amsterdam.

05:09:37  9              THE COURT:  Okay.  And --

05:09:38 10              THE WITNESS:  But we have -- sorry.

05:09:39 11              THE COURT:  I was going to say, and did you come

05:09:41 12   from the Netherlands in order to be here today?

05:09:43 13              THE WITNESS:  I come from the Netherlands.  Yes,

05:09:48 14   I arrived two days ago.

05:09:50 15              THE COURT:  Okay.  But basically you came from

05:09:54 16   Europe --

05:09:55 17              THE WITNESS:  Yeah.

05:09:56 18              THE COURT:  -- in order to testify in this

05:09:57 19   hearing?

05:09:57 20              THE WITNESS:  Yeah.

05:09:57 21              THE COURT:  Okay.  Go ahead.

05:10:01 22              MS. GENTRY:  Thank you.

05:10:01 23                   CROSS-EXAMINATION

05:10:09 24   BY MR. O'KELLY:

05:10:09 25   Q.    Good afternoon, Mr. Zaal.  My name is Sean O'Kelly,

Zaal - Cross

05:10:23  1    and I represent the plaintiffs in this case.

05:10:27  2            Mr. Zaal, I'm going to mark as Plaintiff's

05:10:31  3    Exhibit 8 your declaration.  I believe it's in front of you,

05:10:34  4    so I'd like you to refer to it.  So bear with me, if you

05:10:37  5    would.

05:11:11  6            MR. O'KELLY:  May I approach, Your Honor?

05:11:12  7            THE COURT:  Yes.

05:11:20  8            THE WITNESS:  Thank you.

05:11:21  9            MR. O'KELLY:  Sure.

05:11:22 10    BY MR. O'KELLY:

05:11:22 11    Q.    Mr. Zaal, if you would, just take a moment and look

05:11:28 12    through that, and I'll ask you some questions.  Do you

05:11:32 13    recognize that document marked as Plaintiff's 8?

05:11:34 14    A.    I do.

05:11:35 15    Q.    Can you tell me what it is?

05:11:36 16    A.    It's the declaration of Rene Zaal.

05:11:43 17    Q.    Thank you, sir.  I'd like to direct your attention,

05:11:46 18    please, to Paragraph 2 of Plaintiff's 8.  Take a moment, if

05:11:49 19    you would, and read that.

05:11:53 20            Okay.  And I'm really trying to get to a more

05:11:57 21    complete record.  There's a reference in the second

05:11:59 22    paragraph that says, "My degree is in political and

05:12:03 23    organizational science from" that school in Amsterdam; is

05:12:06 24    that correct?

05:12:07 25    A.    That's right.

Zaal - Cross

05:12:08 1   Q.      Okay.  Could you state for the record the name of

05:12:09 2   that school in Amsterdam?

05:12:11 3   A.      The school in Amsterdam which is written here is the

05:12:17 4   Vrige Universiteit Amsterdam.

05:12:18 5   Q.      Thank you.  I want to be sure again that the record

05:12:22 6   is complete.  That's actually not the only degree that you

05:12:25 7   have; isn't that right?

05:12:26 8   A.      I have another degree that's a degree as a sport --

05:12:36 9   PE teacher.

05:12:36 10  Q.      Okay.  And so a gym teacher in sort of American

05:12:40 11  vernacular?

05:12:40 12  A.      Yeah, a long time.

05:12:41 13  Q.      All right.  Thank you, sir.

05:12:42 14          And to be clear, you don't have an engineering

05:12:44 15  degree?

05:12:45 16  A.      No.

05:12:45 17  Q.      Correct?

05:12:47 18  A.      Correct.

05:12:47 19  Q.      You don't have a law degree; isn't that right?

05:12:49 20  A.      No.  Right.

05:12:50 21  Q.      So we don't have double negatives on the record,

05:12:53 22  that's correct that you don't have a law degree?

05:12:55 23  A.      That's right.

05:12:55 24  Q.      Thank you, sir.  So what I'd like to do, if you

05:12:59 25  would, is first before we move beyond that, you would agree

Zaal - Cross

05:13:06  1   with me, wouldn't you, that because you don't have a law

05:13:08  2   degree, you're not qualified to give legal opinions; isn't

05:13:11  3   that right?

05:13:11  4   A.     You're asking my opinion?  I think I stated that on

05:13:17  5   the legal or on the technical.

05:13:19  6          What was the question?

05:13:20  7   Q.     I'll be very clear.  Because you don't have a law

05:13:24  8   degree, you're not qualified to give legal opinions; isn't

05:13:26  9   that correct?

05:13:27 10   A.     That's correct.

05:13:27 11   Q.     Okay.  Thank you.

05:13:28 12          So what I'd like to do then is I'd have you turn

05:13:32 13   to Page 2, particularly Paragraph 4 of your declaration.

05:13:42 14   I'd ask that you take a look at the last sentence of

05:13:45 15   Paragraph 4.  Take a moment and read that, if you would.

05:13:45 16   A.     (Witness reviewing.)

05:13:50 17   Q.     Okay.  In particular, I'm drawing your attention to

05:13:53 18   the last clause that reads, "and such general statements do

05:13:56 19   not establish the existence of a claim element."

05:13:59 20          Do you see that language?

05:14:00 21   A.     Yes, I see that.

05:14:01 22   Q.     Do you agree with me that that is a legal conclusion?

05:14:04 23   A.     Well, it's difficult for me to say.  I think that is

05:14:12 24   a general and proper conclusion based on logic, and I think

05:14:18 25   law school is also based on a lot of logic.

Zaal - Cross

05:14:22  1   Q.      You think a recitation to a claim element and the

05:14:26  2   existence of a claim element is an argument related to logic

05:14:30  3   rather than law; is that correct?

05:14:31  4   A.      It's also -- also related to logic.

05:14:35  5   Q.      Why don't we take a different approach here.  If I

05:14:37  6   were to tell you that that is a legal conclusion, would you

05:14:40  7   agree with me that you're not qualified to make a legal

05:14:43  8   conclusion?

05:14:43  9   A.      I can't answer that.

05:14:52 10   Q.      Okay.  I want to be clear, you already did answer

05:14:54 11   that.  I asked you if you were qualified to be making a

05:14:57 12   legal conclusion.  Your answer was no, I'm not qualified;

05:15:00 13   correct?

05:15:00 14   A.      Yes, but you still can be qualified on legal aspects

05:15:05 15   that you can further qualify.

05:15:08 16   Q.      And that may be an answer to a different question,

05:15:10 17   but not the question I asked.  So sir, what I'd like to do

05:15:15 18   now is turn to Paragraph 6, if you would, of your

05:15:17 19   declaration.

05:15:18 20   A.      Yeah.

05:15:19 21   Q.      I'd like you to look at the second sentence that

05:15:21 22   reads, "These claims cannot be infringed."  Do you see that?

05:15:24 23   A.      Yeah.

05:15:27 24   Q.      Okay.  That's also a legal conclusion, isn't it?

05:15:30 25   A.      Well, content of 16, 17, 18 and 19, and I can judge

Zaal - Cross

05:15:40  1    the content of it.

05:15:42  2    Q.    I'm sorry.  I didn't understand the answer.

05:15:46  3    A.    I know the content, what's written in 16, 17, 18 and

05:15:49  4    19, and I, by experience and knowledge, can make a

05:15:53  5    conclusion about whether this is very, let's say, unlogical

05:16:04  6    content and never existing practice technically.  So I can

05:16:12  7    judge that, I suppose.

05:16:14  8    Q.    Okay.  And again, that may all be true, but my

05:16:16  9    question was:  That is a legal conclusion, is it not?

05:16:23 10          THE COURT:  You know, I'm not sure, Mr. Kelly,

05:16:26 11    that arguing with the witness about what is or is not a

05:16:28 12    legal conclusion -- in the end, that's something you can

05:16:32 13    just tell me, and I'll know whether it is or it isn't.

05:16:35 14          MR. O'KELLY:  Thank you, Your Honor.  Maybe

05:16:36 15    that's the easier way to do this.  Your Honor, I would

05:16:39 16    submit that throughout Mr. Zaal's eight paragraph --

05:16:44 17          THE COURT:  Well, so let's do that later.

05:16:46 18    Mr. Zaal is here.  There's another witness.  Let's try to

05:16:49 19    get through the witnesses.

05:16:50 20          MR. O'KELLY:  Yes, Your Honor.  Yes, indeed.

05:16:54 21    BY MR. O'KELLY:

05:16:54 22    Q.    Mr. Zaal, what I'd like to do is mark as Plaintiff's

05:16:58 23    Exhibit 9.  If you give me just a moment, I'd like to hand

05:17:01 24    that up to you.

05:17:21 25          MR. O'KELLY:  May I approach, Your Honor?

                          Zaal - Cross

05:17:22   1              THE COURT:  Sure.

05:17:25   2              THE WITNESS:  Thank you.

05:17:26   3   BY MR. O'KELLY:

05:17:26   4   Q.    Mr. Zaal, if you could, take a moment and look

05:17:40   5   through Plaintiff's Exhibit 9.  Let me know when you've read

05:17:43   6   through it.

05:17:57   7              Have you read through it?

05:17:57   8   A.    Well, not fully, but I know.  I guess, you want me --

05:18:02   9   to give me time so I can read it?

05:18:04  10   Q.    Why don't we just move things along.  Do you

05:18:06  11   recognize this document?

