## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DASSO INTERNATIONAL, INC. and EASOON USA, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 17-1574-RGA (cons.) |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| MOSO NORTH AMERICA, INC. and MOSO INTERNATIONAL BV, | ) ) ) | **PUBLIC VERSION** |
| Defendants. | ) ) | |

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY

OF COUNSEL:

Thomas G. Pasternak
John M. Schafer
Ruben Castillo
AKERMAN LLP
71 S. Wacker Drive, 47th Floor
Chicago, IL 60606
Tel: (312) 634-5700

Evelina Gentry
AKERMAN LLP
601 West Fifth Street, Suite 300
Los Angeles, CA 90071
Tel: (213) 688-9500

Dated: October 16, 2020
PUBLIC VERSION
Dated: October 23, 2020
6912353 / 44587 (cons.)

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

*Attorneys for Defendants MOSO North America, Inc., MOSO International BV, Brett Kelly, Mark Clifton, and David S. Osterman a/k/a Steve Osterman*

## TABLE OF CONTENTS

I.  NATURE AND STAGE OF PROCEEDINGS ...................................................... 1

II.  SUMMARY OF ARGUMENT ............................................................................ 2

III.  STATEMENT OF FACTS ................................................................................... 5

    A.  The '578 Patent ........................................................................................ 5

        1.  Asserted Claims and Claim Construction ................................... 6

    B.  The Parties ............................................................................................... 6

IV.  ARGUMENT – DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ............. 7

    A.  The Accused Process Does Not Infringe the '578 Patent. ...................... 8

        a)  The Accused Process Does Not Include Claimed Steps Directed to Processing of Slotted Strips. ...................................................... 8

        b)  The Evidence Cited by Plaintiffs' Expert Does Not Establish Infringement of the Slots Limitations. ..................................... 12

        c)  There Is No Evidence Establishing Infringement of the Heat Treatment Limitation of Claim 16. ........................................ 18

    B.  The '578 Patent's Definition of "Absolute Dryness" Does Not Provide Reasonable Clarity as to the Scope of the Term in the Claims............................ 20

    C.  Because Easoon's Customer and Price Lists Are Not Trade Secrets, Easoon's Misappropriation of Trade Secrets Claim Fails as a Matter of Law ................................................................................................... 23

    D.  Easoon's Claims Based on a Breach of a Duty Fail as a Matter of Law Because the MOSO NA Defendants Were Not Fiduciaries and Did Not Owe a Duty of Loyalty. ............................................................ 25

    E.  There Is No Evidence to Establish Easoon's Claims Based on Alleged Defamatory Statements Made by the MOSO NA Defendants. ........................... 29

V.  ARGUMENT – DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY .................................................................................................. 34

    A.  Dr. Shmulsky's Unreliable Analysis of an Accused Process Should Be Excluded ........................................................................................... 34

    B.  Mr. Newman's Unsupported Damages Opinions Should Be Excluded .............. 38

VI.  CONCLUSION ............................................................................................... 40

i

# TABLE OF AUTHORITIES

**Cases**

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
No. 16-453-RGA, 2017 WL 6508715 (D. Del. Dec. 20, 2017) ............................................. 10

*Accenture Glob. Servs. GmbH v. Guidewire Software Inc.*,
691 F. Supp. 2d 577 (D. Del. 2010) ..................................................................................... 7

*Agilent Techs., Inc. v. Kirkland*,
No. CIV.A. 3512-VCS, 2009 WL 119865 (Del. Ch. Jan. 20, 2009) ...................................... 33

*ART+COM Innovationpool GmbH v. Google Inc.*,
155 F. Supp. 3d 489 (D. Del. 2016) ................................................................................. 38, 40

*Aylus Networks, Inc. v. Apple, Inc.*,
856 F.3d 1353 (Fed. Cir. 2017) ............................................................................................ 10

*Bacon v. Volvo Service Center, Inc.*,
266 Ga. App. 543 (Ga. App. 2004) ...................................................................................... 25

*Bob Davidson & Assocs., Inc. v. Norm Webster & Assocs, Inc.*,
251 Ga. App. 56 (2001) ....................................................................................................... 26

*Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*,
139 F.3d 1396 (11th Cir. 1998) ........................................................................................... 31

*Capital Asset Research Corp. v. Finnegan*,
160 F.3d 683 (11th Cir. 1998) ............................................................................................. 24

*Chapter 7 Trustee Constantino Flores v. Strauss Water Ltd.*,
No. 11141-VCS, 2016 WL 5243950 (Del. Ch. Sept. 22, 2016) ............................................ 31

*Coffee Butler Serv., Inc. v. Sacha*,
208 Ga. App. 4 (1993) ......................................................................................................... 31

*Cont'l Mar. Servs., Inc. v. Mar. Bureau. Inc.*,
275 Ga. App. 533 (2005) ..................................................................................................... 26

*Contract Furniture Refinishing & Maint. Corp. of Ga. v. Remanufacturing & Design
Grp., LLC*,
317 Ga. App. 47 (2012) ....................................................................................................... 28

*Crystal Semiconductor Corp. vs. TriTech Microelectronics Int'l, Inc.*,
246 F.3d 1336 (Fed. Cir. 2001) ........................................................................................... 39

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ........................................................................................................ 34, 38

*DeBonaventura v. Nationwide Mut. Ins. Co.*,
419 A.2d 942 (Del. Ch. 1980) ............................................................................................. 32

*DeRubies v. Witten Technologies, Inc.*,
244 F.R.D. 676 (N.D. Ga. 2007) ......................................................................................... 25

*Diamond Power Int'l v. Bergemann, Inc.*,
   370 F. Supp. 2d 1339 (N.D. Ga. 2005) ............................................................ 24, 25

*Duke Galish, LLC v. Manton*,
   291 Ga. App. 827 (2008) ...................................................................................... 29

*Dynacore Holdings Corp. v. U.S. Phillips Corp.*,
   363 F.3d 1263 (Fed. Cir. 2004) ..................................................................... 14, 20

*E.I. Dupont De Nemours and Company, v. Unifrax I LLC*,
   No. 14–1250–RGA, 2017 WL 1822279 (D. Del. May 5, 2017) ............................ 7

*Equifax Svcs, Inc. v. Examination Mgmt Svcs, Inc.*,
   216 Ga. App. 35, 39-40 (1994) ............................................................................ 25

*Forehand v. Perlis Realty Co.*,
   198 Ga. App. 165 (1990) ...................................................................................... 33

*Friedlander v. HMS-Pep Products, Inc.*,
   226 Ga. App. 123 (1997) ...................................................................................... 34

*Grand Ventures, Inc. v. Whaley*,
   622 A.2d 655 (Del. Super. 1992) ......................................................................... 33

*Halo Elecs., Inc. v. Pulse Elecs, Inc.*,
   136 S. Ct. 1923 (2016) .......................................................................................... 12

*Hanson Staple Co., Inc. v. Eckelberry*,
   297 Ga. App. 356 (2009) ...................................................................................... 27

*Head v. Sears Roebuck & Co.*,
   233 Ga. App. 344 (1998) ...................................................................................... 31

*Hologic, Inc. v. Minerva Surgical, Inc.*,
   325 F. Supp. 3d 507 (D. Del. 2018)...................................................................... 35

*In re Aoyama*,
   F.3d 1293 (Fed. Cir. 2011) ................................................................................... 20

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994) ................................................................................... 35

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
   902 F.3d 1372 (Fed. Cir. 2018) ............................................................................ 23

*Interval Licensing LLC v. AOL, Inc.*,
   766 F.3d 1364 (Fed. Cir. 2014) ............................................................................ 21

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999).........................................................................................34, 38

*Leo Publ'ns v. Reid*,
   265 Ga. 561 (1995) ............................................................................................... 24

*Lipson v. Anesthesia S'rv's, P.A.*,
   790 A.2d 1261 (Del. Super. 2001)...................................................................30, 31

*Malpiede v. Townson,*
    780 A.2d 1075 (Del. 2001) ......................................................................... 29

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995) ...................................................................... 8

*McHugh v. Board of Educ. of Milford School Dist.,*
    100 F. Supp. 2d 231 (D. Del. 2000) .......................................................... 30

*McIntee v. Deramus,*
    313 Ga. App. 653 (2012) ........................................................................... 34

*Megel v. Donaldson,*
    288 Ga. App. 510 (2007) ........................................................................... 26

*Messina v. E.I. Du Pont de Nemours & Co.,*
    308 F. Supp. 2d 491 (D. Del. 2004) .......................................................... 32

*Naghiu v. Inter-Continental Hotels Grp., Inc.,*
    165 F.R.D. 413 (D. Del. 1996) .................................................................. 32

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
    572 U.S. 898 (2014) ................................................................................... 21

Nilan's Alley, Inc. v. Ginsburg,
    208 Ga. App. 145, 145 (1993) ............................................................ 27, 28

*Organovo Holdings, Inc. v. Dimitrov,*
    162 A.3d 102 (Del. Ch. 2017) ................................................................... 31

*Pineda v. Ford Motor Co.,*
    520 F.3d 237 (3d Cir. 2008) ...................................................................... 36

*Schneider ex rel. Estate of Schneider v. Fried,*
    320 F.3d 396 (3d Cir. 2003) ...................................................................... 34

*Singleton v. Itson,*
    192 Ga. App. 78 (1989) ............................................................................. 33

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,*
    859 F.2d 878 (Fed. Cir. 1988) ................................................................... 8

*Sommers Co. v. Moore,*
    275 Ga. App. 604 (2005) ...................................................................... 32, 33

*Spine Solutions, Inc. v. Medtronic Sofamar Danek USA, Inc.,*
    620 F.3d 1305 (Fed. Cir. 2010) ................................................................. 12

*Summit Auto. Grp., LLC v. Clark,*
    298 Ga. App. 875 (2009) ........................................................................... 34

*Teva Pharm. USA, Inc. v. Sandoz, Inc.,*
    574 U.S. 318 (2015) ................................................................................... 21

*U.S. v. Mitchell,*
    365 F.3d 215 (3d Cir. 2004) ...................................................................... 36

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*,
   949 F.3d 825 (3d Cir. 2020) ......................................................................... 36

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ................................................................... 38

*Vernon Library Supplies v. Ard*,
   249 Ga. App. 853 (2001) ....................................................................... 26, 27

**Statutes**

35 U.S.C. § 112, ¶ 2 ......................................................................................... 21

35 U.S.C. § 271(g) ......................................................................................... 7, 33

6 Del. C. § 2532(a)(8) ................................................................................. 30, 33

O.C.G.A. § 10-1-372(a)(8) ............................................................................... 30

