# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

DASSO INTERNATIONAL, INC. and
EASOON USA, LLC,

     Plaintiffs/Counterclaim Defendants,

v.

MOSO NORTH AMERICA, INC. and
MOSO INTERNATIONAL BV;

     Defendants/Counterclaim Plaintiffs.

 

C.A. No. 17-1574-RGA
(consolidated)

**(UNSEALED
PUBLIC VERSION)**

EASOON USA, LLC,

     Plaintiff,

v.

BRETT KELLY, MARK CLIFTON,
and DAVID OSTERMAN, a/k/a
STEVE OSTERMAN,

     Defendants.

C.A. No. 19-564-RGA

## REPORT & RECOMMENDATION

## I.    INTRODUCTION

This litigation relates the sale of bamboo flooring and decking products manufactured abroad. Plaintiffs seek to enforce a patent as against the accused products and pursue damages and injunctive relief resulting from various alleged business torts. In addition to challenging validity and infringement of the asserted patent, defendants assert numerous business-tort counterclaims. Before the court are various dispositive motions as well as motions to strike, to exclude, and to shift the burdens at trial. As is set forth below, the court recommends that the district court GRANT-IN-PART and DENY-IN-PART the pending motions.

## II.    BACKGROUND

### A.    Nature and Stage of Proceedings

#### 1.    Second Amended Complaint

On November 1, 2017, Dasso International, Inc. ("Dasso") and Easoon USA, LLC ("Easoon") (collectively, "plaintiffs") brought this action[1] against Moso North America, Inc. and Moso International, BV ("MOSO") alleging infringement of U.S. Patent No. 8,709,578 ("the '578 patent") entitled "Bamboo scrimber and manufacturing method thereof."[2] Plaintiffs filed a First Amended Complaint[3] and later, on February 2, 2018, a Second Amended Complaint ("SAC").[4] In addition to patent infringement, the SAC alleges: tortious interference with prospective economic advantage, violation of Delaware Deceptive Trade Practices Act, and aiding and abetting breach of fiduciary duty.[5]

#### 2.    MOSO's Counterclaims to the SAC

MOSO answered the SAC on February 16, 2018 and asserted various state-law counterclaims.[6] MOSO later amended its counterclaims.[7] Presently, MOSO's counterclaims are: declaratory judgment as to non-infringement of the '578 Patent, declaratory judgment of patent exhaustion, declaratory judgment as to invalidity of the '578 Patent, violation of the Delaware Deceptive Trade Practices Act, tortious

---

[1] D.I. 1.

[2] '578 Patent.

[3] D.I. 10.

[4] D.I. 25.

[5] D.I. 25.

[6] D.I. 28.

[7] D.I. 46.

interference with prospective economic advantage, libel *per se*, trade libel, and slander *per se*.[8] On April12, 2018, the court entered a Scheduling Order in this matter.[9]

### 3. Companion Complaint

On November 17, 2017, Easoon filed suit (the "Companion Complaint") in the United States District Court for the Northern District of Georgia against Brett Kelly ("Kelly"), Mark Clifton ("Clifton"), and David S. Osterman a/k/a Steve Osterman ("Osterman") (collectively, "individual defendants").[10] The Georgia action was transferred to this court on March 26, 2019 under Civil Action Number 19-564.[11] On May 7, 2019, Judge Andrews granted a motion to consolidate Easoon's action against the individual defendants with Dasso and Easoon's action against the MOSO defendants.[12] The Companion Complaint alleges: breach of fiduciary duty, breach of the duty of loyalty, violation of the Uniform Deceptive Trade Practices Act, misappropriation of trade secrets, tortious interference with business relations, fraud, and civil conspiracy.[13]

### 4. Other proceedings

#### (a) Preliminary injunction

On November 14, 2018, plaintiffs moved for a preliminary injunction.[14] The motion was fully briefed on March 1, 2019.[15] Judge Andrews heard the parties on July

---

[8] D.I. 263.

[9] D.I. 32.

[10] C.A. No. 1:17-cv-04615 (N.D. Ga.).

[11] C.A. No. 19-564, D.I. 35.

[12] D.I. 108; C.A. No. 19-564, D.I. 43.

[13] C.A. No. 19-564, D.I. 1.

[14] D.I. 50.

[15] D.I. 93.

2, 2019[16] and denied the motion on August 14, 2019.[17] As is discussed herein, the parties rely in part on evidence presented at the preliminary injunction hearing as a basis for the motions presently before the court.

### (b)    Claim construction

After receiving briefing and hearing the parties at a *Markman* hearing on April 25, 2019, Judge Andrews entered an order on claim construction on May 22, 2019.[18] In his opinion, Judge Andrews disagreed with defendants' assertion that the "absolute dryness" term in claims 13 and 17 of the '578 patent is indefinite but stated that "Defendants may readdress the definiteness of this claim at the summary judgment stage after expert discovery."[19]

### 5.    Asserted Claims

Plaintiffs allege that the Accused Products infringe claims 1, 2, and 4-7[20] and that the Accused Process infringes claims 8-10, 13, 15, 16, and 19.[21]

### 6.    Pending Motions

### (a)    Dispositive Motions

After a number of amendments to the scheduling order,[22] fact discovery closed on December 20, 2019. The parties met with Judge Andrews on January 3, 2020 to address discovery disputes—Judge Andrews found good cause to extend discovery to

---

[16] D.I. 143, 144.

[17] D.I. 146, 147.

[18] D.I. 128, 131.

[19] D.I. 128 at 12.

[20] D.I. 241 at 6.

[21] *Id.*

[22] D.I. 126, 153.

allow for depositions of the MOSO representatives and the individual defendants.[23] The parties then stipulated to additional amendments to the scheduling order that moved the deadline for dispositive motions to October 2020 and the trial date to May 2021.[24]

On October 16, 2020, the parties filed the following dispositive motions:

- Defendant, MOSO, moved for summary judgment of noninfringement of the '578 patent;[25]

- MOSO moved for summary judgment that certain claims of the '578 patent are invalid as indefinite;[26]

- MOSO moved for summary judgment in its favor as to the SAC's Count II (Tortious Interference with Prospective Economic Advantage), Count III (Violation of Delaware Deceptive Trade Practices Act), and Count IV (Aiding and Abetting Breach of Fiduciary Duty);[27]

- The individual defendants (Kelly, Clifton, and Osterman) moved for summary judgment in their favor as to the Companion Complaint's Count I (Breach of Fiduciary Duty), Count II (Breach of the Duty of Loyalty), Count III (Violation of the Uniform Deceptive Trade Practices Act), Count IV (Misappropriation of Trade Secrets), and Count V (Tortious Interference With Business Relations);[28]

- Plaintiffs moved for summary judgment that the '578 patent is not invalid as obvious;[29]

---

[23] D.I. 199. At the time, Judge Andrews denied plaintiffs' request to depose third party witness, Mr. Francis James of Weston.

[24] D.I. 205, 209, 228, 236, 238.

[25] D.I. 239.

[26] *Id*.

[27] *Id*.

[28] D.I. 240.

[29] D.I. 248.

- Plaintiffs moved for summary judgment in their favor as to MOSO's patent exhaustion defense;[30] and

- Plaintiffs moved for summary judgment in their favor as to MOSO's counterclaims Count VI (Libel *per se*) and Count VII (Trade Libel).[31]

These motions are opposed. Briefing on the dispositive motions was complete on December 8, 2020.[32]

### (i)    Motion to Strike

In conjunction with the papers filed with the briefing on summary judgment, on December 14, 2020, defendants moved to strike two declarations filed by plaintiffs at D.I. 271, Exs. 30 and 31.[33] Plaintiffs oppose the motion.[34] Briefing on the motion to strike was complete on January 13, 2021.[35]

### (b)    Other Motions

Also on October 16, 2020, the parties filed three other motions as follows:

- Defendant, MOSO, moved to exclude portions of the testimony of plaintiffs' technical expert, Dr. Rubin Shmulsky;[36]

- MOSO and the individual defendants (Kelly, Clifton, and Osterman), moved to exclude portions of the testimony of plaintiffs' damages expert, Mr. Glenn Newman;[37] and

---

[30] *Id.*

[31] *Id.*

[32] *E.g.*, D.I. 293.

[33] D.I. 295, 296.

[34] D.I. 307.

[35] D.I. 309.

[36] D.I. 239

[37] *Id.*; D.I. 240.

- Plaintiffs moved for the presumption, pursuant to 35 U.S.C. § 295, that the accused products are made by the process described in the '578 patent.[38]

As with the dispositive motions, these motions are opposed, and briefing was complete on December 8, 2020.

### 7.    Referral and additional stipulations

On March 11, 2021, pursuant to 28 U.S.C. § 636(b), Judge Andrews referred the Motions for Summary Judgment,[39] Motion for Presumption Under 35 U.S.C. Section 295,[40] and Motion to Strike[41] to the court.[42]

On May 17, 2021, the parties stipulated to give up the May 2021 trial date in favor of a date possibly in the fall of 2021.[43]

---

[38] D.I. 243.

[39] D.I. 239, 240, 248.

[40] D.I. 243.

[41] D.I. 295.

[42] D.I. 312.

[43] D.I. 314, 315.

## III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[44] The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question.[45] Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party."[46] The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case.[47]

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial.[48] A non-moving party asserting that a fact is genuinely disputed must support such an assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials[.]"[49] Alternatively, the non-moving party may show "that the materials cited [by the moving party] do not establish the absence or presence of a genuine dispute or that an adverse party cannot produce admissible evidence to support the fact."[50]

---

[44] Fed. R. Civ. P. 56(a).

[45] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[46] *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[47] *Celotex*, 477 U.S. at 323.

[48] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989).

[49] Fed. R. Civ. P. 56(c)(1).

[50] *Id.*

This standard does not change merely because there are cross-motions for summary judgment.[51] Cross-motions for summary judgment

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.[52]

The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party.[53]

## IV.    DISCUSSION

### A.    Daubert Motions

#### 1.    Dr. Shmulsky

MOSO has moved to exclude "portions of the proposed trial testimony of [plaintiffs' expert,] Dr. Rubin Shmulsky[.]"[54] This specifically includes "evidence of Dr. Shmulsky's testing"[55] of MOSO's "Bamboo X-Treme products[.]"[56] Since Dr. Shmulsky's proposed testimony is central to many of the cross motions for summary judgment, the potential exclusion of his testimony could impact these pending motions. The court addresses this motion first, and for the following reasons recommends that the district court DENY MOSO's motion.[57]

---

[51] *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

[52] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

[53] *Krupa v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

[54] D.I. 239.

[55] D.I. 241 at 34.

[56] *Id.* at 2.

[57] D.I. 239.

### (a)    Dr. Shmulsky's Testing

Section VI of Dr. Shmulsky's opening expert report at paragraphs 43-51 discusses "Tests Performed on MOSO's Bamboo X-Treme Product."[58] These tests include physical inspection, measurement of product dimensions, calculation of density, and general comparisons between Bamboo X-Treme and plaintiffs' Dasso XTR products.[59] Figure 1 is a cross-sectional microscopic picture of MOSO's Bamboo X-Treme planks showing what Dr. Shmulsky identifies as "bamboo strips or scrim elements."[60]



Figure 1. Cross sectional picture of Moso X-treme showing bamboo strips or scrim elements, arranged substantially parallel to each other and the long axis of the plank, in a state of disorder, on the order of about 1.0 to 4.5 mm in cross section. 10x magnification. Ruler scale is in mm.

---

[58] D.I. 242, Ex. D at 17–23.

[59] *Id.* at 17-19, ¶¶ 43–49, Tables 1–2.

[60] *Id.* at Figure 1.

Similarly, Figure 3 is a photograph of a magnified image of the surface of a Bamboo X-Treme plank.[61] In the caption of Figure 3, Dr. Shmulsky identifies "a slot, slit, or incision"



Figure 3. Cross sectional picture of Moso X-treme showing what appears to be a slot, slit, or incision substantially parallel to the bamboo scrim bundle as noted by the arrow. 10x magnification. Ruler scale is in mm.

in MOSO's Bamboo X-Treme product.[62] In paragraph 51 of his report, Dr. Shmulsky states that "[m]icroscopic examination revealed that the MOSO and the Dasso products both contain slots consistent with those described in the [']578 patent (Figures 3 & 4). As the product is pressed subsequent to the slotting process, many of the slots are obliterated or compressed beyond recognition during the pressing (whether hot or cold) process."[63]

---

[61] D.I. 242, Ex. D at 22, Figure 3.

[62] *Id.*

[63] *Id.* at ¶ 51.

**(b)    Standard**

The admissibility of expert testimony is governed by the Federal Rule of Evidence 702, which states in relevant part:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharma., Inc.*, the Supreme Court stated that when faced with a proffer of expert scientific testimony, "the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is going to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."[64] "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[65] The trial judge has broad latitude in determining whether the *Daubert* factors are reasonable measures of reliability.[66]

In evaluating expert testimony, the Third Circuit has instructed courts to look to qualifications of experts,[67] the reliability of the scientific methodologies applied,[68] and "the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case."[69] The question of whether an

---

[64] 509 U.S. 579, 592 (1993).

[65] *Id.* at 593–94.

[66] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 139 (1999).

[67] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994).

[68] *Id.* at 742.

[69] *Id.* at 743 (internal quotation marks omitted) (citing *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985)).

expert's testimony is admissible based on his qualifications, reliability, and fit is committed to the court's discretion.[70] Moreover, "even if the judge believes 'there are better grounds for some alternative conclusion,' and that there are some flaws in the scientist's methods, if there are 'good grounds' for the expert's conclusions, it should be admitted."[71]

### (c)    Discussion

In the case at bar, there is no dispute as to the qualifications of Dr. Shmulsky, his expertise in the field, or whether his knowledge could assist the trier of fact to determine a fact in issue.[72] Nor is there a dispute that Dr. Shmulsky's proposed testimony directly relates to disputed factual issues, namely whether the accused product was made by the process claimed in the '578 patent. Thus, the only question is whether his methodologies are reliable.

MOSO identifies two general faults with Dr. Shmulsky's report. First, Dr. Shmulsky sanded the surface of the Bamboo X-Treme planks with a medium-grit sandpaper and did not record this fact or the grade of the sandpaper. MOSO contends that this procedure "lacks any scientific basis"[73] and is likely to "give misleading results."[74] Second, when applying the Third Circuit's factors for evaluating expert testimony, MOSO explains that the "testable hypothesis" is "whether one can examine a bamboo scrimber to determine the condition of the bamboo material prior to pressure pressing."[75]

---

[70] *Id.* at 749.

[71] *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152-53 (3d Cir. 1999) (quoting *In re Paoli*, 35 F.3d at 744).

