**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **DASSO INTERNATIONAL, INC.** | ) | |
| **and EASOON USA, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 17-cv-1574** |
| | ) | |
| **MOSO NORTH AMERICA, INC. and** | ) | |
| **MOSO INTERNATIONAL BV,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ------------------------------------------------- | ) | |
| | ) | |
| **EASOON USA, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 19-cv-564** |
| | ) | |
| **BRETT KELLY, MARK CLIFTON,** | ) | |
| **and DAVID OSTERMAN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Dasso International, Inc. and Easoon USA, Inc. sued MOSO North America, Inc. and MOSO International BV (collectively MOSO), alleging that MOSO's Bamboo X-treme product willfully infringes numerous claims of U.S. Patent No. 8,709,578 (the '578 patent).[1]  Easoon also alleged that MOSO committed tortious interference with prospective economic advantage, violated the Delaware Deceptive Trade Practices Act (DTPA), and aided and abetted a breach of fiduciary duty.  In a separate action that was

---

[1] At trial, the plaintiffs contended that MOSO's Bamboo X-treme product infringes claims 1, 2, 4, 5, 6, 7, 8, 9, 10, 13, and 15 of the '578 patent.

later consolidated with the first-filed case, Easoon sued Brett Kelly, Mark Clifton, and David Osterman (collectively the individual defendants) for misappropriation of trade secrets, and it also sued Kelly for breach of fiduciary duty and fraud.  In addition to asserting a defense of non-infringement and contending that the '578 patent was invalid on various grounds, MOSO counterclaimed against Easoon for tortious interference with prospective economic advantage, violations of the DTPA, defamation, and trade libel.

The parties' claims were tried before a jury in June 2023.  The jury found in the plaintiffs' favor on the questions of infringement, willful infringement, and validity of the '578 patent.  The jury also found that (1) MOSO was liable for tortious interference with Easoon's prospective economic advantage, violating the DTPA, and for aiding and abetting Kelly's breach of fiduciary duty; (2) Clifton and Osterman were liable for misappropriation of trade secrets; (3) Kelly was liable for misappropriation of trade secrets, breach of fiduciary duty, and fraud; and (4) on MOSO's counterclaim, Easoon was liable for violating the DTPA and defamation.  The jury found MOSO, Kelly, Clifton, and Osterman jointly and severally liable for $1.5 million in damages.  The jury also found Easoon liable to MOSO for $100,000 in damages on the counterclaim.

Before the Court instructed the jury, both sides moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  The Court heard the motions and took them under advisement.  The plaintiffs, MOSO, and the individual defendants have now renewed their Rule 50 motions and have each moved for a new trial under Federal Rule of Civil Procedure 59(a).  The plaintiffs have also moved for a permanent injunction against MOSO, enhanced damages under 35 U.S.C. § 284, attorney's fees under 35 U.S.C. § 285, supplemental damages, and pre- and post-judgment interest.

For the reasons set forth below, the Court grants the plaintiffs' motions for a permanent injunction, for enhancement of damages under the Patent Act, and for supplemental damages and interest, but otherwise denies the motions.

## Background

The Court assumes familiarity with this case's factual and procedural background, which the Court has discussed in prior written opinions. The following background is relevant to the post-trial motions.

The '578 patent relates to a method of manufacturing "bamboo scrimber"—a "variety of engineered wood product"—"including a plurality of pressure-pressed bamboo strips impregnated with an adhesive and modified through heat-treatment." *Dasso Int'l, Inc. v. MOSO N. Am., Inc.*, No. 17–01574–RGA, 2019 WL 2135855, at *1 (D. Del. May 16, 2019) ("*Claim Construction Opinion*") (quoting '578 Patent at 1:20–24). The accused product, MOSO's Bamboo X-treme, consists of outdoor bamboo decking boards that have been thermally modified.

## A.   Procedural history

This dispute involves two cases, one filed by the plaintiffs against MOSO and another filed by Easoon against the individual defendants. In Case No. 17-1574, filed in this district in November 2017, Dasso and Easoon sued MOSO for infringement of the '578 patent, tortious interference with prospective economic advantage, violation of the DTPA, and aiding and abetting a breach of fiduciary duty. Moso counterclaimed, alleging noninfringement and invalidity of the '578 patent, patent exhaustion, violations of the DTPA, tortious interference with prospective economic advantage, libel per se, trade libel, and slander per se. Case No. 19-564 was originally filed by Easoon in the

3

Northern District of Georgia and was transferred to this district in March 2019, where it was later consolidated with Case No. 17-1574.  In the second suit, Easoon asserted claims against the individual defendants for, among other things, misappropriation of trade secrets, breach of fiduciary duty, and fraud against Kelly.

On April 25, 2019, Judge Andrews, to whom the case was previously assigned, held a claim construction hearing to address three disputed terms of the '578 patent. On May 16, 2019, Judge Andrews issued an opinion construing the three disputed claim terms as follows:

| Claim term | Construction |
|---|---|
| "modified through heat-treatment so that at least a part of hemicelluloses in said bamboo strips is pyrolysized" | Plain and ordinary meaning. |
| "wherein each of said bamboo strips is formed with a plurality of slots penetrating through said bamboo strip" and "forming a plurality of slots in each of the prepared bamboo strips penetrating through the bamboo strip substantially in a direction of thickness defined by the bamboo strip" | "Plain meaning. The slots need not extend all the way through the strip, but must penetrate deeper than an incision." |
| "absolute dryness" | "The water content in the bamboo strips being very small so that the subsequent hemicelluloses pyrolysing will not be affected." |

*Claim Construction Opinion*, 2019 WL 2135855, at *2–6.  In October 2020, the parties filed cross-motions for summary judgment.  MOSO moved for summary judgment of noninfringement and indefiniteness regarding the '578 patent and for summary judgment on all of the plaintiffs' state law claims against it.  The individual defendants moved for summary judgment on all of Easoon's state law claims against them.  The plaintiffs moved for summary judgment in their favor on MOSO's obviousness and

patent exhaustion defenses and MOSO's libel per se and trade libel claims.  The plaintiffs also moved for a finding that there was a presumption of infringement under 35 U.S.C. § 295 on certain method claims.

Magistrate Judge Thynge issued a report and recommendation.  She recommended granting summary judgment in the plaintiffs' favor regarding MOSO's patent exhaustion defense, partially granting summary judgment for the plaintiffs regarding nonobviousness of the patent claims, granting the plaintiffs' motion for the presumption of infringement under section 295, and denying the other motions.  *See* Dkt. no. 316 at 72–73.  Judge Andrews adopted the recommendation regarding the summary judgment motions and adopted in part the recommendation regarding the presumption under section 295.  The case was reassigned to the undersigned Judge in April 2022.

**B.    Evidence at trial**

A jury trial was held from June 5 through June 9, 2023.  The jury found that MOSO's Bamboo X-treme infringed the asserted claims of the '578 patent and that the asserted claims of the '578 patent were valid.  It also found that MOSO's infringement was willful.  In addition, the jury found MOSO and the individual defendants liable on the state law claims the plaintiffs asserted at trial.[2]  Finally, the jury found Easoon liable to MOSO for defamation and violating the DTPA but not for tortious interference with prospective economic advantage or trade libel.

---

[2] At trial, Easoon limited its claims against the individual defendants to breach of fiduciary duty and fraud against Kelly and misappropriation of trade secrets against Kelly, Clifton, and Osterman.

5

### 1.    Patent infringement

Regarding infringement, one of the grounds for MOSO's post-trial motion concerns Easoon's exclusive license of the patent.  Easoon CEO Seng Chee "Avery" Chua testified at trial that Dasso held ownership rights in the '578 patent, granted Easoon an exclusive license in 2014 to distribute products manufactured in accordance with the patent for twenty years, and renewed that license in 2017.  Evidence admitted at trial indicated that Easoon was obligated to make a one-time, lump-sum payment to Dasso in 2034 that was equivalent to five percent of the gross revenues of all sales from 2014 to 2034.  When asked on cross-examination if this obligation existed even though the '578 patent expires in 2028, Chua answered that Easoon agreed to pay royalties for the entire twenty-year period.

Another infringement-related argument that MOSO raises in its post-trial motion concerns the testimony of the plaintiffs' infringement expert, Dr. Rubin Shmulsky, about distinguishing between "slots" and "incisions."  At claim construction, Judge Andrews had construed claim terms with the phrase "a plurality of slots" as having their plain meaning and held that "[t]he slots need not extend all the way through the strip, but must penetrate deeper than an incision."  *Claim Construction Opinion*, 2019 WL 2135855, at *3.  Judge Andrews also held that "the ['578 patent] Applicant disclaimed 'incisions' such as those disclosed in [a prior patent that] . . . describe[d] 'incisions' as surface level penetrations of wood to improve penetration of preservatives or the like."  *Id.* at *5.  "Based on the representation at oral argument that 'incisions' are known in the art," Judge Andrews concluded that it was not necessary to construe the term "incision."  *Id.*

6

Dr. Shmulsky testified at trial that the difference between a slot and an incision "is related to the depth of the cut" in the bamboo and that "[t]he boundary [between an incision and a slot] is qualitatively wherein an incision's purpose is to be as shallow as possible to facilitate preservative penetration versus a slot which needs to be as deep as necessary to facilitate cracking, controlled fracture of the applications." Trial Tr. 420:10–12, 15–19. Although he agreed that "we need to know the purpose of the cut" to determine if it is an incision or a slot, Dr. Shmulsky also explained that "the purpose in this case is driven by the needed outcome to make a strip that won't further break in hot pressing and will also be pre-fractured in a controlled manner." Id. 420:23, 421:4–7.

When asked if a cut that was "10 percent of the depth of the work piece" was an incision or a slot, Dr. Shmulsky reiterated that "we have to look at the outcome. That is, the roller in this case needs to make deep enough cuts that they will propagate cracks through the work piece or the strip . . ." Id. 421:8–13. Earlier in his testimony, Dr. Shmulsky had explained that the "residual stiffness" of bamboo strips—which is a "cubic function" that he could determine as a percentage—was indicative of the purpose or outcome of a cut, as strips that are "much less stiff and much less strong . . . would suggest those cuts are going to act as crack initiators or . . . will propagate through the thickness of the strip." Id. 399:15–22. Dr. Shmulsky also stated that he could not "provide any percentage depth guidance where if we're in one range, we're doing incisions and if we're in another range, we're doing slots" because he believed the percentage depth "depends on the material and how it's further processed." Id. 421:17–21.

MOSO's post-trial motion also takes issue with the testimony of Glenn Newman,

the plaintiffs' damages expert.  As relevant to MOSO's motion, Newman testified that he "saw [that] 86 percent [of total customers] were common customers" between Easoon and MOSO, but he did not "prove each and every sale" because he believed it was not necessary and if "[y]ou want an indication, is it reasonable that they would have made those sales." *Id.* 470:11–15.  He also stated that he had listened to the testimony at trial, spoken with Chua and Dr. Shmulsky, and reviewed both Easoon's and MOSO's materials in concluding that "there are no other parties that practice the patent that are in the marketplace competing for these bamboo deck boards."  *Id*. 458:23–459:1.  When asked on cross-examination about acceptable non-infringing substitute products , Newman said that he believed there were none because of the "features and benefits that are offered by the products that we're talking about, the certifications and the other features." *Id.* 478:24–488:1.