05:18:07  12   A.    Yes, I do.

05:18:08  13   Q.    Okay.  Can you tell the Court what that is?

05:18:10  14   A.    This is a press release that informs the market that

05:18:21  15   MOSO separates from Dasso Group.

05:18:26  16   Q.    All right.  Excuse me just one minute.

05:18:42  17              All right.  Mr. Zaal, you will agree with me

05:18:44  18   that the document that I handed you that's marked as

05:18:49  19   Plaintiff's 9 is dated November 29th, 2018; correct?

05:18:52  20   A.    That's correct.

05:18:54  21   Q.    Okay.  And if you turn to Page 2 of that exhibit,

05:18:58  22   you'll see at the bottom it references Brett Kelly, CEO of

05:19:04  23   MOSO North America.

05:19:05  24              Do you see that?

05:19:06  25   A.    I see that.

Zaal - Cross

05:19:07 1   Q.    Now, I understood from your testimony earlier that

05:19:12 2   MOSO Bamboo X-Treme products are made in several different

05:19:15 3   factories; is that correct?

05:19:16 4   A.    That's right.

05:19:18 5   Q.    Okay.  I'd like to direct your attention to about

05:19:23 6   halfway down the first paragraph.  I'd like you to find the

05:19:27 7   sentence that starts with, "MOSO will continue the

05:19:29 8   production."

05:19:30 9         Do you see that sentence?

05:19:31 10  A.    Yeah.

05:19:32 11  Q.    Okay.  And for the record, MOSO --

05:19:35 12  A.    Wait.  Wait a second.  That's in the second

05:19:48 13  paragraph?

05:19:49 14  Q.    The first paragraph.

05:19:50 15  A.    Oh, sorry.

05:19:51 16  Q.    Roughly, halfway down.  The sentence that begins

05:19:56 17  with, "MOSO will continue the production."

05:19:58 18  A.    That's right.

05:20:00 19  Q.    Okay.  So to be complete, the language in this

05:20:04 20  paragraph in this sentence reads, "MOSO will continue the

05:20:07 21  production of its MOSO Bamboo X-Treme decking boards

05:20:09 22  unchanged with its traditional production plant."

05:20:12 23        Do you see that sentence?

05:20:13 24  A.    Yes.

05:20:14 25  Q.    Will you agree with me that it refers to one plant,

Zaal - Cross

1    not two plants or several plants?

2    A.    No, I don't agree.

3    Q.    You don't agree?  Can you tell me why it is that the

4    singular word of plant suggests something more than one

5    plant?

6    A.    No.  I already told you this.  The MOSO Bamboo

7    X-Treme products is a family of products.  That's basically

8    hundreds of products.

9          Here, it is mentioned MOSO Bamboo X-Treme

10   decking products.  That is one out of the family of

11   products, so it is not contradiction.

12   Q.    Okay.  So I guess I want to be sure I understand.

13   MOSO's own press release, it says that both the MOSO Bamboo

14   X-Treme decking boards, particularly this production, will

15   be unchanged with its traditional production plant; correct?

16         So it's specifically referring to the X-Treme

17   decking boards and one plant; is that correct?

18   A.    Well, that is -- it's so far correct to hear you say

19   that there is a continuity to produce and to buy the

20   products in the same -- same plant.  And let's say it's

21   95 percent a fact.

22         We have several boards, decking boards, fascia

23   boards, different kinds of products which has a similarity

24   of the decking which we will not buy from, in this case,

25   Swathka (phonetic) which was already, I don't know,

Zaal - Cross

05:21:50 1    identified use, if I'm using the right pronunciation.

05:21:54 2            So that is -- that's a company here we were

05:21:58 3    referring to.  That was the joint venture company of Dasso.

05:22:04 4    And until more or less this period of time, August 2018,

05:22:09 5    Dasso Group was 51 percent owner of that company, and we

05:22:15 6    continued, like we stated, to buy.  Thereafter, they split.

05:22:23 7    Q.     All right.  Sir, I'd ask you to move down to the

05:22:26 8    second paragraph, and in particular, I'd like you to read

05:22:28 9    the first sentence.  Let me know when you've done that.

05:22:31 10   A.     (Witness reviewing.)  Okay.

05:22:36 11   Q.     Okay.  You will agree with me, won't you, that that

05:22:40 12   sentence reads, "In the future, MOSO will manufacture Bamboo

05:22:44 13   X-Treme decking boards in the same sustainably certified

05:22:47 14   quality in the existing production plant"; correct?

05:22:51 15   A.     Yeah, that's correct.

05:22:51 16   Q.     Again, no reference to multiple plants.  No reference

05:22:54 17   to two plants, more than one.  No reference to any of that,

05:22:57 18   just one plant; correct?

05:22:58 19   A.     I'm sorry.  I don't see a contradiction.  We continue

05:23:01 20   to produce in the same plant also in the future, so I think

05:23:06 21   it's a matter of close reading.

05:23:08 22   Q.     I see.  Does MOSO sell anything other than decking in

05:23:12 23   the United States?

05:23:13 24   A.     We do, but a small amount.

05:23:18 25   Q.     What in particular?

Zaal - Redirect

05:23:19  1    A.     It can be furniture blocks.  It can be certain

05:23:24  2    accessories.

05:23:26  3    Q.     I'm sorry.  What was the last part?  I didn't hear

05:23:28  4    you.

05:23:28  5    A.     Accessories.  Smaller components.

05:23:31  6    Q.     Accessories.

05:23:33  7              MR. O'KELLY:  Thank you, sir.  I appreciate it.

05:23:35  8           That's all I have, Your Honor.

05:23:35  9              THE COURT:  Anything further, Ms. Gentry?

05:23:39 10              MS. GENTRY:  Just one question.  Thank you, Your

05:23:39 11    Honor.

05:23:43 12                     REDIRECT EXAMINATION

05:23:43 13    BY MS. GENTRY:

05:23:47 14    Q.     Mr. Zaal, how many years of experience in bamboo

05:23:50 15    production do you have?

05:23:52 16    A.     Well, at least the time that I worked and established

05:23:58 17    MOSO, but even before that from 1994.  So 25 years.

05:24:02 18              MS. GENTRY:  Thank you very much, Mr. Zaal.

05:24:04 19    Nothing further, Your Honor.

05:24:05 20           Thank you.

05:24:06 21              MR. O'KELLY:  Your Honor, I'd just like to move

05:24:08 22    into evidence the exhibits that I handed to Mr. Zaal.

05:24:11 23              THE COURT:  Okay.  That's fine.

05:24:12 24              MR. O'KELLY:  Plaintiff's Exhibits 8 and 9.

05:24:14 25              THE COURT:  I think, Mr. Zaal, you may step

Kelly - Direct

05:24:16 1    down.  Watch your step.  Okay.  And leave them there.

05:24:19 2                   THE WITNESS:  Yeah.  Thank you.

05:24:19 3                   (Plaintiff's Exhibit Nos. P8 and P9 were

05:24:36 4    admitted into evidence.)

05:24:36 5                   MS. GENTRY:  Your Honor, defendants would like

05:24:37 6    to call Mr. Brett Kelly as a fact witness.

05:24:40 7                   THE COURT:  Okay.

05:24:41 8                   MS. GENTRY:  Thank you.

05:24:54 9                   COURT CLERK:  Would you like to swear or affirm?

05:24:56 10                  THE WITNESS:  Swear.

05:24:56 11                  COURT CLERK:  State and spell your name for the

05:24:59 12   record.

05:24:59 13                  THE WITNESS:  Brett Kelly.  B-R-E-T-T K-E-L-L-Y.

05:25:02 14                  COURT CLERK:  Please place your left hand on the

05:25:05 15   Bible and raise your right hand.

05:25:05 16                  Brett Kelly, after having been duly sworn under

05:25:14 17   oath, was examined and testified as follows:

05:25:14 18                  COURT CLERK:  You may take the stand.

05:25:17 19                       DIRECT EXAMINATION

05:25:17 20   BY MS. GENTRY:

05:25:23 21   Q.    Mr. Kelly, please introduce yourself to the Court.

05:25:25 22   A.    My name is Brett Kelly.

05:25:28 23   Q.    Where are you employed, Mr. Kelly?

05:25:30 24   A.    MOSO North America.

05:25:31 25   Q.    And how long have you been employed there?

Kelly - Direct

05:25:33 1   A.      Since its inception in 2017.

05:25:36 2   Q.      What is your position at MOSO NA?

05:25:38 3   A.      CEO.

05:25:40 4   Q.      And what does MOSO NA do?

05:25:42 5   A.      MOSO NA is a subsidiary of MOSO International, and we

05:25:47 6   sell bamboo building products.

05:25:51 7   Q.      As MOSO NA's CEO, are you familiar with MOSO NA's

05:25:54 8   day-to-day operations as to just sales?

05:25:58 9   A.      Yes.

05:25:58 10   Q.      What is MOSO NA's key product?

05:26:02 11   A.      Bamboo X-Treme.

05:26:03 12   Q.      And why is it its key product?

05:26:05 13   A.      The company was set up to move into the exterior

05:26:11 14   building products market.  Based on our experience and it

05:26:14 15   being the primary product of MOSO International, it was the

05:26:17 16   clear choice as the lead when we started MOSO North America.

05:26:22 17   Q.      Where were you employed prior to your employment with

05:26:24 18   MOSO North America?

05:26:26 19   A.      I was an independent contractor for Easoon.