O.C.G.A. § 10-1-761 ..................................................................................... 24, 25

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---|---|
| A | U.S. Patent No. 8,709, 578 |
| B | Relevant excerpts from the transcript from the Evidentiary Hearing held on July 2, 2019 (D.I. 144) |
| C | Relevant excerpts from the Rebuttal Expert Report on Non-Infringement of Dr. Felix Böck, dated July 20, 2020 |
| D | Relevant excerpts from the Opening Expert Report of Dr. Rubin Shmulsky, dated June 8, 2020, annotated to included paragraph numbers |
| E | Relevant excerpts from Patent Owner Dasso International, Inc.'s Corrected Preliminary Response Pursuant to 37 C.F.R. § 42.107(a), filed in IPR2019-00184 |
| F | Relevant excerpts from the Deposition Transcript of Dr. Rubin Shmulsky, dated September 2, 2020 |
| G | Exhibits DDX-108 and DDX-109 from the Deposition of Dr. Rubin Shmulsky |
| H | Exhibits DDX-114, DDX-115, and DDX-116 from the deposition of Dr. Rubin Shmulsky held on September 2, 2020 |
| I | Relevant excerpts from the Deposition Transcript of Rene Zaal, dated February 7, 2020 |
| J | Relevant excerpts from the Reply Expert Report of Dr. Rubin Shmulsky, dated August 7, 2020, annotated to include paragraph numbers |
| K | Relevant excerpts from the Opening Expert Witness Report on Invalidity of Felix Böck, dated June 8, 2018 |
| L | Relevant excerpts from the Deposition Transcript of Dr. Rubin Shmulsky, dated December 4, 2018 |
| M | Relevant excerpts from the Reply Expert Witness Report on Invalidity of Felix Böck, dated August 7, 2020 |
| N | Relevant excerpts from the Rebuttal Expert Report of Dr. Rubin Shmulsky, dated July 20, 2020, annotated to include paragraph numbers. |
| O | Relevant excerpts from the Deposition Transcript of Brett Kelly, dated January 22, 2020. |

| Exhibit | Description |
|---|---|
| P | Relevant excerpts from the Deposition Transcript of Mark Clifton, dated January 21, 2020 |
| Q | Relevant excerpts from the deposition of Seng Chee Chua, dated December 19, 2019 |
| R | Relevant excerpts from the Opening Expert Report of Glenn Newman, dated June 8, 2020 |
| S | Relevant excerpts from the Deposition Transcript of Glenn Newman, dated August 28, 2020 |

Defendants MOSO North America, Inc. ("MOSO NA"), MOSO International, B.V. ("MOSO International, with MOSO NA, "MOSO"), Brett Kelly, Mark Clifton, and David S. Osterman (collectively, "MOSO NA Defendants"; with MOSO, "Defendants") respectfully submit this brief in support of their respective motions for summary judgment and to exclude expert testimony. For at least the reasons set forth below, Defendants respectfully request that the Court grant the motions.

## I.     NATURE AND STAGE OF PROCEEDINGS

Dasso International, Inc. ("Dasso") and Easoon USA, LLC ("Easoon", with Dasso, "Plaintiffs") initiated this lawsuit on November 1, 2017 ("Lead Case"). The Second Amended Complaint (D.I. 25) accuses MOSO of infringement of U.S. Patent No. 8,709,578 ("'578 Patent"), as well as three torts arising under Delaware law: violation of the Delaware Deceptive Trade Practices Act (6 Del. C. § 2531 *et seq.*, "Delaware DTPA") , tortious interference with prospective economic advantage, and aiding and abetting breach of fiduciary duty.  (D.I. 25 at Counts I-IV) ("Lead Complaint"). On November 17, 2017, Easoon filed in the Federal District Court for the Northern District of Georgia a lawsuit ("Companion Case") against Messrs. Kelly, Clifton, and Osterman, asserting a variety of state law torts arising under Georgia law: breach of fiduciary duty, breach of duty of loyalty, violation of the Georgia Uniform Deceptive Trade Practices Act (O.C.G.A. § 10-1-370 *et. seq.*, "Georgia DTPA"), misappropriation of trade secrets under the Georgia Trade Secrets Act (O.C.G.A. § 10-1-760 *et. seq.*), tortious interference with business relations, fraud, civil conspiracy, and a claim for punitive damages. (See 19-CV-00564-RGA, D.I. 1 at Counts I-VIII; "Companion Complaint"). On March 25, 2017, the Georgia court transferred the case to this Court, which consolidated the cases on May 7, 2019. (D.I. 124).

On November 1, 2008, MOSO filed with the U.S. Patent and Trademark Office's Patent Trial and Appeals Board ("PTAB") a petition for *inter partes* review ("IPR") of the '578 Patent

("IPR Petition"). Then on November 14, 2018, Plaintiffs filed a motion for a preliminary injunction (D.I. 50, "P.I. Motion"), seeking to enjoin MOSO from importing into and selling in the United States its Bamboo X-Treme products ("Accused Products"). While the P.I. Motion was pending, the Court construed several disputed claims in the '578 Patent (D.I. 128, 131), and the PTAB denied MOSO's petition to institute an IPR of the '578 Patent. On July 2, 2018, the Court held an evidentiary hearing on the P.I. Motion ("Evidentiary Hearing"), and subsequently denied the motion. (D.I. 147).

The Parties have completed expert discovery, and trial is scheduled for May 3, 2021.

## II.    SUMMARY OF ARGUMENT

MOSO moves for summary judgment of non-infringement of the Asserted Claims. It is undisputed that the process for manufacturing the Accused Products ("Accused Process") includes a step in which bamboo strips are crushed into loosely-connected fiber bundles, or "crushed bundles." Based on the language of the Asserted Claims and statements made in its Dasso's Preliminary Response to the IPR Petition, the crushed bundles as a matter of law do not fall within the scope of the limitations in independent claims 1, 8, and 16 directed to forming a plurality of slots in a plurality of bamboo strips (i.e., a "Slots Limitation"). Additionally, Plaintiffs cannot meet their burden of proving that the Accused Process includes a step within the scope of the Slots Limitations or of the limitation recited in claim 16 of modifying a bamboo scrimber through heat treatment.

MOSO also moves for summary judgment of invalidity of claims 13-15 and 17. Each of these claims includes a limitation directed to drying bamboo strips to "absolute dryness." Adopting the lexicographical definition provided in the '578 Patent's specification, the Court construed "absolute dryness" to mean "the water content in the bamboo strips [is] very small so that the subsequent hemicelluloses pyrolyzing will not be affected." (D.I. 131). Because there is no

2

objective means for determining how small the water content can be before it affects the pyrolysis of hemicelluloses in bamboo strips, the term "absolute dryness" is indefinite, rendering claims 13 and 17 invalid under 35 U.S.C. § 112.

The MOSO NA Defendants move for summary judgment on Easoon's claims for misappropriation of trade secrets. The evidence establishes that Easoon did not take reasonable measures to protect such information, as it stored such information on another company's database without establishing conditions for protecting the confidentiality of Easoon's proprietary information, much less its trade secrets. As a result, Easoon cannot establish that any proprietary information obtained by the MOSO NA Defendants qualifies as the existence of a trade secret under Georgia law, entitling the MOSO NA Defendants to summary judgment on Count IV of the Companion Complaint.

The MOSO NA Defendants also move for summary judgment on Easoon's claims for breach of fiduciary duty and the duty of loyalty. Simply put, none of the MOSO NA Defendants was were officers or directors of Easoon, and therefore did not owe fiduciary duties to Easoon. And because the duty of loyalty rises and falls with a fiduciary duty under Georgia law, the MOSO NA Defendants did not owe a duty of loyalty to Easoon. For these reasons, the MOSO NA Defendants are entitled to judgment as a matter of law on Counts I and II of the Companion Complaint. Further, MOSO moves for summary judgment on Count IV of the Lead Complaint, as it cannot as a matter of law aid and abet breach of a fiduciary duty by the MOSO NA Defendants if the MOSO NA Defendants did not owe such a duty in the first place.

The Defendants collectively move for summary judgment on Easoon's claims for tortious interference claims with prospective economic advantage and prospective business relations (D.I. 25 at Count II; Companion Compl. at Count V, respectively) and for violation of the

Delaware and Georgia DTPAs (collectively, "Competition Claims"). *See* (D.I. 25 at Counts II & III; Companion Compl. at Counts II & V). There is insufficient evidence to establish a genuine issue of material fact as to whether certain allegedly disparaging comments made by the MOSO NA Defendants proximately caused Easoon to lose customers. Moreover, the evidence does not support that the statements made by MOSO NA Defendants were false, and in any event such statements are protected under the privilege of fair competition.

MOSO also moves for exclusion of testing done by Dr. Shmulsky in support of his infringement opinions. In preparing and visually analyzing a specimen Accused Product, Dr. Shmulsky used an untested and unreliable methodology that and does not fit with the fact that the bamboo material used to manufacture the Accused Products is fused during a high-pressure - pressing operation. Moreover, Dr. Shmulsky manipulated the specimen Accused Product in way that introduced the potential for creating the indentation he identified as a slot, and his testing cannot be repeated because he did not record the steps taken to prepare the specimen Accused Product.

Finally, Defendants move to exclude testimony from Plaintiffs' damages expert, Glenn Newman. Mr. Newman's methodology for calculating damages is legally insufficient in so far as he failed to track damages for non-patent claims to specific torts allegedly committed by the Defendants. Additionally, in relation to his lost profits analysis, Mr. Newman's improperly based his assessment of non-infringing alternatives on his personal opinions, which he admitted were outside the scope of his expertise. Finally, Mr. Newman did not analyze the price elasticity of demand for the increased price for lost sales that he advocated in his lost profits damages analysis. Therefore, Mr. Newman's opinions on these topics should be excluded from his testimony.

### III.    STATEMENT OF FACTS

#### A.    The '578 Patent

The '578 Patent is entitled "Bamboo scrimber and manufacturing method thereof." Ex. A. The '578 Patent generally relates to a process for making a bamboo scrimber, which according to the inventors is "especially suitable for outdoor environments." At a high level, the '578 Patent discloses examples and variations of a method for manufacturing a bamboo scrimber that includes the following steps:

1) Preparing bamboo strips from bamboo;

2) Forming a plurality of slots in each bamboo strip along a longitudinal direction of fibers of the bamboo strip;

3) Modifying the bamboo strips formed with slots through heat treatment;

4) Dipping the modified bamboo strips into an adhesive and drying the adhesive-impregnated bamboo strips; and

5) Either hot pressing the bamboo strips (applying heat and pressure simultaneously) or cold pressing the bamboo strips (applying pressure, removing pressure, and then applying heat in a separate drying room or chamber) until the adhesive is cured so as to form the bamboo scrimber.