[72] D.I. 241 at 37 ("That leaves the seventh factor—qualifications of the testifying expert—which MOSO concedes weighs in favor of allowing the testing.").

[73] D.I. 241 at 34.

[74] *Id.* at 35.

[75] D.I. 241 at 36.

Although MOSO discusses these two critiques in a single section addressing the *Paoli* factors, they are two distinct arguments. For instance, MOSO argues that: (1) Dr. Shmulsky's identification of the slots in the surface of the Bamboo X-Treme plank is unreliable, because he failed to properly document that he sanded the surface, and (2) Dr. Shmulsky's inspection of the finished product is unreliable, because "it is not possible to determine the condition of the bamboo material prior to hot-pressing by examining a scrimber."[76]

### (i)    Sanding

Dr. Shmulsky's proposed testimony is that, after sanding the finished surface of the planks, he used a microscope to inspect the surface of the plank and observed a small incision or slot in the surface of the Bamboo X-Treme plank. Dr. Shmulsky's conclusion is that the slot is a remnant of the slotting step during manufacture.[77]

MOSO contends that Dr. Shmulsky's failure to document the fact that he sanded the Bamboo X-Treme planks with a medium-grit sandpaper "makes it impossible for one to replicate Dr. Shmulsky's preparation of a specimen Accused Product and consequently, test the falsifiability of his methodology."[78] Plaintiffs explain that Dr. Shmulsky sanded a Bamboo X-Treme plank "across the grain to remove any finish" and inspected the "sanded surface under a microscope to determine if there was evidence of slotting."[79] In support, plaintiffs attached to Dr. Shmulsky's declaration two technical articles discussing how to remove finishes from wood products, including through

---

[76] *Id.* at 37 (citing D.I. 242-1, Ex. C at ¶ 84 (Dr. Bock's report)).

[77] D.I. 274 at ¶¶ 39–52.

[78] D.I. 293 at 18.

[79] D.I. 269 at 34 (citing D.I. 274 at ¶¶ 39–52).

sanding.[80] MOSO argues that this is "*post hoc* justification" that "actually supports exclusion."[81]

MOSO's arguments ultimately go to the weight the jury may choose to give to Dr. Shmulsky's testimony, but MOSO does not credibly raise any issues as to the reliability of Dr. Shmulsky's practice of sanding the surface of the Bamboo X-Treme plank prior to examining it under the microscope. Even MOSO's expert, Dr. Böck, is able to see the "indentations identified by Dr. Shmulsky"[82]—he simply disagrees as to the source[83] and further hypothesizes that the indentations could have been created by Dr. Shmulsky when he sanded the plank.[84] These are clearly questions for the jury. But as to the question of reliability, whether others can observe the indentations in the surface of the plank, whether the indentations can be seen under a microscope without sanding, and whether the sanding causes the indentations are questions that are easily tested. Thus, this aspect of Dr. Shmulsky's testing offers no basis for excluding his conclusions.

### (ii)    Observing the finished product

As to the source of the "slot" or "indentation" in the surface of the accused products, MOSO introduces its second argument in the context of the first *Paoli* factor, "whether a method consists of a testable hypothesis[.]"[85] MOSO avers that the "testable

---

[80] D.I. 274-1, Exs. E, F.

[81] D.I. 293 at 18. MOSO appears to take issue with Plaintiffs' lack of argument related to these materials, *id.*, but presents the court with a heavily-excerpted record and only includes a small portion of Dr. Shmulsky's reply report, D.I  242-1, Ex. J. In light this limited record, it is difficult for the court to reach the same conclusions MOSO has.

[82] D.I. 242-1, Ex. C at ¶ 85.

[83] *Id.* ("During pressing, friction created on the surface of the board during post-processing could have caused a splinter to break off the board at a point where fibers had weakly fused, thereby producing small indentations like the ones identified by Dr. Shmulsky.").

[84] *Id.* at ¶ 87 ("[I]t's possible that whatever created the perpendicular lines in the specimen also caused the indentation Dr. Shmulsky identified as a slot.").

[85] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994).

hypothesis" in Dr. Shmulsky's opening expert report on infringement is "whether one can examine a bamboo scrimber to determine the condition of the bamboo material prior to pressure pressing."[86] In support of its argument for exclusion, MOSO cites solely to Dr. Böck's report, but that report does not discuss alternative testing methodologies or identify any outside sources, studies, or literature to support MOSO's position.[87] Plaintiffs respond that MOSO's "criticisms . . . go to the weight rather than the admissibility of the evidence."[88]

The court agrees with plaintiffs for the following reasons. First, there is no evidence that Dr. Shmulsky's opinion is based upon the "testable hypothesis" that MOSO articulates. The report does not chronicle a blind inspection of unknown bamboo scrimbers in search of evidence of infringement of the '578 patent—Dr. Shmulsky knew the source of the floor planks and was aware of the processes used to manufacture them.[89] There is no equivalent "fingerprint identification" here.[90]

Second, MOSO's briefs does not accurately reflect Dr. Böck's report.[91] For example, the only opinion Dr. Böck expresses has to do with the "condition" of the "bamboo fibers" pre- and post-manufacture.[92] This is an opinion on noninfringement as

---

[86] D.I. 241 at 36. MOSO treats this as a rhetorical question and, assuming that the court is not versed in this form of argument, answers it in the following sentence: "It cannot." *Id.*

[87] *Id.* at 37 (citing D.I. 242-1, Ex. C at ¶ 84).

[88] D.I. 269 at 35.

[89] D.I. 242-1, Ex. D at ¶¶ 38, 52.

[90] *Contra United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) (discussing testing and "falsifiability" in the context of fingerprint identification of a defendant).

[91] D.I. 241 at 37 (citing D.I. 242-1, Ex. C at ¶ 84 (Dr. Bock's report)).

[92] D.I. 242-1, Ex. C at ¶ 84 (footnote omitted) ("In other words, a bamboo scrimber cannot comprise a plurality of bamboo strips because pressure-pressing fundamentally changes the structure of fibers such that the material making up the scrimber can no longer be considered bamboo strips.).

to specific claim limitations; whether it is a critique or analysis of Dr. Shmulsky's "methodology" is not evident from the cited paragraph.[93]

Third, MOSO's contention that "it is not possible to determine the condition of the bamboo material prior to hot-pressing by examining a scrimber"[94] is unsupported attorney argument that goes beyond the boundaries of the report of MOSO's expert. For example, Dr. Böck stated that it is "nearly impossible to determine the condition of the **bamboo material** (e.g., crushed bundles) before pressing."[95] This is in response to Dr. Shmulsky's opinion that "many or most" of the slots formed during manufacture do not survive the manufacturing process.[96] Although this appears to be a difference of opinion as to the frequency with which remnants of the slots appear in the finished product, Dr. Böck does not clearly address any such opinion in his discussion of how the bamboo fibers are fused. In fact, Dr. Böck explains in a footnote that an objective for manufacturers is to "reduce[] the likelihood of **gaps or voids** between crushed bundles, which could cause variations in the density of the resulting scrimber."[97] Here, Dr. Böck does not use absolute language (e.g. "eliminating all gaps or voids") and instead acknowledges reducing a "likelihood" of those gaps or voids. Since Dr. Shmulsky has identified a "gap or void" that he identifies as a "slot, slit, or incision,"[98] and Dr. Böck has acknowledged a "likelihood" that such structures could exist in the scrimber,[99] Dr. Böck's report is not a rebuttal of Dr. Shmulsky's report as MOSO avers.

---

[93] *Id.*

[94] D.I. 241 at 37 (citing D.I. 242-1, Ex. C at ¶ 84 (Dr. Bock's report)).

[95] D.I. 242-1, Ex. C at ¶ 84 (emphasis added). The court notes that MOSO has translated Dr. Bock's "nearly impossible" into "not possible" (or "impossible") in its argument.

[96] D.I. 242-1, Ex. D at ¶ 21.

[97] D.I. 242-1, Ex. C at ¶ 84 n.53 (emphasis added).

[98] D.I. 242-1, Ex. D at 21–22, ¶ 51, Figure 3.

[99] Whether this is what Dr. Bock meant is properly the subject of cross examination.

Finally, to the extent Dr. Böck's report contains a critique of Dr. Shmulsky's methodology, Dr. Böck does not identify any countervailing science, studies, reports, literature, or otherwise, that support such a critique.[100] In fact, Dr. Böck appears to have followed a similar method as Dr. Shmulsky, which is to view the finished product in light of his own experience[101] and with detailed knowledge of the process used to manufacture the accused product.[102] Dr. Böck also appears to be quite comfortable interpreting the images in Dr. Shmulsky's report to explain his own opinion.[103]

### (d)    Conclusion

As the moving party, MOSO carries the burden to raise an argument for excluding Dr. Shmulsky's testimony—it has not done so. Despite a recitation of the *Paoli* factors, MOSO's briefs do not accurately reflect the contents of the expert reports they cite. This is not a case of one expert following commonly-accepted scientific principles and another testing the boundaries of credibility. Here, both experts know details about the process used to manufacture the accused products, both experts are able to identify elements of the raw bamboo inputs in the finished product, and both are able to express opinions based upon their knowledge and experience. In the end, the experts express differing opinions based upon this same information. These are properly matters for a jury and not for exclusion under *Daubert*.[104] For the

---

[100] D.I. 242-1, Ex. C at ¶ 84.

[101] *E.g.*, D.I. 242-1, Ex. C at ¶ 84 n.53 (emphasis added) ("I believe the cross-sections shown in Figures 1 and 2 show that, after compression and densification, the former strands in the crushed bundles now appear to be in a state of disorder in the cross-section. **In my experience**, crushed bundles are carefully laid out on hot plates.").

[102] D.I. 271, Ex. 11 at ¶¶ 1–4, 16, 60–65.

[103] D.I. 242-1, Ex. C at ¶ 84 n.53 (expressing an opinion about the significance of Figures 1 and 2 of Dr. Shmulsky's report).

[104] Were the district court inclined to exclude Dr. Shmulsky's examination of the finished products, it should also consider excluding Dr. Bock's testimony on the same subject. The court does not recommend this, as both reports appear to be reliable and, under Federal Rule of Evidence 702, helpful to the jury.

aforementioned reasons, the court recommends that the district court DENY MOSO's motion to exclude Dr. Shmulsky's testimony.

### 2.     Mr. Newman

The defendants move[105] to exclude plaintiffs' damages expert, Mr. Glenn Newman, on the grounds that his opinions "lack sufficient factual and/or scientific bases."[106] They make three separate arguments to exclude, Mr. Newman's testimony, which the court addresses in order.[107] For the reasons that follow, the court recommends that the district court DENY defendants' motions.[108]

### (a)     Apportionment of damages to specific bad acts for non-patent damages claims

Defendants argue that Mr. Newman, failed "to assign a value to any individual trade secret or bad act under" the non-patent damages claims, which "renders his damages analysis unreliable and irrelevant to the trier of fact[.]"[109] Defendants present a handful of excerpted pages from Mr. Newman's report and cite a single patent case, *ART+COM Innovationpool GmbH v. Google, Inc.*,[110] as the basis for their reasoning—defendants contend that Mr. Newman made "no attempt to tie his unjust enrichment damages to the use of any trade secrets, instead *assuming* that *all* MOSO NA sales from 2017 through present were the result of unspecified trade secret or tortious interference claims (or alternatively patent claims), including revenues from customers that neither party had made sales to until several years after the date of the alleged bad

---

[105] D.I. 239, D.I. 240.

[106] D.I. 241 at 38.

[107] D.I. 241 at 38–40.

[108] D.I. 239, 240.

[109] D.I. 241 at 38.

[110] *ART+COM Innovationpool GmbH v. Google, Inc.*, 155 F. Supp. 3d 489 (D. Del. 2016).

acts."[111] Plaintiffs respond that "Mr. Newman's report identified approximately two dozen instances of alleged improper conduct" and that this establishes "a reasonable basis for a trier of fact to conclude that the Defendants' actions harmed Plaintiffs."[112] Moreover, plaintiffs add, "as Mr. Newman noted, 86 percent of Defendants' revenues were derived from customers who were also (or previously) served by Plaintiffs."[113] Finally, plaintiffs argue that the case law cited by defendants does not support their request and that the issues presented go to the weight of the evidence and should be addressed at trial.[114] In reply, defendants argue that "Mr. Newman's opinion is defective and should be stricken, as it does not rise to the level of scientific rigor required under *Daubert*."[115]

The *ART+COM* case concerns damages associated with patent infringement.[116] In that case, the court excluded a damages expert's report pertaining to a 5.5 year "activations" multiplier that, the court noted, "is detached from the facts of the case."[117] The court explained further that "[t]here is no document that supports this number, nor is there any calculation, such as some sort of weighted average."[118] That case is distinguishable on the facts, because in the case at bar, Mr. Newman provides a detailed basis for his non-patent damages calculations.[119] Defendants have not identified a specific unsupported assumption[120] in their heavily-excerpted version of Mr.

---

[111] D.I. 241 at 38 (emphasis in original).

[112] D.I. 269 at 36 (citing D.I. 271, Ex. 33 at ¶¶ 47–56).

[113] *Id.* (citing D.I. 271, Ex. 33 at ¶ 104).

[114] *Id.* at 36–37.

[115] D.I. 293 at 19.

[116] *ART+COM*, 155 F. Supp. 3d at 515–16.

[117] *Id.* at 515.

[118] *Id.*

[119] D.I. 271, Ex. 33 at ¶¶ 40–58, 67–88, 124–143.

[120] *ART+COM*,155 F. Supp. 3d at 515–16.

Newman's report.[121] Moreover, to the extent defendants aver that Mr. Newman must apportion damages by "individual trade secret or bad act," this is one of defendants' myriad assertions lacking citation to supporting case law.

### (b)    Non-infringing substitutes for lost profits

Defendants argue that Mr. Newman's opinion about other products as "nonviable non-infringing alternatives relating to his lost profits analysis is based only on his 'analysis of the available documents, deposition testimony, and research' and discussions with his client, not by discussions with Dasso's technical expert and he admitted at deposition that he is not an industry expert on decking materials."[122] As a result, Defendants contend that Mr. Newman did not have a "reasonable basis" for his opinion.[123] Plaintiffs respond that Dr. Shmulsky's report, which Mr. Newman reviewed, "contains a section on lack of acceptable non-infringing alternatives" and that defendants' damages expert, Mr. Brian Napper, based his opinion on counterclaim damages solely on conversations with MOSO's Mr. Zaal.[124] The court is not aware of any requirement that an economic damages expert also be a subject matter expert in the technology involved in patent litigation. Here, Mr. Newman consulted the record, including Dr. Shmulsky's report, which specifically addressed the question of non-infringing alternatives.[125] The jury can decide how much weight to assign to this aspect of Mr. Newman's opinion.