Chua also discussed the differences between Easoon's Dasso XTR and other products.  He admitted that there are other outdoor decking products, but he asserted that "each of these decking material[s] has its own characteristics and prices" and "[t]here's a segment specifically for bamboo."  *Id.* 238:14–16.  Chua said that Dasso XTR and MOSO's Bamboo X-treme were the only brands in the bamboo segment, and "[t]here's nothing else in the market that's considered bamboo." *Id.* 238:16–19.  Chua further testified that Dasso XTR and Bamboo X-treme had obtained various certifications, and he stated that bamboo products from other companies like Amboo and Rebo were not acceptable to Easoon's customers because those products lacked comparable certifications.

Ryan Kline, President and CEO of Disdero Lumber Company, agreed with Chua

regarding the lack of other acceptable products.  Kline testified that Disdero had been a customer of Easoon and later of MOSO.  He also stated that after terminating its relationship with MOSO, Disdero returned to Easoon because there were no other options in the marketplace for outdoor bamboo decking.

### 2.   State law claims

The jury also heard testimony about the plaintiffs' history with MOSO and the individual defendants.

Chua testified that Dasso is a Chinese company that produces bamboo and wood flooring and that he began working for Dasso's predecessor in 2005.  Around 2007, Chua decided to set up a company in the United States because of growing sales in this country.  Chua named the U.S. company Easoon, and it initially focused on interior wood flooring.  A few years later, Easoon decided to partner with another company, Tesoro Woods, to form a joint venture known as TW Flooring Group and launch an outdoor bamboo decking product called Dasso XTR.  At trial, Chua also referred to Dasso XTR as a "sales channel" for Easoon and referred to himself and Tesoro Woods CEO William Jopling as "co-CEOs of Dasso XTR" even though Dasso XTR was not a separate entity according to Chua.

In 2013, Chua and Jopling hired Brett Kelly as "the president of Dasso XTR Sales Channel."  *Id*. 184:13.  The letter confirming Kelly's employment, which was admitted into evidence, stated that Chua and Jopling were Kelly's supervisors, and it listed Kelly's responsibilities as including "sales of XTR, setup & management of independent outside rep network," among others.  PTX 687.  The letter also stated that Kelly could perform "outside, non-XTR work" but that "[i]n all cases, the above non-XTR

9

work . . . must be preauthorized by [Jopling/Chua]."  *Id.*  Chua also testified that Kelly was paid as an independent contractor but that he was authorized to sign agreements on behalf of Easoon.

In 2015, Jopling hired Mark Clifton.  Chua stated that Clifton, as Vice President of TW Flooring Group and Vice President of Dasso XTR Sales, was "controlling the financial[s] of the company of the Dasso XTR" and had access to internal Easoon financial information.  Trial Tr. 987:2–3, 11–14.  Clifton testified that he was a "shared resource" between Tesoro Woods and Dasso XTR, was responsible for day-to-day management of sales and business platforms, and had access to Dasso XTR sales data.

In 2017, Chua hired David "Steve" Osterman as West Coast Regional Manager for Dasso XTR.  Chua stated that Osterman's responsibilities included making sales and servicing customers on the West Coast.

Chua also testified that throughout the 2010s, Easoon and Tesoro Woods had approximately ten employees each.  He said that Easoon restricted access to its confidential information through usernames and passwords with varying levels of access.  Chua stated this confidential information included a customer relationship management database known as Zoho that contained information on Easoon's customers.  Kelly and Osterman had access to information about Easoon's customers, including contact information and the type and amount of products purchased, whereas Clifton had access to more financial and business intelligence information.

MOSO CEO Rene Zaal testified that by April 2017, he and MOSO sales director Arjen Veltman were in contact with the individual defendants about working together to

bring MOSO into the U.S. market.  After receiving a March 21, 2017 email from Kelly

with future pricing for Dasso XTR, Veltman told Zaal in Dutch that Kelly was "on a roll."

Evidence admitted at trial also established that in an April 28, 2017 email to Veltman,

Kelly explained his detailed strategy for working with Clifton and Osterman to manage

operations, increase sales, build warehouses, and secure customers that he believed

are "key to the growth of [MOSO's Bamboo X-treme]."  PTX 183.  Kelly also stated in

that email that Dasso XTR is a product channel rather than a separate company from

Easoon, and he included as attachments data files on Dasso's customers and Dasso

XTR sales by item and profit margin.  Furthermore, Zaal also admitted at trial that

between March and June of 2017, Kelly and Clifton sent him and Veltman various

documents relating to Dasso XTR, including but not limited to:  Easoon's shipping report

as of April 2017, updated Dasso XTR price lists, Dasso XTR inventory data by

warehouse, and Easoon's Zoho database.  Zaal stated that he believed this information

came from Tesoro Wood rather than Easoon.  Chua testified that even though the price

lists were shared with some customers, all of the information listed above was

proprietary and confidential to Easoon.

Around the same time, the individual defendants and MOSO began contacting

Easoon's customers about switching to MOSO.  Osterman confirmed during his

deposition that he and Kelly had discussions over email about the best time to inform

Easoon's customers about MOSO's products, and Osterman mentioned in one of those

emails that he knew Kelly wanted to "squash Dasso."  In other emails that were

admitted into evidence, Kelly stated that he wanted to act quickly to put Chua on the

defensive and make it difficult for Easoon to catch up with MOSO.  To that end, Kelly

directed Veltman and others to not contact certain Dasso XTR customers to prevent Chua from learning that Kelly and MOSO had the entire customer database.  Kelly did, however, instruct MOSO employees to make sure to include "flooring dealers who have inquired about [Dasso XTR]" in an announcement about MOSO.  PTX 54.  In addition, Osterman admitted to informing a marketing consultant in August 2017 that MOSO's products were the "[s]ame products, same factory, same technology, same personnel, same drive to succeed" as Dasso XTR.  *Id.* 346:3–4.

One of the Easoon customers whom the individual defendants and MOSO contacted was Ryan Kline, who led Disdero Lumber Company.  Kline testified that while Kelly and Osterman were still employed with Easoon, they arranged multiple conference calls to convince him to switch his business from Easoon to MOSO.  He stated that in one of those calls, Kelly and Osterman said Easoon was facing financial struggles and possible bankruptcy and was planning to move back to China.  Kline also testified that he learned in late April or early May 2017 that Kelly planned to travel to the Netherlands and strike a deal with MOSO before going on to China for Easoon-related business.

When Kelly testified at trial, he did not dispute that he stopped in the Netherlands and met with MOSO on May 5, 2017 on his way to China.  He also admitted that the purpose of his trip to China was for business relating to Easoon and Dasso XTR, but he asserted that he visited MOSO to talk about factory supply issues in China and possible solutions.  Kelly agreed, however, that he was still President of Dasso XTR at the time and that he did not inform Chua of his stop in the Netherlands or his reasons for doing so.

In late May 2017, after Kelly's trip to China and his stayover in the Netherlands,

Kline had a conference call with Kelly, Osterman, and MOSO executives Zaal and Veltman to discuss Disdero going into business with MOSO. Kline testified that he believed Kelly, Osterman, and Clifton were still employed by Easoon at that time but that it was clear they had already made the decision to leave Easoon for MOSO.

Chua testified at trial that Kelly resigned as President of Dasso XTR around June 11, 2017, and Kelly testified that he began his employment with MOSO on June 14. Zaal testified that he advised Clifton to hold off on resigning from Tesoro Woods until after Zaal met with other individuals regarding a factory in China. Clifton ultimately ended his employment with Tesoro Woods around June 15 and subsequently refused to sign an employment agreement with Easoon. Osterman resigned on June 19. Clifton and Osterman joined MOSO soon after.

Kline testified that around the time the individual defendants left Easoon, he had an in-person meeting with Veltman, Kelly, and Osterman at his office to kick off the relationship between Disdero and MOSO. At this meeting, he was informed that MOSO's Bamboo X-treme was the same product and produced at the same Chinese factory as Dasso XTR. According to Kline, the fact that the products were the same was important because Disdero had invested significant resources in the outdoor bamboo decking market and believed Dasso was going bankrupt and leaving the market. At some point while Disdero was working with MOSO, Kline asked MOSO to cover any warranty claims involving Dasso XTR because he believed Dasso soon would no longer be in the marketplace. MOSO agreed to do so. Nevertheless, Kline ended the business relationship between Disdero and MOSO after a little over a year because he learned that Dasso XTR was not going bankrupt or moving back to China

and due to issues with the MOSO sales team as well as the patent infringement dispute. As previously noted, Kline testified that he decided to return to Dasso XTR and Easoon because Disdero had no other options in the marketplace for outdoor bamboo decking.

At trial, Chua did not dispute that he communicated to many individuals that MOSO's Bamboo X-treme was counterfeit and infringing after MOSO and the individual defendants launched that product in the United States. Chua asserted that when he said MOSO's product was "counterfeit," he meant that it was infringing the '578 patent. Zaal, by contrast, said that he understood the term "counterfeit" to mean that a product is of low quality and a "copycat," and Kelly testified that being accused of counterfeiting implies criminality and has "major ramifications" in the building materials market. Kelly also testified that some individuals would not do business with MOSO because of the allegations and that he had to travel to California to meet with MOSO's customers and explain that the Bamboo X-treme was not a counterfeit product.

## Discussion

### A.    Applicable law

For issues that are not patent-law-specific, the Federal Circuit defers to the law of the regional circuit in which the district court sits—here, the United States Court of Appeals for the Third Circuit. *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1248 (Fed. Cir. 2005); *see also, In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1367 (Fed. Cir. 1999) ("we apply our own law with respect to issues of substantive patent law and certain procedural issues pertaining to patent law, but as to nonpatent issues, we apply the law of the circuit in which the district court sits."). In particular, the Federal Circuit "review[s] the denial or grant of JMOL under regional circuit law." *ActiveVideo*

*Networks, Inc*. v. *Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1319 (Fed. Cir. 2012).

**B.    Motions for JMOL and a new trial**

The parties have moved for judgment as a matter of law (JMOL), or in the alternative for a new trial, on various claims.  Under Federal Rule of Civil Procedure 50(b), JMOL is proper only if "viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find" for the nonmovant. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (citing *Wittekamp v. Gulf & Western Inc.*, 991 F.2d 1137, 1141 (3d Cir. 1993)).  "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Id.* (quoting *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir. 1978)).

"In order to preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgment as a matter of law at the close of the nonmovant's case, pursuant to Rule 50(a), and specify the grounds for that motion." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1172 (3d Cir. 1993).  The moving party's Rule 50(a) motion must be "*sufficiently specific* to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which otherwise might make its case legally insufficient." *Id.* at 1173 (emphasis in original).  As a result, a party's "failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the plaintiffs on notice waives [that party]'s right to raise the issue in their Rule 50(b) motion." *Williams v. Runyon*, 130 F.3d 568, 571–72 (3d Cir. 1997).

To grant JMOL on infringement in favor of the party with the burden of proof, the

Court "must be able to say not only that there is sufficient evidence to support the finding [sought by that party] . . . but additionally that there is *insufficient evidence for permitting any different finding*." *Fireman's Fund Ins. Co. v. Videfreeze Corp*., 540 F.2d 1171, 1177 (3d Cir. 1976) (emphasis added); *see also*, *Smollett v. Skayting Dev. Corp.,* 793 F.2d 547, 548 (3d Cir. 1986) (motion for JMOL must be denied when "the record contains the minimum quantum of evidence from which a jury might reasonably afford relief"). In assessing each motion, the Court must give the non-movants "the benefit of all logical inferences that could be drawn from the evidence presented" and must "resolve all conflicts in the evidence in [the non-movant's] favor and, in general, view the record in the light most favorable to [the non-movant]." *Williamson v. Consol. Rail Corp*., 926 F.2d 1344, 1348 (3d Cir. 1991).