05:26:31 20   Q.      And in what period of time were you an independent

05:26:35 21   contractor for Easoon?

05:26:36 22   A.      I believe 2014 through 2017.

05:26:42 23   Q.      And what was your position at Easoon USA?

05:26:45 24   A.      My position was an independent contractor.  I held

05:26:49 25   titles in the product line of DassoXTR.

Kelly - Direct

05:26:53 1    Q.      And what kind of titles did you hold at Easoon, LLC

05:27:02 2    or Easoon USA, LLC?

05:27:04 3    A.      I was a sales manager.  I think I might have been

05:27:08 4    national sales manager, president.  And then at the end, I

05:27:14 5    was given a title of director of business development for

05:27:18 6    Dasso Group.

05:27:21 7    Q.      Okay.  So did you hold a title of president of

05:27:27 8    Easoon?

05:27:27 9    A.      No.

05:27:29 10   Q.      So what kind of title did you actually hold?

05:27:32 11   A.      There were nomenclature for the business cards to

05:27:36 12   help me open doors as I was leading the sales effort.

05:27:39 13   Q.      Okay.  Were your responsibilities at Easoon strictly

05:27:45 14   sales related?

05:27:46 15   A.      Yes.

05:27:50 16   Q.      So how would you describe your job duties at Easoon

05:27:55 17   USA?

05:27:55 18   A.      Going out to the market, educating the market on the

05:28:00 19   product line, using years of experience in my network in

05:28:07 20   resources to open doors and try to get people to look at

05:28:10 21   that, and along the lines of just being the voice out there

05:28:15 22   selling.

05:28:16 23   Q.      Did you have any managerial responsibility at Easoon?

05:28:21 24   A.      No, I did not.

05:28:21 25   Q.      Did you independently supervise any employees at

Kelly - Direct

05:28:25 1    Easoon?

05:28:25 2    A.    No, I did not.

05:28:26 3    Q.    Were you involved in any financial or planning

05:28:28 4    decisions at Easoon?

05:28:29 5    A.    No, I was not.

05:28:31 6    Q.    Did you advise any of Easoon's officers or directors?

05:28:36 7    A.    I gave opinions on market data, but not a formal

05:28:40 8    advisory position.

05:28:41 9    Q.    Did you hold a position of an officer at Easoon?

05:28:44 10   A.    No, I did not.

05:28:45 11   Q.    Did you hold a position of a director at Easoon?

05:28:47 12   A.    No, I did not.

05:28:49 13   Q.    What are MOSO NA's direct competitors in the U.S.

05:28:53 14   market with respect to the distribution of bamboo flooring?

05:28:57 15   A.    Easoon.

05:29:00 16   Q.    Okay.  And from the inception of MOSO in 2017, how

05:29:07 17   many customers, based on your knowledge, left Easoon and

05:29:12 18   joined MOSO?

05:29:13 19   A.    Three or four.

05:29:17 20   Q.    And when was that?

05:29:18 21   A.    2018 maybe.  I know in 2017, we had sales from common

05:29:28 22   customers, but I would say the bulk, if they would come

05:29:32 23   over, would be 2018.

05:29:34 24   Q.    Okay.  Has any customer, based on your knowledge,

05:29:36 25   left Easoon after the plaintiffs filed their motion for

Kelly - Direct

05:29:40 1    preliminary injunction in November of 2018?

05:29:42 2    A.    Not to the best of my knowledge.

05:29:44 3    Q.    What about the other way around, have any customers

05:29:46 4    left MOSO and joined Easoon?

05:29:49 5    A.    Yes.

05:29:51 6    Q.    How many?

05:29:51 7    A.    One.

05:29:53 8    Q.    Okay.  Was it a big customer?

05:29:55 9    A.    Yes, it was.  It was Disdero Lumber, our distributor

05:29:59 10   in the Pacific Northwest.

05:30:01 11   Q.    Were there customers or are there customers that sell

05:30:04 12   both Easoon and MOSO products?

05:30:05 13   A.    I'm sure there are.  Yes.

05:30:10 14   Q.    Did you enter into a non-compete agreement while you

05:30:14 15   were employed by Easoon?

05:30:15 16   A.    No, I did not.

05:30:18 17   Q.    Is MOSO NA now actively pursuing Easoon's customers?

05:30:22 18   A.    Not that I'm aware of.

05:30:24 19   Q.    What will happen to MOSO if this injunction is

05:30:29 20   granted?

05:30:29 21   A.    It would be -- it would be devastating.  The

05:30:33 22   reputational harm would be very hard to overcome.  Through

05:30:39 23   press releases and messages from Dasso Group, Easoon, MOSO

05:30:44 24   North America has been accused of counterfeiting, and

05:30:48 25   allowing the injunction would almost give credence to that.

81

Kelly - Direct

05:30:53  1    Q.    And what do you think will happen to Easoon after the

05:30:55  2    injunction is granted if the injunction is granted?

05:30:57  3    A.    I think they would suffer, too.

05:31:00  4    Q.    Why do you think so?

05:31:03  5         MR. HOOPES:  Objection, Your Honor.

05:31:05  6    Speculation.

05:31:05  7         THE COURT:  Yeah.  Well, you know, so why

05:31:11  8    doesn't he answer the question.  I reserve the right to

05:31:13  9    strike it because I think there may be some merit to the

05:31:16 10    objection.

05:31:16 11         Go ahead, Mr. Kelly.

05:31:18 12         THE WITNESS:  Certainly our product is warranted

05:31:20 13    for longer, 25 years in the residential market.  Also,

05:31:25 14    worked for 15 years longer in the commercial market.

05:31:28 15    Additionally, we have a certification in one particular

05:31:31 16    market that Easoon does not have that has a lot of value to

05:31:33 17    the state.  Additionally, we were told through distribution

05:31:37 18    customers that representatives --

05:31:39 19         MR. HOOPES:  Objection, Your Honor.  Hearsay.

05:31:41 20         THE COURT:  Well, I think this may have merit,

05:31:43 21    too, but go ahead, Mr. Kelly.

05:31:45 22         THE WITNESS:  Thank you.  That representatives

05:31:47 23    of DassoXTR had informed downstream customers had they not

05:31:52 24    stopped buying product from MOSO that DassoXTR would find a

05:31:58 25    way around and sell to their customers directly.  That kind

Kelly - Direct

05:32:01 1    of conversation, those things in the field means that if we

05:32:06 2    go out of business, our customers won't go to Easoon.  They

05:32:09 3    would stop selling the product, which means less attention

05:32:13 4    in the market and less saleability and bad things.

05:32:13 5    BY MS. GENTRY:

05:32:18 6    Q.    So what will that mean for the market?

05:32:21 7    A.    The market is not comfortable with single-supplier

05:32:25 8    sources in anything.  I think that it's just sloppy, and I

05:32:30 9    don't think that the -- I just don't think our customers

05:32:35 10   will go back over.  I think our customers are our customers.

05:32:38 11   I think Easoon's customers are Easoon's customers.  And I

05:32:41 12   think the market is better with both of us being present.

05:32:45 13   Q.    Are you now actively pursuing any of Easoon's

05:32:47 14   customers?

05:32:48 15   A.    No, I'm not.

05:32:49 16          MS. GENTRY:  Thank you.  Nothing further.

05:32:51 17          THE COURT:  All right.  And just in terms of the

05:32:53 18   two objections, the first one that was followed by a bunch

05:32:58 19   of statements that I do not think were speculative.  They

05:33:01 20   were things he is in a position to know, so I'm not going to

05:33:05 21   strike those.

05:33:06 22          The second one which was sort of the hearsay

05:33:10 23   based, that seemed to me to be too much hearsay based, and

05:33:14 24   so the hearsay statement itself and the direct follow-on, I

05:33:22 25   will strike that and not consider that in making a ruling

Kelly - Cross

05:33:26 1    here.

05:33:26 2                    All right?

05:33:27 3                    MS. GENTRY:  Thank you.

05:33:27 4                    THE COURT:  Go ahead, Mr. Hoopes.

05:33:56 5                    MR. HOOPES:  May I approach the witness, Your

05:33:59 6    Honor?

05:33:59 7                    THE COURT:  Sure.

05:33:59 8                    CROSS-EXAMINATION

05:33:59 9    BY MR. HOOPES:

05:34:00 10   Q.     I'm handing you what's been marked as P10,

05:34:03 11   Plaintiff's Exhibit 10, and I'll represent to you,

05:34:17 12   Mr. Kelly, I'm trying to -- good afternoon.

05:34:20 13   A.     Good afternoon.

05:34:21 14   Q.     As well, we've seen each other many times now?

05:34:23 15   A.     Yes.

05:34:24 16   Q.     It's good to see you.  I'll represent to you that

05:34:27 17   these are the exhibits from the deposition that you took in

05:34:30 18   this case.  If you flip through it real quick, do you have

05:34:36 19   any reason to believe that these are not the deposition

05:34:40 20   exhibits?

05:34:42 21   A.     I believe these are the deposition exhibits.  Yes.

05:34:46 22   Q.     And let me approach you with what I've marked as P11.

05:35:01 23   And do you recognize that?

05:35:02 24   A.     It appears to be the transcript from my deposition.

05:35:07 25   Q.     And this was in, I believe, January 2019, this year?

Kelly - Cross

05:35:11 1    A.      Yes, January 22nd.

05:35:16 2    Q.      And so looking at P10 that I handed to you, the

05:35:24 3    declaration --

05:35:24 4    A.      Yes.