Ex. A at 5:56-7:22; Fig. 6. After describing the above general method, the '578 Patent discloses several specific examples. The first four examples use hot-pressing (heat and pressured applied simultaneously to cure the adhesive) to form a scrimber and differ according to heat treatment parameters or the shape of the mold. *See* Ex. A at 7:29-10:3. The fifth example substitutes the hot-pressing step with steps for cold pressing bamboo strips and then drying the resulting scrimber to allow the adhesive to cure. *See* Ex. A at 10:7-46. The final example differs from the others in that

the heat-treatment step is performed after a hot-pressing step. *See* Ex. A at 10:50-11:19. That is, it is the formed bamboo scrimber, not the bamboo strips, that is modified through heat treatment.

### 1.        Asserted Claims and Claim Construction

Plaintiffs allege the Accused Process infringes claims 1 2, 4-10, 13, 15, 16, and 19 of the '578 Patent ("Asserted Claims"). Of these claims, claims 1, 8, and 16 are independent, and each includes a Slots Limitation, as set forth below:

> **1.** … each of said bamboo strips is formed with a plurality of slots penetrating through said bamboo strip substantially in a direction of thickness defined by said bamboo strip and a substantially longitudinal direction defined by said slots is substantially consistent with a substantially longitudinal direction defined by fibers of said bamboo strip. …
>
> **8.** … forming a plurality of slots in each of the prepared bamboo strips penetrating through the bamboo strip substantially in a direction of thickness defined by the bamboo strip and a substantially longitudinal direction defined by the slots is substantially consistent with a substantially longitudinal direction defined by fibers of the bamboo strip; …[1]

The Court construed each of these limitations to have its "plain meaning. The slots need not extend all the way through the strip, but must penetrate deeper than an incision." (D.I. 131 at ¶¶6, 7).

Additionally, claims 13-15[2] and 17 each includes an "Absolute Dryness Limitation": "wherein the heat-treatment includes steps of heating the bamboo strips to absolute dryness." The Court construed "absolute dryness" to mean: "The water content in the bamboo strips being very small so that the subsequent hemicelluloses pyrolysing will not be affected." (D.I. 131 at ¶8).

### B.        The Parties

MOSO International is a global distributor of bamboo products, including the Accused Products. However, MOSO is not a manufacturer of bamboo products. Instead, MOSO works with its partners in China to manufacture bamboo products having the physical appearance and

---

[1] Claim 16 uses the exact same claim language for the Slots Limitation.
[2] Claims 14 and 15 depend from claim 13.

mechanical properties established by MOSO. The manufacturers of the Accused Products are located in China.

In June 2017, MOSO International established MOSO NA as a subsidiary of MOSO International. Shortly thereafter, Messrs. Kelly, Clifton, and Osterman joined MOSO NA. Prior to working with MOSO NA, all three individuals worked with Easoon to sell and distribute dasso.XTR products. Easoon "is a distributor, wholesaler and marketer of wood flooring and bamboo products and transacts business in the United States, Canada and Mexico under the brand and trade name [d]asso, [d]asso Group, [d]asso.XTR and [d]asso USA, among other brand names." (Companion Compl. at ¶8). To this end, Easoon is the exclusive licensee of the '578 Patent, which Dasso owns and purportedly covers dasso.XTR prodcuts. However, while the MOSO NA Defendants each had titles that projected high-level positions under the dasso.xtr brand, their duties and responsibilities were limited to sales of dasso.XTR products. Moreover, only Mr. Osterman was an employee of Easoon; Mr. Kelly was a contracted salesman, and Mr. Clifton was employed by another company – TW Flooring Group. ("TWFG").

## IV.   ARGUMENT – DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This Court is well familiar with the standard for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *E.I. Dupont De Nemours and Company, v. Unifrax I LLC*, 2017 WL 1822279, at *1 (D. Del. May 5, 2017) (citations omitted); *see also Accenture Glob. Servs. GmbH v. Guidewire Software Inc.*, 691 F. Supp. 2d 577, 582 (D. Del. 2010) ("The mere existence of some evidence in support of the non-moving party . . . will not be sufficient for denial of a motion for summary judgment.").

**A.      The Accused Process Does Not Infringe the '578 Patent.**

A patent is infringed when a person "without authority imports into the United States … a product which is made by a process patented in the United States shall be liable as an infringer, if the importation … of the product occurs during the term of such process patent." 35 U.S.C. § 271(g). A two-step analysis is employed in making an infringement determination. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). First, the Court must construe the asserted claims to ascertain their meaning and scope. *Id*. Second, the properly construed claims must be compared with the accused infringing product. *Id*. The patent owner has the burden of proving infringement by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988).

**1.      Plaintiffs' Cannot Establish Infringement of the Asserted Claims.**

**a)      The Accused Process Does Not Include the Claimed Steps Directed to Processing of Slotted Strips.**

Each Asserted Claim includes a step for forming a plurality of slots in a bamboo strip, thereby resulting in a plurality of slotted strips. Additionally, the claimed processes methods recite additional limitations directed to performing additional processes on the slotted strips to form a scrimber. Because the Accused Process does not include forming a plurality of slotted strips, much less the performing operations on the processing the slotted strips to make a scrimber, the Accused Products do not literally infringe the Asserted Claims.

In view of this claim language and the '578 Patent's specification, a manufacturing process falling within the scope of independent claims 1, 8, and 16 must include a step for forming a plurality of slots in a plurality of bamboo strips, thereby producing a plurality of "slotted strips." *See* Ex. A at claims 1, 8, 16. Moreover, the subsequent steps in an infringing process would include performing additional actions on the plurality of slotted strips. That is, a process within the scope

of each of claims 1, 8 and 16 must include steps for (i) impregnating the slotted strips with an adhesive, and (ii) pressure-pressing the slotted strips to provide a scrimber. *See id.* Additionally, a process falling within the scope of claims 1 and 8 must include a step for modifying the slotted strips through heat treatment so that at least part of the hemicelluloses in the bamboo strips is pyrolyzed; to be within the scope of in claim 16, the scrimber itself must be modified through heat treatment so that at least part of the hemicelluloses in the scrimber is pyrolyzed.

As a threshold matter, it is undisputed the bamboo material used to manufacture the Accused Products is processed into bamboo strips that are subsequently crushed. As explained by Rene Zaal, MOSO International's CEO, the Accused Process includes a step where roughly planed bamboo strips are crushed into "loosely-connected fiber bundles." Ex. B at 61:4 – 62:8; *see also id.* at 62:16 – 63:23. These "loosely-connected fiber bundles" are also referred to as "crushed bundles." Ex. C at ¶44. Plaintiffs' technical expert, Dr. Rubin Shmulsky, also acknowledged that the bamboo strips used in the Accused Process are crushed, such that "fiber bundles produced in subsequent rolling steps are more or less uniform in size." Ex D. at ¶¶61; *see also id.* at ¶69. Thus, it is ***crushed bundles*** in the Accused Process, not slotted strips, that are modified through heat treatment, impregnated with an adhesive, dried and ultimately pressure-pressed to form a scrimber product. To establish infringement of the Asserted Claims, Plaintiffs therefore must establish that a crushed bundle is a slotted strip. Based on statements made by Dasso and Dr. Shmulsky, Plaintiffs cannot meet this burden as matter of law.

Dasso took positions in its Corrected Preliminary Response to MOSO's IPR Petition that distinguished the scope of the claims from the prior art. The Federal Circuit has held that statements made in an IPR Proceeding can limit the scope if statements made by the patent owner "constitute a clear and unmistakable surrender of claim scope." *Aylus Networks, Inc. v. Apple, Inc.*,

856 F.3d 1353, 1362 (Fed. Cir. 2017). Initially, Dasso presented a claim construction for "slot" and the Slots Limitations consistent with Plaintiffs' claim construction positions. *See* Ex. E at 6-9. But Dasso did not stop there. Dasso went on to characterize the prior art cited by MOSO – specifically the Li and Fujiwara references – and further explained why these references do not disclose the Slots Limitations. Specifically, Dasso affirmatively stated that, in the context of the invention claimed in the '578 Patent, a crushed bundle ***is not*** a slotted strip. Ex. E at 14. This was not an isolated statement made in passing. Rather, Dasso made multiple statements in which it sought to clearly and unequivocally distinguish the scope of the Slots Limitations from the cited art. Consequently, Dasso has disclaimed any argument that a crushed bundle falls within the scope of the Slots Limitations.

With respect to the Li reference, Dasso acknowledged that Li discloses forming crushed bundles, which Dasso specifically distinguished from the Slots Limitations:

> The Li reference describes the conversion of bamboo strips into bamboo filaments or strands … or crosslinked bamboo filaments or strands …. ***These are what Petitioner's expert describes as "crushed bundles", which are distinct from the bamboo strips formed with a plurality of slots described in the '578 Patent.***

Ex. E at 14 (citations omitted).[3] This statement alone could suffice to limit the scope of the Slots Limitations, as it was fundamental to Dasso's opposition argument. *Accord Acceleration Bay LLC v. Activision Blizzard, Inc.*, No. 16-453-RGA, 2017 WL 6508715, at *5 (D. Del. Dec. 20, 2017) (limiting the patent owner to a general statement "essential" to that patent owner's argument against institution of an IPR). But Dasso continued to distinguish Li from the claimed Slots Limitations, stating that the bamboo material described by Li – previously acknowledged to be a crushed bundle – "***is no longer a strip***," and "is therefore disclosing something which is ***clearly distinguished in the art from the '578 Patent's 'bamboo strips . . . formed with a plurality of***

---

[3] Emphasis added throughout unless otherwise noted.