---

[121] D.I. 241 at 38 (citing D.I. 242-1, Ex. R at ¶¶ 128–38).

[122] D.I. 241 at 39.

[123] *Id.*

[124] D.I. 269 at 37.

[125] D.I. 271, Ex. 34 at 38–39.

### (c)    Price erosion

Finally, defendants seek to reduce the amount of Mr. Newman's lost profits damages analysis by 11%, arguing that he "performed no analysis of the price elasticity of demand for the increased price for lost sales[.]"[126] Defendants cite two cases as supporting exclusion: *Crystal Semiconductor Corp. vs. TriTech Microelectronics Int'l, Inc.*[127] and *ART+COM*.[128] Plaintiffs contend that defendants are wrong, because Mr. Newman did not base his analysis on a hypothetical price and instead "measured the Plaintiffs' lost revenues at its historical actual selling prices," based upon defendants' actions undercutting plaintiffs' prices.[129] Plaintiffs argue that Mr. Newman explained his reasoning that he did not think an analysis of price elasticity was necessary because the lost revenues came from customers that had agreed to pay plaintiffs' prices, both in his report and at his deposition.[130]

In *Crystal Semiconductor* the Federal Circuit stated that, in a claim for lost profits based on a theory of price erosion, "'the question as to the character and sufficiency of the evidence' places the burden on the patentee to show that 'but for' infringement, it would have sold its product at higher prices."[131] "Moreover, in a credible economic

---

[126] D.I. 241 at 39.

[127] *Crystal Semiconductor Corp. vs. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336 (Fed. Cir. 2001).

[128] *ART+COM*, 155 F. Supp. 3d at 489.

[129] D.I. 269 at 38.

[130] *Id.* In their reply brief, defendants raise a new argument challenging Mr. Newman's 11% value based upon opinions in the rebuttal expert report of their expert Mr. Napper. D.I. 293 at 20 (citing D.I. 294-1, Ex. AA at ¶¶ 50–52, 61, 66–72). Since this argument was not made and presented to plaintiffs in the opening brief, D.I. 241 at 39–40, and since it does not respond to an issue raised in the answering brief, D.I. 269 at 38, plaintiffs have not had an opportunity to respond to this argument, and the court declines to consider it. D. Del. L.R. 7.1.3(c)(2) ("The party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief.").

[131] *Crystal Semiconductor*, 246 F.3d 1336, 1357 (Fed. Cir. 2001) (quoting *BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1222 (Fed. Cir. 1993)).

analysis, the patentee cannot show entitlement to a higher price divorced from the effect of that higher price on demand for the product."[132] *Crystal Semiconductor* suggests that when plaintiffs assert a higher price than is available on the market, they must analyze the price elasticity of demand.[133] However, the facts of that case do not apply to the case at bar.[134] To wit, as to the "but for" analysis, Mr. Newman relies on historical sales data and is able to base lost profits on actual lost sales, because the majority of MOSO's customers paid those higher prices in the past. Thus, Mr. Newman does not rely on an elasticity analysis to determine the appropriate sales volume for a hypothetical higher price. The actual values of these variables are known through historical data for a large majority of MOSO's present customer base.[135] Mr. Newman's report addresses the "but for" analysis and does so without engaging in price elasticity—the court discerns no deficiency as to this aspect of his opinion.

### (d)    Conclusion

For the foregoing reasons, the court recommends that the district court DENY defendants' motions to exclude Mr. Newman's report.

---

[132] *Id.*

[133] *Id.*

[134] Defendants' argument here is that, based upon *Crystal Semiconductor*, Mr. Newman must perform a price elasticity analysis. D.I. 241 at 39–40. The additional citation to *ART+COM* simply faults Mr. Newman for not performing the price elasticity analysis, although that case does not stand for any proposition related to price elasticity or price erosion. *See generally ART+COM*, 155 F. Supp. 3d 489 (D. Del. 2016).

[135] The court notes that neither party included the entirety of Mr. Newman's report, specifically Exhibit C "Pricing Analysis – Revenue Factor," which ostensibly explains the math behind his analysis. *See* D.I. 271, Ex. 33 at ¶ 114 (footnote omitted) (citing "Exhibit C") ("I determined that in total, the net difference in the parties' average selling price for Relevant Products was in excess of ten percent. To achieve Easoon equivalent pricing, I utilized an 11 percent factor (i.e., markup) to recognize the ten percent lower prices realized by MosoNA.").

## B.    Noninfringement of the '578 patent

Plaintiffs assert that MOSO infringes claims: 1 2, 4–10, 13, 15, 16, and 19.[136] MOSO has moved for partial summary judgment of noninfringement of independent claims 1, 8, and 16, reasoning that the accused process does not work with "slotted strips" and instead processes "crushed bundles" which do not literally infringe, and which plaintiffs have, nonetheless, disclaimed.[137] MOSO also argues that Plaintiffs have failed to present evidence to establish infringement of the heat treatment limitations in claims 16 and 19.[138]

For the reasons that follow, the court recommends that the district court DENY the motion as to the "slots" limitations and DENY the motion as to the heat treatment limitations.

### 1.    Standard

When an accused infringer moves for summary judgment of noninfringement, such relief may be granted only if at least one limitation of the claim in question does not read on an element of the accused product, either literally or under the doctrine of equivalents.[139] Thus, summary judgment of noninfringement can only be granted if, after viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue as to whether, under the court's construction of the relevant limitations, the accused product is covered by the claims.[140]

---

[136] D.I. 241 at 6; D.I. 244 at 1.

[137] D.I. 241 at 8–18.

[138] *Id.* at 18–20.

[139] *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005); *see also TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) (citation omitted) ("Summary judgment of noninfringement is [] appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial.").

[140] *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999).

### 2. No Specific Argument as to Claim 1 and the Article of Manufacture Claims

MOSO's briefing lacks the hallmarks of summary judgment in patent litigation, such as an identification of specific claims and relevant claim language. For example, MOSO creates an omnibus argument that nominally lumps together article of manufacture and process claims under the moniker "Asserted Claims." The argument focuses solely on the process steps and yet avers that claim 1 is not infringed. Independent claim 1 recites:

> A **bamboo scrimber** comprising:
>
> a plurality of pressure-pressed bamboo strips impregnated with an adhesive and modified through heat-treatment so that at least a part of hemicelluloses in said bamboo strips is pyrolysized, wherein each of said bamboo strips is formed with a plurality of slots penetrating through said bamboo strip substantially in a direction of thickness defined by said bamboo strip and a substantially longitudinal direction defined by said slots is substantially consistent with a substantially longitudinal direction defined by fibers of said bamboo strip.[141]

This is a claim to an article of manufacture, not a process.[142] Since the entire section of argument is directed to process steps,[143] it does not relate to independent claim 1 and claims 2, 4, 5, 6, and 7, which depend on claim 1.[144] On this basis the court recommends the district court DENY the motion as to claim 1.

### 3. The "forming a plurality of slots . . ." limitations in claims 8 and 16

MOSO makes two arguments in support of summary judgment of noninfringement of the "forming a plurality of slots . . ." limitations: (1) that under

---

[141] '578 patent, 11:35–45 (emphasis added) (cl. 1).

[142] 35 U.S.C. § 101.

[143] D.I. 241 at 8 (emphasis added) ("The Accused **Process** Does Not infringe the '578 Patent"); *see generally id.* at 8–20 (failing to mention claim 1 with any specificity).

[144] '578 patent, 11:35–64 (cls. 1–7). The court notes that claim 3 is not asserted in this litigation.

MOSO's construction of this limitation, plaintiffs disclaimed "crushed bundles" in the *Inter Partes* Review proceeding, and the accused process does not infringe;[145] and (2) that the evidence cited by Dr. Shmulsky does not "establish infringement."[146] Plaintiffs respond that MOSO's purported "crushed bundles" are within the scope of claims 8 and 16 and argue that, "if accepted, MOSO's argument would exclude the preferred embodiments of the '578 patent from the scope of the claims because it would exclude the output of the 'slot-forming machine' employing the 'toothed rollers' taught by the '578 patent."[147] Plaintiffs also argue against disclaimer and that the additional, crushing step, still falls within the scope of claims 8 and 16.[148] Plaintiffs argue further that there is sufficient evidence for a jury to find infringement of the "forming a plurality of slots . . ." limitations.[149] For the reasons that follow, the court recommends the district court DENY the motion.

### (a)    It is undisputed that the accused process includes an additional "crushing" step

As a preliminary matter, there is no dispute that the accused process crushes the strips of bamboo after the strips have been through the (disputed) step of "forming a

---

[145] D.I. 241 at 8–12 (Section IV.A.1.a.).

[146] *Id.* at 12–18 (Section IV.A.1.b.).

[147] D.I. 269 at 8.

[148] *Id.* at 11–15.

[149] *Id.* at 15–19.

plurality of slots."[150] For example, claim 8, which is one of the two independent process claims,[151] recites:

> [8pre] A method of manufacturing a bamboo scrimber comprising steps of:
>
> [8a] preparing bamboo strips from bamboo;
>
> [8b] forming a plurality of slots in each of the prepared bamboo strips penetrating through the bamboo strip substantially in a direction of thickness defined by the bamboo strip and a substantially longitudinal direction defined by the slots is substantially consistent with a substantially longitudinal direction defined by fibers of the bamboo strip;
>
> [8c] modifying the formed bamboo strips through heat-treatment so that at least a part of hemicelluloses in said bamboo strips is pyrolysized;
>
> [8d] impregnating the modified bamboo strips into an adhesive;
>
> [8e] drying the impregnated bamboo strips; and
>
> [8f] pressure-pressing the dried bamboo strips in a mold until the adhesive is cured so as to form the bamboo scrimber.[152]

The parties appear to agree that, for example in claim 8, this additional crushing step is performed somewhere during, or after, step 8b and before step 8c.

---

[150] D.I. 242-1, Ex. C at ¶ 44 ("Immediately following the incising rollers are pressure rollers, which have ridges that apply vertical pressure to squeeze the strips to tangentially separate strands of the strip. The number of pressure roller pairs typically depends on the thickness of the strips and the desired level of crushing. After passing through the last pair of pressure rollers, the now-formed crushed strip (i.e., collection of loosely connected fiber bundles) is discharged into a chute and deposited in a bin for collection."); *id.*, Ex. D at ¶ 69 ("As set forth above, MOSO uses a combination of a bladed roller and at least one flat-faced roller in the "crushing' process shown in DX-90 step 4.").

[151] Claim 16 claims the process in a different order but otherwise uses language similar to claim 8. *Id.*, 12:47–63.

[152] '578 patent, 11:65–12:13.

## (b)    The alleged disclaimer of "crushed bundles"

With this undisputed crushing step present, MOSO argues that the accused process does not infringe claims 8 and 16 on the basis that the accused process does not perform the steps directed to "processing the slotted strips,"[153] because these subsequent steps are performed on "crushed bundles."[154] MOSO bases its argument upon a logical proof[155] that reaches the conclusion that "[t]o establish infringement of the Asserted Claims, Plaintiffs therefore must establish that a crushed bundle is a slotted strip[.]"[156] MOSO contends that Dasso disclaimed these "crushed bundles" in responding to the *Inter Partes* Review petition, and that the process claims must be read as being limited to a specific article of manufacture, namely "slotted strips."[157]

Despite all the arm-waving and assertions of disclaimer, this is—fundamentally— a claim construction argument. Here, MOSO argues that if the court agrees with its proposed construction (which incorporates the alleged disclaimer), then summary

---

[153] D.I. 241 at 8 ("Because the Accused Process does not include forming a plurality of slotted strips, much less the performing operations on the processing the slotted strips to make a scrimber, the Accused Products do not literally infringe the Asserted Claims.").

[154] *Id.* at 8–9.

[155] A cite check of this proof uncovers a few logical leaps. For example, MOSO relies on its expert, Dr. Bock, to explain that the "loosely-connected fiber bundles" identified by MOSO's Mr. Zaal "are also referred to as 'crushed bundles.'" D.I. 241 at 9 (citing D.I. 242-1, Ex. C at ¶ 44 (Dr. Bock's report)). But the cited portion of Dr. Bock's report does not use such a term and instead refers to "the now-formed **crushed strip**[.]" In addition, MOSO seeks to manufacture agreement, claiming that "Dr. Shmulsky's deposition testimony further supports the unmistakable conclusion that a crushed bundle is not a slotted strip." D.I. 241 at 12. But the court is unable to discern such an obvious conclusion from the same materials—Dr. Shmulsky, acknowledges the presence of "fiber bundles" in the finished product, D.I. 242-1, Ex. D at ¶¶ 61, 69 (cited by MOSO in D.I. 241 at 9), but he does not use the term "crushed bundles" in his report and there is no evidence in the record that he agrees that the process steps after slotting are performed on "crushed bundles." D.I. 242-1, Ex.C at ¶ 44 (emphasis added).

[156] D.I. 241 at 9.

[157] D.I. 241 at 8–9.

judgment is appropriate. This is wrong for two reasons. First, as a matter of law, the proposed claim construction is indefinite. Second, as to noninfringement of the process claims, MOSO bears the burden to show that there is "no genuine dispute as to any material fact and . . . [it] is entitled to judgment as a matter of law."[158] But here, the one fact the parties agree about, the additional "crushing" step in the accused process, is not a "material fact" that could affect the outcome of the case.[159]

> ### (i)    MOSO's construction relies on structural disclaimers, which the '578 patent's process claims cannot include

First, as a matter of law, the '578 patent's process claims cannot include structural limitations and cannot, therefore, disclaim specific structures (i.e. "crushed bundles"). In its brief MOSO essentially asks the court to reopen claim construction and to re-construe the term "forming a plurality of slots in each of the prepared bamboo strips penetrating through the bamboo strip substantially in a direction of thickness defined by the bamboo strip" as used in claims 8 and 16 of the '578 patent.[160] MOSO did not raise this argument at claim construction,[161] nor has it explicitly proposed a new construction of the term. The construction is instead implicit to MOSO's briefing on noninfringement: "it is **crushed bundles** in the Accused Process, not slotted strips, that are modified through heat treatment, impregnated with adhesive, dried, and ultimately pressure-pressed to form a scrimber product."[162] MOSO essentially argues that claim 8 should be construed to limit each of the open terms in the claim (*i.e.*, "formed bamboo

---

[158] Fed R. Civ. P. 56(a) (emphasis added).

[159] *See, e.g.*, *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) ("Facts that could affect the outcome are 'material facts[.]'").

[160] *See, e.g.*, D.I. 131 at ¶ 7 (order on claim construction).

[161] D.I. 106 at 26–52 (Joint claim construction brief).