The Third Circuit has held that motions for judgment as a matter of law under Rule 50(b) should be granted only sparingly. *Marra v. Phila. Hous. Auth*, 497 F.3d 286, 300 (3d Cir. 2007) (citation omitted). This is particularly true when, as just discussed, the motion involves an issue on the movant bears the burden of proof. *Fireman's Fund Ins. Co.*, 540 F.2d at 1177 (entry of JMOL after a jury verdict "is rare[ ] [and] reserved for extreme circumstances.").

The Court has discretion to grant a new trial under Rule 59(a) "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a). Some reasons for granting a new trial are: (1) the jury's verdict is against the clear weight of the evidence and a new trial is necessary to prevent a miscarriage of justice; (2) improper conduct by an attorney or the Court unfairly influenced the verdict; or (3) the jury's verdict was facially inconsistent.

16

*See Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 85 F. Supp. 3d 768, 775 (D. Del. 2015).

### 1.    Infringement

MOSO raises two grounds for JMOL on infringement or, in the alternative, for a new trial on that issue.  It also moves for JMOL or a new trial on infringement-related damages.  The Court addresses each motion in turn.

### a.    Standing / enforceability

MOSO contends that because Easoon's license agreement with Dasso provided for royalties after the expiration date of the patent, the license was unenforceable and Easoon therefore did not have standing as a co-plaintiff.  The Court disagrees.

In this case, Easoon's exclusive license requires it to make a lump-sum payment in 2034 equivalent to of five percent of sales of products covered by the '578 patent during the license term.  The license term is twenty years, and Dasso and Easoon signed the license in 2014 and renewed it in 2017.  As a result, Easoon is obligated to pay royalties for sales made after 2028, when the '578 patent expires in 2028.

MOSO relies on the Supreme Court's statement that "[a] court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent.  If not, no problem; if so, no dice."  *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 459 (2015).  Based on the words "no dice," MOSO contends that any license providing for post-expiration royalties is unenforceable *in its entirety*, even regarding to pre-expiration royalties and other pre-expiration rights.

But *Kimble* was clear that "*Brulotte* allows a licensee to defer payments for pre-expiration use of a patent into the post-expiration period; all the decision bars are

*royalties* for using an invention after it has moved into the public domain." *Id.* at 454 (emphasis added). Nowhere in the opinion does the Supreme Court hold that a license requiring post-expiration royalties is unenforceable for the *entire life of the license* rather than for just the post-expiration period. In fact, the defendant in *Kimble* only "sought a declaratory judgment in federal district court confirming that the company could cease paying royalties come 2010—the end of [the] patent term." *Id.* at 450. The district court granted that declaratory judgment, and the Ninth Circuit and Supreme Court affirmed. But none of those courts held—and the defendant in that case did not argue—that the defendant had no obligation to pay royalties *prior* to the 2010 expiration date. The Court did not find—nor did MOSO provide—any legal authority interpreting *Kimble* in such a manner. For these reasons, the Court concludes that Easoon's license is enforceable with regard to everything other than the post-2028 royalty payments.

Because Easoon is an exclusive licensee and its license is enforceable during the term of the '578 patent, Easoon has standing to bring suit on the patent and seek damages.

### b. Indefiniteness

MOSO seems to contend that indefiniteness should not have been decided by the jury and that the claims of the '578 patent are indefinite because it is not possible for a person of ordinary skill in the art (POSITA) to distinguish between a "slot" (which is covered by the patent) and an "incision" (which is not). The Court disagrees with both arguments.

Although a question of law, indefiniteness "is amenable to resolution by the jury where the issues are factual in nature." *BJ Servs. Co. v. Halliburton Energy Servs.*,

Inc., 338 F.3d 1368, 1372 (Fed. Cir. 2003).  In such cases, a court "review[s] the jury's verdict to determine if the ultimate conclusion reached is supported by substantial evidence," *id.*, and "any fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence."  *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1284-85 (Fed. Cir. 2023) (internal citation and quotation marks omitted).  "[E]xtrinsic evidence may play a significant role in the indefiniteness analysis. Indeed, definiteness is evaluated from the perspective of a person of skill; requires a determination of whether such a skilled person would understand the scope of the claim when it is read in light of the specification; and is evaluated in light of knowledge extant in the art at the time the patent application is filed[.]"  *Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 809 F.3d 1223, 1225 (Fed. Cir. 2015) (Moore, J., concurring in the denial of reh'g en banc) (collecting cases) (internal citations omitted).  As a result, when "[t]he evidence presented on [the understanding of a person of ordinary skill in the art] was almost exclusively extrinsic, in large part encompassing warring expert testimony[,]" it is proper for a jury to resolve those "critical factual issues" and decide indefiniteness. *Bombardier Recreational Prods. Inc. v. Arctic Cat Inc.*, 785 F. App'x 858, 867 (Fed. Cir. 2019)

As a result, the question for the Court is whether substantial evidence supports the jury's finding that the claims were not indefinite.  The Court concludes that it does.

Judge Andrews construed the claim language to mean "[t]he slots need not extend all the way through the strip, but must penetrate deeper than an incision."  *Claim Construction Opinion*, 2019 WL 2135855, at *3.  MOSO contends that the plaintiffs' expert Dr. Rubin Shmulsky ignored the claim construction.  Not so.  Dr. Shmulsky

testified that the difference between a slot and an incision is related to the depth of the cut.  He did not give a precise percentage depth at which point a cut becomes a slot versus an incision, but "a patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement."  *Invitrogen Corp. v. Biocrest Mfg.*, L.P., 424 F.3d 1374, 1384 (Fed. Cir. 2005).  Rather, Dr. Shmulsky testified that a POSITA could determine whether a cut was a slot or an incision by considering its depth, the residual stiffness of the bamboo strips, and whether the process resulted in controlled cracking.

More specifically, Dr. Shmulsky explained that a slot is a cut that is deep enough to propagate "controlled cracking"; an incision is a cut that is shallow enough to facilitate preservative penetration"; and the depth necessary to facilitate either controlled cracking or preservative penetration would vary depending on the material and how that material is further processed.[3]  Although he admitted that the distinction involved understanding an individual's purpose in making the cut, Dr. Shmulsky testified that a POSITA could determine the purpose of a cut by looking at the outcome of hot pressing a bamboo strip.  He stated that if a cut causes the bamboo strip to crack or "pre-fracture" in a controlled manner and not break further in hot pressing, then the cut would be a slot because it facilitated controlled cracking.  Furthermore, Dr. Shmulsky testified that other metrics like the "residual stiffness" of a bamboo strip—which can be

---

[3] To the extent that MOSO contends this distinction is improper because the term "controlled cracking" is not in the '578 patent, the Court did not find—nor did MOSO provide—any controlling authority stating that proving the knowledge of a POSITA requires intrinsic evidence.  Rather, as stated previously, "extrinsic evidence may play a significant role in the indefiniteness analysis," which is " evaluated from the perspective of a person of skill . . . [and] in light of knowledge extant in the art at the time the patent application is filed[.]"  *Dow Chem.*, 809 F.3d at 1225.

determined as a precise percentage—inform a POSITA whether a cut would facilitate controlled cracking, as strips that are less stiff or strong indicate that the cuts in those strips will act as "crack initiators" or will propagate cracks through the thickness of the strip.

The jury was free to credit Dr. Shmulsky's testimony rather than that of MOSO's infringement expert Dr. Kent Harries.  Considering this testimony in the light most favorable to the plaintiffs, the non-movants on this point, the Court cannot say that MOSO has established that the slot-incision distinction depends "on the unpredictable vagaries of any one person's opinion."  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (internal quotation marks and citation omitted).

For the reasons above, the Court finds that substantial evidence supports the jury's finding on indefiniteness.  The Court therefore denies MOSO's motion for judgment as a matter of law or for a new trial on this ground.

### c.    Damages

MOSO also argues that the jury's $1.5 million damages award is not supported by substantial evidence because the plaintiffs failed to properly prove lost profits.  In particular, MOSO contends that the Federal Circuit requires a plaintiff to establish the absence of non-infringing substitutes on a customer-by-customer basis, *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1287 (Fed. Cir. 2017), and that Glenn Newman, the plaintiffs' damages expert, did not do so.

The best characterization of this point is that it is an afterthought on MOSO's part.  MOSO's counsel breathed not a word of this during closing argument.  Nor did MOSO seek a jury instruction telling the jury that customer-by-customer evidence or

findings were required.  Equally importantly, MOSO did not reference the plaintiffs'

claimed failure to establish customer-by-customer a lack of acceptable non-infringing

alternatives when it stated the grounds for its Rule 50(a) motion.  Instead it stated only,

rather vaguely, that Easoon failed to "engage in a properly informed lost profits

analysis."  Trial Tr. 994:18.

The Court finds that MOSO has waived this issue, because its general statement

in its end-of-trial Rule 50(a) motion was not "*sufficiently specific* to afford the party

against whom the motion is directed with an opportunity to cure possible defects in

proof which otherwise might make its case legally insufficient."  *Lightning Lube*, 4 F.3d

at 1173 (emphasis in original).

That said, MOSO would not prevail on this point even without the waiver.  "To

recover lost profits a patentee must show that 'but for' infringement it reasonably would

have made the additional profits enjoyed by the infringer."  *Micro Chem., Inc. v. Lextron,*

*Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003).  The Federal Circuit has "not restricted

patentees to any one particular method of proving 'but for' causation[,]" and "[t]he

*Panduit* and two-supplier market tests are recognized methods of showing 'but for'

causation."  *Id.*  Although Newman stated at trial that the outdoor bamboo decking

market is "effectively" a two-supplier market, the plaintiffs indicate in their response that

he did not perform a two-supplier analysis and instead analyzed the *Panduit* factors.

Regarding Newman's *Panduit* analysis, the parties dispute whether he sufficiently

established a lack of acceptable non-infringing alternatives for Easoon's customers.

The Federal Circuit has required a "customer-by-customer" analysis of this factor.

*Mentor Graphics*, 851 F.3d at 1287.  This does not mean, however, that a plaintiff's

22

evidence must intone the name of each customer.  Rather, evidence that addresses the market as a whole—which is the approach the plaintiffs took here—should suffice in appropriate circumstances.  Along these lines, courts have noted that there is "no set methodology for establishing lost profit damages" and have rejected requiring plaintiffs to prove what each and every individual customer would have found acceptable or not. *See Sioux Steel Co. v. Prairie Land Mill Wright Servs.*, No. 16 C 2212, 2022 WL 17184469, at *3 (N.D. Ill. Nov. 23, 2022) (collecting cases) (finding it "sufficient that [the plaintiff's expert] considered the possible non-infringing alternatives Defendants offered and concluded that none 'had the advantages' of Plaintiff's patented products based on his general knowledge of the industry and his conversations with consumers"); *AU New Haven, LLC v. YKK Corp.*, No. 15 C 3411, 2019 WL 1254763, at *20 (S.D.N.Y. Mar. 19, 2019) (a defendant's conclusion "based on decades of experience in the outdoor apparel industry" that certain zippers are possible substitutes is sufficient).  Although these cases address the reliability and admissibility of an expert's opinion, they are helpful here because an expert opinion that is sufficiently reliable to be admitted also provides support for a jury's verdict.