05:35:25 5    Q.      -- first of all, let's look at Paragraph 3, in this

05:35:33 6    paragraph.  And I believe you had testified moments ago that

05:35:38 7    your job duties as the president of DassoXTR were strictly

05:35:44 8    related to sales; is that fair to say?

05:35:46 9    A.      That is correct.

05:35:53 10   Q.      If you look at your declaration or P10, if you turn

05:36:02 11   to what's identified in the bottom, you see those EASOON

05:36:07 12   numbers at the bottom, the Bates numbers?

05:36:10 13   A.      Yes.

05:36:10 14   Q.      If you could turn to EASOON 612.  And again, this was

05:36:19 15   an exhibit that we talked about in your deposition, and this

05:36:22 16   was a copy of your LinkedIn page.  Do you recall that?

05:36:26 17   A.      Yes.

05:36:29 18   Q.      And if you'll look at the second page of your

05:36:32 19   LinkedIn page, it identifies at least two different

05:36:37 20   positions that you held with DassoXTR or Dasso USA from the

05:36:43 21   time that you were with Easoon; is that correct?

05:36:46 22   A.      That would be correct.  Yes.

05:36:48 23   Q.      Okay.  And the very first position, so if you go down

05:36:53 24   to the bottom one, because I guess they're in order.  So the

05:36:57 25   bottom one is -- it says December 2012 to January 2017.  And

Kelly - Cross

05:37:03 1    I believe in your deposition, you corrected that and said

05:37:05 2    that that was an error.  It shouldn't have been in 2012.

05:37:09 3         Correct?

05:37:09 4    A.    That is correct.

05:37:10 5    Q.    And you were in the courtroom earlier when Mr. Chua

05:37:15 6    was testifying, and he was testifying concerning the time

05:37:19 7    that you started employment or being engaged by Easoon being

05:37:24 8    2013.  Do you recall that?

05:37:26 9    A.    Yes, that is correct.

05:37:28 10   Q.    Okay.  So between 2013 and 2017, is it okay to

05:37:34 11   assume, based on your LinkedIn page, that you held the title

05:37:38 12   of president of DassoXTR?

05:37:40 13   A.    Sure.

05:37:41 14   Q.    Okay.  And in fact, your testimony earlier is you

05:37:46 15   were strictly just sales related.  And I believe your

05:37:51 16   testimony was you were just an independent contractor.  You

05:37:54 17   had no reporting.  You had nobody under you.  You didn't

05:37:57 18   manage anybody.

05:38:00 19        Can you read the description there under the

05:38:03 20   president of DassoXTR for four years?

05:38:06 21   A.    Sure.  "Introducing DassoXTR Fused Bamboo to the

05:38:11 22   North American market, Americanization of marketing and

05:38:14 23   website materials.  Develop sales staff and training

05:38:17 24   materials, implement warehouses and inventory management

05:38:20 25   systems.  Develop commercial business through specification.

Kelly - Cross

05:38:24  1          Introduction of the product has also led to the

05:38:29  2     contract for developing North American market for Carver

05:38:32  3     finishes in Italy.

05:38:33  4          Developing sales distribution in Mexico, Canada

05:38:33  5     and Australia have been added to responsibility for

05:38:33  6     DassoXTR."

05:38:36  7     Q.   And then going up to the "Director of New Business

05:38:41  8     Development" for Easoon through Dasso USA, this is your

05:38:45  9     LinkedIn page.  It says that you held a position from

05:38:48 10     January 2017 to June 2017.

05:38:51 11          Is that correct?

05:38:51 12     A.   That is correct.

05:38:53 13     Q.   Okay.  And can you read what you've put on your

05:38:55 14     LinkedIn page as far as your description?

05:38:57 15     A.   Sure.  "Head Business Development efforts for all of

05:39:00 16     Dasso Group's products and services in North America.  Areas

05:39:04 17     of concentration will be in office and home furnishings,

05:39:06 18     housewares container and truck flooring, as well as

05:39:12 19     expanding current DassoXTR customer base."

05:39:13 20     Q.   And so during this time period and looking at what's

05:39:17 21     on your LinkedIn page, is it your testimony that you were

05:39:22 22     strictly just an outside sales guy, or were you more of an

05:39:25 23     integral part of introducing and growing the DassoXTR

05:39:31 24     product in the U.S. for Easoon?

05:39:33 25     A.   I was an integral part of growing Dasso as an outside

Kelly - Cross

05:39:37 1    sales rep.

05:39:43 2    Q.    And so what type of services did you provide in

05:39:48 3    developing, integrating, introducing, and growing the

05:39:52 4    DassoXTR product in the U.S.?

05:39:54 5    A.    I'm sorry.  I don't understand what you're asking me.

05:39:57 6    Q.    What did your services entail when you were in there

05:40:00 7    between 2013 to June 2017?  What were the types of services

05:40:06 8    that you provided to introduce, Americanize, integrate, and

05:40:13 9    grow the DassoXTR brand in the United States for Easoon?

05:40:16 10   A.    I was trained in the product, given some background

05:40:20 11   knowledge, and then I used my 25 years of network as an

05:40:24 12   industry rep to go out and present it to people in my

05:40:27 13   network.  Americanization-wise, I changed it from

05:40:30 14   millimeters to inches.  I gave recommendations on

05:40:34 15   nomenclature.

05:40:35 16   Q.    Okay.  And so during the time that you were there for

05:40:39 17   DassoXTR for four and a half -- well, let's say four years;

05:40:43 18   is that fair?

05:40:44 19   A.    Yeah.

05:40:44 20   Q.    Okay.  What were the sales overall every year; do you

05:40:50 21   recall?  Were the sales increasing?

05:40:52 22   A.    I believe so.  I never had access to sales data.

05:40:57 23   Q.    Okay.  So you're the president of DassoXTR, and

05:41:03 24   you're the sales guy, but you're saying that you never had

05:41:07 25   access to sales data?

Kelly - Cross

05:41:08 1    A.      I'm saying I was an independent contractor

05:41:11 2    responsible for sales and did not have access to sales data.

05:41:14 3    I had a title of president which had nothing that went with

05:41:18 4    it.

05:41:22 5    Q.      So how is it that you're the president of DassoXTR --

05:41:26 6    A.      That's -- DassoXTR is not a company.

05:41:29 7    Q.      Can I finish --

05:41:30 8    A.      Sorry.

05:41:31 9    Q.      So how is it that you're in charge of the DassoXTR

05:41:35 10   sales for four years, you identify yourself on LinkedIn as

05:41:40 11   the president of DassoXTR and the director of new business

05:41:45 12   development, but yet you never have any access to any of the

05:41:50 13   sales data?

05:41:51 14   A.      That is correct.

05:41:53 15   Q.      Okay.  Did you ever ask for the sales data?

05:41:58 16   A.      No.

05:42:15 17   Q.      In Paragraph 4, going back to your declaration, you

05:42:20 18   say Easoon's customer list was stored in a customer database

05:42:24 19   owned by TW Flooring Group, and that TW Flooring Group

05:42:28 20   shared that database with Easoon and other companies.

05:42:31 21           Do you see that?

05:42:31 22   A.      Yes.

05:42:35 23   Q.      And do you recall during your deposition we discussed

05:42:38 24   a software database called Zoho?

05:42:43 25   A.      Yes.

Kelly - Cross

05:42:44  1    Q.      And can you tell the Court what Zoho is?

05:42:46  2    A.      It's a database.

05:42:50  3    Q.      Okay.  Is it a database of customers -- of sales of

05:42:54  4    perspective customer opportunities?

05:42:56  5    A.      Database of perspective customers.

05:43:01  6    Q.      Okay.  And that was maintained by TW Flooring Group?

05:43:04  7    A.      Yes, that is correct.

05:43:06  8    Q.      Okay.  In the declaration in Paragraph 4, you were

05:43:11  9    saying that Easoon's customer list was stored in a customer

05:43:15 10    database owned by TW Flooring Group?

05:43:18 11    A.      Yes.

05:43:18 12    Q.      Was that their existing customers or their

05:43:20 13    perspective customers through the Zoho?

05:43:22 14    A.      That was perspective.

05:43:24 15    Q.      Okay.  So if they are perspective customers, they're

05:43:29 16    not customers at the time; correct?

05:43:31 17    A.      Correct.

05:43:32 18    Q.      So your declaration that you're saying that Easoon's

05:43:34 19    customers list was stored in a customer database owned by TW

05:43:40 20    Flooring Group and shared with other companies, that wasn't

05:43:42 21    Easoon's existing customers; correct?

05:43:43 22    A.      I don't know how many of them would have -- were

05:43:47 23    Easoon's existing customers or not.

05:43:49 24    Q.      Okay.  But your testimony just a moment ago was that

05:43:52 25    the Zoho database was perspective customers; correct?

Kelly - Cross

05:43:56 1    A.      Correct.  Yes.

05:43:57 2    Q.      Okay.  So but your declaration doesn't say Easoon's

05:44:00 3    perspective customers, it specifically says Easoon's

05:44:03 4    customer list was stored by, you know, TW Flooring Group and

05:44:09 5    then shared with other companies.  So that's not necessarily

05:44:12 6    a true statement, would you agree?

05:44:13 7    A.      Which one?

05:44:15 8    Q.      The representation that you've made to the Court in

05:44:18 9    your declaration that Easoon's customer list was stored in a

05:44:22 10   customer database owned by TW Flooring Group and shared with

05:44:26 11   Easoon and other companies?