*slots*.'" Ex. E at 22 (citations omitted); *see also id.* (in drawing this distinction, referencing a description of a crushed bundle provided by Dr. Felix Böck, MOSO's technical expert, in a declaration submitted in support of MOSO's IPR Petition). Dasso found additional bases for distinguishing Li, even if Li describes a strip. Particularly, Dasso focused on Li's description of forming gaps in the bamboo material:

> Gaps are not slots for several reasons. "Gap" implies an opening or space of indefinite size and shape. "Slots" are, in their plain meaning, "narrow, elongated depression[s]" or "groove[s]" in addition to "slit[s]" or "aperture[s]." Further, the specification of the '578 Patent recites the use of a "slot-forming machine" which "may be any known slot forming machine in the related art." Li does not recite "slots," *nor does it recite a method of forming a "gap" in bamboo any more specific than rolling or crushing*. ... Accepting Petitioners' conflation of the words "gaps" and "slots" would impermissibly broaden–even under a Broadest Reasonable Construction standard– the scope of the term "bamboo strips . . . formed with a plurality of slots" to an extent not supported by the specification of the '578 Patent.

Ex. E at 22-23 (citations omitted). Dasso made similar comments distinguishing Fujiwara's disclosure on processing bamboo strips:

> Fujiwara discloses bamboo that, after … crushing, is no longer intact bamboo strip, but is cross-linked bamboo filament (or fiber); and "gaps" present in the bamboo resulting from the Fujiwara process cannot be synonymous with "slots" formed in bamboo strips as described in the '578 Patent.

Ex. E at 16, 24-25; *see also id.* at 16, 25 (again citing to Dr. Böck's description of crushed bundles in the context of distinguishing Fujiwara's disclosure). Finally, Dasso made a point to distinguish Li and Fujiwara by comparing the prior art disclosures to Figure 1 of the '578 Patent:

> Li does not recite "slots," nor does it recite a method of forming a "gap" in bamboo any more specific than rolling or crushing. Moreover, *the appearance of Figure 1 in the specification of the '578 Patent does not support Petitioners' contention that "slots" and "gaps" are the same thing*.
>
> …
>
> That Fujiwara is not disclosing strips of bamboo is further supported by the description in the reference itself: "in the lengthwise direction (the longitudinal direction), the fibers are dispersed and crossed." This indicates that the resulting

bamboo fiber has lost its structure and ***no longer appears in a flat strip, in the manner illustrated by Figure*** 1 in the specification of the '578 Patent.

Ex. E at 23, 25. These statements are not simply passing remarks tangentially related to Dasso's validity positions. Rather, when viewed in context, Dasso's statements amount to a clear and unmistakable disclaimer of crushed bundles from the scope of the Slots Limitations.

Dr. Shmulsky's deposition testimony further supports the unmistakable conclusion that a crushed bundle is not a slotted strip. Although he opined that the Accused Process literally infringes the Asserted Claims, Dr. Shmulsky could not identify any "slots" in the crushed bundle provided for inspection by MOSO after the Evidentiary Hearing. Ex. F at 84:3-105:25; Ex. G. However, Dr. Shmulsky could identify "gaps" in the crushed bundle. *Id.* at 94:16-95:25. Combined with Dasso's clear and unmistakable statements narrowing the scope of the Slots Limitations to exclude crushed bundles, it is clear Plaintiffs cannot establish infringement of the '578 Patent. *Spine Solutions, Inc. v. Medtronic Sofamar Danek USA, Inc.*, 620 F.3d 1305, 1316-17 (Fed. Cir. 2010) (finding that the accused device could not infringe the claims literally or under the doctrine of equivalents based on a disclaimer made by the patent owner), *abrogated on other grounds by Halo Elecs., Inc. v. Pulse Elecs, Inc.*, 136 S. Ct. 1923 (2016).

Accordingly, Plaintiffs cannot as a matter of law meet their burden of establishing infringement of the Asserted Claims, entitling MOSO to summary judgment of non- infringement.

        **b)**      **The Evidence Cited by Plaintiffs' Expert Does Not Establish Infringement of the Slots Limitations.**

Notwithstanding the clear limitation Dasso placed on the scope of the Slots Limitations, the evidence cited by Dr. Shmulsky does not establish infringement of the Slots Limitations. Dr. Shmulsky opined that the Accused Products infringe the Asserted Claims because of his belief that the Accused Process includes forming "slots" in bamboo strips during the crushing process. In support of his opinion, Dr. Shmulsky primarily relies on testimony from Mr. Zaal, a declaration

from Dr. Böck, a statement made in MOSO's opening claim construction brief, and testing Dr. Shmulsky performed on a sample of an Accused Product specimen.[4] But even if slotting bamboo strips prior to crushing could literally infringe the claims (it cannot), the evidence cited by Dr. Shmulsky does not create a genuine issue of material fact as to whether the Accused Process includes a step within the literal scope of the Slots Limitations.

The Court construed the Slots Limitations to have their plain meaning, with a critical caveat: "the slots need not extend all the way through the strip, but must penetrate deeper than an incision." D.I. 131 at ¶¶6 &7. Thus, an issue central to Dr. Shmulsky's opinions is the distinction between a "slot" and "incision." But Dr. Shmulsky never explained the distinction between a slot and an incision. At most, Dr. Shmulsky concluded that the Accused Process includes slotting bamboo strips because "'incisions' are not at such a depth as to promote failure along the plane of the incision," while "'slots' are to such a depth so as to cause or purposely promote the failure of the strip." Ex. D at ¶64. However, Dr. Shmulsky does not cite any technical publication or other evidence that supports his conclusion. Such unsupported, conclusory statements cannot establish a genuine issue of material fact. *Dynacore Holdings Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) ("'[I]t It is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact, and that a

---

[4] Dr. Shmulsky also cites three deposition exhibits – DX-90, DX-91, and DX-92 – and Figures 4-9 of Dr. Böck's Rebuttal Report. None of these documents establish the existence of the Slots Limitations. DX-90 describes a high-level flow chart of a general scrimber manufacturing process, as well as two additional demonstrative exhibits used at the Evidentiary Hearing. See Ex. H. DX-91 and DX-92 are pictures of an incision roller MOSO made available for inspection after the Evidentiary Hearing. Id. Finally, Figures 4-9 of Dr. Böck's Rebuttal Report are demonstrative pictures showing an example milling machine. See Ex. C at ¶¶42-44. Because the pictures are not evidence, Dr. Böck did not rely on these figures when forming his opinions, and neither should Dr. Shmulsky.

party may not avoid that rule simply by framing the expert's conclusion as an assertion that a particular critical claim limitation is found in the accused device.").

Not surprisingly, none of the nearly seventy pages of testimony cited by Dr. Shmulsky supports his opinion that the Accused Process includes slotting bamboo strips.[5] Mr. Zaal clearly explained that the first stage of the crushing process includes forming ***incisions*** in the roughly-planed bamboo strips. Ex. B at 61:12-16, Ex. I at 191:19 – 192:10. At no point did Mr. Zaal testify that bamboo strips are slotted during the Accused Process, and Dr. Shmulsky conceded that Mr. Zaal did not provide a quantitative indication of the depth of the incisions that would reasonably lead one to conclude that the cuts were actually slots.[6] Ex. F at 151:3-7; 277:20-278:6. Similarly, Dr. Shmulsky admitted that Dr. Böck's supplemental declaration only refers to "incisions" being made in bamboo strips. Ex. F at 123:3-124:5; *see also* D.I. 137 at ¶¶20-23. Moreover, Dr. Shmulsky admitted that the crushing process described by Mr. Zaal and Dr. Böck is not literally the same as slotting:

> Q. How, again, do you know what happened in the manufacture?
>
> A. Well, Zaal talked about and Böck's report talks about the cutting followed by crushing. He calls it a crushing machine or an incising machine, but they are -- both are very clear that they need two steps in order to puncture the bamboo strip with a

---

[5] Incredibly, Dr. Shmulsky cited the entirety of Mr. Zaal's testimony at the Evidentiary Hearing and almost fifty pages of deposition testimony as evidence of infringement of the Slots Limitations. Despite Dr. Shmulsky's efforts to find some relevance in (at best) tangentially related topics, clearly not all of cited testimony is relevant to the Slots Limitations.

[6] At most, Mr. Zaal testified that the incision should be "through the membrane." Ex. I at 194:24-25. Taken out of context, one might conclude such an incision could be a slot. Not so. As Mr. Zaal testified earlier in his deposition, the step prior to crushing involve planing a bamboo split into a bamboo strip, which involves removing the "skin" of the bamboo as well as the inner membrane (also called the "pith"). *Id.* at 153:19-154:5; *see also* Ex. K at ¶¶45-46 (explaining the structure of the bamboo culm). Because the membrane may not be completely removed, Mr. Zaal explained that the "because there are always [] residues of … the membrane, and you want to break it, you cut through it." Id. at 191:25 – 192:3. Mr. Zaal further testified the incisions should be "the minimum deepness through the inner membrane," and that the cuts should be as small as possible. *Id.* at 194:24-25; 195:13-14.

toothed wheel and then crush it in order to propagate the fracture, ***which is functionally the same as slotting***.

Ex. F at 174:14-24. This admission further weighs against a finding that the Accused Process includes a step that meets the Slots Limitations.

Dr. Shmulsky also cites a statement made in MOSO's opening claim construction brief, where MOSO stated that a picture "shows a photograph of a bamboo strip in which the slots do not penetrate through the strip, which is what MOSO's manufacturer uses to manufacture the accused product, and which, not surprisingly, is [Plaintiffs'] proposed construction." D.I. 106 at 6-7. Despite having never inspected the strips, Dr. Shmulsky concluded the picture is "strong evidence of infringement." Ex. J at ¶46. Not so. The cited picture is a strip removed from a crushing machine after passing through incision rollers but before passing through pressure rollers for crushing:

 

**Figure 1 - Incised Strip from MOSO's Opening Claim Construction Brief and Magnified Portion Showing Incision Pattern.**

D.I. 106 at 7. Obviously, MOSO made the statement before the Court construed the Slots Limitations; had MOSO known the Court would draw a distinction between "slots" and "incisions," it would have provided a different description of the picture. In any event, nothing in

MOSO's Opening Claim Construction Brief indicated the depth of the "slots," and Dr. Shmulsky admitted that the "slots" in the picture could be incisions. Ex. F at 197:14-198:12. The pattern of cuts is also consistent with Mr. Zaal's explanation of using an incision roller to forming incisions in the surface of the roughly planed strips, as shown in the magnified portion of the picture. Moreover, Plaintiffs never asked MOSO to produce these strips, or strips otherwise subjected to incision rollers but not pressure rollers, to allow confirm Dr. Shmulsky to confirm his suspicions.[7]

Finally, Dr. Shmulsky cites testing he did in support of Plaintiffs' P.I. Motion as additional support for his infringement opinion. As discussed in more detail below, Dr. Shmulsky's testing does not appear to comport with any established scientific principles that support the conclusion he draws. Indeed, it strains the bounds of credibility to believe that Dr. Shmulsky could find a single slot in material a scrimber that was pressure-pressed at high pressure and temperature, but could not identify a single slot during his examination of a crushed bundle that was not pressure-pressed. Moreover, Dr. Shmulsky in his P.I. Declaration (D.I. 50-2) made the following observations from his visual analysis of the specimen Accused Process, which he incorporated into his Opening Report: "Cross sectional [sic] picture of MOSO X-Treme showing what appears to be a *slot, slit, or incision* substantially parallel to the bamboo scrim bundle." Ex. D. at p. 22. Additionally, in his claim chart identifying evidence supporting his infringement opinions, Dr. Shmulsky's offered a similar description of the Accused Process:

> The Moso X-treme product shows evidence of the remnants of slots or *incisions* (Figure 3) substantially parallel or consistent with the longitudinal fiber direction and consistent with an *incising process* aimed at improving permeability / resin penetration through the thickness.