[162] D.I. 241 at 9 (emphasis in original).

strips" in 8c, "modified bamboo strips" in 8d, "impregnated bamboo strips" in 8e, and "dried bamboo strips in 8f) to a specific structure, namely "slotted strips," even though the term "slotted strips" appears nowhere in the '578 patent.[163] Moreover, MOSO argues that the court must further determine that any construction of the "slotted strips" term should also include a disclaimer of "crushed bundles."

Plaintiffs argue that claim 8 "does not limit the steps after 'slotting' to 'slotted strips'" and that the claim language is open and relies on the antecedent basis of the prior steps—the "formed bamboo strips" are modified, and become the "modified bamboo strips" and so forth.[164] The court agrees with plaintiffs, because MOSO's construction is contrary to the law. The Federal Circuit has found claims to be invalid as indefinite when they cross statutory classes of invention.[165] In this case, MOSO seeks to add article of manufacture limitations to process claims. MOSO has cited no case law to explain how its theory of disclaimer of various articles of manufacture would apply to the process steps at issue in claims 8 and 16.[166] Therefore, to the extent MOSO seeks additional construction of specific terms in claims 8 and 16 of the '578 patent, the court recommends that the district court DENY the request.

---

[163] The court will not chronicle the myriad principles of claim construction that importing a term with no support in the specification into a construction would violate.

[164] D.I. 269 at 8–9.

[165] *E.g.*, *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005) ("Because claim 25 recites both a system and the method for using that system, it does not apprise a person of ordinary skill in the art of its scope, and it is invalid under section 112, paragraph 2."). Oddly, in proposing an indefinite construction limiting process steps to specific intermediate structures, MOSO's own expert, Dr. Bock clearly stated in his report that he relied on the court's construction of the "forming a plurality of slots" limitation, "[t]o the extent" it is "not indefinite as construed[.]" D.I. 271, Ex. 11 at ¶ 69.

[166] D.I. 241 at 8–12.

### (ii)    The fact that the accused process performs an additional step is not a "material fact"

Second, it is hornbook law that "[t]he transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps."[167] And there is no dispute that the preambles to claims 8 and 16 recite "comprising steps of."[168] In view of this language, additional steps such as crushing the "formed bamboo strip" remain within the scope of the claims.[169] As a result, the undisputed fact that the accused process includes an additional, unclaimed step does not shift the question of infringement from "infringed" to "not infringed" and does not change the outcome of the case. In other words, it is not "material." Therefore, MOSO's disclaimer argument relating to "processing of slotted strips" does not address a material fact and cannot present a basis for summary judgment. For this reason, the court recommends the district court DENY the motion.

### (c)    Dr. Shmulsky's proof of the "forming a plurality of slots . . ." limitations

MOSO makes numerous arguments that the evidence cited by Dr. Shmulsky does not establish infringement of the "forming a plurality of slots . . ." limitations.[170] Plaintiffs respond: (a) there is sufficient evidence; (b) circumstantial evidence is enough to prove infringement; (c) the claim does not require the "forming a plurality of slots"

---

[167] *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1368 (Fed. Cir. 2003); *see also* D.I. 269 at 11.

[168] '578 patent, 11:65–66, 12:47–48.

[169] *Id.* Although MOSO acknowledges the case law and cites to the *Dippin' Dots* case, D.I. 293 at 5, this is a conclusory quotation that lacks any argument applying the facts of that case to the matter presently before the court.

[170] D.I. 241 at 12–18. MOSO generically refers to the "Slots Limitations." The court instead relies on the relevant language of the contested limitations.

step to be performed by a single structure (*i.e.*, a toothed roller only); (d) MOSO infringes under the doctrine of equivalents; and (e) the experts disagree.[171]

Claim 8 recites the step of

> [8b] **forming a plurality of slots in each of the prepared bamboo strips penetrating through the bamboo strip substantially in a direction of thickness defined by the bamboo strip** and a substantially longitudinal direction defined by the slots is substantially consistent with a substantially longitudinal direction defined by fibers of the bamboo strip;[172]

The court has construed the "forming a plurality of slots . . ." language (emphasized above) to have its plain meaning and that "[t]he slots need not extend all the way through the strip, but must penetrate deeper than an incision."[173] Despite ample evidence in the record that the accused process performs this step,[174] MOSO contends that the evidence plaintiffs cite in support of infringement of limitation 8b is insufficient to raise a genuine issue of material fact, because "Dr. Shmulsky never explained the distinction between a slot and an incision."[175] MOSO also argues that, because Dr. Shmulsky did not cite to a "technical publication or other evidence that supports his conclusion[,]" his expert opinion is an "unsupported, conclusory statement[.]"[176] These arguments are without merit.[177]

---

[171] D.I. 269 at 15–19.

[172] '578 patent, 12:1–6 (emphasis added).

[173] D.I. 131 at ¶ 7.

[174] D.I. 271, Ex. 34 at 25–26, 29; D.I. 245, Ex. H at ¶¶ 20–23; *id.*, Exs. C, F, G; D.I. 106 at 6–7.

[175] D.I. 241 at 13.

[176] *Id.*

[177] At a minimum, MOSO asks the court to draw inferences in its favor and to weigh evidence, both of which are inappropriate at summary judgment.

In his expert report, Dr. Shmulsky explained the purpose of the slotting step as well as the difference between a "slot" and an "incision."[178] For example, Dr. Shmulsky stated:

> Slots in the MOSO product are of sufficient depth to cause the strips to fail in a reasonably controlled manner at their weakest points. As a result, the fiber bundles produced in subsequent rolling steps are more or less uniform in size and contain non-broken fibers. Were this slotting lacking, the strips would crack in an uncontrolled manner. This would result in a non-uniform distribution of fiber bundle sizes. Adhesive applied in the subsequent gluing step used to manufacture the scrimber product would not be evenly distributed and this would result in poor product performance.

> Without the slotting, a larger proportion of small or fine fibers would be produced and these would have to be discarded as waste. This results in a decrease in yield and an increase in end product cost.

> In my further opinion, the process that MOSO uses does not constitute an "incision" within the meaning of the Court's claim construction Order. When wood or other like material is "incised" to allow for absorption of, for example, chemical treatments, the "incisions" are surface level and at such a depth as to allow for increased permeability of the wood to the treatment. That is, the "incisions" are not at such a depth as to promote failure along the plane of the incision.

> In contrast, in the manufacture of the accused products, the "slots" are to such a depth so as to cause or purposely promote the failure of the strip along the plane of the slot so that it propagates the through the thickness of the strip. See Supplemental Böck Declaration at pars. 20 – 23.[179]

---

[178] D.I. 242-1, Ex. D at ¶¶ 52, 58–64 ("In my further opinion, the process that MOSO uses does not constitute an 'incision' within the meaning of the Court's claim construction Order. When wood or other like material is 'incised' to allow for absorption of, for example, chemical treatments, the "incisions" are surface level and at such a depth as to allow for increased permeability of the wood to the treatment.").

[179] *Id.* at ¶¶ 61–64.

In addition, Dr. Shmulsky's proposed testimony is offered in the form of a declaration.[180] Attached to this declaration is a definition from a technical dictionary of the term "incising."[181] Given the ample evidence in the record supporting infringement of the "forming a plurality of slots" limitation, the question of whether the cutting wheel forms a "slot" or an "incision" is clearly a question for the jury.

As to MOSO's specific argument that Dr. Shmulsky's report is conclusory,[182] that really is a matter of the pot calling the kettle black, because MOSO's argument is a conclusory citation to case law with no accompanying argument or explanation.[183] *Dynacore Holdings* does not provide much of an explanation as to why, in that case, the expert reports were conclusory,[184] but the *Arthur A. Collins* matter cited therein provides more insight.[185] In that case, plaintiff's expert stated in a declaration that a structural limitation was met by an element of the accused product, but the court observed that the declaration was devoid of any explanation, specifically, "there is nothing in his declaration that would allow a finder of fact to conclude that JNET constitutes a TST switch as that term is used in the patent."[186] Here, there is ample material in Dr. Shmulsky's report for a jury to conclude that the accused process performs the claimed step. For example, Dr. Shmulsky explained the purpose of the slotting step and

---

[180] See generally D.I. 271.

[181] D.I. 274-1, Ex. C ("Incising - Cutting slits into the surfaces of a piece of wood prior to preservative treatment to improve absorption.").

[182] D.I. 241 at 13–18 (citing *Dynacore Holdings Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004)).

[183] *Id.* at 13. *See, e.g.*, Merriam Webster "Conclusory" at https://www.merriam-webster.com/dictionary/conclusory (last visited May 18, 2021) ("consisting of or relating to a conclusion or assertion for which no supporting evidence is offered.").

[184] *Dynacore Holdings Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) (cited by MOSO in D.I. 241 at 13).

[185] *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042 (Fed. Cir. 2000).

[186] *Id.* at 1046.

addressed the differences between a slot and an incision.[187] In addition, Dr. Shmulsky's opinion is based upon a definition of the term "incision" consistent with the intrinsic record of the '578 patent, including the Amundsen prior art, which allegedly discloses "an incisor roll used to make incisions in lumber for the purpose of improving the penetration of a preservative into the lumber."[188] The incision term and the Amundsen prior art was discussed in detail during claim construction.[189] For at least these reasons, the case law cited by MOSO is clearly distinguished on the facts.

MOSO raises numerous additional arguments that are duplicative of other motions[190] or that go to the weight of the evidence.[191] But these arguments largely address disputed facts and are not appropriate for the court to consider in the context of summary judgment.[192] For these reasons, the court recommends that the district court DENY the motion.

### 4. The "modifying the bamboo scrimber through heat-treatment" step

MOSO argues that plaintiffs have failed to identify "any evidence" that the accused process performs the "modifying the bamboo scrimber through heat-treatment" step in independent claim 16 and dependent claim 19.[193] Plaintiffs respond that "[s]trong

---

[187] D.I. 242-1, Ex. D at ¶¶ 52, 58–64.

[188] D.I. 276-1, Ex. 5 at 8 (September 9, 2013 Response to Office Action dated June 11, 2013).

[189] D.I. 128 at 9–11; D.I. 269 at 19.

[190] *E.g.*, D.I. 241 at 16 (raising the same argument as in MOSO's *Daubert* motion).

[191] *Id.* at 17–19 (throwing the proverbial "spaghetti" on the wall identifying all the alleged "inconsistencies" in Dr. Shmulsky's reports).

[192] The court declines to consider a number of arguments that are either previews for motions *in limine*, *e.g.*, D.I. 269 at 18, or are arguments in the alternative addressing concepts such as the doctrine of equivalents, *id.* at 18–19, that are moot in light of the court's recommendation.

[193] D.I. 241 at 18–20.

circumstantial evidence of infringement exists" based upon largely undisputed facts.[194] For the reasons that follow, the court recommends that the district court DENY the motion.

Unlike claim 8, in which the heat treatment step is performed before pressing and curing the scrimber, claims 16 and 19 place the heat treatment step after the scrimber is formed.[195] For instance, claim 16 recites:

> A method of manufacturing a bamboo scrimber comprising steps of:
>
> preparing bamboo strips from bamboo;
>
> forming a plurality of slots in each of the prepared bamboo strips penetrating through the bamboo strip substantially in a direction of thickness defined by the bamboo strip and a substantially longitudinal direction defined by the slots is substantially consistent with a substantially longitudinal direction defined by fibers of the bamboo strip;
>
> impregnating the formed bamboo strips into an adhesive;
>
> drying the impregnated bamboo strips;
>
> pressure-pressing the dried bamboo strips in a mold until the adhesive is cured so as to form the bamboo scrimber; and
>
> **modifying the bamboo scrimber through heat-treatment so that at least a part of hemicelluloses in said bamboo scrimber is pyrolysized.**[196]

In his declaration attached to plaintiffs answering brief, Dr. Shmulsky states the following:

> 73.    With regard to claim 16, proof of infringement of pyrolysis of the scrimber is shown by the literature cited herein. Initially, MOSO uses a hot press in all its factories that make Bamboo X-treme that enters the United States. A

---

[194] D.I. 269 at 19–20.

[195] It appears to be undisputed that MOSO performs a heat treatment step before pressing the strips into the scrimber, as in claim 8. *E.g.*, D.I. 244 at 2.

[196] '578 patent, 12:47–63 (emphasis added).

hot press applies both heat and pressure to adhesive-soaked bamboo strips to cure (i.e., harden) the adhesive. "Platens" contact the bamboo strips in the hot press and these are typically heated to temperatures that exceed the curing temperature of the adhesive.

74.     It is well-known that pyrolysis reactions begin to take place at approximately 350°F. *See, e.g.,* Jiang et al. (2011). According to Maloney & Koch, phenolic resins (which are the type of adhesives MOSO uses in its production process) need to be heated to at least 350°F to cure them. Platens in hot presses are usually heated well-above that temperature. As a result, it is my opinion that pyrolysis occurs in the hot presses used in MOSO's manufacturing to at least some extent.[197]

MOSO's expert, Dr. Böck has expressed the opinion that 100% of the hemicelluloses were pyrolyzed in the earlier heat treatment step and therefore cannot be pyrolyzed in the accused step.[198] Dr. Shmulsky disagrees and contends that "it would be exceedingly difficult, time-consuming and/or costly to pyrolyze 100% of the hemicelluloses in MOSO's heat treatment step. As a result, it is more likely than not that at least some hemicelluloses remain in the material that enters the hot press."[199]

Plaintiffs argue that it is undisputed that "pyrolysis of hemicellulose in bamboo takes place above 150°C" and that "MOSO uses an adhesive in its scrimber that cures around 150°C."[200] On this basis, plaintiffs contend that the experts disagree and that summary judgment is inappropriate.[201]

As a preliminary matter, MOSO introduces new argument and case law in its reply brief.[202] Because plaintiffs were not given the opportunity to respond to these

---

[197] D.I. 274 at ¶¶ 73–74.

[198] D.I. 242-1, Ex. J at ¶ 49.

[199] D.I. 274 at ¶ 75; *see also* D.I. 242-1, Ex. J at ¶ 49 (reply expert report).

[200] D.I. 269 at 20.

[201] *Id.*

[202] D.I. 293 at 8 (citing *Novartis Corp. v. Ben Venue Labs, Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001)); *see also id.* (citing D.I. 274 at ¶ 74 (Dr. Shmulsky's declaration)).

arguments, the court declines to consider them.[203] In addition, MOSO repeatedly faults plaintiffs for the lack of "direct evidence" of infringement.[204] This is irrelevant—a reasonable jury may conclude that a patent is infringed based upon circumstantial evidence.[205] Moreover, MOSO complains that plaintiffs did not produce in discovery "several journal articles" cited in Dr. Shmulsky's reply expert report and that his claim charts cite a link "to MOSO's website that is no longer active[,]" which MOSO's contends "alone doom Dr. Shmulsky's opinion[,]"[206] but this argument is not persuasive.[207]

MOSO relies on the *Dynacore Holdings* case and notes that Dr. Shmulsky's opinion is unsupported conjecture.[208] In *Dynacore Holdings*, the Federal Circuit stated that "an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact, and [] a party may not avoid that rule simply by framing the expert's conclusion as an assertion that a particular critical claim limitation is found in the accused device."[209] As discussed with respect to the

---

MOSO argues in its reply brief that Dr. Shmulsky's opinion contradicts the disclosure of the '578 patent. *Id.* However, MOSO treats Dr. Shmulsky's declaration as if it were a new set of arguments and not as a restatement of his expert reports, which it is. *See* D.I. 242-1, Ex. D at 34–35 (opening); *id.*, Ex. J at ¶¶ 22, 49 (rebuttal).