Viewed in the light most favorable to the plaintiffs, the evidence at trial was sufficient to establish that Newman "considered the possible non-infringing alternatives Defendants offered and concluded that *none* 'had the advantages' of Plaintiff's patented products" even though he did not specifically analyze the preferences of each individual Easoon customer.  *Sioux Steel Co.*, 2022 WL 17184469, *3 (emphasis added). Newman testified that after speaking with Chua and Dr. Shmulsky and reviewing Easoon's and MOSO's materials, he concluded that there were no other parties in the

market who used a similar process and created comparable bamboo deck boards as Easoon and MOSO.  Consequently, he believed there was a lack of *any* acceptable non-infringing substitutes because of the difference in features, benefits, and certifications between the Dasso XTR and Bamboo X-treme on one hand and other bamboo products or wood flooring more generally.  Similarly, Chua testified that bamboo decking is a subsegment within the general decking market and that Easoon and MOSO were the only two sellers in that segment.  Chua also testified that the products sold by other bamboo companies like Ambo and Rebo were significantly different because they lacked the certifications that Easoon and MOSO's products obtained.  Finally, Kline—the only actual customer of Easoon and MOSO who testified—said that he considered bamboo decking *in general* to be a "complementary replacement" for other forms of decking but that his company had *no options* for outdoor bamboo decking other than Easoon and MOSO.

Having heard all of this testimony, a jury could have reasonably concluded that the only *acceptable* alternative to the Dasso XTR was another bamboo decking product with comparable certifications—and the only such product was MOSO's Bamboo X-treme, which the jury found to have infringed the '578 patent.  This, in the Court's view, is sufficient proof relating to each and every one of the customers that formed the basis of the claim for lost profits and was sufficient to establish damages customer-by-customer even if MOSO had not waived the point in its Rule 50 motion.  The jury's decision to award damages is therefore supported by substantial evidence.

In addition, if one applies the two-supplier test, MOSO likewise would not be entitled to JMOL or a new trial.  "[U]nder the two-supplier test, a patentee must show: 1)

24

the relevant market contains only two suppliers, 2) its own manufacturing and marketing capability to make the sales that were diverted to the infringer, and 3) the amount of profit it would have made from these diverted sales."  *Micro Chem.*, 318 F.3d at 1124. MOSO does not challenge Easoon's manufacturing/marketing capability or the amount of profit but instead appears to argue that there were more than two suppliers in the relevant market or that the plaintiffs did not prove otherwise.

"The proper starting point to identify the relevant market is the patented invention."  *Id.* at 1125.  "The relevant market also includes other devices or substitutes similar in physical and functional characteristics to the patented invention[,]" but does not include "alternatives 'with disparately different prices or significantly different characteristics.'"  *Id.* (citation omitted).  The number of suppliers in a relevant market "focuses on the number of companies involved, not the number of alternatives in the relevant market."  *Id.*

Based on Newman's, Chua's, and Kline's testimony as described above, the jury reasonably could have concluded that the relevant market is not just outdoor decking or bamboo decking in general, but bamboo decking with certain quality certifications. Such a market would have excluded non-bamboo alternatives like Ipe and Trex and other bamboo companies like Amboo and Rebo as having "significantly different characteristics," and contrary testimony by defense damages expert Brian Napper is not a basis for JMOL or a new trial.  The jury then could reasonably conclude that, as supported by Kline's testimony, Easoon and MOSO were the only suppliers in this relevant market.

"In the two-supplier market, it is reasonable to assume, provided the patent

owner has the manufacturing and marketing capabilities, that it would have made the infringer's sales." *Micro Chem.*, 318 F.3d at 1124 (citation and internal quotation marks omitted).  If the patentee satisfies the three criteria above, then "that showing erects a presumption of 'but for' causation. Although the burden of persuasion remains with the patentee, the burden of going forward then shifts to the infringer. The infringer may rebut the presumption by showing that the patentee reasonably would not have made some or all of the diverted sales 'but for' the infringement." *Id.* at 1124–25. *Micro Chem* does not reference the need for a customer-by-customer approach.

Under the two-supplier test, because there is sufficient evidence for the jury to find there was a two-supplier market and MOSO does not challenge the other criteria, the burden then shifts to MOSO to show that Easoon reasonably would not have made MOSO's sales but for the infringement.  MOSO's evidence on this point consists of (1) Kelly's and Williams' testimony that the jury reasonably could have discredited and (2) Chua's mention of Ipe, Trex, Ambo, and Rebo, which the jury reasonably could have found not to be in the relevant market.  Consequently, the Court cannot say that no reasonable jury would have found that Newman's analysis was sufficient under the two-supplier approach to establish damages.

Lastly, MOSO contends that the $1.5 million amount awarded by the jury is unsupported by substantial evidence.  The law is clear that a jury is "entitled to choose a damages award within the amounts advocated by the opposing parties[]" in determining a reasonable royalty.  *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1347 (Fed. Cir. 2011).  The Court sees no basis to believe a lost profits award within the estimates of the parties' damages experts is any different, especially as the Federal Circuit has

26

"never required absolute precision in this task; on the contrary, it is well-understood that this process may involve some degree of approximation and uncertainty." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014).  MOSO is not entitled to JMOL or a new trial on this basis.

### 2.    Tortious interference with Easoon's economic advantage

Next, MOSO contends that substantial evidence did not support the jury's finding of liability on Easoon's claim for tortious interference with economic advantage.  The Court concludes otherwise.

Establishing a claim for tortious interference with economic advantage "requires (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages[.]"  *De Bonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980).  MOSO argues that Easoon failed to establish a reasonable probability of a business opportunity.

"To meet the reasonable probability of a business opportunity prong, a plaintiff 'must identify a specific party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant and cannot rely on generalized allegations of harm.'"  *U.S. Bank Nat'l Ass'n v. Gunn*, 23 F. Supp. 3d 426, 436 (D. Del. 2014) (quoting *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009)).  "To be reasonably probable, a business opportunity must be 'something more than a mere hope or the innate optimism of the salesman' or a 'mere perception of a prospective business relationship.'"  *Agilent Techs.*, 2009 WL 119865, at *7.  Although a "highly discretionary, one-off" past transaction would "fail[] to form a bona fide

27

conspiracy," "*long-standing customer relationships* were found to give the plaintiff a 'reasonable probability of obtaining repeat business,' even without contemplating specific transactions."  *Preston Hollow Capital LLC v. Nuveen LLC*, 2020 WL 1814756 (Del. Ch. Apr. 9, 2020) (emphasis added) (quoting *Beard Rsch. Inc. v. Kates*, 8 A.3d 573 (Del. Ch. 2010), *aff'd*, 11 A.3d 749 (Del. 2010).

In this case, Chua testified that there was no market for outdoor bamboo decking when he started Easoon and that future customers were very skeptical at first because they thought of bamboo as a grass that would rot quickly.  He stated that after investing in the marketing of bamboo decking at trade shows and exhibitions and reaching out to lumberyards and specialty retailers, Easoon made its first sales of the Dasso XTR product in 2010 and 2011.  He also said secured Disdero, Kline's company, as a customer in 2015 and that he was later able to secure more distributors as customers. Newman, the plaintiffs' damages expert, testified that Easoon had business relationships with 86 percent of the entities that later became customers of MOSO customers.  Considering this testimony in the light most favorable to the plaintiffs, the Court concludes that there is more than sufficient evidence for a jury to find that Easoon had "long-standing customer relationships" with the 86 percent of MOSO's customers that had formerly purchased its product and that its expectation of future business with those customers was more than "a mere hope or the innate optimism of the salesman." *Agilent Techs.*, 2009 WL 119865, at *7.

The Court therefore denies MOSO's motion for JMOL or a new trial on this ground.

### 3.    Easoon's DTPA claim

28

MOSO also moves for JMOL or a new trial on Easoon's Delaware Deceptive Trade Practices Act claim.  It argues that substantial evidence did not support the jury's finding of liability.  The Court disagrees.

"A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person . . . [d]isparages the goods, services, or business of another by false or misleading representation of fact."  6 Del. C. § 2532(a)(8).  A plaintiff "need not prove competition between the parties or actual confusion or misunderstanding" in order to prevail.   6 Del. C. § 2532(b).

MOSO's only argument on this point is that Kelly's statements were not false or misleading, but the jury could have reasonably found otherwise based on the evidence presented at trial.  Kline testified that when Kelly spoke with him in April and May of 2017 to convince him to switch to MOSO, Kelly led him to believe that Dasso XTR was effectively going bankrupt and moving back to China.

MOSO argues that Chua's testimony about "turmoil in China" and his declaration in a Georgia state case suggest that Kelly's statements were true, but the jury was under no obligation to come to that conclusion.  The "turmoil in China" testimony indicated that Dasso was experiencing a change in ownership, moving a factory, and having to re-register the company.  It is unclear to the Court why that would compel a jury to conclude that *Easoon* was in financial trouble and leaving the United States. Similarly, viewed in the light most favorable to Easoon, Chua's declaration that Easoon would experience business troubles *in the future* without intervention by the Georgia court supports a conclusion that it was not yet experiencing those troubles at that time. And MOSO points to no evidence—other than Kelly's testimony, which the jury

29

reasonably could decline to credit—that Easoon was in fact planning to leave the United States and return to China.  Furthermore, Kline testified that he later learned that Dasso XTR—which both Chua and Kelly in emails referred to as a sales or product channel for Easoon—was in fact neither going bankrupt nor moving back to China, and this discovery was one of the factors that led Kline to switch from MOSO back to Easoon.

The Court therefore finds that sufficient evidence supports the jury's verdict on Easoon's DTPA claim and denies MOSO's motion for JMOL or a new trial on this issue.

### 4.    Misappropriation of trade secrets

The individual defendants argue that they are entitled to JMOL or a new trial on the plaintiffs' claim for misappropriation of trade secrets under the Georgia Trade Secrets Act for several reasons.  None of their arguments are availing.

"Under the Georgia Trade Secrets Act, a claim for misappropriation of trade secrets requires a plaintiff to prove that '(1) it had a trade secret and (2) the opposing party misappropriated the trade secret.'  Whether information constitutes a 'trade secret' is a question of fact."  *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1290-91 (11th Cir. 2003) (internal citations omitted).  A "trade secret" is "information . . . which is not commonly known by or available to the public" that "(A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Ga. Code Ann. § 101–761(4).  Even if "some or all of the components of the trade secret are well-known," a "secret combination, compilation, or integration of the individual elements" may still be protected.  *Essex*

*Group, Inc. v. Southwire Co.*, 269 Ga. 553, 554, 501 S.E.2d 501, 503 (1998) (quoting Restatement (Third) of Unfair Competition § 39(f) (1995)).

First, it was reasonable for the jury to find from the evidence presented at trial that Easoon owned the trade secrets in question. Whether it was price lists or financial information, all of the identified trade secrets concerned Dasso XTR. The defendants appear to argue that information related to Dasso XTR could not be *Easoon's* trade secrets. Chua testified, however, that Dasso XTR was a product and a sales channel that Easoon launched in partnership with Tesoro Woods through their joint venture TW Flooring Group. Chua's testimony was corroborated by one of Kelly's emails to MOSO, in which Kelly stated that Dasso XTR was not a separate company but rather was a product channel. Kelly's employment letter also suggested a partnership between Easoon and Tesoro Woods, as it listed Chua (the CEO of Easoon) and William Jopling (the CEO of Tesoro Woods) as co-CEOs of Dasso XTR and Kelly's supervisors. Furthermore, Clifton testified to being a "shared resource" for TW Flooring Group and Dasso XTR, and he stated that Chua and Jopling—and thus Easoon and Tesoro Woods—each had access to information on the other entity's servers. A reasonable jury could find based on this evidence that even if Tesoro Woods or TW Flooring Group also owned the data, Easoon was at least a co-owner of any sales and financial data about a product that (1) Easoon had worked with Tesoro Woods to develop and (2) was manufactured in accordance with a patent that Easoon had licensed.