05:44:27 12   A.      You're right.  I should have said perspective

05:44:29 13   customer base.

05:44:33 14   Q.      In Paragraph 5 of your declaration, you put "Easoon's

05:44:37 15   price list was widely known between its contractors and

05:44:41 16   customers through publicly available price sheets."

05:44:44 17           Do you see that?

05:44:45 18   A.      Yes.

05:44:47 19   Q.      Is it your testimony that these publicly-available

05:44:51 20   price sheets represented Easoon's fixed pricing?

05:44:54 21   A.      I have -- I don't understand what you mean by fixed

05:45:00 22   pricing.  I said Easoon's price lists were widely known

05:45:04 23   through its contract customer base and publicly available

05:45:08 24   from price branches.  I don't understand what you mean by

05:45:10 25   fixed.

91

Kelly - Cross

05:45:12  1    Q.      Fair enough.  Those price sheets that are publicly

05:45:14  2    available and known to contractors and customers, is that

05:45:19  3    actually the final end price that's negotiated with a

05:45:22  4    customer to get their business?

05:45:24  5    A.      I have no idea.  I have no idea.

05:45:38  6    Q.      Okay.  Turn to P11, your deposition transcript.  If

05:45:50  7    you can look at -- it's probably easier to look at the Bates

05:45:53  8    number, EASOON 581, and it's Page 53 of your deposition

05:46:05  9    transcript.

05:46:05 10    A.      Okay.

05:46:08 11    Q.      Are you there?

05:46:08 12    A.      Yes.

05:46:17 13    Q.      So I asked you in your deposition starting on Line 9,

05:46:21 14    I said, "Okay.  So were there times that you had to contact

05:46:24 15    a customer who had the price list, but then negotiate a

05:46:29 16    better price in order to win the business or the project?"

05:46:31 17    A.      Oh, I'm sorry, yes.

05:46:33 18    Q.      Yes?

05:46:33 19    A.      Yes.  I didn't understand the way you asked the

05:46:36 20    question the first time.

05:46:37 21    Q.      Okay.  And so --

05:46:38 22    A.      You're referring to price page --

05:46:39 23    Q.      So your answer was, "Oh, I'm sure there were."  Okay.

05:46:44 24            MS. GENTRY:  Objection, Your Honor.  Improper

05:46:47 25    impeachment.

Kelly - Cross

05:46:48  1          THE COURT:  I'm not sure this is actually

05:46:50  2   impeachment at this point, so much as trying to draw out

05:46:55  3   testimony.  But if it is impeachment, I don't think it's

05:47:01  4   improper.  So go ahead.

05:47:03  5   BY MR. HOOPES:

05:47:03  6   Q.    Okay.  So you admitted in your deposition that there

05:47:07  7   were actually times where, yes, that the end price would be

05:47:12  8   a negotiated price that wasn't the generally circulated or

05:47:17  9   known customer price sheet?

05:47:20 10   A.    Yes.

05:47:21 11   Q.    Okay.  But in your declaration, under five,

05:47:29 12   Paragraph 5, you put "Easoon's price list was widely known

05:47:34 13   between its contractors and customers through publicly

05:47:38 14   available price sheets."

05:47:39 15          Do you recall?

05:47:39 16   A.    Yes.

05:47:39 17   Q.    At no point in your declaration did you say, however,

05:47:42 18   that wasn't actually the end result of the negotiated deal,

05:47:47 19   those were just general price sheets that were circulated;

05:47:51 20   correct?

05:47:51 21   A.    Yes.

05:47:54 22   Q.    Under Paragraph 7, do you recall in May of 2017 where

05:48:05 23   you had a scheduled trip to China to meet with Easoon's

05:48:11 24   customers over in China?

05:48:12 25   A.    Yes.

93

Kelly - Cross

05:48:16  1   Q.     In Paragraph 7 of your declaration, you say, "Easoon

05:48:19  2   did not pay my expenses to fly to the Netherlands as part of

05:48:23  3   a trip to China in 2017."

05:48:26  4          Do you see that?

05:48:27  5   A.     Yes.

05:48:27  6   Q.     And is that a true statement?

05:48:28  7   A.     Yes, it is.

05:48:29  8   Q.     In fact, that's a very true statement; correct?

05:48:32  9   A.     Yes.

05:48:32 10   Q.     Okay.  And during your deposition when we discussed

05:48:37 11   this, who was it that actually paid for your trip to go from

05:48:40 12   the U.S. to the Netherlands and then from the Netherlands to

05:48:45 13   China?

05:48:45 14   A.     MOSO North America or MOSO International.

05:48:49 15   Q.     MOSO International.  And in your deposition, I had

05:48:51 16   asked you if you had told Avery or anybody at Easoon that

05:48:57 17   you were stopping by the Netherlands to meet with MOSO at

05:49:02 18   their international headquarters.

05:49:03 19          Do you recall that?

05:49:04 20   A.     I do.

05:49:04 21   Q.     And did you tell Avery, or Easoon, or anybody that

05:49:07 22   you were stopping by MOSO B.V.'s international headquarters?

05:49:12 23   A.     No.

05:49:13 24   Q.     And in fact, were you there to discuss MOSO and

05:49:18 25   Easoon?  Since you were still the president of DassoXTR and

Kelly - Cross

05:49:22  1    under contract with Easoon, were you there to discuss a

05:49:25  2    joint business or perspective business between Easoon and

05:49:28  3    MOSO?

05:49:28  4    A.    No, and I was not the president of DassoXTR when I

05:49:34  5    was there.  I was doing development for Dasso Group.

05:49:36  6    Q.    New business development?

05:49:38  7    A.    For Dasso Group.

05:49:39  8    Q.    For Dasso Group?

05:49:40  9    A.    In China, yes.

05:49:41 10    Q.    Okay.  Where does it say Dasso Group?  Your LinkedIn

05:49:47 11    page says Dasso USA.

05:49:48 12    A.    I was always told they were -- we were all part of

05:49:52 13    Dasso Group.  In my LinkedIn description, I write Dasso

05:49:55 14    Group.

05:49:55 15    Q.    But you don't write Dasso Group in LinkedIn, do you?

05:49:58 16    A.    Dasso Group doesn't have a LinkedIn.  Dasso USA at

05:50:01 17    the time.

05:50:02 18    Q.    I'm talking about your LinkedIn page.

05:50:03 19    A.    Right.  And I'm telling you why.

05:50:06 20    Q.    Right.  But all I'm asking is:  You didn't say Dasso

05:50:10 21    Group, that you're the new business developer?

05:50:12 22    A.    I did.

05:50:12 23    Q.    Correct?

05:50:13 24    A.    If you go down through the description, it says I

05:50:15 25    have business for Dasso Group.

Kelly - Cross

05:50:17 1  Q.     And you list your title, though, director of new

05:50:20 2  business development directly under that Dasso USA; correct?

05:50:24 3  A.     Yes.

05:50:25 4  Q.     Okay.

05:50:26 5  A.     And then I say below head of business development,

05:50:30 6  efforts for all of Dasso Group's products.  Yes, to -- so

05:50:33 7  Dasso Group.

05:50:33 8  Q.     Not Dasso Group.  You identified it as Dasso USA

05:50:36 9  under your title; correct?

05:50:37 10  A.     Okay.  I identified it as Dasso USA.

05:50:39 11  Q.     Okay.  And during your deposition, I asked you on

05:50:46 12  Page 62 and Page 63 -- if you'll turn to that, I asked you

05:51:03 13  if you informed Avery and Easoon that you were going over

05:51:16 14  there.  You said, no, just as you testified.

05:51:18 15         And then I asked you:  Would you have told Avery

05:51:22 16  about conversations with MOSO about any type of a business

05:51:26 17  opportunity?  And on 63, your answer was, "Probably not."

05:51:31 18         Do you recall that?

05:51:31 19  A.     Yeah.

05:51:34 20  Q.     And I asked you, "Okay.  Why would you have kept that

05:51:37 21  from Avery?"

05:51:38 22         And what was your answer?

05:51:39 23  A.     I'm trying to find that in the exchange.

05:51:42 24  Q.     Page 63, Line 9.

05:51:45 25  A.     "I don't know."

Kelly - Cross

05:51:48  1    Q.      That was your answer?

05:51:49  2    A.      Yeah.

05:51:49  3    Q.      Why would you have kept that from Avery?  You're

05:51:52  4    there.  You're under contract with Easoon?

05:51:56  5    A.      I'm on my own time.  I believe I took the days off.

05:51:59  6    I filed for those three days off in vacation time before I

05:52:02  7    went to China.

05:52:02  8    Q.      But you're under contract at the time?

05:52:04  9    A.      But I'm not under contract 24-7.

05:52:07 10    Q.      Sir, you're under contract with Easoon at the time, a

05:52:12 11    full-time position to help generate sales, develop business

05:52:20 12    opportunities.  And when you were asked if you would have

05:52:25 13    told Avery about going there, you said "Probably not."

05:52:28 14    A.      Yes.

05:52:28 15    Q.      Correct?

05:52:29 16    A.      Correct.

05:52:31 17    Q.      And when did you leave your contracted agreement with

05:52:35 18    Easoon?  Do you recall when?

05:52:37 19    A.      The end of May, first of June, I believe.

05:52:39 20    Q.      June 14th?