---

[7] To MOSO's knowledge, Plaintiffs never attempted to acquire documentation concerning the Accused Process from the manufacturers of the Accused Products. In fact, Plaintiffs did not ask MOSO to obtain documents from its manufacturers.

Ex. D at claim chart on p. 27-28; *see id.* at claim charts on pp. 29, 33. Dr. Shmulsky also characterized "slotting" and "incising" as being "analogous":

> Q:     What does the phrase or the term "with an incising or slotting process" mean?
>
> A:     The patent describes a slotting process. And commonly in the wood products industry an analogous process is used, and it's called ***incising***.

Ex. L at 34:5-10. Although Dr. Shmulsky made these statements before the Court construed the Slots Limitations, he initially adopted and included them in his Opening Report. Only after Dr. Böck in his Rebuttal Brief noted the equivalence between incisions and slots did Dr. Shmulsky revise his claim charts to remove the words "incisions" and "incising." Ex. J at ¶34; *compare id.* at claim charts on pp. 22-23, 24, 28-29 *with* Ex. D at claim charts on pp. 27-28, 29, 33. In contrast to the statement in MOSO's claim construction brief, which is not inconsistent with MOSO's non-infringement positions, Dr. Shmulsky's reference to an incising process in his Opening Report is clearly inconsistent with his subsequent opinions.[8]

But even if it is admissible, and notwithstanding his statements characterizing the process as an incision process, Dr. Shmulsky's testing would not reasonably lead one to conclude that the Accused Process infringes the Slots Limitations for several reasons. First, Dr. Shmulsky admitted that the alleged slot he identified "could be a void" created during hot pressing. Ex. F at 179:23-180:18. Second, assuming that the identified slot is a remnant from the crushing process, Dr. Shmulsky did not measure the depth of the microscopic cut. Ex. F at 173:10-13. As a result, the identified slot could be an incision, as Dr. Shmulsky admitted. Ex. F at 173:14-23. Finally, assuming that the identified slots could reasonably be considered a slot (a proposition that seems

---

[8] Dr. Shmulsky attempted to explain the difference between an incision and a slot as having "different intents and different results," but he was not able to explain why he used the terms interchangeably in his P.I. Declaration. Ex. F at 79:18-81:24.

doubtful based on the previous two admissions), Dr. Shmulsky only identified a single slot. Yet the Slots Limitations require a plurality of slots in each of a plurality of bamboo strips. Thus, even if one assumes that Dr. Shmulsky's testing could establish slotting prior to a crushing process (a dubious suggestion at best), the results of the test are at best inconclusive on the existence of a single slot in the specimen. Dr. Shmulsky's conclusion that a single slot in a single specimen establishes the presence of a plurality of slots in a plurality of bamboo strip prior to hot-pressing is unadulterated speculation. Consequently, Dr. Shmulsky's analysis cannot create a genuine issue of material fact as to whether the Accused Process meets the Slots Limitations.

In sum, none of the evidence cited by Shmulsky establishes the depth of the cuts made into the bamboo strips during crushing. Moreover, Dr. Shmulsky's characterization of the Accused Process' crushing step as being equivalent to slotting, his testimony that "slotting" and "incising" are analogous processes, and the admitted alternative explanations for the slot identified make it clear that Plaintiffs cannot establish the presence of the Slots Limitations in the Accused Process.[9] Accordingly, Plaintiffs cannot establish infringement of the Asserted Claims as a matter of law.

c)   **There Is No Evidence Establishing Infringement of the Heat Treatment Limitation of Claim 16.**

Additionally, claim 16 includes the limitation of modifying a bamboo scrimber through heat-treatment so that at least a part of hemicelluloses in said bamboo scrimber is pyrolyzed. Because the Accused Process does not include this step, the Accused Products do not infringe claims 16 or 19.

---

[9] In his claim charts, Dr. Shmulsky also makes reference to his analysis of the dasso.XTR product sold by Easoon. Aside from being irrelevant to determining whether the ***Accused Products*** infringe the asserted claims, there is no evidence establishing that the process used to make the dasso.XTR products includes a step within the scope of the Slots Limitations. Moreover, Dr. Shmulsky testified that the only evidence he had for the process by which the dasso.XTR products are made came from Seng Chee "Avery" Chua, Easoon's CEO, ███████████████████████

18

It is undisputed that in the Accused Process the crushed bundles, not the scrimbers, are heat treated. Ex. I at 160:5-10; Ex. D at ¶40. To get around this inconvenient fact, Dr. Shmulsky offers a creative theory: the scrimber undergoes heat treatment during the hot-pressing step. According to Dr. Shmulsky, the platens used to hot press the crushed bundles and cure the adhesive would be at temperature in excess of 150 °C. Ex. D at ¶66; Ex. J at ¶¶22, 49. Because the platens would subject the outer surfaces of the scrimber to temperatures sufficient to cause pyrolysis, Dr. Shmulsky concludes that some pyrolysis must occur, thereby meeting the heat-treatment limitation of claim 16. Ex. D at ¶66; Ex. J at ¶49. While theoretically possible, this opinion suffers from a fatal flaw: it is not supported by any evidence.

Dr. Shmulsky does not cite any evidence in support of his opinion of this limitation. Ex. D at claim chart on pp 34-35. Rather, he cites to several journal articles—none of which Plaintiffs' produced—and a link to MOSO's website that is no longer active. This alone dooms Dr. Shmulsky's opinion. Moreover, Dr. Shmulsky's opinion is premised on his belief that "platens in hot presses are **usually** heated well-above" the temperatures necessary to cause pyrolysis. Ex. D at ¶66; *see also id.* at claim chart on pp 34-35. But Dr. Shmulsky does not **know** to what temperature the platens are heated to during the manufacture of the Accused Process.[10] He is simply guessing that the platen would be hot enough. Such unsupported conjecture cannot create a genuine issue of material fact. *Dynacore Holdings*, 363 F.3d at 1278.

Dr. Shmulsky also assumed that the crushed bundles—which have already undergone several hours of heat treatment—have hemicelluloses left to pyrolyze. While Dr. Shmulsky

---

[10] While Dr. Shmulsky cites several scientific articles alleged to support his conclusion, Plaintiffs did not produce these journal articles. In any event, these references at best could only support the theoretical possibility of pyrolysis during hot pressing, not actual evidence establishing that the hot-pressing parameters used during the Accused Process or the hemicelluloses present in the bamboo material before and after hot pressing.

disagrees with Dr. Böck's opinion that the hemicelluloses in the crushed bundles have been completely pyrolyzed (Ex. J at ¶49), there is no evidence establishing the amount of hemicelluloses present in the crushed bundles before pressing or in the bamboo scrimber after pressing. Dr. Shmulsky does not even explain how one would go about making this determination. Rather, he simply concludes—again without support—that the Accused Process includes the heat treatment limitation of claim 16 simply because it is possible. Such an unsupported assumption cannot establish infringement of this claim limitation.

Therefore, for this additional reason, the Court should grant summary judgment in favor MOSO on the issue of infringement of claims 16 and 19.

**B.     The '578 Patent's Definition of "Absolute Dryness" Does Not Provide Reasonable Clarity as to the Scope of the Term in the Claims**

Each of claims 13-15 and 17 include an Absolute Dryness limitation. As noted above, the Court adopted the '578 Patent's lexicographical definition of absolute dryness in construing this term. Because there is no objective basis for determining when the water content in bamboo strips is "very small" such that it does not affect the pyrolysis of hemicelluloses in the bamboo strip, claims 13-15 and 17 are indefinite and therefore invalid.

Indefiniteness is a legal issue evaluated by a court as part of "its duty as the construer of patent claims." *In re Aoyama*, 656 F.3d 1293, 1299 (Fed. Cir. 2011); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.,* 574 U.S. 318, 324 (2015) (analyzing indefiniteness in the context of claim construction). Because patent claims define the patentee's right to exclude, the claims must "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2.[11] A claim is indefinite if, when "read in the light of the

---

[11] In 2011, the America Invents Act ("AIA") amended § 112 to, *inter alia*, change the numbering of the subsections. Because the effective filing date of the '578 Patent predates enactment of the AIA, MOSO refers to the pre-AIA version of § 112.

specification delineating the patent, and the prosecution history, [it] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 901 (2014).

Both Dr. Böck and Dr. Shmulsky agree that "absolute dryness" is a term of art. Ex. M at ¶19; Ex. N at ¶39. The trouble here is that the applicants, acting as their own lexicographer, provided a new definition of "absolute dryness": "[T]he term 'absolute dryness' does not refer to the bamboo strips containing no water, but refers to water content in the bamboo strips being very small so that the subsequent hemicelluloses pyrolysing will not be affected." Ex. A at 4:62-66. Because the Court adopted this definition in construing absolute dryness, whatever meaning this term has to a PHOSITA is irrelevant. Absolute dryness is now assessed according to the Court's construction—the '578 Patent's definition of absolute dryness—which is too vague and ambiguous to reasonably inform a PHOSITA of the scope of the term.

As Dr. Böck explains, there are two problems with the '578 Patent's definition of absolute dryness. First, the definition requires that the water content of the bamboo strips be "very small." Ex. M at ¶24. A term of degree, like "very small," complies with the definiteness requirement if the claim "provide[s] enough certainty to [Ordinary Artisans] when read in the context of the invention." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014). The '578 Patent's definition of absolute dryness indicates that "very small" means "so that the subsequent hemicelluloses pyrolysing will not be affected." '578 Patent at 4:64-66. This leads to the second problem with the definition: the '578 Patent does not provide any indication as to what it means to "affect" the pyrolysis of hemicelluloses in the slotted strips. Ex. M at ¶25.