[203] D. Del. L.R. 7.1.3(c)(2) ("(The party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief."). The contents of the Shmulsky declaration were known to MOSO when it filed its opening brief, and thus, MOSO cannot raise arguments in response to it for the first time in its reply brief.

[204] D.I. 293 at 8 ("Lacking direct evidence . . .").

[205] *E.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009).

[206] D.I. 241 at 19 (citing D.I. 242-1, Ex. D at 34–35).

[207] For instance, the court finds it hard to believe that MOSO is unable to access materials on its own website.

[208] D.I. 241 at 19.

[209] *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004).

"forming a plurality of slots" limitations, above, the *Arthur A. Collins* case[210] provides greater insight into the degree of detail required in expert reports. Here, Dr. Shmulsky has explained the basis for his conclusion, namely: (1) the accused process uses a hot press; (2) a hot press applies heat and pressure to cure the adhesive in the bamboo strips; (3) "platens" contact the bamboo strips and are "typically heated to temperatures that exceed the curing temperature of the adhesive[;]" (4) "pyrolysis reactions begin to take place at approximately 350°F[;]" (5) the accused process uses phenolic resins; (6) "phenolic resins need to be heated to at least 350°F to cure them;" and (7) "[p]latens in hot presses are usually heated well-above that temperature."[211]

In contrast to the experts in *Arthur A. Collins*, who made a conclusory assertion that the claim limitations were present in the accused products, Dr. Shmulsky explains his reasoning step by step and provides a basis for his conclusions.[212] MOSO argues that this is somehow insufficient, because "Dr. Shmulsky does not **know** to what temperature the platens are heated to during the manufacture of the Accused Process [sic][,]"[213] but—again—circumstantial evidence is sufficient to establish infringement.[214] MOSO's remaining arguments go to the weight of the evidence and are not appropriate for the court to consider at summary judgment. For these reasons the court recommends that the district court DENY the motion as to claims 16 and 19.

---

[210] *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042 (Fed. Cir. 2000).

[211] D.I. 274 at ¶¶ 73–74.

[212] *Cf. Arthur A. Collins*, 216 F.3d at 1046 ("there is nothing in his declaration that would allow a finder of fact to conclude that JNET constitutes a TST switch as that term is used in the patent.")

[213] D.I. 241 at 19 (emphasis in original) (footnote omitted).

[214] *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009).

### C.    Invalidity of the '578 patent

#### 1.    Definiteness of the "absolute dryness" term

MOSO moves for summary judgment that "claims 13-15 and 17 are indefinite and therefore invalid."[215] Since only claims 13 and 15 are asserted,[216] the court will only consider the motion as to these claims.

At claim construction, MOSO challenged the validity of the "absolute dryness" term, and the district court stated: "[d]efendants' attorney argument does not provide clear and convincing evidence of whether a POSA could understand the scope of the claim. Thus I will not find the claim indefinite at this time. Defendants may readdress the definiteness of this claim at the summary judgment stage after expert discovery."[217]

Claims 13 and 15 recite:

> **13.** A method of manufacturing a bamboo scrimber as set forth in claim **8,** wherein the heat-treatment includes steps of heating the bamboo strips to **absolute dryness** and cooling the pyrolysized bamboo strips.

> **15.** A method of manufacturing a bamboo scrimber as set forth in claim **13,** wherein the step of heating is performed at a temperature in a range of about 100°C. to about 130°C., the step of pyrolysing is performed at a temperature in a range of about 150°C. to about 220°C., and the pyrolysized bamboo-strips scrimber are cooled to a temperature lower than about 90°C.[218]

The district court construed the "absolute dryness" term to mean "[t]he water content in the bamboo strips being very small so that the subsequent hemicelluloses pyrolyzing will not be affected."[219]

---

[215] D.I. 241 at 20.

[216] *Id.* at 6 ("Plaintiffs allege the Accused Process infringes claims 1 2, 4-10, 13, 15, 16, and 19 of the '578 Patent ("Asserted Claims")").

[217] D.I. 128 at 12.

[218] '578 patent, 12:32–35, 12:40–46 (emphasis added).

[219] D.I. 131 at 3, ¶ 8.

With expert discovery complete, MOSO again challenges the validity of these claims on grounds of indefiniteness.[220] For the reasons that follow, the court recommends that the district court DENY the motion.

### (a)    Standard

An issued patent is presumed to be valid.[221] And an invalidity defense must be proven by clear and convincing evidence.[222] Section 112, ¶ 2 of the Patent Act states in relevant part "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."[223] "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."[224]

### (b)    The parties' arguments

MOSO argues that claims 13 and 15 are invalid, because a person of ordinary skill in the art ("POSITA") would not understand the scope of the term "absolute dryness" as used in those claims.[225] Specifically, MOSO argues that even though "absolute dryness" is a term of art, a POSITA cannot rely on his or her own knowledge of the term, because the applicant acted as its own lexicographer and defined the term

---

[220] D.I. 241 at 20–23.

[221] 35 U.S.C. § 282.

[222] *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 111 (2011).

[223] 35 U.S.C. § 112, ¶ 2 (2006). The '578 patent originated with a U.S. national stage application on September 27, 2010 that claims priority to a PCT application. These dated predate the implementation of the America Invents Act, and therefore, the earlier (2006) version of § 112 applies to the '578 patent.

[224] *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

[225] D.I. 241 at 20–23.

in the '578 patent.[226] MOSO notes that the term "very small" is a term of degree and that the '578 patent provides no indication as to what it means to "affect" the pyrolysis of the hemicelluloses in the slotted strips.[227] Plaintiffs respond that: the term is defined in the specification, Dr. Shmulsky's testimony addresses how a POSITA would approach it, the ThermoWood reference teaches drying wood until "absolutely dry," and that case law does not require terms of degree be mathematically precise.[228]

### (c)    Discussion

As a preliminary matter, the court is not persuaded that because the applicant acted as its own lexicographer in defining the term "absolute dryness" a POSITA cannot apply his or her own knowledge as to what both experts agree is a term of art.[229] MOSO presents no case law on this subject and simply asserts this premise without any explanation.[230] As Dr. Shmulsky points out, the ThermoWood Handbook, which Dr. Böck relies on extensively in his opinion on invalidity,[231] refers to drying wood "until absolutely dry[.]"[232] Dr. Böck eventually agrees that "absolute dryness" is a term of art and states that it would "mean the point at which the moisture content can no longer be reduced."[233] Dr. Shmulsky states that it is "well-understood that the moisture content

---

[226] *E.g.*, D.I. 241 at 21 ("Because the Court adopted this definition in construing absolute dryness, whatever meaning this term has to a PHOSITA is irrelevant. Absolute dryness is now assessed according to the Court's construction—the '578 Patent's definition of absolute dryness—which is too vague and ambiguous to reasonably inform a PHOSITA of the scope of the term.").

[227] D.I. 241 at 21.

[228] D.I. 269 at 20–22.

[229] D.I. 242-1, Ex. M at ¶ 19 (Dr. Bock reply), Ex. N at ¶¶ 37, 39 (Dr. Shmulsky). MOSO's expert, Dr. Bock, did not address this subject until his reply brief.

[230] D.I. 241 at 21.

[231] *E.g.*, D.I. 271, Ex. 14 at ¶ 237 (relying on the ThermoWood Handbook as a catch-all for obviousness theories).

[232] D.I. 271, Ex. 15 at MOSO 46649 (emphasis added).

[233] D.I. 242-1, Ex. M at ¶ 19.

does not need to be zero, but it should be very low. It is impractical to dry materials to and maintain materials at a zero percent moisture content."[234]

In his opening report on invalidity, Dr. Böck summarizes the knowledge of a POSITA in detail[235] and opines that, based upon that knowledge, "any water content in the bamboo strips can, at a microscopic level, 'affect' the pyrolysis of the hemicelluloses" and thus, a determination of whether "an effect is adverse is a subjective matter depending on the desired mechanical properties (e.g., strength, rigidity, water resistance) and physical properties (e.g., color)."[236]

In his report, Dr. Shmulsky adds detail about the knowledge of a POSITA. For example, he states "[i]t is well understood in the bamboo art that, in order for pyrolysis to occur, the bamboo needs to be heated up in a non-oxygenated atmosphere. If bamboo has water in it, [the water] has to heat up and evaporate before beginning the pyrolysis reaction."[237] As a result, he explains "[o]ne of the ways water content affects pyrolysis is that it makes the process takes longer. It also causes an increased consumption of energy."[238] Dr. Shmulsky states that a POSITA would also know that it is "difficult to have an equal amount of water in each bundle before pyrolysis in the absence of a drying step" which "causes uneven pyrolysis" and "a non-uniform product[.]"[239] Dr. Shmulsky opines that a POSITA, "would understand that a strip has reached 'absolute dryness' when the pyrolysis can occur in a rapid and energy efficient fashion."[240]

---

[234] D.I. 242-1, Ex. N at ¶ 42.

[235] D.I. 242-1, Ex. K at ¶¶ 81–83.

[236] *Id.* at ¶ 84.

[237] D.I. 242-1, Ex. N at ¶ 41.

[238] *Id.*

[239] *Id.* at ¶ 42. In fact, claim 14 of the '578 patent adds the step of using saturated stream to adjust the moisture content after drying. '578 patent, 12:36–39.

[240] *Id.* at ¶ 43.

Dr. Böck's reply report consists primarily of argument questioning Dr. Shmulsky's opinions, followed by conclusory recitation to the standard for indefiniteness.[241] It does not provide any additional, or alternative, insight into how a POSITA would understand the "absolute dryness" term.[242]

In view of the expert reports, it is clear that—despite blanket statements of disagreement—the experts largely agree about the role of the drying step. As the ThermoWood Handbook states, "[d]rying is the longest phase in the heat-treatment process."[243] Both experts agree that too much moisture in the bamboo strips during pyrolysis can cause problems with the finished product. Taken together, the experts opine that a POSITA would know that too much moisture in the bamboo strips during pyrolysis can slow down the heat-treatment process, require more energy, add cost, and decrease the quality of the finished product. Dr. Böck, however, avers that because the '578 patent does not specify (or claim) a moisture content for the bamboo strips prior to pyrolysis, a POSITA would simply be unable to determine when, or if, a given process had reached "absolute dryness."[244] In addition, he argues that this is a "subjective matter" that depends on the desired mechanical and physical properties of the finished product.[245]

Oddly, MOSO contends that in his deposition, "Dr. Shmulsky admitted that the level of absolute dryness is subjective."[246] There is no evidence of this. In the cited portion of his deposition, when asked about how one would determine the range for "very small," Dr. Shmulsky stated:

---

[241] D.I. 242-1, Ex. M at ¶¶ 18–27.

[242] *Id.*

[243] D.I. 271, Ex. 15 at MOSO 46649 (emphasis added).

[244] D.I. 242-1, Ex. K at ¶ 84.

[245] *Id.*

[246] D.I. 241 at 23 (citing D.I. 242-1, Ex. F at 210:7–212:5 (Shmulsky deposition)); *see also* D.I. 293 at 11 (citing D.I. 294-1, Ex. W at 211:16–19).

> [I]n practice one would dry the bamboo strips to near zero
> and one might weigh them and take a sample and oven dry
> them to know their moisture content and then subsequently
> put them through the heat treatment process, and if -- if they
> are too wet when they go in then -- and given the time and
> temperature allowed for the heat treatment process, if they
> come out and they are still just warming up because they
> spent most of that time evaporating water, then one knows
> they weren't dry enough.·So in practice one would have to
> develop what's the range that's acceptable.[247]

And when asked whether "that range would vary based on the – I guess the end

product that was desired?"[248] Dr. Shmulsky agreed.[249] This is essentially the same

opinion Dr. Böck expressed in his opening report.[250] And yet, MOSO and Dr. Böck

assert that a range that varies by the desired end product is "subjective" and, therefore,

indefinite.[251]

"Subjective" is defined as "peculiar to a particular individual," "modified or

affected by personal views, experience, or background," or "arising from conditions

within the brain or sense organs and not directly caused by external stimuli."[252] The '578

patent gives examples of the properties of potential end products of the claimed

---

[247] D.I. 242-1, Ex. F at 210:24–211:12

[248] Id. at 211:13–15.

[249] Id. at 211:16–17. MOSO attempts to turn Dr. Shmulsky's deposition into a "gotcha" moment, including it twice in its attachments to the briefing. D.I. 293 at 11 (citing D.I. 294-1, Ex. W at 211:16–19). The court is not convinced that Dr. Shmulsky has made a statement that is clear and convincing evidence of indefiniteness.

[250] D.I. 242-1, Ex. K at ¶ 84 ("Whether such the water content an effect is adverse is a subjective matter depending on the desired mechanical properties (e.g., strength, rigidity, water resistance) and physical properties (e.g., color).").

[251] In their reply brief, MOSO introduces a new argument that "two bamboo scrimber manufacturers, having different target end-product properties, time available for manufacturing, and equipment, could have completely different tolerances for what constitutes 'absolute dryness.'" D.I. 293 at 11. Since this is new argument, the court declines to consider it. D. Del. L.R. 7.1.3(c)(2). This is the third time in this Report and Recommendation that MOSO has raised a new argument in a reply brief.

[252] Merriam Webster, "Subjective" at https://www.merriam-webster.com/dictionary/subjective (last visited May 26, 2021).

processes—these include physical dimensions, density, swelling rate when soaked in water, modulus of rupture, and modulus of elasticity.[253] Dr. Böck specifically discussed the desired "mechanical" and "physical" properties of the finished product and expressed that the "absolute dryness" of the bamboo entering the heat treatment process would depend on those final properties.[254] Dr. Shmulsky agrees.[255] These ranges of "absolute dryness" depend on the objectively measurable properties of the finished products, not the subjective experience or sensations of an individual factory operator. As such, Dr. Böck's ultimate opinion on indefiniteness is inherently contradictory, because he identifies the objective measures that a POSITA would use to determine the "absolute dryness" for a particular finished product, and then he claims these are—in fact—"subjective." This nonsensical conclusion falls far short of the clear and convincing standard that MOSO must meet. For these reasons, the court recommends that the district court DENY the motion.