Second, substantial evidence supports the finding that Easoon took reasonable efforts to maintain the secrecy of at least some of the trade secrets. The defendants' claim that Tesoro Woods or TW Flooring Group were third parties—and thus that the

31

claimed trade secrets already had been disclosed—similarly lacks merit because the

evidence discussed above is sufficient to support Chua's testimony that the entities

were in a partnership.  Chua also testified—and Clifton confirmed—that individuals at

Easoon, TW Flooring, and Tesoro Woods had different levels of access to the entities'

information.  The defendants seize on Chua's passing statement that everything at

Easoon is *currently* password-protected to suggest that it was not the case at the time

of the defendants' misappropriation.  That's an unwarranted leap.  Chua testified at

length about both Easoon and Tesoro using passwords to restrict access at the relevant

time:  he explained the different levels of access that Kelly, Clifton, and Osterman had

to Dasso XTR data as a result of their different roles.  Because none of those

individuals are currently employed with Easoon, it is clear that Chua's testimony referred

to their levels of access at the time they were claimed to have misappropriated

Easoon's trade secrets.  And even if one does not consider the employee handbook, the

Court cannot say that Easoon's use of passwords and varying levels of access was

anything less than a reasonable effort under the circumstances to maintain the

confidentiality of its information.

The only possible exception to this is the Dasso XTR price lists, which Easoon

admitted that it sent to customers without asking them to sign any sort of a

confidentiality agreement.  Yet the evidence shows that (1) Osterman did not share any

price lists, and (2) Kelly and Clifton shared financial information other than price lists—

specifically Dasso XTR sales, margin, and inventory data—with MOSO.  As a result,

any claim that the price lists were not kept confidential does not affect the individual

defendants' liability.  The defendants do not contend that Easoon had shared financial

data with its customers or anyone other than Tesoro Woods and TW Flooring, and the jury reasonably could believe that such information about Dasso XTR—a product or sales channel of Easoon's—also constituted internal financial information of Easoon itself.

For these reasons, the Court concludes that there was sufficient evidence to support the jury's finding of liability as to Kelly and Clifton.

The defendants also argue that there is insufficient evidence to support the jury's finding that Osterman was liable for misappropriation of trade secrets. They argue that the evidence presented at trial establishes only that Osterman shared the customer database. Because the jury instructions stated that the claimed trade secrets were "price lists and internal financial information," the defendants argue that the jury's verdict that he was liable for misappropriation of trade secrets is unsupported by the evidence.

The Court finds that MOSO waived this argument by failing to raise it in its Rule 50(a) motion made during the trial. When moving under Rule 50(a) on the misappropriation claim, defendants' counsel stated only that Easoon had failed to show (1) the trade secrets were actually kept secret, (2) Easoon derived economic value from the secrets, (3) any of the defendants utilized improper means in misappropriating the secrets, and (4) the secrets were not ascertainable by proper means. Despite the specificity of these other bases for judgment as a matter of law, defendants' counsel made no reference to Osterman or the customer database. On this point, the defendants' Rule 50(a) motion made during the trial was not "*sufficiently specific* to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which otherwise might make its case legally insufficient." *Lightning*

*Lube*, 4 F.3d at 1173 (emphasis in original).[4]

### 5.    Breach of fiduciary duty

Kelly argues that he did not have a fiduciary duty to Easoon, but sufficient

evidence supports the jury's finding to the contrary.

"A fiduciary or confidential relationship arises where one party is so situated as to

exercise a controlling influence over the will, conduct, and interest of another or where,

from a similar relationship of mutual confidence, the law requires the utmost good faith,

such as the relationship between partners, principal and agent, etc." *Thunderbolt*

*Harbour Phase II Condo. Ass'n v. Ryan*, 326 Ga. App. 580, 581–82, 757 S.E.2d 189,

191 (Ga. Ct. App. 2014) (quoting Ga. Code Ann. § 23-2-58).  "A fiduciary or confidential

relationship may be created by law, contract, or the facts of a particular case.

Generally, the existence of a confidential or fiduciary relationship is a factual matter for

the jury to resolve." *Id.* (internal citations omitted).  "[A]lthough a principal or an agent

may testify as a fact of their status as a principal or an agent of the other, such

testimony must have some evidentiary support and is only conclusive on the question of

an agency relationship when both the principal and agent testify of their status as to the

other." *Lynn v. Lowndes Cty. Health Servs., LLC*, 354 Ga. App. 242, 246, 840 S.E.2d

623, 629 (2020).

---

[4] If this argument had not been waived, the Court would have found insufficient
evidence to support the jury's verdict against Osterman.  Easoon does not dispute that
the evidence presented at trial shows only that Osterman misappropriated the customer
database and that the customer database is distinct from "price lists and internal
financial information."  The applicable jury instruction not only did not include the exhibit
containing the customer database; it also expressly stated that trade secrets were
Easoon's price lists and internal financial information—and nothing else.  To the extent
that this was an inadvertent error by plaintiffs' counsel, then it is only logical that the
plaintiffs rather than the defendants ought to bear the burden of that error.

Kelly contends that there is no evidence of a fiduciary relationship between him and Easoon.  The record, however, includes a letter signed by both Kelly and William Jopling—on behalf of both Jopling and Chua—that confirmed the terms of Kelly's employment.  There is no merit to Kelly's argument that the letter established a fiduciary relationship only with Dasso XTR:  Kelly himself stated in a later email that Dasso XTR was not a separate company but rather was a product channel.  The Court has already addressed the evidence supporting a conclusion that Easoon jointly owned the Dasso XTR product channel with Tesoro Woods.  As a result, a jury reasonably could find that the employment letter outlined Kelly's responsibilities not just to Dasso XTR but also to Easoon.

The letter stated that Kelly's position would be "Dasso XTR President," Chua and Jopling were his supervisors, he was expected to work full-time, and he could perform "outside non-XTR work" *if* it was preauthorized by Chua and Jopling.  Although the plaintiffs did not dispute that Kelly's pay was reported to the IRS on a Form 1099 as if he were an independent contractor, the jury reasonably could view that as simply a means of maximizing Kelly's disposable income and avoiding tax withholding, and not as dictating the nature of his legal relationship with the company.  What's more important is that Kelly's agreement indicates that Chua—the CEO of Easoon—supervised Kelly and retained control over what outside work Kelly could take on.  Those are the key factors the jury was instructed to consider in determining—as it had to—whether Kelly was an agent or instead was an independent contractor.  In addition, Chua testified at trial that Kelly was authorized to sign agreements on behalf of Easoon and Dasso XTR.  MOSO's counsel asserted at trial that a letter by Chua's attorney after

Kelly resigned "implied" that he did not have authority to sign agreements, but that is far too thin a reed to serve as a basis for JMOL or a new trial, given Chua's testimony and Kelly's employment letter.  The jury had to weigh this conflicting evidence; there is no contention that it was instructed incorrectly regarding the applicable standard; and it reasonably could find based on the evidence that Kelly, as president of Easoon's Dasso XTR product channel and a direct report to Easoon's CEO, owed Easoon a fiduciary duty.

Because Kelly's fiduciary duty argument lacks merit and he does not challenge any other aspect of the jury's finding on this claim, the Court denies his motion for JMOL and a new trial on this claim.

### 6.    Aiding and abetting a breach of fiduciary duty

Because substantial evidence supports the jury's verdict of liability on Easoon's claim against Kelly for breach of fiduciary duty, MOSO is not entitled to JMOL or a new trial on Easoon's claim against it for aiding and abetting that breach.  MOSO advances no separate argument on this claim aside from the claimed insufficiency of the evidence relating to Kelly.

### 7.    Fraud

Substantial evidence also supports the jury's verdict on Easoon's fraud claim against Kelly.  In Georgia, "[t]he tort of fraud has five elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages."  *Remax N. Atlanta v. Clark*, 244 Ga. App. 890, 893, 537 S.E.2d 138, 141 (2000) (citation omitted).

36

Kelly admitted at trial that he visited MOSO's headquarters in the Netherlands on May 5, 2017, while he was working for Easoon, and that he did not inform Chua that he was doing so.  The jury could reasonably found this failure to disclose a meeting with a head-to-head competitor of Easoon to be an omission of material fact.  This is especially true given that the purpose of Kelly's visit was, according to Kline, to "strike a deal" with MOSO about leading its North American operations.  Although Kelly asserted at trial that his meeting with MOSO was for other purposes, the jury was entitled to disbelieve his testimony.  The Court also notes in this regard that Kelly sent Veltman a detailed email a week before his visit that laid out his strategy for doing exactly as Kline stated.

Kelly also contends that there was no evidence of his intent to deceive Easoon. The Georgia Court of Appeals has, however, "affirm[ed] the jury's finding of fraud [where] [the plaintiff] presented some evidence showing that [the defendant]'s subsequent conduct demonstrated fraudulent intent."  *JTH Tax, Inc. v. Flowers*, 302 Ga. App. 719, 726, 691 S.E.2d 637, 642 (2010).  In this case, Kelly's subsequent conduct was sufficient to permit a reasonable jury to find fraudulent intent:  he continued misappropriating Easoon's trade secrets, told Kline that Easoon was going bankrupt and leaving the United States in an effort to get Kline to switch from Easoon to MOSO, and planned his outreach to Easoon customers around keeping Chua in the dark.  Given that "[f]raud may be proved by slight circumstances, and whether a misrepresentation is fraudulent and intended to deceive is generally a jury question[,]" *id.* (citation and internal quotation marks omitted), there is no basis for JMOL or a new trial on this claim.

37

8.    **Damages—state law claims**

MOSO and the individual defendants also argue that the plaintiffs failed to establish causation and damages relating to the state law claims.  The Court concludes otherwise.  There was sufficient evidence for the jury reasonably to find a causal nexus on all the state law claims for which it awarded damages.

The tortious interference claim is perhaps the clearest:  Kline testified that MOSO and the individual defendants spoke with him several times and communicated misleading information about Easoon to persuade him to switch his business to MOSO.  As shown by emails admitted at trial, MOSO and the individual defendants worked on a campaign to inform Easoon's customers of a new MOSO product that—as various individuals testified—was similar if not identical to the Dasso XTR.[5]  As a result, the jury reasonably could infer that MOSO and the individual defendants were having similar conversations with other Easoon customers as those with Kline about switching from Easoon to MOSO.