05:52:40 21    A.      June 14th.  Okay.

05:52:45 22    Q.      And again, this was in May 2017; correct?

05:52:48 23    A.      What was in May?

05:52:50 24    Q.      The trip.

05:52:51 25    A.      The trip?

Kelly - Cross

05:52:52  1    Q.      2017?

05:52:53  2    A.      Yes.

05:52:53  3    Q.      In fact, if you go to EASOON 615 on P10, you identify

05:53:14  4    yourself as being in Zwaag, Netherlands on May 5th in a

05:53:19  5    Facebook post; right?

05:53:21  6    A.      Yes.

05:53:31  7    Q.      Let's go to Paragraph 9 of your declaration.  You

05:53:40  8    say, "MOSO North American recently lost the business for

05:53:43  9    selling bamboo products to Disdero Lumber company to Easoon,

05:53:47 10    USA, LLC in the amount of approximately $400,000."

05:53:51 11            Do you see that?

05:53:51 12    A.      Yes.

05:53:52 13    Q.      Anywhere in your declaration do you say, but this is

05:53:56 14    a customer that I took from Easoon when I left and started

05:54:01 15    up MOSO as the president of MOSO North America?

05:54:05 16    A.      No.

05:54:07 17    Q.      And so when you say that you recently lost the

05:54:10 18    business, is it your understanding that Disdero went back to

05:54:14 19    Easoon?

05:54:14 20    A.      Yes.

05:54:16 21    Q.      And so this lost business opportunity was, in fact, a

05:54:20 22    business opportunity that you took away from Easoon?

05:54:23 23    A.      Okay.

05:54:24 24    Q.      Correct?

05:54:25 25    A.      I have -- I had the business, and then I lost the

Kelly - Cross

05:54:28  1    business.  Yes.

05:54:32  2    Q.      In Paragraph 10, you say, "If the Court were to grant

05:54:36  3    Dasso's motion for preliminary injunction and stop MOSO from

05:54:39  4    selling Bamboo X-Treme in the United States, that would be

05:54:43  5    the end of the company."

05:54:45  6            Do you recall that?

05:54:45  7    A.      Yes.

05:54:46  8    Q.      Is that a true statement?

05:54:47  9    A.      I believe so.  Yes.

05:54:49  10   Q.      Okay.  Do you recall in your deposition discussing or

05:54:54  11   testifying concerning the percent of business that MOSO

05:54:59  12   North America does in the U.S. and in Canada?

05:55:01  13   A.      That is correct.

05:55:03  14   Q.      And what do you recall that percent that you told me

05:55:05  15   of sales -- and this is just in January of this year -- what

05:55:09  16   percent of sales between the United States and Canada?

05:55:11  17   A.      For 2018, it was 60-40.

05:55:15  18   Q.      64-40?

05:55:16  19   A.      (Witness nods head.)

05:55:17  20   Q.      And so if the Court grants a preliminary injunction,

05:55:20  21   you still maintain 40 percent of your DassoXTR sales up in

05:55:25  22   Canada; correct?

05:55:25  23   A.      I don't have DassoXTR sales.

05:55:27  24   Q.      You're right, MOSO Bamboo X-Treme sales.

05:55:32  25   Forty percent of the company can continue to do business up

Kelly - Cross

05:55:36 1    in Canada; right?

05:55:37 2    A.    You asked me about results from 2018 in the

05:55:39 3    deposition.  As of 2019, we have done zero business in

05:55:42 4    Canada.

05:55:43 5    Q.    Well, we can look at it.  So Page 85 of your

05:55:51 6    deposition transcript.

05:55:52 7    A.    Yes.

05:55:53 8    Q.    So do you have it in front of you?

05:55:59 9    A.    Yes.

05:56:02 10   Q.    And this is January of 2019.

05:56:04 11   A.    Yes, so we just closed books from 2018.

05:56:07 12   Q.    Okay.  And I asked you on Line 9, "And what percent

05:56:13 13   of the product can you estimate goes to the U.S. market and

05:56:16 14   what percent goes to the Canadian market?"

05:56:20 15            Correct?  Do you see that?

05:56:20 16   A.    Yes.

05:56:22 17   Q.    What was your answer?

05:56:23 18   A.    "Maybe 60/40."

05:56:25 19   Q.    U.S. to Canada?

05:56:26 20   A.    Yes.

05:56:27 21   Q.    So this was six months ago?

05:56:28 22   A.    Yes.

05:56:29 23   Q.    Okay.  And if the Court enters an injunction, there's

05:56:33 24   nothing that stops you from going all over Canada and trying

05:56:37 25   to get sales of MOSO Bamboo X-Treme; correct?

Kelly - Cross

05:56:40  1   A.      No.

05:56:42  2   Q.      In fact, MOSO Bamboo X-Treme is not the only product

05:56:47  3   that MOSO North America sells; correct?

05:56:49  4   A.      Correct.

05:56:52  5   Q.      In fact, you testified in your deposition that MOSO

05:56:55  6   North America also does sales of flooring to TW Flooring

05:57:00  7   Group; correct?

05:57:00  8   A.      That's correct.

05:57:01  9   Q.      It's on Page 84 of your deposition.  And so in

05:57:05 10   addition to MOSO Bamboo X-Treme up in Canada being able and

05:57:08 11   no limitations up there, you also are in the business of

05:57:13 12   selling other products to other customers in the U.S.?

05:57:17 13   A.      But that's -- it's a minimal part of our sales.  It's

05:57:20 14   not enough to sustain the company.

05:57:25 15   Q.      Okay.  My question -- what I'm getting at is:

05:57:28 16   There's nothing that stops you from actively pursuing

05:57:31 17   customers and sales opportunities up in Canada; correct?

05:57:34 18   A.      Correct.

05:57:35 19   Q.      And there's nothing that would prevent you from

05:57:37 20   selling other types of products.  Mr. Zaal testified that

05:57:40 21   there's dozens of products in up to ten factories being

05:57:48 22   produced all the over the place.  They have this huge

05:57:50 23   product line.

05:57:50 24          There's nothing that would stop you from selling

05:57:52 25   those other products to customers in the United States;

Kelly - Cross

05:57:55 1   correct?

05:57:56 2   A.      No.

05:58:02 3   Q.      In Paragraph 11, you make a statement that you say,

05:58:07 4   "Granting the preliminary injunction might also mean the

05:58:10 5   death knell for Easoon.  Customers would not go back to

05:58:14 6   Easoon, but rather would stop selling the category."

05:58:16 7            Do you see that?

05:58:17 8   A.      Yes.

05:58:25 9   Q.      When I asked you about that on Page 87 of your

05:58:28 10  deposition, I asked you what you were basing that statement

05:58:32 11  on.

05:58:34 12            THE COURT:  Didn't we already hear that here?

05:58:36 13            THE WITNESS:  Yeah.

05:58:42 14            THE COURT:  Didn't you ask me to strike it?

05:58:44 15  Maybe not you, but somebody did.

05:58:46 16            MS. GENTRY:  Yes.

05:58:47 17            MR. HOOPES:  No, my question is:  What are you

05:58:49 18  basing that statement in your declaration on?

05:58:52 19            THE COURT:  Okay.

05:58:53 20            MR. HOOPES:  Is it personal experience, or does

05:58:54 21  he have any other information or knowledge specifically out

05:58:57 22  there concerning that statement in his declaration?

05:59:01 23            THE WITNESS:  I did.  I gave that answer to Eve.

05:59:01 24  BY MR. HOOPES:

05:59:04 25  Q.      Okay.  Correct.

Kelly - Cross

05:59:04 1          When I asked you in your deposition, your

05:59:09 2   response on Page 88 of your deposition was, well -- and we

05:59:14 3   were talking about Disdero.

05:59:17 4   A.    Okay.

05:59:18 5   Q.    And I said, What evidence do you have concerning that

05:59:22 6   statement, and you said, "it's my opinion based on

05:59:25 7   experience and the circumstances."

05:59:27 8          Correct?

05:59:27 9   A.    Page 88?

05:59:30 10  Q.    Yeah, top of Page 88.  Actually if you go to the top

05:59:34 11  of Page 87, I specifically asked you what you were basing

05:59:38 12  the statement on at the end of 86, top of Page 87.

05:59:41 13  A.    Yes, but I said, It's my opinion based on experience

05:59:43 14  and circumstances.

05:59:45 15  Q.    Right.  So I asked specifically -- I said what are

05:59:48 16  you basing the statement from in Paragraph 11, and your

05:59:52 17  answer was "my experience and my opinion in the industry."

05:59:56 18  A.    And I gave more detail to that.

05:59:58 19  Q.    Correct.  I'm asking you about the deposition.

06:00:00 20  A.    Okay.  I don't remember the deposition.  It was six

06:00:03 21  months ago.

06:00:04 22  Q.    Okay.  Well, that's why we have it in front of us.

06:00:06 23  A.    Okay.

06:00:06 24  Q.    I specifically asked you about Paragraph 11.  I said,

06:00:10 25  "Where are you basing this statement from?"  And what --

Kelly - Cross

06:00:12 1    A.    I answered that.

06:00:13 2    Q.    What was the answer at the top of 87?

06:00:16 3    A.    My answer at the top of 87?  Okay.  Eighty-seven or

06:00:20 4    88?

06:00:21 5    Q.    Eighty-seven, very top line, 1 and 2?

06:00:23 6    A.    "My experience and my opinion is in the industry."