The '578 Patent describes heating slotted strips to absolute dryness in four examples:

[T]he bamboo strips are heated at about 100° C. to about 130° C. to absolute dryness….

21

> When the temperature had reached about 100 °C, the heating rate slowed down, and the bamboo strips were heated to absolute dryness (Step 203a).
>
> The pressure in the pressure tank was maintained at about 0.4 MPa, and the temperature was increased slowly from 100 °C. to 130 °C. so that the bamboo strips were heated to absolute dryness (Step 303a).
>
> When the temperature had reached about 100 °C, the heating rate slowed down, and the bamboo scrimber was heated to absolute dryness (Step 503a).

'578 Patent at 6:24-25, 7:52-55, 9:13-16, 11:1-3. Yet none of these descriptions provides any indication of the water content of the bamboo material prior to heat treatment. Böck Reply at ¶21. The '578 Patent only provides temperature ranges for the pre-heat treatment drying step. This is insufficient information to allow a PHOSITA to determine the moisture content of the slotted strips prior to heat treatment used in the example, which would ostensibly give some indication as to the moisture content below which pyrolysis of hemicelluloses are not affected. *Id.*

Although Dr. Shmulsky disputed Dr. Böck's analysis of absolute dryness, he offered little in the way of rebuttal. Although Dr. Shmulsky stated that "it is also well-understood that the moisture content does not need to be zero, but it should be very low," and that a PHOSITA "would understand that a strip has reached 'absolute dryness' when the pyrolysis can occur in rapid and energy efficient fashion," he does provide any objective basis for assessing these parameters. That is, he does not refer to any technical references that establish what moisture content is "very low," or how fast the pyrolysis has to occur to be done in "rapid and energy efficient fashion." *See* Ex. N at ¶¶41-42. Dr. Böck, on the other hand, noted that commercial process for heat treating wood vary from nearly zero to green wood having a moisture content of more than 50%. Ex. M at ¶26.

Dr. Shmulsky's contrary opinion is further blunted by his apparent ignorance of the Court's construction; he stated that, because absolute dryness is a term of art, a PHOSITA would readily

22

understand what it means.[12] Ex. N at ¶37; Ex. F at 206:24-207:13. Even more tellingly, Dr. Shmulsky admitted that the level of absolute dryness is subjective. Ex. F at 210:7-212:5. As the Federal Circuit has explained, "a term of degree that is purely subjective and depends 'on unpredictable vagaries of any one person's opinion is indefinite." *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018) (quotations omitted). Dr. Shmulsky's admission concerning the subjectivity of the water content that affects the pyrolysis of the hemicelluloses is further evidence of the lack of reasonable certainty in the '578 Patent's definition of absolute dryness.

Given the absence of any objective guidance in the specification, the wide variations in moisture content of known heat treatment processes, and Dr. Shmulsky's admission that the water content that will not affect the subsequent pyrolysis of hemicelluloses is subjective, MOSO has clearly and convincingly established that absolute dryness—as defined by the '578 Patent and subsequently construed by the Court—is indefinite. Accordingly, MOSO is entitled to summary judgment in its favor on the issue of invalidity of claims 13-15, 17, and 18.

### C.   Because Easoon's Customer and Price Lists Are Not Trade Secrets, Easoon's Misappropriation of Trade Secrets Claim Fails as a Matter of Law

In the Companion Case, Easoon brought a claim against each MOSO NA Defendant for misappropriating trade secrets. (Companion Compl. at Count IV). To establish a misappropriation of a trade secret, Easoon must show that "(1) that it had a trade secret and (2) that it was misappropriated by the opposing party." *Diamond Power Int'l v. Bergemann, Inc.*, 370 F. Supp. 2d 1339, 1346 (N.D. Ga. 2005); *see also* O.C.G.A. § 10-1-761. "The party asserting the existence

---

[12] Dr. Shmulsky further demonstrated his lack of familiarity with the claim language by testifying that the moisture content for absolute dryness can depend on whether the drying occurs before heat treatment, adhesive application, or hot pressing. Ex. F at 207:14-208:3, 208:13-209:2. Claims 13 and 17 are clearly further limitations to the steps in claims 8 and 16, respectively, directed to modifying bamboo material through heat treatment.

of a trade secret has the burden of proving that the information so qualifies and that the accused party violated the Act." *Capital Asset Research Corp. v. Finnegan*, 160 F.3d 683, 685 (11th Cir. 1998). Because Easoon cannot meet this burden, the MOSO NA Defendants are entitled to judgment in their favor on Count IV of the Companion Complaint.

A trade secret is "information, without regard to form . . . which is not commonly known by or available to the public and which information: (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." O.C.G.A. § 10-1-761(4). Thus, information "(1) must not be readily ascertainable by proper means by persons who can benefit from its use and (2) must be the subject of reasonable efforts to maintain its secrecy." *Leo Publ'ns v. Reid*, 265 Ga. 561, 562 (1995); *see also Capital Asset*, 160 F.3d at 685. An employer must prove both prongs. *Id.*, 160 F.3d at 686.

As a threshold matter, Easoon has not identified with sufficient particularity the trade secrets allegedly misappropriated by the MOSO NA Defendants.[13] *Capital Asset*, 160 F.3d at 685; *DeRubies v. Witten Technologies, Inc.*, 244 F.R.D. 676, 681-82 (N.D. Ga. 2007). In any event, Easoon cannot establish that it made reasonable efforts to maintain the secrecy of any "internal and proprietary information." To prove the existence of its trade secrets, Easoon must show the information "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Diamond Power II*, 540 F. Supp. 2d at 1332; O.C.G.A. § 10-1-761(4). It is undisputed

---

[13] Easoon has generally alleged that the trade secrets "internal and proprietary information, primarily customer lists, pricing information and costs related to shipping, importing, purchasing and distributing product in the U.S., Canada and Mexico markets" and transmitted and disclosed that information to MOSO. (Companion Compl., ¶112).

that Easoon shared its customer and price lists with TW; Clifton was not an employee of Easoon, yet he had access to Easoon trade secret information. Moreover, Mr. Clifton testified that other companies and contractors had access to this same database. Ex. P at 46:20-50:20. Easoon did not produce any contract or agreement with TWFG requiring TWFG and its employees to maintain the confidentiality of Easoon's trade secrets or confidential information, much less that Easoon and TWFG had similar agreements with the other companies that could access the communal database. Moreover, Easoon cannot establish it took reasonable steps to make its employees and contractors aware of its internal policy for protecting trade secrets. At most, Easoon had an employee handbook with a confidentiality provision. But there is no evidence that Messrs. Kelly or Osterman received the handbook or acknowledged the contents and requirements. The absence of such documentation further dooms Count IV of the Companion Complaint.[14] *Bacon v. Volvo Service Center, Inc.*, 266 Ga. App. 543, 545 (Ga. App. 2004) (absence of a signed confidentiality agreement by former employee weighed against a finding of reasonable measures to protect employer's trade secrets).

Because Easoon did not take reasonable measures to protect its alleged trade secrets, the MOSO NA Defendants are therefore entitled to summary judgment.

### D.    Easoon's Claims Based on a Breach of a Duty Fail as a Matter of Law Because the MOSO NA Defendants Were Not Fiduciaries and Did Not Owe a Duty of Loyalty.

To support a breach of fiduciary duty claim, Easoon must "prove the existence of such [a fiduciary] duty, breach of the duty, and damages proximately caused by the breach." *Megel v. Donaldson*, 288 Ga. App. 510, 515 (2007) (affirming summary judgment for the defendant and

---

[14] Even if Easoon could establish that the MOSO NA Defendants signed a confidentiality agreement, such action by itself does not necessarily constitute a reasonable measure to protect a trade secret. *Equifax Svcs, Inc. v. Examination Mgmt Svcs, Inc.*, 216 Ga. App. 35, 39-40 (1994).

concluding that he did not breach a fiduciary duty because no such duty was owed to the plaintiff); *see also Vernon Library Supplies v. Ard*, 249 Ga. App. 853, 855 (2001) ("An employer's cause of action against an employee for breach of duty of loyalty must be based upon a fiduciary duty owed by the employee and must rise and fall with any claim for breach of fiduciary duty"). The "first step in a successful [breach of fiduciary duty] suit is the establishment of a defendant as an officer or director, present or former, of the suing corporation." *Bob Davidson & Assocs., Inc. v. Norm Webster & Assocs, Inc.,* 251 Ga. App. 56, 62 (2001) (internal citation omitted).

Here, despite their titles, none of the MOSO NA Defendants were officers or directors of Easoon, nor did they have the authority to bind Easoon in contracts or in any other matter with third parties. *Cont'l Mar. Servs., Inc. v. Mar. Bureau. Inc.,* 275 Ga. App. 533, 534-35 (2005) (finding an employee not an officer or director despite having the title of president of employer). Rather, the MOSO NA Defendants were salesmen for Easoon. They did not have any authority to bind Easoon in contracts, they did not supervise any employees, and they were they not involved in any of Easoon's financial decisions or planning. Likewise, they did not advise any officers or directors at Easoon. Indeed, Mr. Chua, Easoon's CEO, exercised independent dominion and control over Easoon's operations.  Moreover, only Mr. Osterman was employed by Easoon, and he did not have managerial responsibilities.  Mr. Kelly was a contract worker. Mr. Clifton was not even employed by Easoon; he was employed by TWFG. It is therefore indisputable that the MOSO NA Defendants were not Easoon's fiduciaries. Therefore, Easoon's claim for breach of fiduciary must fail as a matter of law.  And because "a cause of action against an employee for breach of loyalty must be based upon a fiduciary duty owed by the employee and must rise and fall with any claim for breach of fiduciary duty," Easoon cannot prevail on Count II of the Companion

26

Complaint. *Hanson Staple Co., Inc. v. Eckelberry*, 297 Ga. App. 356, 360 (2009) (quotation omitted).