### D.    Nonobviousness

Plaintiffs move for partial summary judgment of nonobviousness in view of the Li reference.[256] For the reasons that follow, the court recommends that the district court GRANT-IN-PART and DENY-IN-PART the motion.

### 1.    Standard

Under the Patent Act, a patent "may not be obtained though the invention is not identically disclosed or described as set forth in section 102, if the differences between the subject matter sought to be patented and the prior art are such that the subject

---

[253] '578 patent, 8:50–58, 10:38–46 (cited by Dr. Bock in D.I. 242-1, Ex. K at ¶ 84 n.42).

[254] D.I. 242-1, Ex. K at ¶ 84.

[255] D.I. 242-1, Ex. F at 211:16–17.

[256] D.I. 248.

matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."[257]

Subsumed within obviousness "is a subsidiary requirement . . . that where . . . all claim limitations are found in a number of prior art references, the burden falls on the challenger of the patent to show by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so."[258] A patent challenger may rely on the doctrine of inherency to show that a particular limitation has been disclosed in the prior art.[259] Inherency is a question of fact, and it "must be carefully circumscribed in the context of obviousness."[260] Specifically, "to establish the existence of a claim limitation in the prior art in an obviousness analysis—the limitation at issue necessarily must be present, or the natural result of the combination of elements explicitly disclosed by the prior art."[261]

"The ultimate judgment of obviousness is a legal determination."[262] Where "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate."[263]

---

[257] 35 U.S.C. § 103(a)(2006).

[258] *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007) (citation omitted).

[259] *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1194 (Fed. Cir. 2014).

[260] *Id.* at 1194–95.

[261] *Id.* at 1196.

[262] *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 427 (2007) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966)).

[263] *Id.*

### 2.    Discussion

Plaintiffs seek partial summary judgment that the '578 patent is not obvious with regards to the combinations that include the Li reference on the basis that Li does not disclose, either expressly or inherently, the following "heat treatment" limitations in independent claims 1 and 8:[264]

> 1. A bamboo scrimber comprising:
>
> a plurality of pressure-pressed bamboo strips impregnated with an adhesive and modified through heat-treatment so that at least a part of hemicelluloses in said bamboo strips is pyrolysized . . .[265]

and

> [8c] modifying the formed bamboo strips through heat-treatment so that at least a part of hemicelluloses in said bamboo strips is pyrolysized[.][266]

MOSO relies on the Li reference to render these limitations obvious under an obviousness-inherency theory[267]—it does not pursue anticipation as a basis for invalidity.[268] Specifically, MOSO contends that the "heat treatment" limitations are inherently disclosed in the Li reference.[269]

The Li reference discloses the following:

> The bamboo material of the invention is subjected to a thermal decomposition and color darkening treatment step before the step of soaking in an adhesive and treated by a high pressure, so that the hardness of the product is increased, and the internal stress is eliminated so as to increase the strength and stability of the finished bamboo

---

[264] D.I. 249 at 6.

[265] '578 patent, 11:35–39.

[266] '578 patent, 12:7–9.

[267] D.I. 250, Ex. G at ¶¶ 150–157, 175–177.

[268] D.I. 250, Ex. L at page 329 of 535 ("MOSO will drop its defense of invalidity based on anticipation under 35 U.S.C. § 102(b).").

[269] D.I. 250, Ex. G at ¶¶ 126–128.

product. In addition, in this step, the thermal decomposition and color darkening treatment parameters can be adjusted according to the desired color within the range of from 100 to 300 °C and 2 to 3 hours so that the product does not need to be further painted in order to achieve the desired natural color.[270]

This is consistent with claim 1 of Li.[271] With respect to specific embodiments, Li also discloses:

5. Color darkening process
The bamboo material is first made into a number of bundles with stainless steel pipe frame, wherein the dimension of the bundles is slightly smaller than the inner cavity of the charring tank, and then the stainless steel pipe frame and the bamboo materials are loaded together into the charring tank, the tank door is tightly closed, and steam is added to the tank, when the read of the pressure gauge increases to 2.8 MPa, the steam is turned off If the pressure drops, more steam needs to be added to reach this pressure. The steam in the tank is discharged once every 20 minutes through a vent, where the discharge time is 1 minute, and then the steam is introduced to the tank again until the pressure reaches 2.8 MPa. The time for each color darkening process is about 2 to 3 hours.[272]

This is consistent with claim 2 of Li.[273]

_____

[270] D.I. 250, Ex. B at Appx038.

[271] *Id.* at Appx031 ("What is claimed is 1. A production process of high density color darkened bamboo material, comprising the following steps: . . . . (3) placing the bamboo strand or bamboo strand strip into a charring tank at a pressure of 2 to 3 MPa and temperature of 100 to 300 °C for 2 to 3 hours.")

[272] D.I. 250, Ex. B Appx040.

[273] *Id.* at Appx031 ("2. The process according to claim 1, characterized in that in step (3), the bamboo strand or bamboo strand strip are bundled with a stainless steel frame and placed in the charring tank, the steam pressure is then increased to 2.8 MPa and maintained for 20 minutes, next the pressure is released through a vent for 1 minute, and then the pressure is increased to 2.8 MPa again by introducing steam.").

### (a)    Li does not expressly disclose the "heat treatment" limitations

MOSO confusingly argues in its answering brief that its "position is Li *discloses* the Heat Treatment Limitations of claims 1 and 8."[274] They characterize plaintiffs argument as being "based on the fact the Li does not specifically use the word 'pyrolysis.'"[275] Here, MOSO contends that its "evidence would allow a reasonable fact finder to determine that Li's disclosure of thermally modifying bamboo material discloses pyrolyzing at least some hemicelluloses in the bamboo material."[276] But this is attorney argument that ignores the fact that MOSO's own expert has stated that the disclosure in Li is inherent, and not express.[277] MOSO identifies no evidence in the record to support a position to the contrary. For this reason, to the extent plaintiffs' motion requires the court to determine whether the Li reference inherently (and not expressly) discloses the "heat treatment" limitations, the court recommends that the district court GRANT the motion.

### (b)    Li – claim 1 disclosure

Plaintiffs allocate most of their briefing on the disclosure found in claim 1 of Li, the charring tank at 2-3 MPa and 100-300°C for 2-3 hours.[278] There is no dispute between the parties that: (1) pyrolysis happens under these conditions at above 150°C; (2) pyrolysis will not occur at the lower end of this disclosed range (*i.e.*, 2 MPa and 100°C for 2 hours); and (3) pyrolysis does not take place across this entire disclosed

---

[274] D.I. 273 at 16–17 (emphasis in original).

[275] *Id*. at 15.

[276] *Id*.

[277] D.I. 250, Ex. G at¶ 128 (emphasis added) ("Therefore, it is my opinion that an Ordinary Artisan would understand Li to be describing heat treatment that **inherently** results in the pyrolysis of at least some hemicelluloses in the bamboo strips, as required by claim 8d.").

[278] D.I. 249 at 6–13.

range.[279] MOSO responds that, because the "ranges overlap," they have established a *prima facie* case of obviousness and that the burden has shifted to plaintiffs "to rebut the presumption of obviousness of these limitations."[280] This is irrelevant, because the case law cited by MOSO is based upon a situation "when the ranges of a claimed composition overlap the ranges disclosed in the prior art[.]"[281] Here, there is no "claimed" range in the '578 patent, no overlap between "ranges," and no *prima facie* case of obviousness on that basis.

Since pyrolysis of the hemicelluloses does not happen across the entire range of the disclosure of step (3) of Li's claim 1, the claimed pyrolysis of the hemicelluloses is not the "natural result" of the performance of this step, it is not inherently disclosed in this claim and the accompanying text of the Li reference. Thus, as to the range disclosed in claim 1, step (3) of Li, the court recommends that the district court GRANT-IN-PART the motion.

### (c)    Li – claim 2 disclosure

MOSO faults plaintiffs for not addressing the specific embodiment of claim 2 of Li.[282] Specifically, MOSO points out that "[a]s Dr. Böck has explained, a POSA would understand that the temperature of steam at a pressure of 2.8 MPa would be approximately 232 °C, well above the temperature at which pyrolysis of hemicelluloses will unquestionably occur. As such, blanketing the bamboo material in 2.8 MPa steam for two to three hours will cause pyrolysis of at least the hemicelluloses on the surface

---

[279] *E.g.*, D.I. 250, Ex. H at 132:21–133:22.

[280] D.I. 273 at 16 (citing cases).

[281] *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003) (cited by MOSO in D.I. 273 at 16).

[282] D.I. 273 at 18–19 ("Plaintiffs make no reference to the specific embodiment disclosed by Li that does provide a specific pressure and temperature in the disclosed ranges, the latter of which will cause pyrolysis of at least part of the hemicelluloses in the bamboo material undergoing thermal modification.")

of the bamboo material, e.g., the bamboo directly exposed to the steam."[283] Plaintiffs reply that "MOSO claims that the steam would be at a temperature of 232 °C. However, that is true only if the steam is *saturated steam* (as opposed to unsaturated or "wet" steam)."[284] Plaintiffs add that "Dr. Böck admitted that Li does not teach the use of saturated steam."[285]

Unfortunately, MOSO cites to the "Böck Reply Report at ¶58," which the court is unable to locate in the record.[286] And while plaintiffs suggest that the court can take judicial notice of "steam tables disclosing th[e] fact" that saturated steam at 2.8 MPa would be at a temperature of 232°C,[287] they fail to acknowledge that the court's task here is to include detailed citation to the record documenting the absence of a genuine issue of material fact.[288] Presumably, some portion of Dr. Böck's Reply Report relates to the inherent disclosure in claim 2 of Li—absent a complete record, including full versions of Dr. Böck's reply report, and any relevant testimony from Dr. Shmulsky, the court is not inclined to take notice of the steam tables. In light of this limited record, page 4 of plaintiff's reply brief is at best attorney argument and does not present an undisputed evidentiary basis for the court to recommend granting summary judgment. For this reason, as to claim 2 of Li, the court recommends that the district court DENY-IN-PART the motion.

---

[283] *Id.* at 17 (footnotes omitted) (citing "Böck Reply Report at ¶58").

[284] D.I. 291 at 4 (footnote omitted). This is attorney argument.

[285] *Id.* (citing D.I. 250, Ex. H at p. 132.).

[286] At best, a portion of Dr. Böck's Reply Report on invalidity is available at D.I. 242-1, Ex. M ¶¶ 1–3, 18–29, 96.

[287] D.I. 291 at 4 n.2.

[288] Fed. R. Civ. P. 56(c)(1).

### E.    Patent Exhaustion

Plaintiffs move for summary judgment as to MOSO's patent exhaustion defense.[289] In the extensive briefing on the subject,[290] the parties appear to agree that MOSO's position on patent exhaustion was shared in an October 2018 e-mail exchange between counsel.[291] Central to MOSO's claim is a document, dated August 10, 2018, that the parties refer to as the China (or Chinese) Agreement.[292] According to MOSO, this agreement, that parties in China entered into nearly a year after the case at bar was filed, exhausts Dasso's rights in the '578 patent through a covenant not to sue the Chinese manufacturers that make the Accused Products for MOSO.[293]

Plaintiffs find numerous faults with this document and object to it as hearsay, because it "has never been verified, attested to, or affirmed."[294] Plaintiffs argue that MOSO has made no effort to present this document in a form that would be admissible in evidence, and that the court should disregard it.[295]

MOSO responds that "Dasso has cited no authority for the proposition that a document of this nature must somehow be 'verified' to be effective."[296] MOSO contends that the "signatures and 'chops' or seals of the signatories . . . . serve to authenticate

---

[289] D.I. 248.

[290] D.I. 249 at 13–25; D.I. 273 at 19–26; D.I. 291 at 6–13.

[291] *E.g.*, D.I. 250, Ex. N.

[292] D.I. 250, Ex. N; D.I. 278-1, Ex, A.

[293] D.I. 273 at 6–11, 19–26. MOSO has discussed this document in detail in pleadings, D.I. 28 at 53, and in motions, *e.g.*, D.I. 58 at 3 ("On August 10, 2018, New Bamboo, as well as several other parties, signed a covenant not to sue the Zhuanghe Factory for patent infringement.").

[294] D.I. 249 at 16.

[295] *Id.*

[296] D.I. 273 at 23.

the document."[297] In support, MOSO cites to a single case from the Court of Chancery and includes printouts of several articles about the Chinese "chop" system.[298]

Plaintiffs reply that in the more than two years since MOSO produced this document, fact discovery has closed, and MOSO has made no effort to authenticate it.[299] On this basis, plaintiffs contend that the agreement is hearsay and is inadmissible.[300] Therefore, plaintiffs argue, MOSO has failed to present admissible evidence in support of its patent exhaustion defense, and summary judgment is appropriate.

The court is inclined to agree. MOSO has produced a document translated from Chinese. The document includes a certification from the translator.[301] None of the declarants in the document have been identified or offered as witnesses. However, based upon the briefing, MOSO clearly seeks to use statements in this document in support of their exhaustion defense.[302] As out-of-court statements offered for the truth of the matter asserted, the statements in the agreement are hearsay.[303] MOSO offers no basis for admission, but it does contend that the agreement is somehow self-authenticating.[304] The case cited by MOSO, *Deutsch v. ZST Digital Networks, Inc.*, mentions Chinese "chops" in a footnote, but this is dicta, as the Delaware Court of Chancery made no holdings as to the authenticity of documents under the rules of

---

[297] *Id.; see also id.* at 24 ("Because the chops appear on the China Agreement, there is no basis to doubt the authenticity of the China Agreement.").

[298] *Id.* at 23–24.

[299] D.I. 291 at 12.

[300] *Id.* at 12–13.

[301] D.I. 278-1, Ex. A at PAGEID #: 7994.

[302] D.I. 273 at 6–11, 19–26.

[303] Fed. R. Evid. 801(c).

[304] D.I. 273 at 23–24.

evidence.[305] Moreover, even if MOSO were to authenticate the document under the rules, MOSO still has not explained how it would overcome the hearsay issue. As MOSO has argued in its own motion for summary judgment, "[i]nadmissible hearsay cannot create a genuine issue of material fact."[306] The court concludes that—after a specific objection by plaintiffs as to the admissibility of the sole document on which the exhaustion defense is based—MOSO has not presented admissible evidence in support of its patent exhaustion defense. Therefore, summary judgment in favor of plaintiffs is appropriate.[307] On this basis, the court recommends that the district court GRANT the motion.

### F.    Section 295

Plaintiffs have moved to transfer the burden of proof on infringement of process claims 8, 9, 10, 13, 15, 16 and 19 of the '578 patent to MOSO under Section 295 of the Patent Act.[308] MOSO opposes this motion.[309] For the reasons that follow, the court recommends that the district court GRANT the motion.