Evidence also showed that this tortious interference would not have been possible without the price lists and internal financial information that the jury found the individual defendants misappropriated.  Veltman stated in various emails that he

---

[5] MOSO does not contend in its opening or its reply briefs that its actions do not constitute "intentional interference," and thus it has waived any such argument.  Even if made, this argument would fail on the merits:  the use of trade secrets misappropriated by the individual defendants constitutes wrongful conduct and thus suffices for intentional interference, and the Georgia Trade Secrets Act preempts common law tort claims only where "the 'full extent' of the plaintiff's tort claims rely on the same allegations as those underlying the plaintiff's claim for misappropriation of a trade secret."  *Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1346 (N.D. Ga. 2007).  That is not the case here:  the plaintiffs' tortious interference claim relies not only on the facts surrounding the misappropriation of Easoon's trade secrets but also on how MOSO used that information after obtaining it.

analyzed Easoon's sales data to determine the timing and size of initial product orders in advance of launching Bamboo X-treme.  MOSO then used that information to put itself in a position to seize market share from Easoon immediately after entering the U.S. market, and Kelly prioritized acting quickly to make it difficult for Easoon to catch up.  Kelly's fraud by omission bought MOSO time to execute this strategy by leaving Chua and Easoon unaware, while he breached his fiduciary duty—and MOSO aided and abetted in him doing so—by pitching MOSO to least one Easoon customer, Kline, while he was still an employee of Easoon's and before MOSO launched in the United States.[6]

Newman, the plaintiffs' damages expert, testified regarding the immediate impact that these actions had on Easoon.  He stated that Easoon's sales had been increasing year to year until MOSO entered the market but then suddenly declined afterwards. Although a decline in sales by itself does not demonstrate causation, Newman noted that 86 percent Easoon's customers switched from buying the Dasso XTR from Easoon to buying a product from MOSO with the same benefits and features from MOSO.  As Newman pointed out, those customers "weren't opening up and say, now, all of a sudden, it's time to go buy Trex or AZEK or another product or Cognac."  Trial Tr. 490:8–10.  A jury reasonably could find from all of this evidence that MOSO's actions were a proximate cause of the damages Easoon incurred, and damages for tortious interference of prospective economic advantage do not require any sort of customer-by-customer analysis.  *See Beard Rsch.*, 8 A.3d at 609 (where defendants were found

---

[6] The Court need not address MOSO's argument—raised only in its reply—that the state law claims are preempted.  The point has been waived, and in any event the state law claims are based on different conduct than the patent infringement claim.

liable for tortious interference with prospective business relations and aiding and abetting a breach of fiduciary duty, estimates of "loss in value to Plaintiff's business" and "lost cash flow" based on the plaintiff's overall sales revenue and net income supported a reasonable estimate of damages)

### 9.   Jury polling

MOSO and the individual defendants next contend that the Court committed per se reversible error in polling the jury collectively rather than individually after MOSO's counsel requested it.  Even if the Court erred, any error is not per se reversible, and in this case it was harmless.

Federal Rule of Civil Procedure 48 states that "[a]fter a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually.  If the poll reveals a lack of unanimity or lack of assent by the number of jurors that the parties stipulated to, the court may direct the jury to deliberate further or may order a new trial."  Fed. R. Civ. P. 48(c).  The courts of appeals that have addressed the issue are split on whether it constitutes per se reversible error, and the Third Circuit has yet to weigh in.

In *SEC v. Sargent*, 66 F.4th 11 (1st Cir. 2023), the First Circuit rejected applying a harmless error standard to violations of Civil Rule 48(d) because it believed its precedent compelled it to treat that rule the same as Criminal Rule 31(d), in which a refusal to poll the jury upon request is per se reversible.  On the other hand, the Sixth Circuit in *Simmons v. Napier*, 626 F. App'x. 129 (6th Cir. 2015), held that a jury polling error is not per se reversible in a civil case.  The Sixth Circuit noted that the Supreme Court "ultimately determined that an error in conducting a jury poll—and even the failure

40

to conduct a poll under some circumstances, such as 'when it is clear that the verdict has received the assent of all the jurors'—does not necessarily 'render the verdict a nullity.'" *Id.* at 140 (quoting *Humphries v. District of Columbia*, 174 U.S. 190, 196 (1899)).

Factually, this case is more similar to *Simmons* than to *Sargent*.  *Sargent* involved a party's counsel asking to poll the jury after the clerk had polled the jury collectively, a request the judge denied.  In contrast, MOSO's counsel—like the plaintiff's counsel in *Simmons*—simply asked, "may we ask for the jury to be polled." Trial Tr. 1161:14-15.  He did not seek *individual* polling.  The Court initially demurred but then polled the jury collectively.  In other words, the Court did not refuse a request for individual polling; it was never asked.  And after the Court conducted the collective poll—asking, "Is there anybody who doesn't agree with the verdict I just read?  If so, raise your hand."—MOSO's counsel did not interpose an objection, nor did he request individual polling.  By its silence, MOSO waived any claim regarding the absence of individual polling; it cannot assign as error the Court's claimed failure to do something that MOSO did not ask it to do.

The Court also finds the Sixth Circuit's reasoning more persuasive than that of the First Circuit.  Even though the court *Simmons* recognized that a "prevailing rule" had developed after *Humphries* stating that the failure to poll the jury upon timely request *in a criminal case* was per se reversible error, it rejected applying that same standard to civil cases because "the doctrine ultimately points against [that position]."  *Simmons*, 626 F. App'x. at 140.  In arriving at that conclusion, the Sixth Circuit described decisions by the First and Seventh Circuits that had declined to apply a per se reversal rule.  *Id.* at

140-43 (citing *Verser v. Barfield*, 741 F.3d 734 (7th Cir. 2013), *Ira Green, Inc. v. Military Sales & Service Co.*, 775 F.3d 12 (1st Cir. 2014)); *see also Smego v. Payne*, 854 F.3d 387 (7th Cir. 2017) (noting that the Seventh Circuit had "expressly engaged in a harmless-error review in *Verser*").  In contrast, the First Circuit in Sargent did not discuss *Humphries* or any of the other courts of appeals decisions that came out the other way, instead concluding that it was bound by First Circuit precedent.  This Court is not bound by that precedent, and it agrees with the Sixth Circuit that "[a]llowing an attorney to request a jury poll and then sit in silence in the face of a potential (and easily correctable) flaw in that poll, only to raise the issue later in an attempt to seek automatic reversal on appeal, 'would place a premium on agreeable acquiescence to perceivable error as a weapon of appellate advocacy.'"  *Id.* at 143 (quoting *Ira Green*, 775 F.3d at 27).

Applying the harmless error standard, the Court concludes that any error was harmless.  The jury instructions stated twice that the verdict must be unanimous; no juror raised a hand when the court asked if there was any disagreement; and MOSO "points to nothing in the record that would 'suggest to even the most wary observer that the jurors were not all of one mind.'"  *Simmons*, 626 F. App'x. at 142-43.  This case is therefore distinguishable from *Verser*, where there "was in fact an affirmation by at least one juror of potential unease with the verdict in the case."  *Id.* at 143.

For the above reasons, the Court denies the defendants' motion for a new trial on this basis.

**10.   Limiting instruction**

MOSO's final argument for a new trial is that the Court erred in failing to instruct

the jury that that the references to "scrimber" in the preambles of claims 1 and 8 are not claim limitations.  Although "[g]enerally, the preamble does not limit the claims," *Allen Eng'g Corp. v. Batell Indus., Inc.*, 299 F.3d 1136, 1146 (Fed. Cir. 2002)), it may do so "if [the preamble] recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim."  *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002); *see also Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 858 F.2d 1251, 1257 (Fed. Cir. 1989).

The parties did not dispute that the term "scrimber" is in the body of claim 8, and MOSO argues that the Court erred in deeming the issue a question of claim construction that was waived.  Though the Court pointed out in ruling on the proposed instruction that it really was an issue of claim construction, that was not the reason for the Court's denial of the instruction.  Rather, the Court noted at trial that when a term is in the body of some claims but only in the preamble in others, instructing a jury to not consider the term risks creating more confusion than it resolves.  The Court then took the motion under advisement.  It ultimately declined to give the instruction because it concluded that the reference to "scrimber" in the preamble was necessary to give life and meaning to the claim.

MOSO has not argued in its post-trial motions that the Court erred in finding the reference necessary to give life and meaning to the claim.  The Court overrules its motion seeking a new trial on this basis.

### 11.   MOSO's DTPA claim

For its part, Easoon argues that sufficient evidence did not support the jury's verdict of liability on MOSO's DTPA counterclaim.  The Court disagrees.

The parties first dispute whether Easoon implicitly consented to trying the DTPA claim as including Chua's statements that MOSO's products were "counterfeit."  MOSO argues that Easoon did so when it did not object to MOSO's statements in the final pretrial order and during opening arguments that its DTPA claim included Chua's statements about MOSO's product being counterfeit.  Thus even though MOSO did not reference Chua's statements in its second amended counterclaim as one of the bases for a DTPA violation, it argues that the issue "must be treated in all respects as if raised in the pleadings" because it was tried with Easoon's implied consent.  Fed. R. Civ. P. 15(b)(2).

In contrast, Easoon asserts that it believed MOSO was trying the DTPA claim only on the grounds it stated in its counterclaim and that Chua's "counterfeit" statements related exclusively to MOSO's defamation claim.  Easoon contends that its position is supported by *Douglas v. Owens*, 50 F.3d 1226 (3d Cir. 1995), in which the court held that "an issue has not been tried by implied consent if evidence relevant to the new claim is also relevant to the claim originally pled, because the defendant does not have any notice that the implied claim was being tried."  *Id.* at 1236.

In *Douglas*, however, the Third Circuit held that the defendant was "not on notice that Douglas wished to argue an additional claim at trial" because Douglas never "(1) advanced this theory to the jury while presenting his case-in-chief; (2) argued this theory after the evidence was elicited during cross-examination; (3) argued this theory to the jury in his closing arguments; or (4) asked that this alternative theory of liability be included in the special verdict questions."  *Id.* at 1236 n.20.  But MOSO's counsel in this case did state in his opening statement that MOSO's claim for "defamation and

deceptive trade practices" boiled down to Chua's allegations about MOSO's products being counterfeit.  And even before that, MOSO's section of the final pretrial order stated that it would seek to enjoin the plaintiffs from referring to the Bamboo X-treme as a counterfeit.  The Court therefore cannot say that Easoon "[did] not have any notice" that MOSO's DTPA claim was being tried on similar facts as the defamation claim.  For these reasons, the Court concludes that Easoon did implicitly consent to trying the DTPA claim as including Chua's statements.

Easoon also argues that the Patent Act preempts MOSO's DTPA claim.  As both parties recognize, "federal patent law bars the imposition of liability for publicizing a patent in the marketplace unless the plaintiff can show that the patent holder acted in bad faith."  *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1336 (Fed. Cir. 1998).  Easoon contends that Chua's "counterfeit" statements meant that MOSO's product was infringing, whereas MOSO argues that testimony by Zaal and Kelly was substantial evidence that term "counterfeit" meant low-quality or potentially illegal in the building products market.  Viewing the evidence in the light most favorable to MOSO as the non-movant on Easoon's motion, the Court agrees that Zaal's and Kelly's testimony is sufficient to support the jury's verdict of liability.  *See United States v. Merlino*, 349 F.3d 144, 160 (3d Cir. 2003) ("a jury can believe some witness's testimony as to some aspects, and disbelieve others, or not believe any, or believe all.").

Consequently, the Court denies Easoon's motion for JMOL or a new trial on this ground.

### 12.    Defamation

Easoon argues that the jury verdict on MOSO's defamation claim cannot stand

because the claim was preempted by the Patent Act and because MOSO did not prove damages.  Easoon's preemption argument is the same as its preemption argument for MOSO's DTPA claim, so the Court denies its motion on that ground for the reasons just discussed.

Easoon also contends that sufficient evidence does not support the jury's award of damages on MOSO's defamation claim.  But in moving for judgment as a matter of law under Rule 50(a) during the trial, it asserted only that the defamation claim was preempted.  As a result, the Court finds that Easoon has waived the argument. *Williams*, 130 F.3d 571–72 (a party's "failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the plaintiffs on notice waives [that party]'s right to raise the issue in their Rule 50(b) motion.").

JMOL or a new trial is therefore not warranted on this basis.

**B.    Permanent Injunction**

The Court grants the plaintiffs' motion for a permanent injunction under the Patent Act but denies their motion for injunctive relief under the DTPA.