06:00:26 7    Q.    Correct.  And at no point then did you provide

06:00:30 8    additional information, evidence, anything else.  You just

06:00:33 9    said I'm basing Paragraph 11 on my experience and my opinion

06:00:38 10   in the industry; correct?

06:00:40 11   A.    I wasn't asked for anything else.

06:00:43 12   Q.    Okay.  All right.  We'll move on.

06:00:46 13             THE COURT:  So Mr. Hoopes, let's move to an end

06:00:48 14   here.

06:00:49 15             MR. HOOPES:  That's where I'm at, Your Honor.

06:00:54 16   BY MR. HOOPES:

06:00:54 17   Q.    Do you recall when this declaration was given?  If

06:00:57 18   you go to EASOON 611.

06:01:03 19   A.    Yes.

06:01:04 20   Q.    And what is the date?

06:01:05 21   A.    12/11/18.

06:01:07 22   Q.    December 11th, 2018; correct?

06:01:09 23   A.    Yes.

06:01:10 24   Q.    And you made a representation in this declaration

06:01:14 25   that customers would not go back to Easoon; correct?

Kelly - Cross

06:01:17  1    A.      Correct.

06:01:19  2    Q.      However, you testified in your deposition, and you

06:01:25  3    said it here today that Disdero went back to Easoon;

06:01:30  4    correct?

06:01:31  5    A.      Yes.

06:01:32  6    Q.      Okay.  And so I asked you, so prior to Disdero going

06:01:37  7    back to Easoon, your understanding was if MOSO was stopped

06:01:41  8    by the Court from selling the product, that Disdero wouldn't

06:01:43  9    go back to Easoon; correct?

06:01:47  10           When did Disdero leave and go back to Easoon; do

06:01:50  11   you remember?

06:01:50  12   A.      Before -- this statement was before the declaration.

06:01:59  13   Q.      Okay.  And the declaration was December; correct?

06:02:00  14   A.      Yes.  We were informed in November.

06:02:09  15   Q.      Okay.  So you are already informed in November that

06:02:12  16   Disdero was switching and going back to Easoon; correct?

06:02:15  17   A.      Correct, which I covered in my statement.

06:02:17  18   Q.      Okay.  In your statement, though, you say if the

06:02:21  19   Court -- that customers would not go back to Easoon, but

06:02:25  20   rather stop selling the category completely; correct?

06:02:28  21   A.      Yes.

06:02:29  22   Q.      However, just a month prior, one of your biggest

06:02:32  23   customers actually did, in fact, go back to Easoon; correct?

06:02:35  24   A.      Correct.

06:02:36  25   Q.      So are you basing this on the rest of the customers?

Kelly - Cross

06:02:41  1    A.      Yeah.  I never said all of the customers wouldn't go

06:02:44  2    back.  I said customers, so yeah, I'm basing it on the rest

06:02:48  3    of them.

06:02:48  4    Q.      Okay.  And no reference there, though, except

06:02:53  5    Disdero; correct?

06:02:54  6    A.      Except for -- you've totally lost me.

06:02:59  7    Q.      There's no reference in Paragraph 11 to Disdero

06:03:01  8    having left and having switched back to Easoon just a month

06:03:05  9    prior; correct?

06:03:05 10    A.      No, right.

06:03:11 11    Q.      In your testimony --

06:03:12 12            MR. HOOPES:  This is my last question, Your

06:03:12 13    Honor.

06:03:12 14    BY MR. HOOPES:

06:03:13 15    Q.      In your testimony, you were specifically asked how

06:03:20 16    many customers left and went with you to MOSO; correct?

06:03:23 17    A.      Yes.

06:03:24 18    Q.      And do you recall what you told the Court?

06:03:27 19    A.      A handful.

06:03:28 20    Q.      Three or four --

06:03:29 21    A.      Yeah.

06:03:29 22    Q.      -- was your testimony; correct?  If you pull up

06:03:39 23    Page 66 of your deposition testimony, 65 and 66.  And 65, I

06:03:54 24    asked you, "How many customers do you recall that left

06:03:56 25    Easoon and went with MOSO?"  And you responded, and you

Kelly - Cross

06:04:01  1    asked me, "How many?"

06:04:02  2             "Yes.  And you can estimate.  I'm not asking for

06:04:04  3    a specific."

06:04:06  4             And your answer in 66, "I honestly, you know

06:04:10  5    somewhere around ten" --

06:04:12  6    A.    I said --

06:04:13  7    Q.    -- "north or south of it."

06:04:15  8    A.    Let's see.  I honestly, you know, somewhere around

06:04:18  9    ten, north or south of it.  So three is definitely -- four

06:04:22 10    or five is south of ten.

06:04:23 11    Q.    And so is a hundred.  That would be north of ten,

06:04:26 12    wouldn't it?

06:04:26 13    A.    Yeah.  You told me to estimate.  You said you can

06:04:28 14    estimate, so I estimated at the time.

06:04:30 15    Q.    Okay.  And then you estimated again today, and you

06:04:33 16    said it was just three or four.  But when I asked you during

06:04:36 17    your deposition, you said around ten.

06:04:39 18    A.    Okay.  So after further study, I found it's been

06:04:42 19    less.

06:04:44 20    Q.    You did further study?

06:04:46 21    A.    Well, I mean, I know my customer base.

06:04:48 22    Q.    Okay.  But so if you did further study, then why

06:04:52 23    today did you say three or four?  Why didn't you have an

06:04:55 24    exact number since you did further study?

06:04:57 25    A.    I don't know.

Kelly - Cross

06:05:00 1        MR. HOOPES:  I have no further questions, Your

06:05:02 2   Honor.

06:05:02 3        THE COURT:  All right.  Mr. Kelly, one thing

06:05:06 4   that's mystifying to me, and I'm just trying to figure out

06:05:09 5   whether there was an answer here, during the time when you

06:05:12 6   were working at Easoon, did you have a written employment

06:05:22 7   agreement, consulting agreement, or something else, or was

06:05:26 8   it all oral?

06:05:27 9        THE WITNESS:  It was mostly oral.  The agreement

06:05:29 10  that they refer to, I believe expired, and most of our

06:05:32 11  dealings were oral.

06:05:33 12       I mean, may I speak freely, Your Honor?

06:05:36 13       THE COURT:  Well, you can speak.  Freely, I'll

06:05:38 14  be the judge of that.

06:05:39 15       THE WITNESS:  Well, for instance, the example of

06:05:42 16  me needing to clear items to make money outside of the world

06:05:46 17  is not true.  I was an independent representative with GRK

06:05:49 18  Fasteners.

06:05:49 19       THE COURT:  Well, so that was the other thing I

06:05:52 20  wanted to ask you about was:  How were you getting paid

06:05:58 21  during those four years?  Did you get a set amount per

06:06:01 22  month?

06:06:01 23       THE WITNESS:  Yes.

06:06:02 24       THE COURT:  Okay.  And did that set amount a

06:06:06 25  month have anything withheld from it?

Kelly - Redirect

06:06:08  1              THE WITNESS:  No, sir.

06:06:09  2              THE COURT:  Okay.  So when you say you're an

06:06:12  3    independent contractor, you kind of mean it in taxes sort

06:06:16  4    of?

06:06:18  5              THE WITNESS:  1099, yes, sir.

06:06:25  6              THE COURT:  And basically your expenses for

06:06:28  7    travel while you worked for Easoon, did you get reimbursed

06:06:37  8    for that by Easoon, or was that part of what you paid out of

06:06:39  9    whatever?

06:06:40  10             THE WITNESS:  Easoon paid the expenses.

06:06:52  11             THE COURT:  Okay.  Thank you.

06:06:52  12             THE WITNESS:  You're welcome.

06:06:54  13             THE COURT:  All right.  Any further questions,

06:06:56  14   Ms. Gentry?

06:06:56  15             MS. GENTRY:  I just have two quick questions.

06:06:58  16                  REDIRECT EXAMINATION

06:06:58  17   BY MS. GENTRY:

06:07:00  18   Q.    Mr. Kelly, can MOSO NA sustain itself by selling the

06:07:05  19   other product other than the Bamboo X-Treme?

06:07:08  20   A.    No, especially not after reputational harm.

06:07:13  21   Q.    And if you were to do percentage-wise, how much

06:07:19  22   percent of MOSO NA sales constitutes that other product?

06:07:26  23   A.    It would be less than three percent.

06:07:29  24   Q.    And how many percent -- what's the percentage of

06:07:31  25   sales that has gone to Canada this year of the MOSO Bamboo

Kelly - Redirect

06:07:35   1    X-Treme product?

06:07:36   2    A.      Zero.

06:07:37   3    Q.      And can MOSO NA sustain itself by selling product

06:07:42   4    to -- MOSO Bamboo X-Treme to Canada?

06:07:45   5    A.      No, not with the market size and limitations to

06:07:48   6    Canada.

06:07:48   7               MS. GENTRY:  Thank you.  Nothing further, Your

06:07:51   8    Honor.

06:07:51   9               THE COURT:  Thank you.

06:07:55  10               MR. HOOPES:  Quickly, Your Honor?

06:07:56  11               THE COURT:  Yes.

06:07:57  12               MR. HOOPES:  First, I just want to move to admit

06:07:59  13    the exhibits that were tendered.

06:08:01  14               MS. GENTRY:  Your Honor, we're objecting to

06:08:04  15    Mr. Hoopes admitting the entire deposition transcript.