However, even if the MOSO NA Defendants owed fiduciary duties to Easoon, there is insufficient evidence to establish a breach of such duty. It is well settled that an employee ***does not*** breach a fiduciary duty to its employer by making plans to compete, even if those plans are made while the employer-employee relationship still exist. *Id.*, at 358. Indeed, the duty is breached by an employee only if he "solicit[s] customers for a rival business before the end of his employment [or does] other similar acts in *direct competition* with the employer's business." *Vernon Library*, 249 Ga. App. at 855 (finding no evidence that an employee solicited an employer's customers or directly competed before the end of his employment; also noting that "a cause of action against an employee for breach of loyalty must be based upon a fiduciary duty owed by the employee and must rise and fall with any claim for breach of fiduciary duty"). Like in *Vernon*, here there is absolutely no evidence that the MOSO NA Defendants engaged in any solicitation or direct competition with Easoon before joining MOSO NA.

*Nilan's Alley, Inc. v. Ginsburg* is also instructive. 208 Ga. App. 145 (1993). There, the court affirmed summary judgement in favor of the defendant and explained that while the evidence showed that the defendant, prior to his resignation, had conversation with the employer's customers regarding his future employment, those conversations were in mere preparation for post-employment competition and that [the defendant] was not thereby in direct competition so as to breach the duties of good faith and loyalty that he then owed to the employer." *Id.* at 145. The court further pointed that the defendant "did not profit at the employer's expense during his actual employment … [and] no agreement was reached with any of the employer's customers prior to the termination of his employment, and "only *after* [the employee] had already left his employment

with the employer … one customer decided to switch from appellant and place its orders with appellee's new employer." *Id*., at 146.

Here, there is absolutely **no** evidence that the MOSO NA Defendants solicited any of Easoon's customer to move their business from Easoon to MOSO, let alone that they directly competed or profited at the expense of Easoon while still employed there. The only evidence Easoon has relied upon to support its claim for breach of fiduciary duty against the MOSO NA Defendants is, at best, purely circumstantial evidence. For example, Easoon has relied on the mere fact that customers decided to switch from Easoon to MOSO NA as evidence that the MOSO NA Defendants breached their purported duty of loyalty to Easoon. However, the fact that customers purchased products from MOSO NA does not establish a breach of fiduciary duty. The evidence produced by Easoon does not establish that the MOSO NA Defendants directly solicited Easoon's customers before joining MOSO NA. Consequently, Easoon's claim for breach of a fiduciary duty fails as a matter of law. *Contract Furniture Refinishing & Maint. Corp. of Ga. v. Remanufacturing & Design Grp., LLC*, 317 Ga. App. 47, 56 (2012) ("In ruling on a motion for summary judgment, a finding of fact that may be inferred from, but is not demanded by, circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists, provided that the circumstantial evidence may be construed consistently with the direct evidence.").

For the same reasons, Easoon's claim for aiding and abetting a breach of fiduciary duty fails. To establish a claim for aiding and abetting a breach of fiduciary duty, Easoon must demonstrate "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty ... (3) knowing participation in that breach by the non-fiduciary defendants, and (4) damages proximately caused by the breach." *Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del. 2001).

Because Easoon cannot establish that the MOSO NA Defendants were Easoon's fiduciaries, Easoon's claim against MOSO for aiding and abetting a breach of fiduciary duty must also fail.

### E. There Is No Evidence to Establish Easoon's Claims Based on Alleged Defamatory Statements Made by the MOSO NA Defendants.

Based on alleged disparaging statements made by the MOSO NA Defendants, Easoon brought the Competition Claims against the Defendants. However, Easoon cannot establish that statements made by the MOSO NA Defendants proximately caused damage to Easoon's business, or that such statements were defamatory. Accordingly, Defendants are entitled to summary judgment in their respective favors on Easoon's tortious interference claims.

Under Georgia law, the elements of a claim for tortious interference with contractual relations, business relations, or potential business relations are: "(1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff." *Duke Galish, LLC v. Manton*, 291 Ga. App. 827, 832 (2008). If the claimant cannot show that it suffered damage to its rights under a contract as a proximate result of the third party's alleged interference, then its claim for tortious interference with business relations fails as a matter of law. *Id*. The Court may decide the issue of proximate cause as a matter of law in indisputable cases such as this one. *Id*. Similarly, under Delaware law, to prove a claim for tortious interference with prospective economic advantage, a plaintiff must establish: "(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with the opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of defendant's privilege to compete or protect his business interests in a fair and lawful manner...." *Lipson v.*

29

*Anesthesia S'rv's, P.A.,* 790 A.2d 1261, 1285 (Del. Super. 2001); s*ee also McHugh v. Board of Educ. of Milford School Dist.,* 100 F. Supp. 2d 231, 246 (D. Del. 2000) (citing the standards set forth in *Restatement (Second) of Torts* § 766B (1979)).

Under Georgia's DTPA, "a person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he: ...; (8) disparages the goods, services, or business of another by false or misleading representation of fact;" O.C.G.A. § 10-1-372(a)(8).   Almost identical requirements must be met under the Delaware DTPA, which prohibits "in the course of a business, vocation, or occupation … [d]isparag[ing] the goods, services, or business of another by false or misleading representation of fact." 6 Del. C. § 2532(a)(8).

As noted above, Easoon's Competition Claims are based on allegedly false or misleading statements made by the MOSO NA Defendants concerning the financial health of the Dasso Group —Easoon's Chinese supplier of dasso.xtr products—and that the dasso.XTR products are identical to the Accused Products. However, to succeed on these claims, Easoon must prove that such statements proximately caused damage to Easoon's business. Easoon cannot meet this burden. Where there is no evidence establishing a genuine issue of fact on the issue on causation, summary judgment in favor of the defendant is appropriate. *Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1409 (11th Cir. 1998) (affirming grant of summary judgment in favor of defendant because plaintiff failed to present any evidence that suggests that it lost business as a result of defendant's alleged wrongful conduct); *see also Coffee Butler Serv., Inc. v. Sacha,* 208 Ga. App. 4, 7 (1993) (affirming grant of summary judgment where there was no evidence regarding *why* any of the accounts left the plaintiff) (internal citation omitted). "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to

[grant summary judgment] for the defendant." *Head v. Sears Roebuck & Co.,* 233 Ga. App. 344, 345 (1998). The same is true under Delaware law. *See, e.g.*, *Lipson,* 790 A.2d at 1285 (the "mere perception of a prospective business relationship or contract will not form the basis of a *bona fide* expectancy."); *see also Organovo Holdings, Inc. v. Dimitrov,* 162 A.3d 102, 122 (Del. Ch. 2017) (a plaintiff must "identify a specific party who was prepared to enter into a business relationship but was dissuaded from doing by the defendant and cannot rely on a generalized harm.").

Much of Easoon's evidence of allegedly defamatory statements is based on what customers allegedly told Chua heard from his customers. Ex. Q at 20:10-24:1, 129:23-131:13; 158:11-160:6. Inadmissible hearsay cannot create a genuine issue of material fact.[15] Moreover,   Easoon has not presented any evidence that it lost business as a result of statements made by the MOSO NA Defendants. To the contrary, there is evidence that while ███████ one of Easoon's largest customers, purchased products from MOSO NA, it returned to Easoon shortly thereafter. Ex. O at 156:21-158:4. Further, because Easoon has no personal knowledge of and has failed to obtain admissible evidence concerning the ***effect*** the allegedly disparaging statements had on Easoon's customers, Easoon cannot make a causal connection between any specific conduct by the MOSO NA Defendants and their alleged harm. Consequently, Easoon's Competition Claims fail as a matter of law and fact.

Moreover, there is no evidence establishing the MOSO NA Defendants' statements were false. To the contrary, statements concerning the Dasso Group's financial health were based on third party credit reports demonstrating Easoon's poor financial condition. Ex. O at 192:23-193:8.

---

[15] Delaware follows a traditional "but-for" analysis to this element: "proximate cause exists when an act or omission in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred." *Chapter 7 Trustee Constantino Flores v. Strauss Water Ltd.*, No. 11141-VCS, 2016 WL 5243950, at *13 (Del. Ch. Sept. 22, 2016).

Easoon's naked assertions that the that the purported statements made by the MOSO NA Defendants were false, without any supporting evidence, are insufficient to withstand summary judgment. *See Messina v. E.I. Du Pont de Nemours & Co.*, 308 F. Supp. 2d 491, 497 (D. Del. 2004) ("[A] plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid a motion for summary judgment."); *Naghiu v. Inter-Continental Hotels Grp., Inc.*, 165 F.R.D. 413, 419 (D. Del. 1996) (noting that the non-movant must come forward with something more than "conclusory allegations"). And by claiming that Accused Products infringe the '578 Patent, Easoon cannot reasonably dispute a statement that the Accused Products and the dasso.XTR products are the same and were made at the same factory.[16]

Easoon's tortious interference claim also fails as a matter of law because the MOSO NA Defendants' alleged statements fall under privilege of fair competition. In this regard, "fair competition is always legal." *Sommers Co. v. Moore,* 275 Ga. App. 604, 605 (2005); *see also DeBonaventura v. Nationwide Mut. Ins. Co*., 419 A.2d 942, 947 (Del. Ch. 1980) *aff'd*, 428 A.2d 1151 (Del. 1981) (the tortious interference claim under the Delaware law "must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner."). Generally, under the privilege of fair competition, a party's actions in soliciting away a business opportunity is privileged where it is motivated by business interests. *Sommers,* 275 Ga. App. at 605; *Forehand v. Perlis Realty Co.,* 198 Ga. App. 165, 166-167 (1990). Here, to the extent the MOSO NA Defendants did make the alleged statements concerning the Dasso Group's financial status, such statements are nothing more than competitive marketing aimed at attracting

---

[16] To be clear, MOSO disputes Plaintiffs' contentions that the process used to manufacture the dasso.XTR Products falls within the scope of the '578 Patent's claims. Rather, MOSO maintains that neither the Accused Products nor the dasso.XTR products are manufactured in a manner that falls within the scope of a claim of the '578 Patent.

business. Moreover, these statements were not malicious; the MOSO NA Defendants merely conveyed information they obtained on a competitor after joining MOSO NA. Ex. O at 192:23-193:8; a*ccord Singleton v. Itson*, 192 Ga. App. 78, 80 (1989) ("Divulging truthful information and expressing critical personal opinions . . . are not wrongful or unlawful acts and those acts cannot, therefore, give rise to liability for tortious interference with contractual relations . . . ."). Thus, the MOSO NA Defendants are entitled to summary judgment on Easoon's tortious interference claims based on the competition privilege.