---

[305] *Deutsch v. ZST Digital Networks, Inc.*, No. CV 8014-VCL, 2018 WL 3005822, at *8 n.64 (Del. Ch. June 14, 2018) (cited in D.I. 273 at 23).

[306] D.I. 241 at 31.

[307] *Countryside Oil Co. v. Travelers Ins. Co.*, 928 F. Supp. 474, 482 (D.N.J. 1995) (rejecting, and declining to consider, an inauthentic document as "inadmissible hearsay" under Federal Rule of Evidence 801). *See also Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 297 (3d Cir. 2014) (emphasis in original) ("We point out, however, a court's obligation to view the evidence in the light most favorable to a non-movant does *not* require the court to take into account evidence that will not be admissible at the trial."); *Wimberly v. Clark Controller Co.*, 364 F.2d 225, 227 (6th Cir. 1966) ("[When ruling on a summary judgment motion, t]he Court has discretion to disregard those facts which would not be admissible in evidence, and to rely on those facts which are competent evidence.").

[308] D.I. 243; D.I. 244 at 1.

[309] D.I. 273.

### 1.    Standard

Section 271 of the Patent Act states in relevant part, "whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent."[310]

"In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States,"[311] "if the court finds--(1) that a substantial likelihood exists that the product was made by the patented process, and (2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable to so determine,"[312] then, "the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made."[313] The Federal Circuit has noted "the existence of a rebuttable presumption in actions alleging infringement of a process patent under 35 U.S.C. § 271(g) relating to importation of products made abroad by a patented process."[314]

---

[310] 35 U.S.C. § 271.

[311] 35 U.S.C. § 295.

[312] *Id.*

[313] *Id.*

[314] *Amgen Inc. v. Sandoz Inc.*, 794 F.3d 1347, 1356 (Fed. Cir. 2015) (citations omitted), *rev'd in part, vacated in part*, 137 S. Ct. 1664 (2017).

### 2.    Discussion

The parties submitted 50 pages of briefing on the burden shift under Section 295.[315] Much of the argument is duplicative of arguments found elsewhere in the briefing on the other motions, and the court declines to revisit them here.

Plaintiffs argue that the burden should be shifted, because even though they contend they have sufficient proof of infringement, plaintiffs contend they were never fully able to "determine" the accused process, despite having sought discovery into the process, including documentation and physical inspection of the process in at least one of the factories in China.[316] MOSO makes three primary arguments. First, MOSO contends that plaintiffs have failed the second prong of section 295, because they make the request conditional—essentially, MOSO argues that the statute requires plaintiffs to be unable to prove infringement in order to obtain the section 295 remedy.[317] Second, MOSO avers that plaintiffs fail to meet the first prong of section 295 for various reasons, some of which repeat other summary judgment arguments, and others for failing to adequately pursue discovery.[318] Third, MOSO avers that by filing the section 295 motion at summary judgment, MOSO is somehow prejudiced.[319]

### (a)    Substantial likelihood

Plaintiffs contend that there is a substantial likelihood that the accused products were made by the patented process, because "the evidence collected . . . demonstrates

---

[315] D.I. 244, 270, 289.

[316] D.I. 244 at 14–19.

[317] D.I. 270 at 6–8.

[318] *Id.* at 8–18. MOSO also makes a separate argument that, by failing to make a separate set of arguments as to the process claims 16 and 19, plaintiffs "waived" their section 295 motion as to those claims. The court disagrees. Plaintiffs explained their reasoning, the primary dispute over the "forming a plurality of slots . . ." limitations, and focused their energies on independent claim 8. D.I. 244 at 2 & n.1; D.I. 289 at 6.

[319] *Id.* at 19–20.

a substantial likelihood of infringement."[320] Since only the "forming a plurality of slots . . ." limitations are in dispute, plaintiffs focus their argument on these aspects of the claims.[321] MOSO responds with a series of arguments the court has already rejected in conjunction with MOSO's *Daubert* and summary judgment motions.[322] Based upon the evidence presented by plaintiffs here, and discussed extensively with respect to MOSO's claims of noninfringement,[323] the court concludes that there is a substantial likelihood that the accused products are made by the patented process.

### (b)    Plaintiffs' efforts

Plaintiffs chronicle their efforts to learn details about the accused process, which is performed in various factories in China owned and operated by third parties.[324] MOSO accuses plaintiffs of "passivity" in their written discovery and fault plaintiffs for not being more aggressive in third-party foreign discovery.[325] MOSO also argues that plaintiffs' failures do not mean that MOSO withheld information during discovery.[326]

Although MOSO seeks to characterize the statute as requiring the court to assess "the reasonableness of a patent owner's efforts to **discover** an accused process,"[327] the statute speaks of whether "the plaintiff has made a reasonable effort to **determine** the process actually used in the production of the product and was unable to so determine."[328] Here, the record is clear that there are various aspects of the accused

---

[320] D.I. 244 at 14.

[321] *Id.* at 14–17.

[322] D.I. 270 at 8–12.

[323] *See* Section IV.B above.

[324] D.I. 244 at 17–19.

[325] D.I. 270 at 12–16.

[326] *Id.* at 16–18.

[327] *Id.* at 13 (emphasis added).

[328] 35 U.S.C. § 295 (emphasis added).

process that are undetermined. For example, the parties disagree whether the accused process performs the "forming a plurality of slots . . ." step based upon the depth of the cut formed by the toothed wheel. MOSO's Dr. Böck goes so far as to call it an "incising wheel" and to assert that the cut is an "incision" and not a "slot." But even Dr. Böck, who was the only person to visit the relevant factory in China, does not know how deep the cut is and took no measurements from the machine or the intermediate products.[329] Additionally, while Dr. Shmulsky expresses an opinion in relation to claims 16 and 19 that the formed scrimber is heat treated to some degree during the curing process, neither he nor Dr. Böck know the actual temperature at which the scrimber is cured.[330]

As to the reasonableness of plaintiffs' efforts, plaintiffs chronicle their efforts.[331] MOSO argues that these efforts were "token" and were, therefore, unreasonable.[332] Regardless, plaintiffs sought documentation of the accused process, which MOSO did not provide.[333] Plaintiffs also sought to inspect at least one Chinese factory, which MOSO opposed.[334] Thus, faced solely with Dr. Böck's inspection of the factory as well as the testimony of MOSO's Mr. Zaal, plaintiffs seek to prove infringement. MOSO then argues that this is not enough. But MOSO cannot have it both ways—it cannot hide

---

[329] *See* Section IV.B.3. above.

[330] *See* Section IV.B.4. above. MOSO also argues that plaintiffs' confidence in their ability to prove infringement at trial "ends the inquiry" into the second prong of Section 295, D.I. 270 at 8, but this is attorney argument. MOSO identifies no case law suggesting that plaintiffs' position on infringement negates the question under Section 295 and "ends the inquiry."

[331] D.I. 244 at 17–19.

[332] D.I. 270 at 12–16.

[333] D.I. 244 at 17–18.

[334] *Id.* at 18.

behind a foreign third-party manufacturer while failing to produce documentation of the accused process.[335]

For these reasons, the court recommends that the district court GRANT the motion.

### G.    State-law claims

There are numerous state-law claims in both the Second Amended Complaint, the Answer and Counterclaims to the Second Amended Complaint, and the Companion Complaint. Both plaintiffs and defendants move for summary judgment on aspects of these state-law claims. In view of the briefing, the court notes that the citation practice on both sides lacks the level of detail necessary for the court to recommend summary judgment and, therefore, recommends that the district court DENY these motions.

### 1.    Standard

In a motion for summary judgment, the burden is on the moving party to show "that there is no genuine dispute as to any material fact" and that they are "entitled to judgement as a matter of law."[336] A moving party must support its assertion that "a fact cannot be or is genuinely disputed"[337] by:

---

[335] *Creative Compounds, LLC v. Starmark Labs*, 651 F.3d 1303, 1315 (Fed. Cir. 2011). With respect to MOSO's claims of prejudice, nothing in the statute requires the court to evaluate potential prejudice. The case law cited by MOSO is inapposite—that case concerned amended infringement contentions at the close of fact discovery. *Revolaze LLC v. J.C. Penney Corp., Inc.*, No. 2:19-CV-00043-JRG, 2020 WL 2220158 (E.D. Tex. May 6, 2020). Moreover, the Section 295 remedy may be applied at summary judgment. *See Nutrinova Nutrition Specialties & Food Ingredients GmbH v. Int'l Trade Comm'n*, 224 F.3d 1356, 1360 (Fed. Cir. 2000) ("The specific point during a trial when the trial court should decide a § 295 motion raised by the patentee will vary with the facts and circumstances of each case."). Here, the court has made its recommendations as to the summary judgment motions without shifting the burden, but the court recommends that the burden as to the asserted process claims be shifted at trial.

[336] Fed. R. Civ. P. 56(a).

[337] *Id.*, 56(c).

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.[338]

### 2.    Defendants' motions as to the state-law claims

The individual defendants move for summary judgment as to Counts I–V of the Companion Complaint.[339] They present extensive attorney argument under three headings, and specifically mention Counts II and IV.[340] The court is left to infer which arguments pertain to the other counts. The briefing also addresses MOSO's motion as to Counts II, III, and IV of the SAC.[341] Despite nearly ten pages of briefing in their opening brief,[342] defendants cite a handful of deposition transcripts as evidence supporting their assertions that various facts cannot be genuinely disputed.[343] In addition, they make numerous factual assertions, some allegedly undisputed[344] and others without any explanation.[345] Nearly all of defendants' argument as to the facts of

---

[338] *Id.*

[339] D.I. 239 (motion), 240 (opening brief).

[340] D.I. 241 at 23–29.

[341] *Id.* at 29–34.

[342] *Id.* at 23–34.

[343] *Id.* at 25 (citing D.I. 242-1, Ex. P), 31 (citing D.I. 242-1, Exs. O, Q).

[344] *E.g.*, D.I. 241 at 24–25 ("It is undisputed that Easoon shared its customer and price lists with TW; Clifton was not an employee of Easoon, yet he had access to Easoon trade secret information.").

[345] *E.g.*, *id.* at 25 ("Easoon did not produce any contract or agreement with TWFG requiring TWFG and its employees to maintain the confidentiality of Easoon's trade secrets or confidential information, much less that Easoon and TWFG had similar agreements with the other companies that could access the communal database. Moreover, Easoon cannot establish it took reasonable steps to make its employees and

the case lack citation to the record.[346] Plaintiffs respond and identify various contrary facts.[347] In reply, defendants respond largely with argument and present a handful of additional citations to the record.[348]

Given the lack of citation, to entertain defendants' argument as to the state law claims, the court would essentially shift the burden onto the non-moving party. Incredibly, defendants argued in their reply brief that the court should apply this shifted burden and require plaintiffs to prove their case in their answering brief.[349]

Under Rule 56(c)(1), the burden is on defendants as the moving party to provide citation to the record or a "showing" that the record lacks such evidence to support an absence or a presence of a genuine dispute—this is missing from defendants' briefing.[350] Since much of the evidence supporting these state-law claims lies in written discovery and documents not presented to the court, the court has no way of knowing, for example, whether a party has "failed to produce" a specific document[351] or whether plaintiffs rely entirely on the testimony of a single individual as the evidentiary basis for a

---

contractors aware of its internal policy for protecting trade secrets. At most, Easoon had an employee handbook with a confidentiality provision. But there is no evidence that Messrs. Kelly or Osterman received the handbook or acknowledged the contents and requirements.").

[346] *Id.* at 23–34. The "Statement of Facts" section is equally unavailing. *Id.* at 6–7.

[347] D.I. 269 at 22–33. The court notes that plaintiffs place their record citations in footnotes—for future reference, citations in briefs are to be inline. *See* D. Del. L.R. 7.1.3(a)(2),(5).

[348] D.I. 293 at 12–17 (citing D.I. 294-1, Ex. Z at 1).

[349] D.I. 293 at 13 ("Plaintiffs must prove that Easoon took reasonable efforts to protect the secrecy of such information when sharing the proprietary information with a third party (TWFG). Plaintiffs made no such showing in the Opposition Brief."). The burden here remains on the moving party. Fed. R. Civ. P. 56(c).

[350] D.I. 241 at 23–34; D.I. 293 at 12–17.

[351] *E.g.*, D.I. 241 at 25 ("Easoon did not produce any contract or agreement with TWFG requiring TWFG and its employees to maintain the confidentiality of Easoon's trade secrets or confidential information, much less that Easoon and TWFG had similar agreements with the other companies that could access the communal database.").

specific cause of action.[352] In addition defendants' briefing on the state-law claims is peppered with language seeking summary judgment on the grounds that the evidence is "circumstantial"[353] or that it must be weighed in defendants' favor.[354] Because defendants' briefing on the state-law claims fails to comply with Rule 56, the court recommends that the district court DENY the individual defendants' motion as to Counts I-V of the Companion Complaint and DENY MOSO's motion as to Counts II, III, and IV of the SAC.

### (a)    Motion to Strike

#### (i)    Background

In opposing defendants' motion for summary judgment as to the state-law claims in the Companion Complaint[355] plaintiffs submitted an appendix containing a number of documents, including the declarations of Francis James[356] and Ryan Kline.[357] Plaintiffs discussed these declarations in their briefing.[358] Defendants move to strike these declarations as untimely.[359] Although the court does not rely on these facts to address

---

[352] *E.g.*, D.I. 241 at 31 ("Much of Easoon's evidence of allegedly defamatory statements is based on what customers allegedly told Chua heard from his customers."). Obviously, in terms of demonstrating the absence of a genuine issue of material fact—as is the moving party's burden under Rule 56—qualifying language such as "much" is neither convincing nor helpful.

[353] D.I. 241 at 28 ("The only evidence Easoon has relied upon to support its claim for breach of fiduciary duty against the MOSO NA Defendants is, at best, purely circumstantial evidence.").

[354] D.I. 241 at 28, 33 (characterizing the evidence as "at best" or "at most" having a specific significance).

[355] D.I. 240.

[356] D.I. 271, Ex. 30.

[357] *Id.*, Ex, 31.

[358] D.I. 269 at 29–30.

[359] D.I. 295.

defendants' motions as to the state-law claims, the court nonetheless recommends that the district court DENY the motion to strike.