**1.    Patent Act**

Easoon asks the Court to issue a permanent injunction directing MOSO to cease making, using, selling, offering for sale, and importing Bamboo X-treme in the United States until the '578 patent expires.  A plaintiff seeking a permanent injunction must establish "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a

permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

###### a.    Irreparable injury

To establish irreparable injury, a plaintiff must show that a "causal nexus relates the alleged harm to the alleged infringement[,]" which "just means that there must be proof that the infringement causes the harm. *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 639 (Fed. Cir. 2015). "When a patentee alleges it suffered irreparable harm stemming from lost sales solely due to a competitor's infringement, a finding that the competitor's infringing features drive consumer demand for its products satisfies the causal nexus inquiry." *Id.* at 651. Similarly, "[w]here two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013).

MOSO has conceded that it and Easoon are direct competitors, and "[d]irect competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351 (Fed. Cir. 2012). MOSO attempts to argue that Easoon provided no evidence of causation, but the plaintiffs' damages expert Newman testified that (1) Easoon's sales declined just as MOSO entered the market; (2) Easoon's customers switched to buying a product with the same features and benefits rather than a non-Bamboo product like Trex; and (3) 86 percent of the two companies' customers were common customers. Easoon and former MOSO customer Ryan Kline corroborated this analysis, as he stated that that he switched to MOSO in part because he believed the Easoon and MOSO products were

47

the same and that he later switched back to Easoon because he believed there were no other options in the outdoor bamboo decking market.  MOSO also marketed its Bamboo X-treme as the same as Easoon's Dasso XTR.  In addition, Easoon correctly points out that the advantages of bamboo decking are not separate from the infringing features in this case because the patent claims are coextensive with the product and manufacturing process.

Taking all of this into account, the Court finds that the "infringing features of MOSO's product—which in this case was the entire product—"drove consumer demand for [the] product."  *Apple*, 809 F.3d at 651.  Easoon has thus sufficiently established that it will suffer irreparable harm if it continues to be "forced to compete against products that incorporate and infringe its own patented inventions."  *Douglas Dynamics*, 717 F.3d at 1345.

### b.    Remedies available at law

An increase in the infringer's market share while infringing on the patentee's products "underscores the profitability of infringement and suggests that *mere damages will not compensate* for a competitor's increasing share of the market, a market which [the patentee] competes in, and a market that [the patentee] has in part created with its investment in patented technology."  *Id.* (emphasis added).

The evidence presented strongly indicates that remedies at law are insufficient. MOSO has been in the outdoor bamboo decking market for over six years now, and the entire time it has been selling a product that the jury found was infringing Easoon's patent.  MOSO's initial entrance into the market saw it take market share from Easoon, and almost ninety percent of MOSO's customers are also familiar with Easoon.  Thus

48

absent an injunction, Easoon would be directly competing against an infringing product in the market that Chua testified he had spent years and hundreds of thousands of dollars developing.  Even without considering Easoon's ability to recover damages from MOSO, Easoon's situation is notably similar to that in *Douglas Dynamics*.

Furthermore, the Federal Circuit has held that money damages are inadequate to compensate a plaintiff where the defendant's "entry into the relevant markets were aided and accelerated by its improper use of [the plaintiff]'s confidential information" and the plaintiff "otherwise would have had those markets to itself, at least for some period of time[.]"  *Sionyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1355 (Fed. Cir. 2020).  MOSO used Easoon's confidential financial information in preparing to launch Bamboo X-treme in the United States, and Easoon otherwise would have had at least the specially certified outdoor bamboo decking market to itself for some period of time. The Court therefore finds that this factor weighs in favor of entry of an injunction.

### c.   Balance of hardships

"[R]equiring [a plaintiff] to compete against its own patented invention, with the resultant harms described above, places a substantial hardship on [that plaintiff]." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011).  The jury also found MOSO to have willfully infringed the '578 patent, and "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986).  The Court will of course draw an injunction narrowly, but this factor also weighs in favor of entry of an injunction.

### d.   The public interest

The parties do not dispute that "the public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions."  *Apple*, 809 F.3d at 647.  As was the case in *Apple*, Easoon is not seeking to "enjoin the sale of life-saving drugs, but to prevent [MOSO] from profiting off the unauthorized use" of its patented technology.  *Id.* MOSO's argument about Easoon's royalty payment structure has nothing to do with the public interest.  This factor also weighs in  favor of issuance of an injunction.

Because Easoon satisfies the four-factor *eBay* test, the Court grants its motion for a permanent injunction.  In light of MOSO's concerns about vagueness, the Court will amend the proposed order to state that it applies "until the expiration of the '578 patent, including any USPTO extensions" and that it prohibits "infringement of the patent by the adjudicated devices and infringement by devices not more than colorably different from the adjudicated devices."

### 2.   DTPA

Under DTPA section 2533(a), "[a] person *likely to be damaged* by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable."  6 Del. C. § 2533(a) (emphasis added).  Courts have interpreted this provision to mean that "[i]njunctive relief under [the DTPA] is warranted where a plaintiff demonstrates that a defendant has engaged in a pattern of deceptive misconduct."  *Smash Franchise Partners, LLC v. Kanda Holdings, Inc.*, C.A. No. 2020-0302, 2023 WL 4560984, at *29 (Del. Ch. July 14, 2023).  Various Delaware state courts and courts in this district have held that the DTPA

"redresses ongoing practices, not past wrongs." *Registered Agent Sols., Inc. v. Corp. Serv. Co.*, No. 21 C 786, 2022 WL 911253, at *6 (D. Del. Mar. 28, 2022) (dismissing DTPA claim because "relief under the statute is dependent on [the plaintiff]'s entitlement to injunctive relief," and "here, the alleged wrongdoing is in the past"); *see also CoreTel Am., Inc. v. Oak Point Partners, LLC*, C.A. No. N21C-10-103, 2022 WL 2903104, at *9 (Del. Super. Ct. July 21, 2022) (dismissing claim because it was "concerned with an isolated incident of misconduct and not any ongoing practices"); *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 537 (Del. Ch. 2005) ("the failure of a party to be able to state a claim for injunctive relief at the time suit is brought is fatal to claims under the Deceptive Trade Practices Act.").  As a result, "[a] claim for injunctive relief must be supported by the allegation of facts that create a *reasonable apprehension of a future wrong*." *Agilent Techs., Inc. v. Kirkland*, C.A. No. 3512, 2009 WL 119865, at *10 (Del. Ch. Jan. 20, 2009) (emphasis added).

The basis for the plaintiffs' DTPA claim is that MOSO and the individual defendants (through whom MOSO allegedly acted) were telling Easoon's customers in early 2017 that Easoon was going bankrupt and was moving back to China.  Kline testified that the individual defendants said as much to him in a conference call sometime during April or May 2017.  The plaintiffs argue that the Court can infer that MOSO and the individual defendants did so with other customers as well.

Even if one assumes that (1) these statements about Easoon were false or misleading representations of fact, (2) they could be attributed to MOSO, and (3) the individual defendants made similar statements to other Easoon customers, the evidence presented at trial established only that this disparagement occurred before and perhaps

during June 2017.  The Court could not find any evidence in the record suggesting that MOSO or the individual defendants—all of whom left Easoon or Dasso XTR over six years ago—are currently misrepresenting Easoon's financial condition and plans to customers, or even that they have done so at any time since 2017.  Rather, Kline stated at trial that he had learned by November 2018 that Easoon was in fact not going bankrupt or moving back to China.  All of this taken together indicates that the wrongdoing is a "past wrong" rather than an ongoing practice.  As a result, there is no basis to conclude that Easoon is "*likely* to be damaged by a deceptive trade practice" now or in the future involving MOSO and the individual defendants misrepresenting Easoon's financial state and plans in the United States.

For these reasons, the Court denies the motion for a permanent injunction under the DTPA.

**D.    Attorney's fees**

The Court denies the plaintiffs' motion for attorney's fees and expenses under both the Patent Act, 35 U.S.C. § 285, and the DTPA.  The Court also declines to award expert witness fees under its inherent authority.

**1.    Patent Act**

Section 285 of the Patent Act permits an award of attorneys' fees in "exceptional" cases.  The Supreme Court has defined this as denoting a case that "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).  "While willfulness is among the reasons that a court may find a case

to be exceptional, an attorney fee award is not mandatory when willful infringement has been found." *Sionyx*, 981 F.3d at 1355 (cleaned up); *see also Microsoft Corp. v. WebXchange Inc.*, 715 F. Supp. 2d 598, 603 (D. Del. 2010) ("The Court of Appeals for the Federal Circuit has cautioned that an award of attorney fees under § 285 *is not intended to be an ordinary thing in patent cases,* and that it should be *limited to circumstances* in which it is *necessary to prevent a gross injustice or bad faith litigation*.") (citation and quotation marks omitted) (emphasis added); *Broadsoft, Inc. v. CallWave Commc'ns, LLC*, No. 13-711, 2019 WL 3750817, at *6 (D. Del. Aug. 8, 2019) ("Courts imposing exceptional case status due to litigation conduct generally find that the nonmoving party took positions contrary to its own evidence or prior statements.") (collecting cases).

The substantive strength of the parties' litigation positions was not so disparate as to make this case exceptional.  The plaintiffs assert that MOSO's noninfringement argument based on the absence of "slots" and its invalidity argument based on the Li reference were objectively baseless.  Yet even if that were the case, MOSO asserted other defenses—including indefiniteness and non-enablement—on which the plaintiffs neither moved for summary judgment and that they did not address in their opening brief for attorney's fees.  The plaintiffs argue that those defenses must also be baseless because MOSO did not move for judgment as a matter of law, but a party's position is not objectively baseless simply because a jury finds against it.  *Checkpoint Sys., Inc. v. All-Tag Security S.A.*, 858 F,3d 1371, 1376 (Fed. Cir. 2017) ("The [Supreme] Court has cautioned that fee awards are not to be used 'as a penalty for failure to win a patent infringement suit.'") (quoting *Octane Fitness*, 572 U.S. at 548); *see also SiOnyx*, 981

F.3d 1339 (affirming the district court's finding that the defendant's "noninfringement and invalidity defenses were not so weak as to be exceptional" and noting that the district court relied in part on the fact that the plaintiff "failed even to move for summary judgment on those issues").

Aside from this, the plaintiffs make conclusory assertions supported only by unexplained citations to pages of trial testimony.  Even if these arguments were not waived under Local Rule 7.1.3(c)(2), they would not be enough to satisfy the plaintiffs' burden of proving their entitlement to fees under section 285 by a preponderance of the evidence.  The Court therefore has no basis to conclude that case "stands out from others with respect ot the substantive strength of [the plaintiffs'] litigation position" or is "so unusual as to warrant fee-shifting."  *Octane Fitness*, 572 U.S. at 548, 549.

There is also no merit to the plaintiffs' contention that MOSO committed litigation misconduct.  Much of the alleged "misconduct" by MOSO involves disputes in which the Court ruled for MOSO and against the plaintiffs.  The Court denied the plaintiffs' motion to compel, granted MOSO's request for supplemental discovery after setting a trial date, and did not find MOSO's counsel negligent regarding the need to substitute experts. The Court did grant the plaintiffs' motion for a presumption of infringement and denied Moso's motion for summary judgment on infringement, but attempting to avoid a presumption and making an argument at trial after losing on summary judgment do not amount to litigation misconduct.  In fact, the plaintiffs do not respond to any of these points on the issue of litigation misconduct in their reply brief, and a failure to respond to arguments "waives, as a practical matter anyway, any objections not obvious to the court to specific points urged by the [the other party]."  *Beazer East, Inc. v. Mead Corp.*,

412 F.3d 429, 437 n.11 (3d Cir. 2005) (internal citation omitted).

The plaintiffs also argue that motivation, compensation, and deterrence warrant granting the motion for attorney's fees, but they cite only a footnote in *Octane Fitness* indicating that these factors may be considered.  There is no basis to conclude that such considerations alone are sufficient to warrant an award of attorney's fees under section 285 in the absence of a substantial difference in the parties' positions or litigation misconduct.