06:08:06  16               THE COURT:  Well, actually, I'm sympathetic to

06:08:09  17    that objection.  You know, the things that you actually used

06:08:19  18    with him, which was his declaration, I have no problem with

06:08:23  19    that.  But just, you know, here's the deposition and here's

06:08:31  20    however many exhibits went with the deposition, yeah, I'm

06:08:37  21    not going to let that in.

06:08:38  22               MR. HOOPES:  It's attached to our reply brief

06:08:40  23    any way, Your Honor.

06:08:41  24               THE COURT:  Okay.  Well, then it's in, but it's

06:08:42  25    not coming in today.

Kelly - Recross

06:08:44  1              MR. HOOPES:  That's fine.

06:08:44  2              (Plaintiff's Exhibit No. 10 was admitted into

06:08:45  3    evidence.)

06:08:45  4              THE COURT:  Okay.  All right.  Is that all?

06:08:47  5              MR. HOOPES:  A quick question.

06:08:47  6                    RECROSS-EXAMINATION

06:08:50  7    BY MR. HOOPES:

06:08:50  8    Q.    MOSO North America is not -- you're saying there's no

06:08:54  9    sales this year going out to Canada; correct?

06:08:56 10    A.    Correct.

06:08:57 11    Q.    Is MOSO International B.V. selling product, not

06:09:00 12    through North America, but directly up to customers in

06:09:03 13    Canada?

06:09:03 14    A.    Not that I'm aware of.

06:09:05 15    Q.    Do you know if they are?

06:09:07 16    A.    I don't believe so, no.  They're in our territory, so

06:09:11 17    no.

06:09:12 18    Q.    Are there bills of lading?  Are there products that

06:09:15 19    have been ordered?  Do you have any POs that have been sent?

06:09:15 20    A.    No.

06:09:18 21    Q.    So there's just no business absolutely in Canada?

06:09:20 22    A.    No.  I have no business in Canada.

06:09:23 23    Q.    Is there anything that would prevent you from going

06:09:26 24    and obtaining the business?

06:09:27 25    A.    No.

Kelly - Recross

06:09:28  1    Q.     And why in January 2019, when you were being deposed,

06:09:34  2    did you say 40 percent?  How did it go from 40 percent down

06:09:39  3    to zero in six months?

06:09:40  4    A.     It went on my 2018 sales which I just closed, and

06:09:44  5    that was the knowledge that I had at the time.  Now, we're

06:09:47  6    six months into 2019, and the information is different.

06:09:50  7    Q.     Okay.  So from last year to this year, how did you go

06:09:53  8    from 40 percent of all of MOSO North American sales and

06:09:57  9    revenue coming in from Canada down to zero?

06:10:00 10    A.     It's a really good question.  Bad weather, I know,

06:10:04 11    has been part of our problem.  But other than that, they

06:10:07 12    over ordered last year.  I'm not sure.

06:10:11 13    Q.     Do you have an expectation that maybe if the weather

06:10:13 14    gets better or if they --

06:10:15 15    A.     I hope.

06:10:16 16    Q.     -- run out of product, then they'll sell to MOSO

06:10:19 17    North America again?

06:10:20 18    A.     I hope.

06:10:21 19    Q.     And was this a customer that you took from Easoon?

06:10:23 20    A.     No.

06:10:25 21    Q.     Was this the customer up in Toronto?

06:10:27 22    A.     Yes.

06:10:28 23    Q.     Was this the customer that you visited on May 31st to

06:10:31 24    June 2nd?

06:10:32 25    A.     Yes.

06:10:32 1  Q.    And was this the customer that, immediately after you

06:10:35 2  resigned from Easoon, that you went with Mr. Veltman from

06:10:39 3  MOSO, and that was your first step to go meet with this

06:10:42 4  customer up in Toronto?

06:10:44 5  A.    Yes, still as an Easoon customer.

06:10:47 6          MR. HOOPES:  I have no further questions, Your

06:10:48 7  Honor.

06:10:48 8          THE COURT:  All right.  Mr. Kelly, you may step

06:10:50 9  down.  Watch your step.

06:10:51 10          THE WITNESS:  Leave everything here; correct?

06:10:52 11          THE COURT:  Leave everything there.  Okay.

06:11:02 12          So we've heard the witnesses, the fact witnesses

06:11:04 13  who appeared.  So I guess just in terms of scheduling

06:11:15 14  things, Mr. O'Rourke and I guess, Mr. Pasternak, how long do

06:11:25 15  you think it will take to finish up getting the expert

06:11:39 16  discovery complete?

06:11:44 17          MR. O'ROURKE:  We would -- Mr. Pasternak and I

06:11:46 18  talked during the intermission.  We think we have to have a

06:11:49 19  meet and confer about what we're going to do.

06:11:51 20          THE COURT:  Okay.  All right.  Well, that's fair

06:11:53 21  enough.

06:11:54 22          MR. O'ROURKE:  How would you like us to handle

06:11:55 23  that?  Would you like us to get back to you in a certain

06:11:57 24  amount of time?

06:11:58 25          THE COURT:  Well, I would prefer that you get

06:12:06  1    back to me.  I'm not going to set a particular amount of

06:12:08  2    time.  You know, generally if I don't hear from you, then

06:12:13  3    I'm assuming things are going good.

06:12:17  4            The reason I was asking you was I was trying to

06:12:19  5    figure out when a date might be to resume this hearing, but

06:12:28  6    trying to pick a date until you figure out when you're going

06:12:31  7    to be ready for it seems like an unproductive exercise.  So

06:12:37  8    why don't you just report when you've met and conferred and

06:12:44  9    think that you have this hopefully resolved.

06:12:47 10            Okay?

06:12:48 11            MR. O'ROURKE:  Yes, Your Honor.

06:12:49 12            THE COURT:  Okay.  And then the other question I

06:12:51 13    had was whether, you know, when you think about a

06:12:54 14    preliminary injunction, you have probability of success on

06:12:59 15    the merits.  To me, that's what the expert testimony is

06:13:02 16    about.

06:13:03 17            The other three preliminary injunction factors,

06:13:07 18    have I now basically got all the information that I'm ever

06:13:10 19    going to get on those three?

06:13:12 20            MR. O'ROURKE:  I believe so, yes.  From

06:13:20 21    plaintiffs, yes.

06:13:21 22            MR. PASTERNAK:  Other than argument about it.

06:13:23 23            MR. O'ROURKE:  Yes, argument.

06:13:24 24            THE COURT:  Well, okay.  Well, so if I need

06:13:32 25    argument about it, I'll have it when we have the expert

06:13:35  1    hearing, but I kind of wanted to think about -- having

06:13:41  2    three-quarters of what I need here, I just wanted to know

06:13:45  3    that I, in fact, have those three-quarters.

06:13:47  4              Okay.  Anything else today?

06:13:50  5              MR. PASTERNAK:  Your Honor, I had a question.

06:13:52  6    As you know, we had submitted a supplemental expert report.

06:13:55  7              Would you like us to withdraw it and put a new

06:13:59  8    one in that we're going to be doing or just leave it out

06:14:01  9    there?

06:14:02 10              THE COURT:  Well, I have no problem with you

06:14:07 11    just leaving it out there because right now it's not hurting

06:14:11 12    anybody, or harming anyone, or bothering anyone, at least

06:14:14 13    not me.  So when you figure out the meet and confer, and

06:14:21 14    what you're going to do, and all that stuff, if there needs

06:14:23 15    to be cleanup about this or that, you can clean it up.  But

06:14:27 16    right now, it seems to me that there's no particular reason

06:14:30 17    to worry about it.

06:14:31 18              MR. O'ROURKE:  I mean, Your Honor --

06:14:32 19              MR. PASTERNAK:  Thanks, Your Honor.

06:14:32 20              MR. O'ROURKE:  -- in all fairness, I mean, the

06:14:34 21    issue is that, in our view, changing theories and adding new

06:14:38 22    theories to what was originally in the record, that's why I

06:14:41 23    started the hearing asking you how we're going to handle

06:14:45 24    Mr. Bock.  So essentially it's almost a do-over from our

06:14:48 25    standpoint with our experts.  But I mean, if you want us to

06:14:51  1   do it, we're able to do it.

06:14:53  2           THE COURT:  Well, I'm not going to enjoin

06:14:56  3   somebody from participating in the market based on, you

06:15:05  4   know, the fact that they submitted a report before I did a

06:15:08  5   claim construction.  And so if it needs to be done over, it

06:15:13  6   needs to be done over.  It's going to need to be done over

06:15:16  7   anyhow.

06:15:17  8           You know, I don't know whether it needs to be

06:15:19  9   done over or not, but that's all good stuff for you to meet

06:15:22 10   and confer about and hopefully resolve.

06:15:25 11           MR. O'ROURKE:  Okay.  Thank you, Your Honor.

06:15:27 12           THE COURT:  Okay?  All right.

06:15:31 13           Well, thank you very much.  Again, I'm sorry I

06:15:39 14   couldn't have done this earlier, but in any event, thank you

06:15:42 15   very much.

06:15:43 16           We'll be in recess.

06:15:44 17           THE CLERK:  All rise.

         18           (Court was recessed at 6:15 p.m.)

         19           I hereby certify that the foregoing is a true

         20   and accurate transcript from my stenographic notes in the

         21   proceeding.                     /s/ Heather M. Triozzi
                                              Official Merit Reporter
         22                                   U.S. District Court

         23

         24

         25