Finally, Easoon cannot establish an issue of fact concerning the likelihood of future damages, as is required to survive summary judgment on its DTPA claim. The DTPA offers only injunctive relief where the plaintiff has established a likelihood of future damage, but it does not address past harm. *Catrett v. Landmark Dodge, Inc.*, 253 Ga. App. 639, 644 (2002); *Moore-Davis Motors, Inc. v. Joyner*, 252 Ga. App. 617, 619 (2001); *see also Agilent Techs., Inc. v. Kirkland*, No. CIV.A. 3512-VCS, 2009 WL 119865, at *10 (Del. Ch. Jan. 20, 2009) (quoting *Grand Ventures, Inc. v. Whaley*, 622 A.2d 655, 661 (Del. Super. 1992)) ("Because [§ 2532(a)(8)] is meant to address 'patterns of deceptive conduct, not isolated incidents,' relief under the statute is dependent on the plaintiff's entitlement to injunctive relief."). *See* O.C.G.A. § 10-1-373(a); *Friedlander v. HMS-Pep Products, Inc.*, 226 Ga. App. 123, 124-125 (1997); *see also Agilent Techs., Inc*, 2009 WL 119865, at *10 ("[A] claim for injunctive relief [under Delaware law] must be supported by the allegation of facts that create a reasonable apprehension of a future wrong."). At best, Easoon can establish that the MOSO NA Defendants made several statements concerning the Dasso Group's financial health and the similarity of the products (which are not disparaging, did not proximately harm Easoon) between June 2017 and August 2017. This is hardly sufficient to establish a pattern of disparaging statements, much less create an issue of fact

as to the threat of future harm based on disparaging statements made by the MOSO NA Defendants over three years ago. Thus, Easoon's DTPA claims fail for lack of future harm as well.

For at least these reasons, Easoon's Competition Claims fail as a matter of law under both Delaware and Georgia law, and judgment should be granted in favor of the Defendants on the respective Counts.[17]

## V.   ARGUMENT – DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

With respect to expert testimony, a court acts as a "gatekeeper" to ensure "that an expert, whether basing testimony upon professional studies or personal experience employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–95 (1993). Expert testimony must be qualified, reliable, and fit the issues in the case. FED. R. EVID. 702; *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003). Reliable expert testimony "must be based on 'the methods and procedures of science rather than on 'subjective belief or unsupported speculation.'" *Hologic, Inc. v. Minerva Surgical, Inc.*, 325 F. Supp. 3d 507, 520 (D. Del. 2018) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994)).

### A.   Dr. Shmulsky's Unreliable Analysis of an Accused Process Should Be Excluded

MOSO moves to exclude evidence of Dr. Shmulsky's testing of the Accused Products. Dr. Shmulsky's procedure lacks any scientific basis, and he manipulated the sample in a way liable to

---

[17] For these reasons Easoon's civil conspiracy claim also fails because it is simply a derivative of the substantive claims. Indeed, in Georgia, civil conspiracy is not an independent tort, but a theory of liability. See, e.g., *McIntee v. Deramus*, 313 Ga. App. 653, 656 (2012); *Summit Auto. Grp., LLC v. Clark,* 298 Ga. App. 875, 879 (2009). But even if it was not a derivate claim, Easoon, nonetheless, has failed to establish it.

give misleading results. Combining these deficiencies with the absence of documentation, it becomes clear that Dr. Shmulsky's analysis is unreliable and should be excluded.

Dr. Shmulsky's description of the methodology used in his analysis is limited to three paragraphs in his Opening Report. First, he indicates that he cut from an Accused Product a single specimen for microscopic examination, which he weighed and determined the density. Ex. D at ¶47. Next, he performed microscopic evaluation of the cut specimen, from which he was able to identify what he now refers to as a "slot" in the surface of the scrimber. *Id.* at ¶¶50, 51. However, Dr. Shmulsky omitted from the explanation of his testing another step: in response to questions raised by Dr. Böck, Dr. Shmulsky acknowledged in his Reply Report that he sanded the surface of the specimen Accused Product before performing the microscopic examination. Ex. J at ¶¶37-38. Although Dr. Shmulsky claims this is "standard procedure for examining a composite through the depth of its thickness," he did not cite a journal article or technical document to substantiate this statement. *Id.* Moreover, Dr. Shmulsky testified that he was not sure what grit of sandpaper he used on the specimen Accused Product, or if there any journal articles exist that would corroborate his methodology. Ex. F at 164:18-24, 169:7-9.

The Third Circuit has identified a non-exclusive list of factors for evaluating the reliability of an expert's testimony:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 834 (3d Cir. 2020) (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008)). Because six of the eight

factors weigh in favor of exclusion, and one factor is neutral, Dr. Shmulsky's testing should be excluded.

The first factor weighs in favor of exclusion because the method employed by Dr. Shmulsky does not have a testable hypothesis. The "testability of a method" examines whether the premise on which the testing relies is "capable of being proved false." *U.S. v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004). Here, the relevant premise is whether one can examine a bamboo scrimber to determine the condition of the bamboo material prior to pressure pressing. It cannot. As Dr. Böck explained, there are other potential causes for the indentation Dr. Shmulsky identified as a slot, such as cracking during pressure-pressing, formation of a void, and ***sanding***. Ex. C at ¶¶84-87. Since these causes happen during or after pressure-pressing, there is no way to control the experiment. Moreover, Dr. Shmulsky did not record the process he used to prepare the specimen for visual analysis; he did not record the grit of sandpaper used, the direction of sanding, or the amount of material removed. Thus, one could not replicate Dr. Shmulsky's testing even if a test could be designed to test the falsifiability of his methodology.

The second, fourth, and fifth factors also weigh in favor of exclusion. Dr. Shmulsky testified that he is unaware of any journal article describing his method, and he did not cite to any journal articles, standards, or other technical document that would validate his methodology. Dr. Shmulsky did not identify an error rate for his testing; in fact, he did not consider any other explanation for the identified slot other than it being a slot formed in bamboo strip. The third factor, thus, weighs in favor of exclusion. And in the context of analyzing a scrimber for the purpose of determining the physical appearance of the starting material before pressing, Dr. Shmulsky did not identify any use of his methodology outside of this litigation. Therefore, eighth factor favors of exclusion.

Factor six is, at best neutral, as there are no methods for performing a similar analysis on a finished composite product that have been established as reliable. It is undisputed that the Accused Process includes a step where adhesive-impregnated bamboo material (crushed bundles) is hot-pressed to form a scrimber. Dr. Böck and Dr. Shmulsky agree that hot-pressing adhesive-impregnated bamboo material "consolidates" or "fuses" the material together. Ex. D at ¶31; Ex. C at ¶84. Consequently, it is not possible to determine the condition of the bamboo material prior to hot-pressing by examining a scrimber. Ex. C at ¶84. The sixth factor is thus neutral, if not favoring exclusion.

That leaves the seventh factor—qualifications of the testifying expert—which MOSO concedes weighs in favor of allowing the testing. But because at least six of the eight factors weigh in favor of exclusion, Dr. Shmulsky's testing is unreliable, and his testimony on the subject should be excluded.

Additionally, Dr. Shmulsky's testing and analysis does not fit with factual issues of the case. While Dr. Shmulsky's methodology of sanding a composite material and then conducting a microscopic analysis to determine what lies beneath the surface may have utility in other contexts, it does not here. As noted above, it is simply not possible to determine the condition of the bamboo material—whether slotted or crushed strips, bamboo stranded, or bamboo slivers—by sanding and then visually analyzing a scrimber. Notwithstanding the lack of reliability, Dr. Shmulsky's testing is not a scientifically valid way for determining the condition of bamboo material prior to pressure pressing, and should therefore be excluded.

For at least these reasons, Dr. Shmulsky's testing should be excluded.

**B.      Mr. Newman's Unsupported Damages Opinions Should Be Excluded**

There are several flaws in the conclusions reach by Mr. Newman, Plaintiffs' damages expert. To wit, Mr. Newman provides opinions that lack sufficient factual and/or scientific bases. Accordingly, such conclusions should be excluded under *Daubert*.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████ It is well-settled that a "patentee must 'sufficiently [tie the expert testimony on damages] to the facts of the case.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (quoting *Daubert*, 509 U.S. at 591) *see also Kumho Tire*, 526 U.S. at 157 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). In *ART+COM Innovationpool GmbH v. Google Inc.*, where the expert relied on unsupported assumptions, this Court excluded the expert's testimony. 155 F. Supp. 3d 489, 515–16 (D. Del. 2016). The same is true here. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████ y.

Second, Mr. Newman's opinion regarding other outdoor decking products as nonviable non-infringing alternatives relating to his lost profits analysis is based only on ███████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████ His testimony should be therefore be limited to exclude such baseless conclusions.

Third, Mr. Newman performed no analysis of the price elasticity of demand for the increased price for lost sales that he advocated in his lost profits damages analysis. ████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████ In *Crystal Semiconductor Corp. vs. TriTech Microelectronics Int'l, Inc.*, the Federal Circuit upheld the district court's denial of price erosion damages, finding that "a patentee must produce credible economic evidence to show the decrease in sales, if any, that would have occurred at the higher hypothetical price." 246 F.3d 1336, 1357 (Fed. Cir. 2001). This Court's opinion in *ART+COM* is also instructive. There, when the expert relied on a multiplication rate that was not supported by any documents or calculations, the Court held that "this unsupported assumption [was] fatal" to the expert's opinion and, therefore, excluded the relevant portions of the opinion. 155 F. Supp. 3d at 516. ███████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████

    For all these reasons Mr. Newman's testimony should either be precluded or adjusted as follows: (1) his testimony about non-patent damages should be excluded; (2) his testimony about unacceptable non-infringing alternatives should be excluded; and (3) his conclusion regarding lost profits damages should be reduced by ████

## VI.    CONCLUSION

    For at least the foregoing reasons, Defendants respectfully request that the Court grant their respective motions for summary judgment.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By:  */s/ David E. Moore*
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Stephanie E. O'Byrne (#4446)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com
    sobyrne@potteranderson.com

OF COUNSEL:

Thomas G. Pasternak
John M. Schafer
Ruben Castillo
AKERMAN LLP
71 S. Wacker Drive, 47th Floor
Chicago, IL  60606
Tel:  (312) 634-5700

Evelina Gentry
AKERMAN LLP
601 West Fifth Street, Suite 300
Los Angeles, CA  90071
Tel:  (213) 688-9500

*Attorneys for Defendants MOSO North America, Inc., MOSO International BV, Brett Kelly, Mark Clifton, and David S. Osterman a/k/a Steve Osterman*

Dated:  October 16, 2020
6906794 / 44587 (cons.)
PUBLIC VERSION
Dated:  October 23, 2020