The facts supporting this motion are simple. Plaintiffs did not identify Mr. James or Mr. Kline in their Rule 26 disclosures or elsewhere in written discovery.[360] Plaintiffs attempted to depose Mr. James,[361] who is in Canada, but were unable to do so before the close of discovery. After discovery closed, plaintiffs again sought to depose these individuals, or other representatives from their respective companies.[362] Judge Andrews met with the parties on January 3, 2020 and denied this request.[363]

Presently, plaintiffs seek to use these declarations in support of their state-law claims as against the individual defendants. Defendants moved separately to strike these declarations on December 14, 2020[364] and presented extensive argument[365] based upon the factors described in *Meyers v. Pennypack Woods.*[366] Briefing on the motion was complete on January 13, 2021.[367] Plaintiffs argue that defendants were placed on notice of Messrs. James and Kline on November 30, 2018 when Mr. Avery Chua was deposed.[368]

---

[360] D.I. 297-1, Exs. C, D.

[361] D.I. 297-1, Ex. L at 3.

[362] D.I. 297-1, Ex. K at 4:22–5:14.

[363] D.I. 297-1, Ex. K at 13:13–15.

[364] D.I. 295.

[365] D.I. 296.

[366] *Meyers v. Pennypack Woods Home Ownership Ass'n.*, 559 F.2d 894 (3d Cir. 1977).

[367] D.I. 307, 309.

[368] D.I. 307 at 4–8. This argument was in response to an argument in an e-mail thread with opposing counsel who expressed surprise at the identity of these individuals as disclosed in a December 2019 deposition of Mr. Chua. D.I. 297-1, Ex. L.

**(ii)    Standard**

Federal Rule of Civil Procedure 26 outlines required disclosures, including "the name . . . address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.[]"[369] In general, a party that has made a Rule 26(a) disclosure, or has

> responded to an interrogatory, request for production, or request for admission—**must supplement or correct its disclosure or response . . . in a timely manner** if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.][370]

The duty to supplement discovery responses is significant, and the Rules specify sanctions for parties that fail to comply with this duty. For example, "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."[371]

In the Third Circuit, courts evaluate the following factors when considering whether to exclude the testimony of potential witnesses:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order.[372]

---

[369] Fed. R. Civ. P. 26(a)(1)(A)(i).

[370] *Id.* 26(e)(1)(A) (emphasis added).

[371] Fed. R. Civ. P. 37(c)(1).

[372] *Pennypack Woods*, 559 F.2d at 904–05.

The Third Circuit has "also stated that 'the importance of the excluded testimony' should be considered."[373]

### (iii)    Discussion

Here, it is clear that plaintiffs did not update their Rule 26 disclosures and other written discovery after Mr. Chua's November 2018 deposition, which identified Messrs. James and Kline as individuals who could have discoverable information. But it is also clear that defendants knew the identity of James and Kline. For example, defendants claim prejudice, having "brought their summary judgment motions without prior knowledge of facts upon which Plaintiffs now rely."[374] But defendants appear to have known these very "facts" and to have sought to exclude a portion of them in their summary judgment briefing, challenging the testimony of Mr. Chua in support of one of the state-law claims as "[i]nadmissible hearsay."[375] The court finds it hard to believe that defendants were "blindsided" by the two declarations plaintiffs filed in response to that specific argument.[376]

Moreover, had that summary judgment briefing been done in accordance with the very rules[377] defendants claim to hold dear,[378] the court would have had a better understanding, for example, of whether the 15,442 pages of documents produced by Disdero Lumber, including "emails and text messages involving Ryan Kline and others pertaining to both Plaintiffs and Defendants[]"[379] also contains those same "facts" now in

---

[373] *Konstantopoulos v. Westvaco Corp.*, 112 F. 3d 710, 719 (3d Cir. 1997) (citing *Pennypack Woods*, 559 F.2d at 904).

[374] *Id.*

[375] D.I. 241 at 31.

[376] D.I. 296 at 12.

[377] To wit, Federal Rule of Civil Procedure 56.

[378] D.I. 296 at 8–10.

[379] D.I. 307 at 7–8.

question in Mr. Kline's declaration. For this reason, the court finds that the first *Pennypack Woods* factor, prejudice, weighs against exclusion.

By the same token, as to the second factor, the ability to cure the prejudice, the parties have given up their trial date, and a new one has not been assigned.[380] Scheduling two depositions between now and an unknown trial date is clearly not prejudicial. Similarly, on the third factor, with no trial date scheduled, there is no schedule for these two potential witnesses to disrupt. With regard to bad faith or failing to comply with the court's order, defendants accuse plaintiffs of circumventing[381] and defying[382] Judge Andrews' January 2020 order denying additional third-party discovery. Plaintiffs respond that at no point after that order, "have the Plaintiffs deposed or attempted to depose Messrs. James and Kline" but rather that these individuals "voluntarily agreed to submit declarations in support of Plaintiff's opposition" to summary judgment.[383] Here, the court is unable to discern bad faith on plaintiffs' part. Finally, as to the additional factor, the significance of the testimony of James and Kline, this clearly weighs in favor of inclusion.[384] These individuals have personal knowledge of facts that are likely relevant to various aspects of the state-law claims plaintiffs assert.

For these reasons, the court recommends that district court DENY the motion to strike the James and Kline declarations.

### 3.    Plaintiffs' motion as to MOSO's Counterclaims

Plaintiffs move to dismiss two of MOSO's defamation counterclaims, specifically Count VI, libel *per se*, and Count VII, trade libel.[385] The briefing is heavy on the case

---

[380] D.I. 314.

[381] D.I. 296 at 3.

[382] *Id.* at 14.

[383] D.I. 307 at 8.

[384] D.I. 296 at 14.

[385] D.I. 248 (motion); D.I. 249 at 25 (opening brief).

law and light in citation to the record. Apparently, MOSO's counterclaim stems from a press release issued by one of the plaintiffs,[386] but plaintiffs citations are unhelpful,[387] and the elusive "Exhibit F"[388] cited by plaintiffs is not attached as Exhibit F to the Declaration of Thomas H. Kramer.[389] Nor does Mr. Kramer's declaration identify a press release in its contents.[390] In response, MOSO sees fit to include several press releases attached to the Declaration of Thomas G. Pasternak[391] and to cite in its brief to an "Ex. F."[392] But Exhibit F to the Pasternak Declaration does not appear to be the specific press release.[393] Finally, in their reply brief, plaintiffs cite to, annotate, and attach the release in question.[394]

---

[386] D.I. 249 at 26 (citing "D.I. 46 at ¶¶ 67-73" and an "Exhibit F" absent a D.I. number or other citation to the record).

[387] For example, D.I. 46 at ¶¶ 67-73 does not detail counterclaims and simply addresses answers to the Second Amended Complaint. Moreover, a review of the docket indicates that MOSO amended its counterclaims in October 2020. *See* D.I. 263.

[388] In hindsight, the court recognizes that this maddening exercise in citation checking could have easily been avoided if counsel for plaintiff had bothered to read the Local Rules. *See* D. Del. L.R. 7.1.3(a)(6) ("Citation by Docket Number. References to earlier-filed papers in any civil action shall include a citation to the docket item number as maintained by the Clerk in the following format: 'D.I.' followed by the docket item number of the paper."). Had plaintiffs cited to "D.I. 46, Ex. F," that would have given the court a far clearer idea of what the parties were arguing about.

[389] *See* D.I. 205, Ex. F (U.S. Patent No. 5,543,197 to Plaehn).

[390] D.I. 251 at 1–2.

[391] D.I. 278 at 2 (identifying Exhibits E, F, and G as various "dasso Group" press releases).

[392] D.I. 273 at 28.

[393] D.I. 278-1, Ex. F.

[394] D.I. 291 at 15 (citing to "Exhibit C"); D.I. 292-1, Ex. C. It is telling that plaintiffs made it so difficult for the court to find the press release.

Plaintiffs argue that summary judgment is appropriate for a litany of reasons but hide behind qualifying language that obscures the facts.[395] Despite having the burden to support their assertion "that a fact cannot be or is genuinely disputed,"[396] Plaintiffs have not cited or shown the absence of a genuine issue of material fact as to these specific defamation claims.

First, plaintiffs argue that the press release was issued in China and "most" of the damages occurred outside of the U.S.[397] MOSO contends this is a "red herring," because the press release was issued on the Internet, plaintiffs chose Delaware and did not announce their intention to apply foreign law to the counterclaims, and the issues can be adjudicated in Delaware.[398] The court agrees with MOSO—the press release appeared online, and the scope and geography of the alleged defamation and damages associated with that document are questions of fact for the jury.

Second, plaintiffs argue that the allegations in the press release that MOSO was selling "counterfeit" goods are not actionable, because the allegations were not false and were merely an opinion.[399] MOSO responds that the statements were demonstrably false, that the press release raises issues of material fact, and that plaintiffs arguments fail as a matter of law for several reasons.[400] Although the parties seek to test the boundaries of Delaware defamation law,[401] the question here is far simpler—whether

---

[395] *Compare* D.I. 249 at 26 (citing D.I. 250, Ex. P at ¶¶ 18–23) (emphasis added) ("Thus, the alleged defamation and **most** of MOSO's purported damages occurred entirely outside the U.S.") *with* D.I. 250, Ex. P at ¶¶ 24–29 (documenting an opinion as to damages based upon lost business in the U.S.).

[396] Fed. R. Civ. P. 56(c)(1).

[397] D.I. 249 at 26–27.

[398] D.I. 273 at 32–33.

[399] D.I. 249 at 28–29.

[400] D.I. 273 at 27–31.

[401] *See, e.g.*, D.I. 249 at 28–29 (citing *In re Nat'l Collegiate Student Loan Trusts Litig.*, No. CV 12111-VCS, 2020 WL 3960334, at *4 (Del. Ch. July 13, 2020) for the

the identified statements are "fact" or "opinion" is obviously something only the trier of fact can address. Moreover, the press release is filled with additional questions for the jury. For example, the press release states that "MOSO Bamboo X-treme is <u>counterfeited</u> product being manufactured and produced at an unauthorized and terminated former factory."[402] This presents at least two questions of fact for the jury: (1) whether the product manufactured by the "terminated former factory" is "counterfeit" under the definition of that word, and (2) whether all product sold by MOSO under the "Bamboo X-treme" name is also "counterfeit." Clearly, some of these questions hinge on allegations of patent infringement, ostensibly in another country, which is another question for the jury.[403] In addition, the press release makes numerous other statements about "counterfeit" products, some directed at MOSO and others directed at the "terminated former factory"—parsing through these specific alleged defamatory statements will require greater detail than the broad brushes of "not false" and "opinion" that plaintiffs wield in their briefing.[404]

Third, plaintiffs argue that "MOSO has not produced any evidence that MOSO lost the Hornbach or Disdero businesses because of the defamation."[405] Plaintiffs present an extensive discussion of the case law surrounding defamation damages.[406] They also cite to a single deposition transcript.[407] MOSO discusses the case law and avers that it "has presented sufficient evidence of the damages it suffered as a result of

---

proposition that "defamation and trade libel require 'the knowing publication of false material that is derogatory to the plaintiff's business'").

[402] D.I. 292-1, Ex. C at 1.

[403] *Id.* at 2 (emphasis in original) ("We, as a company, cannot allow a former factory to continue manufacturing <u>counterfeited</u> product in violation of Dasso's patent rights.").

[404] The word "counterfeit" appears underlined 9 times in the press release. *Id.* The name "MOSO" appears well over a dozen times. *Id.*

[405] D.I. 249 at 31.

[406] *Id.*

[407] *Id.* at 32.

Easoon's defamatory statements to survive a motion for summary judgment."[408] As to the case law, general damages suffice for the claimed defamation, because "under Delaware law, injury to reputation is permitted without proof of special damages."[409] With respect to damages, plaintiffs' citation practice here is lacking—they have not presented to the court enough information for it to determine whether there is a lack of proof of damages. For example, plaintiffs have not provided a response to an interrogatory in which MOSO identifies the specific documents or witnesses that it contends establish its theory of damages for the defamation claims. Absent the type of documentation required under Rule 56, the court has no basis on which to recommend granting summary judgment.

For the reasons discussed above, the court recommends that the district court DENY plaintiffs' motion as to Count VI and VII of MOSO's counterclaims.

---

[408] D.I. 273 at 30.

[409] *Gannett Co., Inc. v. Kanaga*, 750 A. 2d 1174, 1184 (Del. 2000)

## V.    CONCLUSION

For the aforementioned reasons, the court recommends that the district court GRANT-IN-PART and DENY-IN-PART the pending motions as follows:

| Moving Party | D.I. | Description | Recommendation |
|---|---|---|---|
| *Daubert* Motions | | | |
| MOSO | 239 | To exclude portions of the testimony of plaintiffs' technical expert, Dr. Rubin Shmulsky | DENY |
| MOSO | 239 | To exclude portions of the testimony of plaintiffs' damages expert, Mr. Glenn Newman | DENY |
| Individual Defendants | 240 | | |
| The '578 Patent | | | |
| MOSO | 239 | Noninfringement | DENY |
| MOSO | 239 | Invalidity (indefiniteness) | DENY as to claims 13 and 15 |
| Plaintiffs | 248 | Nonobviousness | GRANT-IN-PART DENY-IN-PART |
| Plaintiffs | 248 | SJ as to MOSO's Patent Exhaustion defense | GRANT |
| Plaintiffs | 243 | Motion for the presumption under 35 U.S.C. § 295 | GRANT |
| State-Law Claims | | | |
| MOSO | 239 | SJ as to the SAC's Count II (Tortious Interference with Prospective Economic Advantage), Count III (Violation of Delaware Deceptive Trade Practices Act), and Count IV (Aiding and Abetting Breach of Fiduciary Duty) | DENY |

| Moving Party | D.I. | Description | Recommendation |
|---|---|---|---|
| Individual Defendants | 240 | SJ as to the Companion Complaint's Count I (Breach of Fiduciary Duty), Count II (Breach of the Duty of Loyalty), Count III (Violation of the Uniform Deceptive Trade Practices Act), Count IV (Misappropriation of Trade Secrets), and Count V (Tortious Interference With Business Relations) | DENY |
| Defendants | 295 | Motion to strike the James and Kline Declarations | DENY |
| Plaintiffs | 248 | SJ as to Counts VI (Libel *per se*) and VII (Trade Libel) of MOSO's counterclaims | DENY |

Because this Report & Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report & Recommendation.  Any such redacted version shall be submitted no later than August 9, 2021 for review by the Court, along with a motion for redaction that includes a clear, factually-detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure."[410]  The Court will subsequently issue a publicly-available version of its Report & Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72 (b)(1), and D. Del. LR 72.1, any objections to the Report & Recommendation shall be filed within fourteen (14) days limited to ten (10) pages after being served with the same.  Any response shall be limited to ten (10) pages.

---

[410] *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted).

The parties are directed to the Court's Standing Order in Non-Pro Se Matters for Objections Filed under Fed. R. Civ. P. 72 dated October 9, 2013, a copy of which is found on the Court's website (www.ded.uscourts.gov).

Dated:   July 25, 2021            _____/s Mary Pat Thynge/_____
                                         Chief U.S. Magistrate Judge