For these reasons, the Court declines to award the plaintiffs attorney's fees under the Patent Act.

### 2.    DTPA

The DTPA states that "a willful violation occurs when the person committing the violation knew or should have known that the conduct was of the nature prohibited by this subchapter."  6 Del. C. § 2533(e). The Delaware Court of Chancery has noted that the statute "does not define what 'exceptional' means," but it agreed with a judge in this district who applied the definition of "exceptional" from section 35(a) of the Lanham Act. *Smash Franchise Partners, LLC v. Kanda Holdings, Inc.*, C.A. No. 2020-0302-JTL, 2023 WL 4560984, at *29 (Del. Ch. July 14, 2023).  For its part, the Third Circuit has held that the Octane Fitness test applies when determining whether a case is "exceptional" under the Lanham Act.  *See Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 313 (3d Cir. 2014) ("Cases are exceptional for purposes of the Lanham Act when (a) there is an unusual discrepancy in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an unreasonable manner.") (citing *Octane Fitness, LLC*, 572 U.S. at 554) (cleaned up).

The DTPA claim against Moso is based on Brett Kelly's statements that Easoon was going bankrupt and was moving back to China. Even if Kelly willfully misrepresented to multiple Easoon clients that the company was going bankrupt and returning to China, this was not an exceptional case.

As MOSO has pointed out, Chua did testify about Dasso/Easoon experiencing challenges in China, and a declaration that he submitted in the Georgia state case did suggest that Easoon was facing financial trouble. Although it was reasonable for a jury to find that this did not legitimize Kelly's misrepresentations that Easoon was going bankrupt or moving back to China, the Court cannot say that MOSO's position at trial was objectively baseless or that there was an unusual disparity in the parties' positions on the merits. Furthermore, the plaintiffs also did not argue that MOSO litigated the DTPA claim—as compared to the patent infringement claim—in an unreasonable manner.

The Court therefore concludes that the plaintiffs' DTPA claim does not present an exceptional case and therefore denies their motion for attorney's fees under the statute.

### 3.    Inherent power

As MOSO correctly points out, awards of expert witness fees under a court's inherent power are appropriate only for abuses of the judicial process. *See MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 921–22 (Fed. Cir. 2012) (affirming award of expert witness fees where the plaintiff's "vexatious conduct and bad faith increased the cost of litigation in ways that are not compensated under § 285"); *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378 (Fed. Cir. 1994) (reversing award of expert witness fees where the opposing party's actions "did not amount to a *fraud on*

*the court* or an *abuse of the judicial process*") (emphasis added).

In arguing for fees under the Court's inherent power, the plaintiffs discuss only MOSO's actions infringing on the patent *prior to* the lawsuit—not any misconduct of MOSO's over the course of litigation.  The Court has also already explained that MOSO did not litigate this case unreasonably, *see* Part D.1, *supra*, which means there is no appropriate basis for an award of expert witness fees.

For the reasons above, the Court denies the plaintiffs' motion for attorney's fees and expert witness fees.

## C.    Enhanced damages

The plaintiffs also move for enhanced damages under both the Patent Act, 35 U.S.C. § 284, and the DTPA.  The Court grants the request under the Patent Act but denies the request under the DTPA.

### 1.    Patent Act

"In patent infringement cases, district courts have discretion to 'increase damages up to three times the amount found or assessed.'"  *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382 (Fed. Cir. 2017) (quoting 35 U.S.C. § 284).  "[S]uch punishment should generally be reserved for egregious cases typified by willful misconduct."  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 100 (2016).  Although "an award of enhanced damages does not necessarily flow from a willfulness finding," "[d]iscretion remains with the court to determine whether the conduct is sufficiently egregious to warrant enhanced damages."  *Presidio Components*, 875 F.3d at 1382.

In deciding whether to enhance damages under section 284, a district court is

only required to "consider the particular circumstances of the case to determine whether it is egregious." *Id.* at 1383.  Many courts, however, have continued to apply the factors outlined in *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992).  Those factors include:  "(1) whether the infringer deliberately copied the ideas or design of another, (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct."  *Vectura Ltd. v. GlaxoSmithKline LLC*, No. 16 C 638, 2019 WL 4346502, at *3 (D. Del. Sept. 12, 2019) (citing *Read*, 970 F.2d at 827).

　　　To the Court, the third, fifth, and ninth *Read* factors all concern the defendant's conduct during litigation.[7]  For the reasons previously described in evaluating the plaintiffs' motion for attorneys' fees, *see* Part C.1, *supra*, the Court does not find that MOSO engaged in misconduct over the course of litigation.  As a result, these factors weigh against enhancement.

　　　The second factor is neutral.  Regarding MOSO's good-faith belief in noninfringement or invalidity, the fact that several of MOSO's defenses made it to trial and were not challenged by Easoon on summary judgment arguably weighs in MOSO's

---

[7] Easoon argues that the ninth factor, whether the defendant attempted to conceal its misconduct, can apply to the defendant's pre-suit infringement behavior.  In explaining this factor, however, *Read* cites to a case enhancing damages on the basis that "the defendant had failed to preserve its records and had failed to cooperate as it should at trial on the issue of damages."  *Read*, 970 F.2d at 827.

favor to some extent.  MOSO concedes that it did not obtain an opinion of counsel

regarding the validity of the '578 patent or whether the Bamboo X-treme infringed it.

MOSO argues, however, that section 298 of the Patent Act prohibits consideration of

"[t]he failure of an infringer to obtain the advice of counsel with respect to any allegedly

infringed patent[.]"  35 U.S.C. § 298.  But Easoon is correct  that section 298 states only

that such a failure "may not be used to prove that the accused infringer *willfully infringed*

the patent," *id.* (emphasis added), and MOSO has provided no legal support for

applying that prohibition in the damage enhancement context.  Rather, the Federal

Circuit has held that "it is inappropriate to discount evidence relating to whether there

was adequate investigation of adverse patent rights." *Spectralytics, Inc. v. Cordis Corp.*,

649 F.3d 1336, 1347 (Fed. Cir. 2011), *abrogated on other grounds by Halo*, 579 U.S.

93.  The Court finds that the second *Read* factor tilts somewhat in favor of

enhancement.

　　The fourth and sixth factors are neutral.  The lack of information about MOSO's

size and financial health makes that factor irrelevant in this case, and the fact that

MOSO continued to sell Bamboo X-treme and did not take remedial action is not

particularly meaningful, as it had plausible defenses.  *See Gustafson v. Intersystem

Indus. Prods., Inc.*, 897 F.2d 508, 510-11 (Fed. Cir. 1990) ("Nor is there a universal rule

that to avoid willfulness one must cease manufacture of a product immediately upon

learning of a patent, or upon receipt of a patentee's charge of infringement, or upon the

filing of suit.") (internal citation omitted).

　　On the other hand, the first and eighth factors weigh strongly in favor of

enhancement.  The evidence shows that Dasso XTR and Bamboo X-treme were

59

produced in the same factory pursuant to the same Chinese counterpart to the '578 patent and were for all intents and purposes identical.  Although the products are compared to the patent claims rather than to each other for the purposes of determining infringement, there is no such limitation in deciding whether to enhance damages. MOSO's contention that it did not copy Easoon's product but merely entered the U.S. market with a product that happened to be identical is a bit hard to swallow, but even if that is the case, it is a distinction without a difference, and thus this factor weighs in favor of enhancing damages.  Similarly, the record indicates that eventual MOSO employee Kelly harbored animus towards Easoon beyond a mere sense of competition. Kelly repeatedly expressed a desire to "squash" or "close the door" on Easoon's business and—as MOSO concedes—made it a goal to have Easoon's customers cancel their orders and switch to MOSO.  The Court therefore finds that these two factors significantly support Easoon's request for enhanced damages.

Given the jury's finding of willfulness and the fact that at least three of the relevant factors tilt in favor of enhancing damages (and some of them significantly so), the Court concludes that an enhancement of the $1.5 million damages amount by fifty percent—$750,000—is warranted.  MOSO's conduct, as well as that of Kelly, who effectively worked on behalf of MOSO in this regard, was sufficiently egregious that a modest enhancement beyond the jury's award is appropriate.

## 2.   DTPA

The plaintiffs also seek treble damages under the DTPA.  But "[t]reble damages are available only in conjunction with injunctive relief under [the statute]," and Delaware courts have required that a plaintiff "must have standing under [the injunctive relief

60

provision] in order to pursue treble damages under § 2533(c)."  *Grand Ventures v.*
*Whaley*, 622 A.2d 655, 661 (Del. Super. 1992), *aff'd*, 632 A.2d 63 (Del. 1993).  Because
Easoon is not entitled to injunctive relief under the DTPA, *see* Part B.2, *supra*, it is also
not entitled to treble damages.

E.    **Supplemental damages and interest**

The Court grants Easoon's motion for supplemental damages.  "District courts
have discretion to award damages for periods of infringement not considered by the
jury." *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 38 (Fed. Cir. 2012).
The parties do not dispute that the jury considered infringement only up until April 1,
2023.  Judgment was entered on June 13, 2023.  Newman, the plaintiffs' expert,
determined that the jury's $1.5 million damages verdict amounted to an 11 percent profit
margin on MOSO's sales during the relevant period.  In response, MOSO argues that
this figure is inaccurate because the $1.5 million suggests that the plaintiffs would have
made fewer sales than Newman asserted at trial.  MOSO instead argues—with no legal
support—that Easoon is not entitled to any supplemental damages.  The Court finds
Newman's calculation reasonable, however, and because MOSO did not propose an
alternative, the Court adopts Newman's proposal.  Consequently, the Court grants
Easoon supplemental damages in the amount of eleven percent of MOSO's sales of
Bamboo X-treme from April 1, 2023 to June 11, 2023.  This supplemental award is
likewise to be enhanced by fifty percent, consistent with the Court's ruling on
enhancement of damages under the Patent Act.

The Court also grants Easoon's motion for pre- and post-judgment interest.  Pre-
judgment interest is awarded at the prime rate, compounded annually.  *Uniroyal, Inc. v.*

*Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1997).  Post-judgment interest accrues as a matter of statute  at the rate of "the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding."  28 U.S.C. § 1961.  Because post-judgment interest applies by operation of law, however, the Court need not amend the judgment to include it.

### Conclusion

For the reasons stated above, the Court grants in part the plaintiffs' motion for a permanent injunction [dkt. no. 448] and their motion for enhanced damages [dkt. no. 450]; grants the plaintiffs' motion for supplemental damages and interest [dkt. no. 452]; and denies the plaintiff's motion for attorney's fees [dkt. no. 442] and all parties' motions for judgment as a matter of law and for a new trial [dkt. nos. 446, 454, 456].  The parties are directed to promptly confer regarding the form of an appropriate injunction and the required text for amending the judgment to include the injunction and the enhanced damages.  A joint status report with proposed language for an amended judgment as well as the full text of an appropriate injunction is to be filed on August 28, 2023.

MATTHEW F. KENNELLY
United States District Judge

Date:  August 21, 2023